STATE OF OHIO, )
) SS: **TIMOTHY P. McCORMICK, J.**
COUNTY OF CUYAHOGA. )

IN THE COURT OF COMMON PLEAS

CRIMINAL BRANCH

**STATE OF OHIO,** )
Plaintiff, )
vs. ) **CR 626899A**
**SIERRA DAY,** )
Defendant. )

- - - o0o - - -

**STATE OF OHIO,** )
Plaintiff, )
vs. ) **CR 626899B**
**DEONTE LEWIS,** ) **CA 108463**
Defendant. )

- - - o0o - - -

TRANSCRIPT OF PROCEEDINGS
VOLUME I OF V
PRETRIAL HEARINGS, VOIR DIRE

- - - o0o - - -

FILED
MAY 29 2019
Clerk of Courts
Cuyahoga County, Ohio

APPEARANCES:

On behalf of the State of Ohio:

MICHAEL C. O'MALLEY, Prosecuting Attorney, by:
**Anna Faraglia**, Assistant Prosecuting Attorney
**Aqueelah A. Jordan**, Assistant Prosecuting Attorney
**Sean M. Kilbane**, Assistant Prosecuting Attorney

On behalf of Defendant Sierra Day:
**Thomas E. Shaughnessy**, Esq.
**Mark B. Marein**, Esq.

On behalf of Defendant Deonte Lewis:
**Nicole C. Longino**, Attorney at Law
**James A. Gay**, Esq.

Luann Z. Cawley, RPR
Kerry L. Paul, RMR
Mary Jo Baden, RPR
Mary Jean Cooley, RMR
Susan M. Ottogalli, RMR

Official Court Reporters
Cuyahoga County, Ohio

STATE OF OHIO, )
) SS: **TIMOTHY P. McCORMICK, J.**
COUNTY OF CUYAHOGA. )

IN THE COURT OF COMMON PLEAS

CRIMINAL BRANCH

**STATE OF OHIO,** )
Plaintiff, )
vs. ) **CR 626899A**
**SIERRA DAY,** )
Defendant. )

- - - o0o - - -

**STATE OF OHIO,** )
Plaintiff, )
vs. ) **CR 626899B**
**DEONTE LEWIS,** ) **CA 108463**
Defendant. )

- - - o0o - - -

TRANSCRIPT OF PROCEEDINGS
VOLUME I OF V
PRETRIAL HEARINGS, VOIR DIRE

- - o0o - - -

BE IT REMEMBERED, that at the January A.D. 2019 Term of said Court, this cause came on to be heard before the Honorable Timothy P. McCormick and a Jury, in Courtroom No. 20-C, The Justice Center, Cleveland, Ohio, commencing on Tuesday, Wednesday, February 26, 2019, upon the indictments filed heretofore.

- - - o0o - - -

# I N D E X


Pretrial hearings .............................. 10 - 30

Voir Dire ..................................... 31 - 361

Opening Statement by the State of Ohio ........ 365 - 373

Opening Statement by Defendant Day ............ 373 - 375

Opening Statement by Defendant Lewis .......... 375 - 385

| STATE'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | FRD | FRC |
|---|---|---|---|---|---|---|
| Heidi Hobart | 385 | 392 | 394 | | | |
| Nathan Lupah | 395 | 418 | 422 | | | |
| | | 419 | -- | | | |
| Robert Swope | 425 | 439 | 443 | | | |
| Chris Wilson | 446 | -- | -- | | | |
| Jeffrey Herold | 455 | 468 | -- | | | |
| Alexis Logan | 481 | 486 | 487 | | | |
| Scott Bailey | 489 | -- | -- | | | |
| Nicholas Edington | 494 | 521 | 526 | | | |
| Louis Catalani | 529 | 537 | -- | | | |
| Stehpanie Millan | 539 | -- | -- | | | |
| Craig J. Murowsky | 550 | -- | -- | | | |
| Laura Storm | 563 | 569 | -- | | | |
| Sherrie Litvak | 572 | 579 | -- | | | |
| Phil Tschetter | 582 | 606 | 607 | 607 | | |
| Michael Caruso | 609 | 616 | -- | | | |
| Nathaniel Reed | 625 | 632 | -- | | | |
| Matthew Rhodes | 634 | -- | -- | | | |
| Tamira Finley | 641 | 653 | -- | | | |
| April Goode | 656 | 666 | -- | | | |
| Michelle Marshall | 668 | 696 | -- | | | |
| Cory Screngi | 698 | -- | -- | | | |
| Michelle Moyer | 712 | -- | -- | | | |
| Matthew Lutz | 722 | -- | -- | | | |
| Anthony Malone | 730 | 736 | -- | | | |
| Chelsea Lilly | 740 | -- | -- | | | |
| Mickhal Garrett | 765 | 802 | 803 | | | |
| Cory McFadden | 805 | -- | -- | | | |
| Twanna James | 810 | -- | -- | | | |
| Chantale Milton | 830 | 841 | 846 | | | |

| STATE'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | FRD | FRC |
|---|---|---|---|---|---|---|
| Sakeya Fitzpatrick | 847 | 858 | -- | | | |
| John Braun | 859 | -- | -- | | | |
| Isaiah Day | 867 | 895 | 911 | 912 | | |
| Erica Johnson | 913 | 940<br>947 | 949 | 953 | | |
| Lorra Greene | 955 | 979 | -- | | | |
| LoriAnn Delsignore | 985 | -- | -- | | | |
| Jennifer Kroczak | 995 | 1023<br>1034 | 1036 | | | |
| Joseph A. Felo | 1048 | 1099<br>1114 | -- | -- | | |

Rule 29 Motion by Defendant Day ............. 1129-1133

Rule 29 Motion by Defendant Lewis ............. 1133-1138

Renewed Rule 29 Motion ......................... 1139

Court's Charge to the Jury .................... 1153-1186

Closing Argument by State of Ohio ............. 1186-1208

Closing Argument by Defendant Day ........... 1208-1215

Final Closing Argument by State of Ohio ....... 1216-1258

Court's Continued Charge to the Jury .......... 1259-1262

Verdict ....................................... 1265-1273

Sentencing .................................... 1274-1290

INDEX

| State's Exhibits | | Identify | Admit | Object |
|---|---|---|---|---|
| Ex. 3 - 6 | Photographs | | 1122 | |
| Ex. 7 | Photograph | 589 | " | |
| Ex. 8 | Photograph | 589 | " | |
| Ex. 9 | " | 589 | " | |
| Ex. 11 | | 589 | " | |
| Ex. 12 | | 589 | " | |
| Ex. 13 | | 589 | " | |
| Ex. 14 | | 589 | " | |
| Ex. 15 | | 589 | " | |
| Ex. 16-20 | | | " | |
| Ex. 21 | Photograph | 590 | " | |
| Ex. 22 | | 887 | " | |
| Ex. 23 | | | " | |
| Ex. 24 | | | " | |
| Ex. 25-34 | " | | " | |
| Ex. 35 | | 591 | " | |
| Ex. 36-41 | | | | |
| Ex. 42 | | 591 | " | |
| Ex. 43 | Photograph | 592 | " | |
| Ex. 44-46 | | | " | |
| Ex. 47 | | 592 | " | |
| Ex. 48 | | 592 | " | |
| Ex. 49-51 | " | | " | |
| Ex. 52 | | 592 | " | |
| Ex. 53-57 | | | " | |
| Ex. 58 | | 592 | " | |
| Ex. 59-60 | | | " | |
| Ex. 61 | | 592 | " | |
| Ex. 62 | | 593 | " | |
| Ex. 63-64 | " | | " | |
| Ex. 65 | | 593 | " | |
| Ex. 66-68 | | | " | |
| Ex. 69-71 | | 593 | " | |
| Ex. 72 | | 593 | " | |
| Ex. 73-84 | | | " | |
| Ex. 85 | | 593 | " | |
| Ex. 86-88 | " | | " | |
| Ex. 89 | | 594 | " | |

| State's Exhibits | | Identify | Admit | Object |
|---|---|---|---|---|
| Ex. 90 | Photograph | | 1122 | |
| Ex. 91 | | 594 | " | |
| Ex. 92-93 | " | | " | |
| Ex. 94 | | 594 | " | |
| Ex. 95 | | | " | |
| Ex. 96 | | 594 | " | |
| Ex. 97-98 | Photographs | | " | |
| Ex. 99 | " | 595 | " | |
| Ex. 100 | | | " | |
| Ex. 101 | | 595 | " | |
| Ex. 102 | | 596 | " | |
| Ex. 103 | | 596 | " | |
| Ex. 104 | | | | |
| Ex. 105 | " | 596 | " | |
| Ex. 106 | | 597 | " | |
| Ex. 107-112 | | | " | |
| Ex. 113 | | 597 | " | |
| Ex. 114-117 | | | " | |
| Ex. 118 | | 597 | " | |
| Ex. 119-121 | | | " | |
| Ex. 122 | | 597 | " | |
| Ex. 123 | " | | " | |
| Ex. 124 | | 597 | " | |
| Ex. 125-128 | | | " | |
| Ex. 129 | | 598 | " | |
| Ex. 130-131 | " | 598 | " | |
| Ex. 132 | Autopsy report | 1058 | " | |
| Ex. 133 | ME Verdict | 1059 | 1122 | |
| Ex. 134 | Toxicology rep | 1059 | 1122 | |
| Ex. 135 | NMS toxicology | 1059 | 1122 | |
| Ex. 150-212 | Photographs | 556 | 1122 | 1122 |
| Ex. 154 | Photograph | 556 | " | |
| Ex. 151 | " | 464 | " | |
| Ex. 152 | " | 464 | " | |
| Ex. 155 | " | 464 | " | |
| Ex. 157 | " | 557 | " | |
| Ex. 164 | " | 558 | " | |
| Ex. 165 | " | 559 | " | |
| Ex. 170 | " | 559 | " | |
| Ex. 174 | " | 559 | " | |

INDEX

| State's Exhibits | | | Identify | Admit | Object |
|---|---|---|---|---|---|
| Ex. | 200 | Photograph | 560 | 1124 | |
| Ex. | 211 | " | 546 | 1124 | |
| Ex. | 220 | EMS Run report | 399 | " | |
| Ex. | 221 | 9-1-1 Audio | 388 | " | |
| Ex. | 222 | Statement | 434 | " | |
| Ex. | 305 | Autopsy photo | 1086 | 1124 | 1124 |
| Ex. | 307 | " | 1087 | 1124 | " |
| Ex. | 309 | " | 1088 | 1124 | " |
| Ex. | 310 | " | 1084 | " | " |
| Ex. | 311 | " | 1088 | " | " |
| Ex. | 313 | " | 1089 | " | " |
| Ex. | 314 | " | 1089 | " | " |
| Ex. | 317 | " | 1090 | " | " |
| Ex. | 318 | Autopsy photo | 1090 | " | " |
| Ex. | 319 | " | 1090 | " | " |
| Ex. | 327 | " | 1091 | " | " |
| Ex. | 328 | " | 1092 | " | " |
| Ex. | 329 | " | 1093 | " | " |
| Ex. | 332 | " | 1084 | " | " |
| Ex. | 334 | " | 1094 | " | " |
| Ex. | 338 | " | 1095 | " | " |
| Ex. | 339 | " | 1095 | " | " |
| Ex. | 401 | Dfd Day stmt | 502 | 1123 | |
| Ex. | 402 | Dfd Lewis stmt | 506 | 1124 | |
| Ex. | 403 | Search warrant | 510 | 1124 | |
| Ex. | 404 | Police report | 519 | -- | |
| Ex. | 406 | Lease agreement | 574 | 1124 | |
| Ex. | 500 | Documents | 600 | 1124 | |
| Ex. | 501 | Documents | 600 | 1124 | |
| Ex. | 502 | Documents | 600 | " | |
| Ex. | 503 | Towel | 602 | " | |
| Ex. | 504 | Azpen tablet | 602 | " | |
| Ex. | 505 | RCA table | 602 | " | |
| Ex. | 506 | HP tablet | 602 | " | |
| Ex. | 507 | Tan towel | 602 | " | |
| Ex. | 508 | Cup | 602 | " | |
| Ex. | 509 | Blanket | 603 | " | |
| Ex. | 510 | Swabs | 603 | " | |
| Ex. | 511 | Swabs | 603 | " | |
| Ex. | 512 | Swabs | 603 | " | |

| State's Exhibits | | | Identify | Admit | Object |
|---|---|---|---|---|---|
| Ex. | 513 | Swabs | 603 | 1124 | |
| Ex. | 514 | Swabs | 603 | 1124 | |
| Ex. | 515 | Vacuum | 604 | " | |
| Ex. | 516 | Swabs | 604 | " | |
| Ex. | 517 | Swabs | 604 | " | |
| Ex. | 518 | Mattress sample | 604 | " | |
| Ex. | 519 | Broom head | 604 | " | |
| Ex. | 520 | Pink coat | 612 | " | |
| Ex. | 521 | Pink T-shirt | 612 | " | |
| Ex. | 522 | Jeans | 612 | " | |
| Ex. | 523 | Pink hat | 612 | " | |
| Ex. | 524 | Pink/green socks | 612 | " | |
| Ex. | 601 | Photograph | 684 | " | |
| Ex. | 602 | Photograph | 684 | " | |
| Ex. | 603 | Photograph | 684 | " | |
| Ex. | 604 | Photograph | 684 | " | |
| Ex. | 605 | Photograph | 685 | " | |
| Ex. | 606 | Photograph | 685 | " | |
| Ex. | 701 | Photograph | 787 | " | |
| Ex. | 703 | Photograph | 787 | " | |
| Ex. | 704 | Photograph | 787 | " | |
| Ex. | 705 | Photograph | 788 | " | |
| Ex. | 801-805 | Observation form | 703 | 1124 | |
| Ex. | 806 | Observation form | 663 | 1124 | 1124 |
| Ex. | 807 | Observation form | 675 | " | " |
| Ex. | 808 | Observation form | 676 | " | " |
| Ex. | 809 | Observation form | 679 | " | " |
| Ex. | 810-811 | Observ. form | 703 | " | " |
| Ex. | 812 | Observation form | 648 | " | " |
| Ex. | 814 | Observation form | 661 | " | " |
| Ex. | 815 | Observation form | | | " |
| Ex. | 901 | Medical record | 717 | 1124 | 1124 |
| Ex. | 902 | Medical record | 724 | " | " |
| Ex. | 903 | Dom. Relations | 792 | " | |
| Ex. | 904 | Common Pleas motion | 793 | " | |
| Ex. | 905 | Dom. Rel. order | 794 | " | |
| Ex. | 906 | Dom. Rel. order | 795 | " | |
| Ex. | 907 | Dom. Relations | 796 | " | |
| Ex. | 908 | Phone extraction | 863 | " | |
| Ex. | 909 | Phone extraction | 863 | " | |
| Ex. | 910 | Dental records | 1007 | 1124 | 1124 |

| State's Exhibits | Identify | Admit | Object |
|---|---|---|---|
| Ex. 911 MetroHealth rec | 1007 | 1124 | 1124 |
| Ex. 912 BCI report | 1012 | 1124 | |
| Ex. 913 Video | 1017 | 1124 | |
| Ex. 1001 Photograph | 759 | " | |
| Ex. 1002 Photograph | 760 | " | |
| Ex. 1003 Photograph | 760 | " | |
| Ex. 1004 Photograph | 760 | " | |

| DEFENDANT DAY EXHIBITS | Identify | Admit | Object |
|---|---|---|---|
| Ex. A Day School record | 1139 | 1139 | |
| Ex. B Day School record | 1139 | 1139 | |

**THE FOLLOWING EXHIBITS WERE RETAINED BY PROSECUTOR KILBANE AND/OR EUCLID POLICE DETECTIVE KROCZAK:**

**State's Exhibits:** 500, 501, 503, 504, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524

**ALSO FILED WITH EXHIBITS:**

***** Court's Charge to the Jury**

***** Court's Exhibits A and B**

(Questions from the Jury during deliberations.)

**ALL EXHBITS FILED IN CASE CR 626899A/CA 108435**

**TUESDAY, MAY 1, 2018**

**MORNING SESSION**

**TIME WAIVER**

THE COURT: We're here on Case No. 626899-B, State of Ohio versus Deonte Lewis. Defendant is in court with counsel, Nicole Longino and James Gay. Present from the State of Ohio Anna Faraglia and Aqueelah Jordan.

We're here for execution and acceptance of a waiver of a speedy trial.

Sir, how old are you?

THE DEFENDANT: Twenty-seven.

THE COURT: How far did you go in school?

THE DEFENDANT: Graduated high school.

THE COURT: As you stand here today are you presently under the influence of drugs, alcohol, or medication?

THE DEFENDANT: No.

THE COURT: Are you undergoing psychiatric treatment?

THE DEFENDANT: No.

THE COURT: You've had an

opportunity to discuss with your attorneys the fact that you have a statutory, constitutional right to a speedy trial; correct?

THE DEFENDANT: Yes.

THE COURT: It's your desire to waive that right until December 31st, 2018; correct?

THE DEFENDANT: Yes.

THE COURT: You've read and understood what's going to be marked Court's Exhibit B, defendant's waiver of speedy trial, you understood what was set forth therein and you signed it of your own free will?

THE DEFENDANT: Yes.

THE COURT: Very good. The Court will accept that waiver, find it was made knowingly, intelligently, and voluntarily.

This matter shall be set for pretrial May 22nd, at 9 a.m. and trial tentatively set for October 15th at 9 a.m.

MS. FARAGLIA: Thank you, Your Honor.

MR. GAY: Thank you, Your Honor.

MR. JORDAN: Thank you, Your

Honor.

MS. LONGINO: Thank you, very much, Your Honor.

- - - o0o - - -

(Adjourned.)

- - - o0o - - -

**MONDAY MORNING SESSION, JUNE 25, 2018**

THE COURT: We're here on Case Number 626899, State of Ohio versus Deonte Lewis. Defendant is in court with counsel.

Defendant was referred to the Court Psychiatric Clinic for purposes of an evaluation of competency to stand trial. A report was authored June 25, 2018, by Dr. Thomas Swales, S-w-a-l-e-s, from the Court Psychiatric Clinic, who opined that the defendant was competent to stand trial.

Nicole, will you stipulate to this?

MS. LONGINO: Yes, your Honor.

THE COURT: Will the State stipulate to this?

MS. JORDAN: Yes.

THE COURT: The court will accept the findings. Do we have a pretrial set?

THE BAILIFF: July 10th.

THE COURT: July 10 is the next pretrial.

- - - -

(The proceedings were adjourned.)

**MONDAY MORNING SESSION, DECEMBER 10, 2018**

- - - - -

THE COURT: We are here on Case No. 626899, State of Ohio versus Deonte Lewis.

Defendant is in court with counsel, James Gay. Aqueelah Jordan is here on behalf of the State.

We are here for execution and acceptance of a waiver of speedy jury trial.

Sir, how old are you?

THE DEFENDANT: 27.

THE COURT: How far did you go in school?

THE DEFENDANT: Graduated.

THE COURT: As you stand here today, are you presently under the influence of drugs, alcohol, or medication?

THE DEFENDANT: No, sir.

THE COURT: Are you undergoing psychiatric treatment?

THE DEFENDANT: Say that again, sir.

THE COURT: Are you undergoing psychiatric treatment?

THE DEFENDANT: Yes.

THE COURT: For what?

THE DEFENDANT: No, sir.

THE COURT: You had an opportunity to discuss with your attorney the fact that you have a constitutional, statutory right to a speedy trial, correct?

THE DEFENDANT: Yes, sir.

THE COURT: It's your desire to waive that right until March 4th, 2019, correct?

THE DEFENDANT: Yes, sir.

THE COURT: You read what's going to be marked Court's Exhibit A, Defendant's Waiver of Speedy Trial, you understood what was set forth therein, and you signed it of your own free will?

THE DEFENDANT: Yes, sir.

THE COURT: Very good. The Court will accept that waiver, find it was made knowingly, voluntarily, and intelligently.

MS. JORDAN: Thank you, your Honor.

MR. GAY: Thank you, your Honor.

THE COURT: It's waived until April 30th, 2019.

MR. GAY: Thank you.

- - - - -

(Proceedings adjourned.)

- - - - -

TUESDAY AFTERNOON SESSION

FEBRUARY 26, 2019

PROCEEDINGS

- - - o0o - - -

THE COURT: We're here on Case Number 626899A and B, State of Ohio versus Sierra Day, Deonte Lewis.

Defendants are in court with counsel; Defendant Day represented by Tom Shaughnessy, Mark Marein; Defendant Lewis represented by James Gay and Nicole Longino.

On behalf of the State of Ohio, Anna Faraglia, Aqueelah Jordan, and Sean Kilbane.

This matter is set for trial today. We have a few preliminary matters to address on the record.

First one, obviously, is a motion for separate trials. This case was originally set to be tried separately. The State then moved to try them together and Defendant Lewis has opposed that joinder.

On behalf of Defendant Lewis, it's your motion.

MR. GAY: May it please the Court, your Honor.

I rise in opposition to the defendants being joined for trial. Rule 14 mandates severance, if joinder causes prejudice to a defendant.

The mother here, Sierra Day, appears to have some mental health issues. There were reports that the child had suffered abuse long before this defendant began a relationship with Ms. Day. She's been the mother four years; he's been in and out with her for approximately six months.

I understand Ms. Day is alleging that my client is the one who caused harm to the child, even though he's writing her with supportive letters and love letters on a frequent basis and denies specifically that he did any harm to the child.

Rule 14 further provides that under these circumstances, where it appears that a defendant is prejudiced by joinder, the Court shall order an election, or separate trials, grant a severance of defendants, or provide such other relief as justice requires. If the co-defendant does not testify, Defendant Lewis will be denied his right to confrontation guaranteed by the U.S.

and Ohio constitutions.

On the other hand, if the co-defendant does testify, and there is no Sixth Amendment violations, severance is required where the co-defendant's statements are likely to have a prejudicial effect on the minds of jurors.

For all of the aforesaid reasons, a joint trial will pose a threat to my client's constitutional right to confront a witness and will have a prejudicial impact on the jury. And, for that reason, the co-defendant should be tried separately.

Finally, my client, Defendant Lewis, is entitled to have his case adjudicated on the basis of his own conduct, not the conduct of his co-defendant. Therefore, failing to sever these two co-defendants will have a prejudicial impact on Defendant Lewis' fundamental rights.

A joint trial deprives a defendant of the right to call a co-defendant as a witness, should the co-defendant choose not to testify, in order to fully avail himself of his 5th Amendment right, his privilege against self-incrimination.

Thank you, your Honor.

THE COURT: Thank you.

On behalf of the State?

MS. JORDAN: Your Honor, in terms of joinder, there is a heavy presumption on behalf of the State that a joinder is permitted as long as the defendants participate in the same series of transactions. What we're talking about in terms of this case in regard to the same series of transactions is a ten-month period where both defendants had equal access to the victim in this case, your Honor.

As this Court is aware, under *State v. Thomas*, 400 N.E.2d 401, the joinder of defendants in avoidance of multiple trials is favored in the law for many reasons, your Honor. The preference for joinder is almost always outweighed by the risk of prejudice to the co-defendant in moving for severance, your Honor. That's under *U.S. v. Velasquez*, 772 F.2d 1348, out of the 7th Circuit, your Honor. That court specifically held, "The dangers of prejudice to the least guilty, or perhaps prejudice to all, from the sheer confusion of a multidefendant trial, is in all but the most unusual circumstances outweighed by the economies of a single trial."

In this case, we're not talking about a

matter of multiple co-defendants but merely two co-defendants that participated in the same activities together, your Honor.

Furthermore, *U.S. v. Harris* requires a heavy burden showing specific and compelling prejudice in order for something to be severed. There has been no showing of specific or compelling prejudice that would justify these matters being severed.

In regard to Mr. Gay's, the defendant's, arguments that somehow there may be mutually antagonistic defenses, meaning that he believes Defendant Day may point to his client as the person responsible for this, your Honor, that again is not a reason to justify severance of cases under *State v. Daniels*, 92 Ohio App.3d 473. So even if defendants present a mutually antagonistic defense, a trial court still should not grant severance under Criminal Rule 14. That is cited by *Zaffiro v. U.S.*, 506 U.S. 534.

In fact, the Supreme Court has held this to such a high issue that the Supreme Court has cautioned courts against granting severance based on solely antagonistic defenses, and specifically said, "Mere finger-pointing among co-defendants,

i.e., the familiar, 'He did the offense, not I,'" is not permissible to argue for severance, your Honor.

In regard to defendant's last argument that somehow Defendant Day may be at greater fault or liability for this, your Honor, it's cited in *State v. Parks* which is an Eighth District case, better known as the spillover effect, your Honor, meaning simply because the defendant argues that one party is more responsible, if there is evidence shown that both parties engaged in the same behavior that ultimately resulted in the same offense, your Honor, then the spillover effect is not applicable. That's cited by *Opper v. U.S.,* 348 U.S. 84.

The State believes there is more than sufficient information here to show that severance would not be appropriate. Defense counsel has not met the requirements of the very high burden that would be in place for severance to be allowed, your Honor.

Thank you.

THE COURT: Thank you. The motion for separate trials is going to be

denied.

There is a -- with respect to the motion to suppress statements filed by counsel for Day?

MR. SHAUGHNESSY: Your Honor, in my discussion with the prosecuting attorneys, it's my understanding that they are not going to use any of the statements that Ms. Day gave, thereby satisfying any Bruton or conflict issue and, as such, I believe it's moot.

THE COURT: State?

MS. JORDAN: Your Honor, The State will only be using the statements used by Defendant Day and Defendant Lewis that were prior to custodial interrogation. Neither of these statements given would impact Bruton.

MR. MAREIN: Judge, if any of those statements, notwithstanding the fact that they were not in-custodial, if any of those statements bear on the issue of pointing the finger at the other, it naturally creates a Bruton issue.

THE COURT: Well, sure. That would be -- apparently that is not the case.

MS. JORDAN: That is not

the case, your Honor.

THE COURT: Absent any Bruton issues where they would be prejudiced with the inability to cross-examine on those statements, then precustodial statements should be admissible.

Finally there is an issue of 404(B) evidence. Go ahead.

MS. JORDAN: Thank you, your Honor.

The State would rely and stand upon its written brief that was submitted for purposes of this motion, your Honor. This Court is well aware of what is admissible under 404(B), and is aware that it is permissible in terms of modus, intent, common scheme, plan, act, opportunity, or identity.

The State would contend that the 404(B) evidence that would be offered in this matter in relation to Defendant Day would satisfy the requirements under motive, opportunity, intent, preparation, plan, and identity.

As this Court is aware, where a defendant puts at issue their identity by denying the crimes, as cited under *State v. Ogletree*, your

Honor, then identity becomes an issue. The 404(B) evidence that would be submitted in this case will show the activity of Defendant Day prior to the murder of the victim here in establishing that she, in fact, was the identified person associated with these offenses.

Furthermore, your Honor, the State believes that *State v. Hartman* would be distinguishable in this incident because *Hartman* discusses an instance where a defendant was not denying the act but merely arguing that consent was present. In this case, the defendant's denial of the act puts identity at issue, your Honor.

It's further required under *State v. Williams* that a three-step analysis be entered into in terms of 404(B). One --

THE COURT: Hold on a second.

Counsel? Let her finish her argument then I'll give you time. The court reporter's having a difficult time hearing.

MS. LONGINO: Oh, I'm sorry.

THE COURT: Go ahead.

MS. JORDAN: In terms of

404(B), your Honor, as required under *Williams*, first the other acts evidence is relevant to showing facts are more consequential. I believe that again has already been outlined.

Second, the other acts must be presented in order to prove the character of the accused -- not to prove the character of the accused acting in conformity, but for another limited purpose, your Honor. I believe we've already outlined that in ID, opportunity, intent, and plan, your Honor.

Your Honor, even in the event that 404(B) is permitted, the State would request a limine instruction be provided to the jury that would waive any issues of error upon appeal, your Honor.

Thank you.

THE COURT: Thank you.

Defense counsel?

MR. SHAUGHNESSY: Judge, we would object to any of the 404(B) evidence. We understand that that's probably going to have to be ruled upon on a selective basis as that evidence comes forward, but as just a general principle, we would disagree with the analysis

provided by the State of Ohio; specifically, that once a person denies they committed the crime for which they're on trial that then opens the door to bring in everything they did before under the theory of identity.

Judge, under that theory, 404(B) would never be excluded because in every trial that you start the person said they didn't do it. I disagree with the proposition to begin with. We feel that the introduction of this evidence, and we will object as we go along specifically, and hopefully have that three-part analysis done at sidebar outside the presence of the jury. But we believe the admission of any of that evidence that they've articulated through discovery would violate our client's rights under both the Ohio and United States constitutions.

Thank you.

THE COURT: I assume the 404(B) is only applicable as to Defendant A, Day?

MS. JORDAN: Correct, your Honor.

THE COURT: I'm going to reserve ruling on that. You're going to provide the Court sometime tomorrow during some recess,

when we're picking a jury, my understanding is there is a finite number of 404(B) acts, you'll provide the Court with either a summary of those acts or a description of how those acts became known and what they purport to show. That way we can review them before opening statements and have a better idea how much leeway you'll have on 404(B).

Anything further?

MR. GAY: Not from defense.

THE COURT: Does either Defendant Day or Defendant Lewis have any questions for the Court?

DEFENDANT DAY: No.

DEFENDANT LEWIS: No, sir.

THE COURT: You're set to go to trial?

DEFENDANT LEWIS: Yes, sir.

THE COURT: You're set to go to trial?

DEFENDANT DAY: Yes.

THE COURT: Both satisfied with your counsel?

DEFENDANT LEWIS: Yes. Yes,

sir.

DEFENDANT DAY: Yes.

THE COURT: Very good. Tomorrow morning, ten o'clock.

- - - o0o - - -

(Thereupon, court stood in recess until Wednesday, February 27, 2019, at 10:00 a.m.)

- - - o0o - - -

WEDNESDAY MORNING SESSION

FEBRUARY 27, 2019

PROCEEDINGS

- - - o0o - - -

THE COURT: We're here on Case Number 626899, State of Ohio versus Sierra Day and Deonte Lewis.

The defendants are in court with counsel. On behalf of Sierra Day is Tom Shaughnessy, Mark Marein. On behalf of Deonte Lewis is James Gay and Nicole Longino. Present from the State of Ohio is Anna Faraglia and Aqueelah Jordan.

Before we bring the jury out, is there anything we need to discuss, counsel?

MS. JORDAN: No, your Honor. We do have a stipulation we can address at a later point in time.

MR. SHAUGHNESSY: No, your Honor.

THE COURT: All right. We'll address those at a later point in time.

Anything further on behalf of the defense?

MR. SHAUGHNESSY: No, your Honor.

MS. LONGINO: No, your Honor.

THE COURT: Very good. We'll bring the jury out momentarily.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury panel entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated. Good morning, ladies and gentlemen.

My name is Judge Timothy McCormick. I want to welcome you to the Justice Center, welcome you to my courtroom. You've been summoned as prospective jurors in a criminal case. This case is captioned State of Ohio versus Sierra Day and Deonte Lewis.

This is an eight-count indictment. Count 1 charges both defendants with aggravated murder; Count 2 charges both Defendants with murder; Count 3 charges both defendants with felonious assault; Count 4 charges both defendants with

permitting child abuse; Count 5 charges both defendants with endangering children; Count 6 charges both defendants with endangering children; Count 7 both defendants with endangering children; Count 8, tampering with evidence.

The purpose of the indictment is to inform the jury, the Court, and the defendants of the crimes that are being charged. The prosecuting attorney has the burden of proving all essential elements of the crime beyond a reasonable doubt. If such proof is not made, the defendants must be found not guilty. The indictment and the fact that it was filed may not be considered as evidence for any purpose.

The defendant has plead not guilty and by his plea -- by their pleas of guilty, they have denied that they have committed the crimes charged in the indictment. They are presumed to be innocent throughout the trial and until they are proven guilty beyond a reasonable doubt.

Reasonable doubt is defined by statute as follows: "Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly

convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense.

"Reasonable doubt is not mere possible doubt because everything relating to human affairs or dependent upon moral evidence is open to some possible or imaginary doubt.

"Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs."

If, after a full and impartial consideration of all the evidence, you are firmly convinced of the truth of a charge, the State has proven its case beyond a reasonable doubt. If you are not firmly convinced of the truth of the charge, you must find the defendants not guilty.

It is crucial that you, the jurors, be as free as humanly possible from any bias, prejudice, or sympathy. And you must not have any preconceived ideas as to the law or the facts. Both the State of Ohio and the accused are entitled to a fair and impartial jury.

Ladies and gentlemen, the rules provide that the Court and counsel can ask questions of

you regarding your background to determine whether you have experienced anything which would make it difficult for you to serve in this particular case. We're not trying to pry into your personal lives, but it is crucial that you answer the questions truthfully and completely. If, at any time during the voir dire process, you wish to respond to a question outside the presence of the other jurors, raise your hand and we will either go to side bar or back in chambers.

For those of you in the back of the courtroom, the questioning will initially focus on the 12 jurors in the jury box. If a -- I\ would ask that you listen attentively, however, to the questions posed to these 12 jurors. If and when you're brought forward, I will ask you whether you have anything to say in response to those questions. That way hopefully we avoid repetitive questioning.

Finally, if at any time during the voir dire process, you wish to take a break, raise your hand, we will accommodate you. That being said, my bailiff will administer the jury oath.

THE BAILIFF: Will all the

jurors please rise and raise your right hand.

- - - o0o - - -

(Thereupon, the Jury panel was duly sworn.)

- - - o0o - - -

THE BAILIFF: Thank you. You may be seated.

THE COURT: I would ask that the county prosecutors introduce themselves to the jury, who is at your table, and state for the record the name of your potential witnesses.

MS. FARAGLIA: Thank you, your Honor.

Good morning, ladies and gentlemen. My name is Anna Faraglia. And I'm the assistant county prosecutor. Along with me is Aqueelah Jordan, another assistant prosecuting attorney. And sitting with us is Detective Jennifer Kroczak from the Euclid Police Department.

THE COURT: You're going to have another county prosecutor?

MS. FARAGLIA: We may have another county prosecutor, Sean Kilbane, sitting with us as well.

THE COURT: Go ahead.

MS. FARAGLIA: A list of potential witnesses in this case are Heidi Hobart, Marra Wargo, Nate Lapuh, Robert Swope, Christopher Wilson, Venita Wiggins, Lorra Greene, Laura Cole, Detective Jennifer Kroczak, Officer Jeff Herold, Officer Nicholas Edington, Officer Blakemore, Alexis Logan, Scott Bailey, Officer Catalani, Stephanie Millam, Detective Caruso, Detective Craig Murowsky, Tamika Robinson, Eddie Day, Mickhal Garrett, Jessica Jenkins, Deborah France, Officer Screngi, Erica Johnson, Michelle Marshall, Charlene Wilson, Angela Colon, Sherrie Crayton, Kelly Cole, Officer David Fox from Cleveland Police Department, Officer McFadden from the Cleveland police department, Chantale Milton, Sakeya Fitzpatrick, Natalie Day, Detective Phillip Tschetter, Lieutenant Michael Knack, Detective Braun from Euclid, Tawanna James, Chelsea Lillie, April Goode, Tamara Finley, Kinasha Stevens, and Dr. Joseph Felo.

THE COURT: Thank you. Is anybody familiar with the assistant county prosecutors, the detective, or the names of those potential witnesses? Okay.

THE BAILIFF: Judge --

A JUROR: Yeah, I am.

THE COURT: We'll address that, Mr. Shelby, at the appropriate time. Is there somebody else who raised their hand? Just you. Okay.

Defense counsel, please introduce yourself and your client to the jury.

MR. SHAUGHNESSY: Thank you. Good morning, your Honor. Good morning, folks.

My name is Tom Shaughnessy. My co-defendant (sic) is Mark Marein and our client is Sierra Day.

MR. MAREIN: Co-counsel. I'm not accused.

MR. SHAUGHNESSY: Sorry, it's early morning.

THE COURT: Counsel, introduce yourself and your client.

MS. LONGINO: Good morning, everyone. My name is Nicole Longino. My co-counsel is Mr. James Gay.

MR. GAY: Good morning.

MS. LONGINO: Our client is Deonte Lewis Our potential witnesses are Brianna Jones, Jason Lewis, Paulette -- not

Paulette, I'm sorry. James Howard, Deborah Manning, Tamira Finley, Alexis Logan, Sherrie Litvak, Tashia Parks, Charles Taylor, Tamika Robinson, Tawanna James, Chantale Milton, Iran Doss Sakeya Fitzpatrick, Michelle Marshall.

THE COURT: Thank you. Anybody familiar with defense counsel, the defendants, and potential witnesses on behalf of Defendant Lewis? Once again, Mr. Shelby, we'll address that.

Actually, let's go to side bar real quick, counsel.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Mr. Shelby, we're going to thank and excuse you, sir.

JUROR NO. 24: Okay. Thank you.

THE COURT: Go back down to the 4th floor.

JUROR NO. 24: Okay.

THE COURT: Thank you.

Ladies and gentlemen, as I indicated, this case is captioned State of Ohio versus Sierra Day and Deonte Lewis This matter occurred in Euclid, Ohio, in March of 2018. The named victim is [redacted] who is four years old. Has anyone heard of this case prior to today?

Okay. Raise your hand, again. Okay. That's Numbers 2, 9, 11 -- 10 rather, excuse me, 10, 13, and 14?

MS. FARAGLIA: 19.

THE COURT: Okay. 19. Here's what we're going to do. I'm going to excuse everybody right now and I'm going to bring those who raised their hand, mark down who raises their hands. Put your hand up, again. Numbers 2, 9, 10, 13, 14, 19, and take it from there.

Counsel, why don't you come to side bar.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Okay. I have a second question for you.

This matter, as I said, occurred in Euclid. There is involvement by the Cuyahoga County Children and Family Services, which was highly publicized.

Does anyone have strong feelings for or against Cuyahoga County Children and Family Services that would prevent you from being fair and impartial in this case? Number 2. Okay. What's that number back there?

THE BAILIFF: She's 35.

THE COURT: Okay. 35.

Ladies and gentlemen, we are going to then ask you -- my bailiff will take you out and you're going to remember your seat assignment, if you can, or your number. We're going to individually ask questions of those jurors who responded in the affirmative to either one or both of those questions.

Additionally I'm going to request and instruct you that during this separate voir dire, you may not discuss this case among yourselves. Don't ask other jurors: Hey, what's this all about, why are we doing this? Can we agree to do

that, everybody? It's very important.

Obviously, it goes without saying you're not go to on your phone and look this up. All right. All rise.

Juror 2, you can stay.

- - - o0o - - -

(Thereupon, the Jury panel exited the courtroom.)

- - - o0o - - -

THE COURT: We're back on the record with Juror Number 2, Suzanne Giordano.

You indicated you have some familiarity with this case?

JUROR NO. 2: I've seen it on TV.

THE COURT: How recently?

JUROR NO. 2: I think it's been pretty recent, within the last month.

THE COURT: Okay.

JUROR NO. 2: More than once I've seen it, I think.

THE COURT: Okay. Do you have any feelings about the case?

JUROR NO. 2: Yeah, I think I do.

THE COURT: What are

those?

JUROR NO. 2: Well, I mean, a child was -- you know, is deceased, and I believe those are the parents that are involved, and I would --

THE COURT: Okay. Do you understand that what's reported on the news is not necessarily always true?

JUROR NO. 2: I understand that.

THE COURT: Do you want to sit on this case?

JUROR NO. 2: I really would not like to.

THE COURT: Why is that?

JUROR NO. 2: Well, it's a sad situation and I think I wouldn't like to.

THE COURT: Do you have children of your own?

JUROR NO. 2: Yes, I do.

THE COURT: Do you have grandchildren?

JUROR NO. 2: Not yet.

THE COURT: How old are your children?

JUROR NO. 2: 26.

THE COURT: Do you want to do a limited inquiry?

MS. FARAGLIA: The fact that you may have seen something, Mrs. Giordano, on TV, can you still set that aside and still listen to the case and make a determination as it's presented? Or do you think that you feel so strongly that you can't do that?

JUROR NO. 2: I think I feel strongly that I can't do it.

MS. FARAGLIA: Okay. You can't follow the law the way the judge gives it to you?

JUROR NO. 2: I mean, I can follow the law but I feel sick --

THE COURT: Mr. Shaughnessy or Mr. Gay or Ms. Longino?

MR. SHAUGHNESSY: Judge, we have no questions on that.

MS. LONGINO: We have no questions.

THE COURT: You can go back to the 4th floor.

Bring out Juror Number 9, please.

- - - o0o - - -
(Off the record.)
- - - o0o - - -

THE COURT: You are Mr. Jablonski?

JUROR NO. 9: Yes.

THE COURT: You indicated you have some familiarity?

JUROR NO. 9: I bought a *Plain Dealer* this morning, and there was an article about it.

THE COURT: Okay. Did you see any other coverage by the television stations?

JUROR NO. 9: No. No.

THE COURT: When you read the article, what did you think?

JUROR NO. 9: Other than that they were being charged with a crime; that is it. Just because there is an article doesn't mean --

THE COURT: You haven't formed any opinion as to innocence or guilt?

JUROR NO. 9: No.

THE COURT: Is this a case

that you'd like to sit on?

JUROR NO. 9: I would. I wouldn't say I'd like to sit.

THE COURT: I understand. You're willing to sit on it?

MR. SHAUGHNESSY: JUROR NO. 9:

Yes, I'm willing.

THE COURT: Do you have any questions?

MS. FARAGLIA: No questions.

THE COURT: Any questions?

MR. SHAUGHNESSY: No.

MS. LONGINO: No.

JUROR NO. 9: I do want to say one more thing. Me and my wife are retired. I retired from the U.S. Postal Service. She retired from the Cuyahoga County. She worked for the auditor's department. I just thought I'd bring that up just to make sure it's not a problem.

THE COURT: It's not an issue.

Any questions?

MR. SHAUGHNESSY: Did you read the entire article this morning, sir?

JUROR NO. 9: No, no. To be honest, no.

MR. SHAUGHNESSY: What do you recall about the article?

JUROR NO. 9: That the -- there was a four-year-old girl involved and she died from some injuries, and the police thought it was because she was abused by the defendants.

MR. SHAUGHNESSY: Okay. What was your reaction when you read that article this morning?

JUROR NO. 9: It was just that this happened, that the girl had died, but I hadn't formed, you know, any opinion about whether they're guilty or not guilty, you know. I wasn't --

MR. SHAUGHNESSY: Did you have any emotional reaction?

JUROR NO. 9: No. No. To be honest with you, no.

MR. SHAUGHNESSY: Thank you.

THE COURT: Nicole?

MS. LONGINO: Mr. Jablonski do you have children?

JUROR NO. 9: Yes.

MS. LONGINO: How old are your children?

JUROR NO. 9: 40 years old and 38.

MS. LONGINO: Do you have grandchildren?

JUROR NO. 9: Yes.

MS. LONGINO: Are your children married?

JUROR NO. 9: Yes.

MS. LONGINO: Do both your children have children?

JUROR NO. 9: Yes.

MS. LONGINO: Do you have any strong or preconceived notions about parental duties?

JUROR NO. 9: Well, parents have to take care of their children and they have to watch out for them.

MS. LONGINO: So you said all you know about this case --

THE COURT: Hold on a second. Side bar, please.

- - - o0o - - -

(Thereupon, a discussion was had between

the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Okay. I would ask you to go back outside and bring in Number 10.

Wait a second. Do you have anything to say?

MR. SHAUGHNESSY: He's not excused?

THE COURT: No.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MR. SHAUGHNESSY: Judge, I don't know if the Court had the opportunity to read the article from this morning, I don't have a paper copy but I have pulled it up on my iPad. Just to quote back to what I read this morning. And it indicates a review of the case by the Ohio Department of Job and Family Services found social workers failed to follow protocols, made few face-to-face contacts with the child, ignored two years worth of injuries reported by [redacted]

day care provider, and didn't check whether the girl's mother attended counseling [redacted] twice told social workers after she was injured, in quotes, "Mommy did it," and that the agency had a pending abuse claim the day when the girl died.

We had off-the-record discussions earlier about the medical records, about this in quotes "Mommy did it."

Judge, I would just suggest, we have 50 jurors, any juror that as recently as this morning read an article that contained quotes from the Department of Jobs and Family Services or law enforcement that, quote, "Mommy did it," and caused injuries to her should be excused.

He may not recall at this moment but certainly the recency of that in his mind, I think, we have plenty of jurors, I would ask the Court to excuse him for cause in an abundance of caution.

THE COURT: Objection?

MS. FARAGLIA: No objection, your Honor.

THE COURT: Very good. He's excused.

Bring in Number 10.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Okay. We're here with Juror Number 10, you're Joan Mason; is that correct?

JUROR NO. 10: Yes.

THE COURT: You indicated that you had read something or had seen something about this case?

JUROR NO. 10: I think I remember hearing about it on TV.

THE COURT: How long ago was it?

JUROR NO. 10: I imagine whenever the incident happened but I usually turn on the morning news when I'm getting ready for work.

THE COURT: So that would have been almost a year ago?

JUROR NO. 10: I guess so.

THE COURT: You haven't read or seen or heard anything since?

JUROR NO. 10: No.

THE COURT: Okay. Do you

recall specifically what you saw on TV? Or is it just that somebody died and somebody was being charged?

JUROR NO. 10: Yes, and the name seemed familiar.

THE COURT: Okay. Did it cause you to form any type of opinion or have any type of emotion or reaction that would make it difficult for you to sit in this case?

JUROR NO. 10: No.

THE COURT: Do you want to serve?

JUROR NO. 10: Yes.

THE COURT: Well, will you serve?

JUROR NO. 10: Yes.

THE COURT: Okay. Go ahead, counsel.

MS. FARAGLIA: I don't have any questions, your Honor.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions.

THE COURT: Ms. Longino?

MS. LONGINO: No questions, your Honor.

THE COURT: Very good. Thank you.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Good morning, sir.
JUROR NO. 13: Good morning.
THE COURT: You are Michael Varga-Sinka?
JUROR NO. 13: Yes, I am.
THE COURT: You raised your hand and indicated that you had heard something about this case?
JUROR NO. 13: Yeah, vaguely I recall it.
THE COURT: Vaguely?
JUROR NO. 13: Yes.
THE COURT: Was it a year ago?
JUROR NO. 13: Vaguely.
THE COURT: Do you recall what you remember about it?
JUROR NO. 13: The details

were, after a while -- I guess the best way to put it is that after a while you've heard of these situations, so if I can say specifically that that's what happened in this instance, I can't say that. But it was sufficient when I heard that that I remembered reading about it.

THE COURT: Well, have you formed any type of opinion or do you have any belief?

JUROR NO. 13: Not really.

THE COURT: When you say not really, is that --

JUROR NO. 13: Well, you know, I mean, we give everybody the benefit of the doubt.

THE COURT: Okay. You haven't seen anything in a year, though; is that correct?

JUROR NO. 13: That's correct.

THE COURT: Okay. Are you willing to serve on this case?

JUROR NO. 13: I can think of better things to do but, under the circumstances, if that's what's required I would.

THE COURT: You're retired; is that correct?

JUROR NO. 13: Semi.

THE COURT: Semi-retired. What do you do?

JUROR NO. 13: I'm an attorney.

THE COURT: What type of law?

JUROR NO. 13: I've done just about everything: Criminal defense, bankruptcy, divorce, immigration, contracts, business, et cetera.

THE COURT: Where did you practice?

JUROR NO. 13: I was a solo practitioner. Still am.

THE COURT: Have you ever handled cases in Common Pleas?

JUROR NO. 13: Have I ever --

THE COURT: Handled criminal cases in Common Pleas?

JUROR NO. 13: I did, but it was quite a long time ago.

THE COURT: Counsel?

MS. FARAGLIA: Mr. Varga-Sinka, can you keep -- can you put aside anything that you may have heard a year ago? I know we hear about these cases all the time in the news but have you already formed an opinion or do you already have an opinion just because you've heard of these cases?

JUROR NO. 13: I have not formed an opinion.

MS. FARAGLIA: So you can sit here and be fair and impartial?

JUROR NO. 13: Of course. I'm an attorney.

THE COURT: Counsel?

MR. SHAUGHNESSY: No questions, Judge.

THE COURT: Questions?

MS. LONGINO: No questions, Judge.

THE COURT: All right. Thank you very much.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: You're Keith?

JUROR NO. 14: Yes.

THE COURT: How do you pronounce your last name?

JUROR NO. 14: Lukianowicz, Luk-yan-oh-vich.

THE COURT: Okay. You raised your hand indicating that you had some familiarity with this matter?

JUROR NO. 14: Yes, I did.

THE COURT: What is the source of that?

JUROR NO. 14: This morning when I was getting ready for work I had Fox 8 News turned on and I saw a short story talking about a case that was going to begin today, and there was a picture of a girl on the screen and with her name. And I thought in the back of my head: I bet you I'm going to end up on that case, and then it just left my mind from there.

THE COURT: But that's the first knowledge you had of this matter?

JUROR NO. 14: That's correct.

THE COURT: What was your reaction when you saw that?

JUROR NO. 14: Just what I said. And then I just dismissed it. And the first time that you asked the question, I didn't raise my hand but then you asked for a second showing of hands, and that's when I made the connection and my hand went up.

THE COURT: So you can disregard whatever you saw on TV and base your decision solely on the evidence which you hear in this court; is that correct?

JUROR NO. 14: Yes.

THE COURT: Are you willing to serve on this case?

JUROR NO. 14: Yes.

THE COURT: Questions?

MS. FARAGLIA: No questions, your Honor.

MR. SHAUGHNESSY: No questions, your Honor.

MS. LONGINO: No questions, your Honor.

THE COURT: All right. Next one is Number 19.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Good morning. You're Maria?

JUROR NO. 19: Marie.

THE COURT: How do you pronounce your last name?

JUROR NO. 19: Bohusch, Boe-hoosh.

THE COURT: All right. Have a seat.

You raised your hand in response to the question whether you had any familiarity with this case?

JUROR NO. 19: Yes, sir.

THE COURT: What's the source of that?

JUROR NO. 19: When I heard about it in the news, I used to have a neighbor, Ms. Lewis, and I couldn't remember how she spelled her last name. I thought that the defendant's name might have been one of her grandsons and so I read the details that were in the news at that time.

THE COURT: So that was a year ago?

JUROR NO. 19: Roughly.

THE COURT: Okay. Did you form any opinion about the matter?

JUROR NO. 19: Just from the details that were in the news that -- not really.

THE COURT: Okay. Can you put aside whatever you read and base your verdict, if selected, solely on the evidence which you received in this courtroom?

JUROR NO. 19: For this case I can but I have a different personal concern that I would ask a side bar.

THE COURT: Do you want to just discuss it with just me?

JUROR NO. 19: Yes.

THE COURT: Objection?

MS. FARAGLIA: No objection.

MR. SHAUGHNESSY: No objection.

MS. LONGINO: No objection.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and Prospective Juror 19 off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: We're going to thank and excuse her.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: You are Darin?

JUROR NO. 22: Yes, sir.

THE COURT: Potprocky?

JUROR NO. 22: Yes, sir.

THE COURT: We've got some tough names today. Yours is one of the easier ones.

You raised your hand indicating that you had some familiarity with this matter?

JUROR NO. 22: Just through the media, what's been on the local TV news.

THE COURT: Is that recent or a year ago or both?

JUROR NO. 22: Both.

THE COURT: You saw something this morning, I assume?

JUROR NO. 22: Yeah, they said you were pulling a jury for this.

THE COURT: What was your reaction?

JUROR NO. 22: Kind of figured I might be one of the ones pulled since today is my first day for jury duty.

THE COURT: Do you have any opinion in this matter?

JUROR NO. 22: Not really, no.

THE COURT: I mean, can you base your decision not what you hear on TV or what you may read in the newspaper, be it a year ago or more recently, you can base it on the evidence presented in the courtroom?

JUROR NO. 22: Yeah.

THE COURT: Is this a case that you would be willing to serve on?

JUROR NO. 22: Yes.

THE COURT: Okay. You work for Goodwill?

JUROR NO. 22: Yes.

THE COURT: You're able to take a week off, obviously?

JUROR NO. 22: Yes.

THE COURT: Any questions?

MS. FARAGLIA: No, your Honor.

THE COURT: Thank you.

MS. LONGINO: I have a question.

THE COURT: I'm sorry. Go ahead.

MS. LONGINO: You said that the only thing you know about are the details that you heard from a year ago and recently.

JUROR NO. 22: Yes. Just what's been reported on television, local news.

MS. LONGINO: What specific details do you remember?

JUROR NO. 22: Just that the girl was murdered. I remember her name and that's about it, really.

MS. LONGINO: Do you not remember reading the names of the defendants or anything about them?

JUROR NO. 22: Her mother.

MS. LONGINO: Okay.

JUROR NO. 22: Other than that, that's about it.

MS. LONGINO: No more questions.

MR. SHAUGHNESSY: No, your

Honor.

THE COURT: Very good.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Any challenges, Nicole?

MS. LONGINO: No, your Honor.

THE COURT: Very good. What's the next number?

THE BAILIFF: 26 -- 25, Steven Thompson.

THE COURT: Okay. Number 25. How are you, sir?

JUROR NO. 25: Good. How about you?

THE COURT: Good. You raised your hand indicating that you had some familiarity with this matter?

JUROR NO. 25: I mean, really vague. Like maybe I heard the names on the news or --

THE COURT: Was that recently or a year ago?

JUROR NO. 25: Maybe a little of both, I mean, it's super vague. I don't mean to lead you to believe that I have any, like, preconceived notions about it or anything.

THE COURT: So you heard there was a death and that's about it?

JUROR NO. 25: Yeah.

THE COURT: Is this a case you're willing to serve on?

JUROR NO. 25: I mean, I don't know. I've never served on a jury before, so I'm not looking forward to any of them but, I mean, I'm here.

THE COURT: Okay. Any questions?

MS. FARAGLIA: No.

THE COURT: Any questions?

MR. SHAUGHNESSY: No, your Honor.

MS. LONGINO: No, your Honor.

THE COURT: Okay. Thank you.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Have a seat.

JUROR NO. 30: Thank you.

THE COURT: Your name is Kirsten Ellenbogen?

JUROR NO. 30: Correct.

THE COURT: Okay. You raised your hand indicating that you have some familiarity with this?

JUROR NO. 30: I read the paper every day. I may have noticed the case more because my father worked for the state for the Department of Child Protective Services for about 35 years in Michigan. I may have been thinking about that.

THE COURT: You know there is a death because this is a murder trial; you haven't formed any opinion?

JUROR NO. 30: I haven't.

THE COURT: What does your father do for Children and Family Services in Michigan?

JUROR NO. 30: He was a social worker.

THE COURT: Do home

visits?

JUROR NO. 30: Mm-hmm, and we were a foster family so we fostered kids.

THE COURT: Okay.

MS. FARAGLIA: No questions, your Honor.

MR. SHAUGHNESSY: Just briefly. Good morning.

JUROR NO. 30: Good morning.

MR. GAY:

MR. SHAUGHNESSY: Did you read today's paper?

JUROR NO. 30: No, I didn't. I did not.

MR. SHAUGHNESSY: Thank you.

MS. LONGINO: Based on what little knowledge you do have about this case, have you come to any opinions or conclusions as to the -- what the facts may be or what the turnout may be?

JUROR NO. 30: Honestly, in my work, I work enough with journalists I know enough not to trust everything I read in the paper.

MS. LONGINO: Thank you.
THE COURT: Thank you.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Mr. Anderson, you raised your hand indicating that you have some familiarity with this case?
JUROR NO. 31: Correct.
THE COURT: Have a seat. What's the source of that?
JUROR NO. 31: I'd read about the incident on-line a couple months ago. And then on top of it I knew they were picking jury selection today in the news, my mother told me.
THE COURT: You read about it on-line a couple months ago?
JUROR NO. 31: Correct.
THE COURT: What was the source of the on-line, was it *cleveland.com*?
JUROR NO. 31: I believe it was Cleveland -- Channel 19.
THE COURT: Do you recall what was said?
JUROR NO. 31: I just know it

was a blunt trauma I believed she ended up dying from, like, a stroke. And I heard about the details and everything in it, about the mother, I believe it was, hearing about the child being beaten in another room or something like that.

THE COURT: This was a couple months ago, you said?

JUROR NO. 31: Yeah.

THE COURT: Can you put that aside?

JUROR NO. 31: In fairness of the trial, I feel like I know too much information by reading it, in all honesty.

THE COURT: We're going to thank you and excuse you. Next one.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Okay. Marylou Humphrey?

JUROR NO. 35: Yes, sir.

THE COURT: You raised your hand in response to both questions.

JUROR NO. 35: Yes.

THE COURT: What's the

source of your familiarity with this matter?

JUROR NO. 35: The news, local news.

THE COURT: Was it recently or over a period of time?

JUROR NO. 35: During the event, you know, like shortly after that.

THE COURT: When was the last time you saw anything in the media about this?

JUROR NO. 35: Close to a year ago.

THE COURT: Okay. And was it a TV story or was it a written article?

JUROR NO. 35: TV.

THE COURT: Did you form any opinion at that time?

JUROR NO. 35: I can't remember.

THE COURT: Okay. Do you have an opinion as you sit here today?

JUROR NO. 35: No.

THE COURT: Now, you also indicated that you have strong feelings for or against Children and Family Services.

JUROR NO. 35: I'm a foster parent for 22 years.

THE COURT: You were?

JUROR NO. 35: I am.

THE COURT: You am -- you are, I should say.

Is that going to cause you to have some sort of feeling, strong feeling or bias for or against either party in this matter?

JUROR NO. 35: It could. I don't know for sure, you know, because I don't know what's happening.

THE COURT: Is this a case that you would prefer not to sit on?

JUROR NO. 35: Yes, sir.

THE COURT: Any questions?

MS. FARAGLIA: No, your Honor.

THE COURT: Questions?

MR. SHAUGHNESSY: No, your Honor.

MS. LONGINO: No, your Honor.

THE COURT: We're going to thank and excuse you. Next one?

THE BAILIFF: 38, Karla Rogers.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Okay. Ms. Rogers, you raised your hand indicating you thought you had some familiarity with this matter?

JUROR NO. 38: I did.

THE COURT: What's the source of that?

JUROR NO. 38: I actually -- I thought it was something I was reading in the newspaper about a possible drive-by shooting, but then when I heard the Children and Family Services, then I realized it wasn't it. But it could be another case I read in the newspaper.

THE COURT: It's not something that you read recently?

JUROR NO. 38: No.

THE COURT: Or saw recently?

JUROR NO. 38: No.

THE COURT: You work at

Calfee?

JUROR NO. 38: I do.

THE COURT: What do you do there.

JUROR NO. 38: I'm a corporate real estate lawyer.

THE COURT: You've never done criminal law?

JUROR NO. 38: No.

THE COURT: Is this a case you're willing to serve on?

JUROR NO. 38: If called to, I guess I would.

THE COURT: Okay. Obviously it's a difficult thing, it's a tough task, but it's something that we're obligated to do.

Questions?

MS. FARAGLIA: No, your Honor.

MR. SHAUGHNESSY: No, your Honor.

MS. LONGINO: No, your Honor.

THE COURT: Okay. You're

excused.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: You are Brad Kostka.

JUROR NO. 39: Yes.

THE COURT: You raised your hand indicating you had some familiarity with this?

JUROR NO. 39: Yes. Newspaper stories, I read a few articles.

THE COURT: Anything recently?

JUROR NO. 39: Yeah. I mean, I get the paper, have a subscription, so whenever I get the paper and whatever it was --

THE COURT: You get a physical copy of the paper?

JUROR NO. 39: Yes, I do.

THE COURT: You're old school.

JUROR NO. 39: Yes.

THE COURT: So do I.

JUROR NO. 39: The days it's

delivered, anyway.

THE COURT: Did you read today's article in the paper?

JUROR NO. 39: I did.

THE COURT: Did you bring it with you?

JUROR NO. 39: No, I left it for my fellow jurors because I was done with it.

THE COURT: The ones back there?

JUROR NO. 39: No, downstairs.

THE COURT: Has reading that article today caused you to form an opinion?

JUROR NO. 39: Yes.

THE COURT: What type of opinion do you hold?

JUROR NO. 39: I guess it would be negative towards the defendant.

THE COURT: We're going to thank and excuse you.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Are you Carol

Piwinski?

JUROR NO. 45: Yes.

THE COURT: Have a seat. You raised your hand indicating that you had some familiarity with this matter?

JUROR NO. 45: I saw it on television.

THE COURT: Today.

JUROR NO. 45: Yesterday and when it was on before.

THE COURT: Okay. Did it cause you to form an opinion?

JUROR NO. 45: If I'm going to be honest, yes.

THE COURT: What is that opinion?

JUROR NO. 45: I did form an opinion.

THE COURT: Do you want to express that opinion?

JUROR NO. 45: I just find it's kind of sad that, you know, that this happened to an innocent person.

THE COURT: Any questions?

MS. FARAGLIA: None, your

Honor.

THE COURT: Any questions?

MR. SHAUGHNESSY: No.

THE COURT: Okay. We're going to thank and excuse you.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: You're Ms. Rae?

JUROR NO. 26: I am.

THE COURT: You raised your hand indicating that you had some familiarity with this matter?

JUROR 26: Yes.

THE COURT: What's the source of that?

JUROR NO. 26: An article in the *Plain Dealer* and I recognized her right away.

THE COURT: How did you recognize her? Was there a picture?

JUROR NO. 26: Yes.

THE COURT: So you read the article. Any other sources that you gathered any information?

JUROR NO. 26: No.

THE COURT: Has it caused you to form any opinion in this matter?

JUROR NO. 26: That hasn't but I did call the county on a sexual -- I'm an elementary schoolteacher, and I called the county on a sexual abuse case when I was a young teacher that really impacted me because the mother said that this is what happens all the time, this is what we do. Her child was being molested from the time she was eight.

THE COURT: You called Children and Family Services?

JUROR NO. 26: Yes, I did.

THE COURT: They didn't take it seriously?

JUROR NO. 26: No, they did. I was at school until 11 o'clock at night. So that's my worry about impartiality.

THE COURT: Questions?

MS. FARAGLIA: No, not on behalf of the State.

MR. SHAUGHNESSY: No, your Honor.

THE COURT: We're going to

thank and excuse you. Thank you.

JUROR NO. 26: You're welcome.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury Panel entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated.

Ladies and gentlemen, we appreciate your patience in this matter.

Mr. Price, you work for UPS?

JUROR NO. 1: Yeah.

THE COURT: What do you do?

JUROR NO. 1: I load trucks.

THE COURT: How long have you been with UPS?

JUROR NO. 1: A year.

THE COURT: Prior to that,

what did you do?

JUROR NO. 1: After that I was a full-time college student.

THE COURT: Where?

JUROR NO. 1: Tri-C.

THE COURT: Have you ever served on a jury?

JUROR NO. 1: No, this is my first time.

THE COURT: Have you or a family member been a victim of crime?

JUROR NO. 1: No.

THE COURT: Have you or a family member ever been accused of committing a crime?

JUROR NO. 1: No.

THE COURT: Do you have any children?

JUROR NO. 1: No.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 1: No.

THE COURT: Can you think of any reason why it would be difficult for you

to serve?

JUROR NO. 1: Huh-uh.

THE COURT: No?

JUROR NO. 1: No.

THE COURT: Michael Varga-Sinka.

JUROR NO. 2: Yes.

THE COURT: I understand you're a semi-retired attorney?

JUROR NO. 2: Correct.

THE COURT: Have you ever served on a jury?

JUROR NO. 2: No, sir.

THE COURT: Have you or a family member ever been a victim of crime?

JUROR NO. 2: No.

THE COURT: Have you or a family member ever been accused of committing a crime?

JUROR NO. 2: No, sir.

THE COURT: Do you have any close friends or family affiliated with law enforcement?

JUROR NO. 2: No.

THE COURT: Can you think

of any reason why it would be difficult or you to serve?

JUROR NO. 2: No, sir.

THE COURT: Thank you. Frank Knauss you work at Swagelok?

JUROR NO. 3: Yes.

THE COURT: What do you do?

JUROR NO. 3: I'm a principle project engineer.

THE COURT: How long have you been there?

JUROR NO. 3: 36 years.

THE COURT: All right. Your spouse is with Bethany Lutheran?

JUROR NO. 3: Yes.

THE COURT: What does she do?

JUROR NO. 3: She's a nighttime custodian.

THE COURT: Have you ever served on a jury?

JUROR NO. 3: Yes.

THE COURT: How long ago?

JUROR NO. 3: Probably 15,

20 years ago.

THE COURT: Was it a criminal or civil case?

JUROR NO. 3: Criminal.

THE COURT: Without telling us the result, did you deliberate and reach a verdict?

JUROR NO. 3: Yes.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 3: No.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 3: Yes.

THE COURT: Who was that?

JUROR NO. 3: My wife was accused.

THE COURT: What was the nature of that crime?

JUROR NO. 3: She was accused of stealing from Wal-Mart. It was dismissed I believe with prejudice, so they can't come back.

THE COURT: How long ago

was that?

JUROR NO. 3: It was about four years ago.

THE COURT: What municipality was involved?

JUROR NO. 3: Parma.

THE COURT: Do you feel like she was treated fairly by the judicial system or the law enforcement?

JUROR NO. 3: Yes.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 3: Yes, my brother.

THE COURT: What's he do?

JUROR NO. 3: He's a park ranger.

THE COURT: At the Metro Parks?

JUROR NO. 3: He's with the state.

THE COURT: Department of Natural Resources?

JUROR NO. 3: Yes.

THE COURT: Okay. Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 3: No.

THE COURT: Thank you. Laurel Arnold, you work for New York Life?

JUROR NO. 4: Yes.

THE COURT: What do you do?

JUROR NO. 4: Customer service.

THE COURT: How long have you been with them?

JUROR NO. 4: A year.

THE COURT: Prior to that, what did you do?

JUROR NO. 4: Insurance sales.

THE COURT: How long were you in that field?

JUROR NO. 4: Seven years.

THE COURT: Your spouse is with B&C?

JUROR NO. 4: Correct.

THE COURT: What's that?

JUROR NO. 4: Communications company.

THE COURT: What does he do?

JUROR NO. 4: Sales.

THE COURT: I'm sorry.

Mr. Knauss, do you have children?

JUROR NO. 3: Yes.

THE COURT: How old are they?

JUROR NO. 3: Two girls that are 22 and 25, and the boys are 28 and 30.

THE COURT: Any grandchildren yet?

JUROR NO. 3: No.

THE COURT: Ms. Arnold, do you have any children?

JUROR NO. 4: One, 17.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 4: No.

THE COURT: Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 4: No.

THE COURT: Thank you. David Jarmusik, you work at Emerson Electric?

JUROR NO. 5: That's correct.

THE COURT: What do you do there?

JUROR NO. 5: I'm a commodity manager.

THE COURT: What's that?

JUROR NO. 5: I manage the supply base of any machining metal fabrications and powder coating metal that comes into the building.

THE COURT: How long have you worked with them?

JUROR NO. 5: Six years.

THE COURT: Your spouse is a teacher?

JUROR NO. 5: Yes.

THE COURT: Where does she teach?

JUROR NO. 5: North Ridgeville High School.

THE COURT: How long has

she been a teacher?

JUROR NO. 5: Less than a year.

THE COURT: Prior to that, what did she do?

JUROR NO. 5: She was in college.

THE COURT: Do you have any children?

JUROR NO. 5: No.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 5: Yes.

THE COURT: What was that?

JUROR NO. 5: Domestic violence.

THE COURT: Who was that?

JUROR NO. 5: Myself.

THE COURT: How long ago was that?

JUROR NO. 5: 15 years.

THE COURT: Did you have to testify in any proceeding?

JUROR NO. 5: No.

THE COURT: Was it

resolved to your satisfaction?

JUROR NO. 5: Yes.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 5: Yes.

THE COURT: Who would that be?

JUROR NO. 5: My brother.

THE COURT: What was that?

JUROR NO. 5: Domestic violence.

THE COURT: So it involved you and your brother?

JUROR NO. 5: (Nodding head.)

THE COURT: Have you guys made up?

JUROR NO. 5: Yes.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 5: No.

THE COURT: Okay. Can you think of any reason why it would be difficult for

you to serve?

JUROR NO. 5: No.

THE COURT: Thank you.

Jonathan Seidel you work at Cleveland Animal Protective League?

JUROR NO. 6: Yes, sir.

THE COURT: How long have you been there?

JUROR NO. 6: Three years.

THE COURT: What do you do there?

JUROR NO. 6: Animal care.

THE COURT: I got my dog there about three-and-a-half-years ago. Will you take him back? No, I'm kidding.

Have you ever served on a jury?

JUROR NO. 6: No.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 6: Yes.

THE COURT: Who would that be?

JUROR NO. 6: Myself and my family. My family's house was robbed when I was a kid. Two, three years ago, I was a victim of

an assault and attempted robbery.

THE COURT: The burglary, that was many years ago when you were a young child?

JUROR NO. 6: Yes.

THE COURT: Do you have any recollection of it?

JUROR NO. 6: No, just they never found the people.

THE COURT: And the attempted robbery and assault, that was when?

JUROR NO. 6: A couple years ago.

THE COURT: Where did that occur?

JUROR NO. 6: Right by my work in Tremont.

THE COURT: Was anybody apprehended?

JUROR NO. 6: No.

THE COURT: Did you call the police?

JUROR NO. 6: Yeah.

THE COURT: Anything about their response that left you with a favorable or

unfavorable opinion?

JUROR NO. 6: No.

THE COURT: All right. Do you have any close friends affiliated with law enforcement?

JUROR NO. 6: Just humane agents at work.

THE COURT: Okay. They've been to my chambers many times for warrants.

Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 6: I have a couple, you know, nieces around the age of --

THE COURT: Okay.

JUROR NO. 6: -- the victim.

THE COURT: I understand, but can you put that aside for purposes of this trial?

JUROR NO. 6: Yeah.

THE COURT: You've got to make sure you can. You have to base your decision solely on the evidence which you hear in this court.

JUROR NO. 6: Yeah.

THE COURT: Robert Travis?

JUROR NO. 7: Yes.

THE COURT: Are you presently employed?

JUROR NO. 7: No, I'm not.

THE COURT: What's the last job you held?

JUROR NO. 7: I've not really worked a real job.

THE COURT: Okay. What do you do with your time?

JUROR NO. 7: I attend classes at Tri-C.

THE COURT: Okay. What are you studying?

JUROR NO. 7: IT business solutions.

THE COURT: Okay. So are you going to school full-time?

JUROR NO. 7: Yes.

THE COURT: What year are you?

JUROR NO. 7: I don't really know.

THE COURT: Okay. Are you going full-time or part-time?

JUROR NO. 7: Full-time.

THE COURT: When are your classes?

JUROR NO. 7: Monday, Tuesday, Wednesday, and Thursday.

THE COURT: This case may take a week, can you give us a week of your time?

JUROR NO. 7: Most likely, yes.

THE COURT: Well, you can't start and not show up. Can you make sure of that?

JUROR NO. 7: Yes.

THE COURT: Okay. Have you or any family member ever been a victim of crime?

JUROR NO. 7: Not that I know of.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 7: Not that I know of.

THE COURT: Do you have any close friends affiliated with law

enforcement?

JUROR NO. 7: No.

THE COURT: Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 7: No.

THE COURT: Thank you. Alfonso -- Mr. O'Leary?

JUROR NO. 8: Yes, sir.

THE COURT: How do you pronounce your first name?

JUROR NO. 8: Alphonsus.

THE COURT: Okay.

JUROR NO. 8: Yeah.

THE COURT: Are you retired?

JUROR NO. 8: I'm retired, been retired 25 years next year. And I work 41 year with the Ford Motor Company.

THE COURT: Your wife is retired?

JUROR NO. 9: She's retired also.

THE COURT: What did she retire from?

JUROR NO. 9: Well, she was a school girl but when we moved out to Strongsville about 40 years ago, it went by the way side.

THE COURT: Okay. Do you have any children?

JUROR NO. 8: I had nine children, yeah.

THE COURT: Any grandchildren?

JUROR NO. 8: I got 13 grandchildren and four-great.

THE COURT: Okay. Have you ever served on a jury?

JUROR NO. 8: Yes, I have about 30 years ago, your Honor. But I forget everything that ever happened.

THE COURT: Good. Have you or any family member ever been a victim of a crime?

JUROR NO. 8: No, sir.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 8: No.

THE COURT: Do you have any close friends affiliated with law enforcement? Do you have any close friends affiliated with law enforcement?

JUROR NO. 8: Well, my son-in-law is a retired deputy sheriff.

THE COURT: Okay. Do you have any firemen in the family? You've got to have some firemen in the family.

JUROR NO. 8: No, no firemen.

THE COURT: Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 8: No, your Honor.

THE COURT: Thank you. Keith?

JUROR NO. 14: Yes.

THE COURT: Are you presently employed?

JUROR NO. 4: Yes.

THE COURT: What do you do?

JUROR NO. 14: Software

engineer.

THE COURT: For who?

JUROR NO. 14: I work for DFAS.

THE COURT: How long have you been with them?

JUROR NO. 14: As an employee since October. I was a contractor for a year before.

THE COURT: Okay. Have you always been in that type of field?

JUROR NO. 14: For the most part, yeah.

THE COURT: Have you ever served on a jury?

JUROR NO. 14: Yes, I have.

THE COURT: How long ago?

JUROR NO. 14: Five years ago.

THE COURT: Civil or criminal?

JUROR NO. 14: Criminal.

THE COURT: Without telling us the result, did you deliberate and reach a verdict?

JUROR NO. 14: No, there was no verdict.

THE COURT: Was it resolved prior to verdict or was it hung?

JUROR NO. 14: It was declared a mistrial.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 14: Yes.

THE COURT: Who would that be?

JUROR NO. 14: Well, my long-time girlfriend, does that count as a family member?

THE COURT: Sure.

JUROR NO. 14: Yes.

THE COURT: What was the nature of the --

JUROR NO. 14: Rape.

THE COURT: How long ago was that?

JUROR NO. 14: 1999.

THE COURT: Were you with her at that time?

JUROR NO. 14: No.

THE COURT: Dating her?

JUROR NO. 14: No, that was about a year before I met her.

THE COURT: So you would not have been involved in whether anybody was tried for that; correct?

JUROR NO. 14: No, not at all.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 14: Yes.

THE COURT: Who would that be?

JUROR NO. 14: My brother.

THE COURT: What was he accused of?

JUROR NO. 14: It had to do with explicit material involving minors.

THE COURT: How long ago was that?

JUROR NO. 14: We weren't on speaking terms at the time, I'm going to say four; three, four years ago.

THE COURT: Was it a

federal case or state case? Do you know?

JUROR NO. 14: I think it was state. I'm not sure.

THE COURT: Was it in Cuyahoga County?

JUROR NO. 14: Yes.

THE COURT: Okay. Did you attend any court proceedings?

JUROR NO. 14: No.

THE COURT: Do you have any opinion whether he was treated fairly or unfairly?

JUROR NO. 14: I don't have an opinion on that.

THE COURT: You were not involved at all?

JUROR NO. 14: I was not involved at all.

THE COURT: Do you have any close friends affiliated with lawsuit?

JUROR NO. 14: My girlfriend's oldest brother is a Cleveland police officer.

THE COURT: What district?

JUROR NO. 14: I'm not

sure.

THE COURT: I assume you don't discuss his job with him; do you?

JUROR NO. 14: When I see him around Christmas he might tell me some stories, but, no, not regularly.

THE COURT: This applies to everybody. We'll have officers testifying. You're to give their testimony the same credibility as any other witness. In other words, merely because they have a badge and that position does not entitle their testimony to any greater or, for that matter, any lesser weight.

Can we agree with that?

THE JURY: Yes.

THE COURT: Additionally, you can't discuss this case during the pendency of this trial. So in other words, you won't discuss it with your girlfriend's brother or brother-in-law or whatever. That applies to everybody.

I'm going to -- you can't discuss it among yourselves during the course of this trial. In other words, when we take breaks, you cannot comment on the testimony of a witness on the

stand. The only time you can discuss this case among yourselves is when you've heard all the evidence, the closing arguments, and the instruction of law.

We can all agree to that?

I would ask that you do this. Please, do this. You're going to get home and your significant other is going to ask you whether you're on a jury. You're going to obviously say, yes or no, depending on what the case is.

The next question will be: Is it a criminal or civil case. I would ask that you not tell them what type of case this is because you're going to get their unsolicited opinion about this case, and they're not sitting here in the trial.

Can we all try to do that? I really ask you.

JUROR NO. 14: Yes.

THE COURT: I also ask you that you do not try to start researching this case. Please don't go on your Web sites or whatever. I don't even know how to turn on my computer so I'm fine, but please don't do it. I'm just looking at you, but it applies to

everybody in the courtroom.

Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 14: No.

THE COURT: Thank you.

Joan Mason, you work for Gateway Consultants. What do they do?

JUROR NO. 10: Started as Gateway Economic Development Corporation to build Jacobs Field and Gund Arena. But it's morphed into a consulting firm. I spend most of my time doing health care consulting. I'm a nurse.

THE COURT: Your background is nursing?

JUROR NO. 10: Nursing, business.

THE COURT: Gateway, that arose when they were building the arena and the ball field; correct?

JUROR NO. 10: Yes.

THE COURT: And your spouse works there as well?

JUROR NO. 10: Yes.

THE COURT: Do you have children?

JUROR NO. 10: Four. 28, 26 and two 24-year-olds.

THE COURT: Any grandchildren?

JUROR NO. 10: No.

THE COURT: Have you ever served on a jury?

JUROR NO. 10: Yes.

THE COURT: How long ago?

JUROR NO. 15: It was probably 30 years ago.

THE COURT: Criminal or civil?

JUROR NO. 10: Civil.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 10: One of my daughters had her car stolen when she was away at college.

THE COURT: Have you or any family members ever been accused of committing a crime?

JUROR NO. 10: Yes. One of my brothers got a DUI or two in his day.

THE COURT: Long time ago?

JUROR NO. 10: I honestly don't know, I don't see him much.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 10: My husband is a lawyer but he doesn't really practice anymore. One of my brothers was in the Cuyahoga County public defender's office.

THE COURT: Who was your brother?

JUROR NO. 10: John Adams.

THE COURT: Sure.

JUROR NO. 10: Then I have a daughter who is an attorney. She has worked in the Cuyahoga County Public Defender's office, and she's now the assistant law director and assistant prosecutor in Euclid. And I have a sister-in-law who is an attorney. She's -- I think she's a magistrate in Lorain.

THE COURT: You're all lawyered up.

Was it your sister or sister-in-law in Euclid?

JUROR NO. 10: That's my

daughter.

THE COURT: How long has she been there?

JUROR NO. 10: She interned there, and then interned with the public defender. She's probably been back in Euclid for a year-and-a-half.

THE COURT: This case arises out of Euclid. So my admonition about not telling anybody what type of case you're on certainly is applicable to you.

JUROR NO. 10: Yes.

THE COURT: Your sister -- your daughter may have some information on this case.

Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 10: No.

THE COURT: Do you want to serve?

JUROR NO. 10: Yes.

THE COURT: Thank you. Thomas Lovey?

JUROR NO. 11: Yeah.

THE COURT: You are

retired?

JUROR NO. 11: Retired from Cleveland Public Health Department.

THE COURT: How long were you with them?

JUROR NO. 11: 24 years.

THE COURT: How long have you been retired?

JUROR NO. 11: About five years.

THE COURT: Have you ever served on a jury?

JUROR NO. 11: Yes.

THE COURT: How long ago?

JUROR NO. 11: Probably about 12 to 14 yours ago.

THE COURT: Civil or criminal case?

JUROR NO. 11: Criminal.

THE COURT: Without telling us the result, did you reach a verdict?

JUROR NO. 11: Yes.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 11: Yes.

THE COURT: What did that involve?

JUROR NO. 11: In 1996, the house where I was the upstairs tenant was blown up. It turned out that the downstairs tenant blew it up. This was done in Little Italy.

THE COURT: Do you know what a small world that is? I was the judge on that case? Mr. Fisco, David Fisco.

JUROR NO. 11: David Lee Fisco.

THE COURT: He had a bad day that day; 17-year-old girlfriend dumped him, he lost his job, and he found out his best friend was cheating with his girlfriend. Just a bad day.

Wasn't somebody blown out of that house?

JUROR NO. 11: That was me. I was blown out of the second story. I was in a wheelchair for nine months. He almost killed me but they didn't bring him up on those type of charges.

THE COURT: You were blown like 30 yards outside.

JUROR NO. 11: About 30

feet.

THE COURT: Well, you look good.

JUROR NO. 11: According to the doctor, the reason why I survived was I was 360 pounds, loaded with fat, and ended up in high weeds and grass. But everything was broken up on the inside of me.

THE COURT: That was a long trial, too. Some characters testified in that one. Sam Bones, remember him?

JUROR NO. 11: Yeah, I remember him. He was our landlord.

THE COURT: Okay. I won't -- we'll talk about it afterward.

Have you or any family member ever been accused of committing a crime?

JUROR NO. 11: No.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 11: No.

THE COURT: Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 11: No.

THE COURT: Do you want to serve?

JUROR NO. 11: Sure.

THE COURT: Tyonne Woods, you are retired?

JUROR NO. 12: Yes.

THE COURT: From where?

JUROR NO. 12: Dry cleaners.

THE COURT: How long have you been retired?

JUROR NO. 12: Six years.

THE COURT: Your spouse is retired?

JUROR NO. 12: Yes.

THE COURT: What did he retire from?

JUROR NO. 12: Cleveland I-Tech, IT.

THE COURT: Do you have any children?

JUROR NO. 12: Yes.

THE COURT: How many?

JUROR NO. 12: Three; Ummm

55, 5, 54, and 49.

THE COURT: Do you have any grandchildren?

JUROR NO. 12: Yes.

THE COURT: How old?

JUROR NO. 12: They start from 17 and go to 26.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 12: No.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 12: My brother-in-law.

THE COURT: What was he accused of?

JUROR NO. 12: Drugs.

THE COURT: How long ago was that?

JUROR NO. 12: About ten years ago.

THE COURT: What municipality?

JUROR NO. 12: Cleveland.

THE COURT: Did you ever attend any court proceedings?

JUROR NO. 12: No.

THE COURT: What happened? Did he get convicted?

JUROR NO. 12: Yes.

THE COURT: Do any time?

JUROR NO. 12: Yes.

THE COURT: Do you have any opinion whether he was treated fairly or unfairly?

JUROR NO. 12: I think he got, you know -- it was fair.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 12: No.

THE COURT: Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 12: No.

THE COURT: Okay. Do you want to serve?

JUROR NO. 12: Yes.

THE COURT: Thank you.

Let's go to side bar.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: We're going to recess for lunch. Do not discuss this case. I'd ask that you gather back on the 4th floor at five after one. We'll bring you back.

- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

- - - o0o - - -

(The lunch recess was had.)

- - - o0o - - -

WEDNESDAY AFTERNOON SESSION

FEBRUARY 27th, 2019

PROCEEDINGS

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury Panel entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated. You may inquire.

MS. FARAGLIA: Thank you, your Honor.

Counsel for the State, Detective, counsel for the defense, may it please this Honorable Court.

Good afternoon, ladies and gentlemen.

THE JURY: Good afternoon.

MS. FARAGLIA: As you know, my name is Anna Faraglia. I, along with Aqueelah Jordan and Mr. Sean Kilbane, have the pleasure to present to you the State of Ohio versus Sierra Day and Deonte Lewis.

Ladies and gentlemen, as the judge told

you, voir dire is a French word that means to speak the truth. We're not looking for the right answers. We're looking for your answers to our questions. Voir dire is the only time that the parties can talk to you and that we can have a dialogue. And we kind of get to know who you are, and if you are a proper juror for this case.

Jury service, folks, is as important as serving in the military. It's your civic duty and you all have taken it very seriously by answering your summons and coming here today. We've got 34 different courtrooms. We may have 34 different trials going on at one time, but when you're seated as a juror in a case, it becomes your case because in this courtroom we all have functions.

The State of Ohio over here has the burden of proof, and you will hear this judge give you the definition. We accept that burden of proof, and that is beyond a reasonable doubt. Okay? The statute in Ohio -- the legislature in Ohio created the statute that has the definition because they thought it was so important, they give the definition of reasonable doubt.

Can you all agree with me that you will

hold the State of Ohio to the definition that this Court gives you?

THE JURY: Yes.

MS. FARAGLIA: Can you all do that?

THE JURY: Yes.

MS. FARAGLIA: When I say it's interactive, you've got to respond back and forth. Okay? Can everybody hear me okay? I have a bit of a cold and I'm a bit nasally today, but if you can't hear me, please tell me.

The burden of proof stays right here. And the function of the prosecutor's office is to present the case: We bring the case, we present the case. Okay? Does everybody understand that?

THE JURY: Yes.

MS. FARAGLIA: These fine attorneys over here don't have to do anything. They will defend their clients but they don't have to do anything. All right?

This judge is going to adjudicate issues of law. When you hear somebody yell "objection" and sometimes you'll see us go to sidebar like you've already seen us, okay, those are issues between the parties and the Court. He's going to

decide the issues of law. Okay?

As children, we're all taught we're not supposed to whisper in front of people because it's rude. But the truth of the matter is, folks, we go up there and whisper because this judge is going to decide the law; whether or not a piece of evidence gets in, whether or not we can ask a question. Fair enough?

THE JURY: Yes.

MS. FARAGLIA: Will somebody be so distracted by that and say: Well, I want to know what they're talking about up there? Or will you just follow the law?

THE JURY: Follow the law.

MS. FARAGLIA: Follow the law?

THE JURY: Yes.

MS. FARAGLIA: Okay. And you, ladies and gentlemen, decide the disputed facts in this case, okay. There is a dispute between the State of Ohio and each one of these parties. Okay?

We've brought the charges; we have to prove the charges. So, you can all agree with me

we come from all walks of life. We come from the east side, the west side, and the south side. Correct?

THE JURY: Yes.

MS. FARAGLIA: We come from different backgrounds, whether we're Irish, Italian, Scottish, German; we come from all different ethnic backgrounds. Right?

THE JURY: Yes. But everybody is afforded the protection of the law. Would you agree with me?

THE JURY: Yes.

MS. FARAGLIA: Okay. And everybody has to follow the law even though we don't like the law sometimes; right?

THE JURY: Yes.

MS. FARAGLIA: We have to wear a seatbelt when we drive a car because if we don't, that's against the law; right?

THE JURY: Yes.

MS. FARAGLIA: But there are still folks that don't put their seatbelts on. Would you agree with me?

THE JURY: Yes.

MS. FARAGLIA: In this

courtroom, whatever law this judge gives you, you have to follow it even though, folks, you may think that: I don't quite agree with the law that Judge McCormick gave me. You still have to follow it. It's not like in your private life; the law says you've got to put your seatbelt on, here in this courtroom, you have to put your seatbelt on and follow the law. All right?

Now, I'm going to ask some questions individually of you folks. And the whole point of voir dire is to pay attention because if you don't pay attention then you're not going to know what's going on.

Juror Number 7, Mr. Travis, good afternoon.

JUROR NO. 7: Good afternoon.

MS. FARAGLIA: You've heard some of the questions I've asked. What kind of things do you look at to judge credibility?

JUROR NO. 7: Status, generally, occupation; depending on what the credibility is about.

MS. FARAGLIA: Do you have siblings, sir?

JUROR NO. 7: I have one.

MS. FARAGLIA: Growing up, did you and your sibling ever fight?

JUROR NO. 7: Not really.

MS. FARAGLIA: Did you ever have, you know, mom said you're not supposed to play ball in the house, and you guys play ball in the house and something breaks?

JUROR NO. 7: No.

MS. FARAGLIA: You never had anything -- never a dispute between you and your brother?

JUROR NO. 7: No.

MS. FARAGLIA: Okay. Have you ever encountered somebody that you had to judge their credibility?

JUROR NO. 7: Yes.

MS. FARAGLIA: Okay. Tell me the circumstances.

JUROR NO. 7: Middle school, there was an argument between friends, I had to figure out who was telling the truth.

MS. FARAGLIA: Okay. And what kinds of things did you look at to determine who was telling the truth?

JUROR NO. 7: Mostly other people's words.

MS. FARAGLIA: Okay.

JUROR NO. 7: Their word.

MS. FARAGLIA: Would you agree with me eye contact is important?

JUROR NO. 7: Generally.

MS. FARAGLIA: Okay. Body language?

JUROR NO. 7: Sure.

MS. FARAGLIA: All right. And when you don't know somebody, you have to use your common sense and your good judgment that you use in your everyday life. Can you do that in this courtroom?

JUROR NO. 7: Yes.

MS. FARAGLIA: All right. Juror Number 1, you've never been -- Mr. Price; you've never been a juror before?

JUROR NO. 1: No.

MS. FARAGLIA: You work for UPS?

JUROR NO. 1: Yes.

MS. FARAGLIA: Are you a driver or do you work in the office?

JUROR NO. 1: I'm a loader, truck loader.

MS. FARAGLIA: Okay. And do you work with other people?

JUROR NO. 1: Yes.

MS. FARAGLIA: All right. So do you make judgment calls every day?

JUROR NO. 1: Yes.

MS. FARAGLIA: Okay. What kind of things do you look at when you're judging credibility?

JUROR NO. 1: The way people were, how people act with other people, how they communicate with other people. So if I have to make, like, a judgment I usually can talk to them and show my emotions to them and so ...

MS. FARAGLIA: Well, here in this courtroom, you're going to get evidence from this witness stand. Okay. Somebody is going to come in, they're going to take the oath; the judge is going to give them the oath to tell the truth, the whole truth, and nothing but the truth as they shall answer under God. You're not going to know these people.

Are you going to look at what they're

going to tell you, are you going to consider the testimony they're going to give you?

JUROR NO. 1: Yes.

MS. FARAGLIA: Now, ladies and gentlemen, it's fair to say you heard the reading of the indictment. This case entails the death of a four-year-old child. So we, as human beings, it's human nature to feel bad, because if you didn't feel bad, then you wouldn't be human; right?

But the fact of the matter is when you walk into this courtroom, you've got to keep prejudice, bias right outside that door, and sympathy. You can't bring it in here. We ask you to bring your life experiences in here, we ask you to bring your good judgment and common sense. But you've got to keep that sympathy, prejudice, and bias right outside those doors.

Can you all do that?

THE JURY: Yes.

MS. FARAGLIA: Can you look at the testimony the way that it will be presented? And what I mean by evidence is: Testimony, there'll be exhibits, maybe medical records, autopsy reports, things of that sort,

and photographs. So, let's talk about the photographs for just a minute.

The photographs are going to be of a child at the morgue. By a show of hands, how many people may be so disturbed by that that you can't consider that a piece of evidence and look at it for the purpose that it's given to you and consider it in your deliberations? Or are you going to have such a hard time looking at the photographs that you may not be able to do it? So I will ask each of you individually.

Mr. Price?

JUROR NO. 1: Huh-uh.

MS. FARAGLIA: You have to answer out loud, because Mary Jo has to --

JUROR NO. 1: No, I should be fine. Yeah.

MS. FARAGLIA: Okay. Mr. Varga-Sinka?

JUROR NO. 2: Yes, I would look at it as evidence.

MS. FARAGLIA: Mr. Knauss?

JUROR NO. 3: I'd be okay.

MS. FARAGLIA: Mrs. Arnold?

JUROR NO. 4: I can look at

it as evidence.

MS. FARAGLIA: Mr. Jarmusik?

JUROR NO. 5: I can look at it as evidence.

MS. FARAGLIA: Mr. Seidel?

JUROR NO. 6: I can look at it as evidence.

MS. FARAGLIA: Mr. Travis?

JUROR NO. 7: Yes, I can look at it as evidence.

MS. FARAGLIA: Mr. O'Leary?

JUROR NO. 7: Yes, ma'am.

MS. FARAGLIA: Mr. Lukianowicz?

JUROR NO. 14: Luke-yan-oh-vich.

MS. FARAGLIA: Sorry. Can you look at it as evidence?

JUROR NO. 14: I've been known to have trouble with disturbing graphic images, especially in movies. I've had fainting spells and things. It's not a -- it's a reflex, let's put it that way; it's something I can't control.

It can happen; it cannot happen. I have no rhyme or reason. I have no ability to tell you if it's going to happen, but it's been

something that I've been known to do, I've fainted in movie theaters. So I have to tell you I can't be certain.

MS. FARAGLIA: Okay. So this has happened to you on more than one occasion?

JUROR NO. 14: Yes.

MS. FARAGLIA: Once you faint, then, do you regain consciousness?

JUROR NO. 14: Yes.

MS. FARAGLIA: And does it take you a few minutes, a little while? Does it take you a day?

JUROR NO. 14: I understand.

MS. FARAGLIA: Because you're going to be working with 11 other people in this deliberation. Right now you're in this big courtroom. You'll be in this big courtroom until you get the case to decide for a verdict, and then you'll be in the jury room, which you've all been in. And then if something should happen in the back there, then the judge would have to be alerted.

So there is no other way to tell you other than to tell you this is the death of a four-year-old child. The pictures are graphic;

I'm not going to lie to you.

Do you feel that it could affect you in a way that you can't serve on this jury?

JUROR NO. 14: The best way I can characterize it is if I have an episode like that, I might be unconscious for seconds to a second or a minute. When I come back, it takes me a long time to get back to where I'm functional, and I would spend the rest of that day feeling completely drained.

So it might not be until the very next day that I'm back to my normal self, because an episode like that will just take everything out of me.

MS. FARAGLIA: That's what I mean, folks. Thank you very much for sharing that with us.

That's what's really important because the fact of the matter is all of us attorneys are trained. The judge is a trained attorney. We could ask you 150 questions, but we're still not going to know what's in your belly; we're still not going to know the person you are.

You know yourself better. That's why it's better to share this type of information

before you get selected because if you're selected, then you're part of the panel and then we have to deal with it, you know, on the back end, but it's better to do it on the front end.

Thank you very much for being honest, sir.

Mrs. Mason, can you --

JUROR NO. 10: I can use them as evidence.

MS. FARAGLIA: Mr. Lovey?

JUROR NO. 11: Yes, I can use them as evidence.

MS. FARAGLIA: And Mrs. Woods?

JUROR NO. 12: Yes, I can use them as evidence.

MS. FARAGLIA: Thank you, folks.

Ladies and gentlemen, there's going to be many witnesses that are going to testify in front -- before you. Can you look at all their testimony the same?

You're going to have a police officer, you're going to have civilians, you're going to have some social workers testify. Can you consider their testimony with the evidence that

they're going to share with you; what information they have? Nobody gets any more greater or less weight.

You have to look at this testimony the same. Do you agree?

THE JURY: Yes.

MS. FARAGLIA: Mr. Taylor, do you agree? I'm sorry.

Mr. Travis, do you agree?

JUROR NO. 7: Yes.

MS. FARAGLIA: I just noticed, Mr. Travis, I don't want to single you out. It seems you seem to be a little tired.

JUROR NO. 7: A little. I'll be fine.

MS. FARAGLIA: All right. Can you tell me why?

JUROR NO. 7: I woke up a little earlier than usual today; didn't sleep well last night either.

MS. FARAGLIA: All right. Well, coming into this courtroom, we're going to need your attention if you're so selected as a juror because you have to decide the disputed facts. So we need everybody on their A game.

Do you understand that?

JUROR NO. 7: Yes.

MS. FARAGLIA: And it's important because both sides come here as a matter of right. Okay? So we need your full, undivided attention. All right?

Now, common sense and good judgment; you use that every day in your everyday lives. Right?

THE JURY: Yes.

MS. FARAGLIA: Mr. Knauss, you work for Swagelok?

JUROR NO. 3: Yes.

MS. FARAGLIA: You're a project manager?

JUROR NO. 3: Project engineer.

MS. FARAGLIA: How many people are you responsible for?

JUROR NO. 3: Directly, nobody.

MS. FARAGLIA: You don't have anybody --

JUROR NO. 3: I handle the projects. I bring equipment in the shop. I

bring all the people together to get the project done, and I facilitate the timeline, the budget, and get everybody done. But, I work with people.

MS. FARAGLIA: Okay. So working with people, I believe you were one of the people that said you've had prior jury service.

JUROR NO. 3: Yes.

MS. FARAGLIA: Without telling us, like the judge said, your verdict, how would you describe your experience?

JUROR NO. 3: It was interesting.

MS. FARAGLIA: What did you take away from it?

JUROR NO. 3: I don't know if I really took much away from it other than there's a lot up to the jury to decide. There's a lot of decisions there to be made, but I don't know if I took away a lot, really, out of it.

MS. FARAGLIA: Okay. Let's see here.

Mr. Seidel, you had jury experience?

JUROR NO. 6: No.

MS. FARAGLIA: You did not?

I'm sorry.

Mr. O'Leary, you had jury experience?

JUROR NO. 8: Yes, I did.

MS. FARAGLIA: Okay. What was your -- what was your take-away from the jury experience? When you were done with it, how did you feel about it?

JUROR NO. 8: I forgot everything about it.

MS. FARAGLIA: Did you enjoy the process?

JUROR NO. 8: Yes, I did.

MS. FARAGLIA: Okay. And did you work with 11 other people you didn't know?

JUROR NO. 8: Yes, I did.

MS. FARAGLIA: Did you, don't tell me what the decision was, but did you come to a decision?

JUROR NO. 8: I did, yes.

MS. FARAGLIA: So would you describe it as a good experience or a bad experience?

JUROR NO. 8: Definitely a good experience.

MS. FARAGLIA: Okay. And

so -- let's see, there's a couple more folks. Thank you, Mr. O'Leary.

Mr. Lukianowicz, you had prior jury service as well but it was declared a mistrial?

JUROR NO. 14: Yes.

MS. FARAGLIA: So you never got an opportunity to deliberate.

And, Mrs. Mason, you had -- how would you describe your experience?

JUROR NO. 10: I thought it was interesting as well. And I don't even remember exactly what the case was about but it was civil, and I thought it was going to be simple and cut and dry, and I was surprised that -- how much both sides brought to the table in terms of the complexity and the amount of deliberation that had to go on.

MS. FARAGLIA: All right. So if someone had asked if you was a good experience or bad --

JUROR NO. 10: It was good.

MS. FARAGLIA: And not like TV.

JUROR NO. 10: No.

MS. FARAGLIA: And you had to

work on a civil case, which is different than a criminal case. So we have to follow the rules that this judge gives you.

With regard to criminal, in a criminal case, you have to have a unanimous verdict. You all have to come together; you have to make a decision for yourself, and then you make a decision as a collective group as a verdict because your verdict has to be unanimous. Okay? Again, this judge will give you that information.

Mr. Lovey?

JUROR NO. 11: Yes.

MS. FARAGLIA: How was your jury service?

JUROR NO. 11: It was interesting also. I've had several jury experiences.

MS. FARAGLIA: Okay. Do you remember who the judges were?

JUROR NO. 11: No, but I could tell you what some of the details were.

MS. FARAGLIA: No. No, we can't hear that.

JUROR NO. 11: I can't remember the judges as much as some of the stuff

that went on, evidence that was -- we had to motion for the judge if we could have the evidence.

MS. FARAGLIA: You asked questions?

JUROR NO. 11: We asked questions.

MS. FARAGLIA: But were you able to work with 11 other people that you just met?

JUROR NO. 11: Yes.

MS. FARAGLIA: Would you agree with me, the folks that were on jury panels, listening is a big --

JUROR NO. 11: Yes, listening and understanding what you're actually being told because sometimes one person may have taken a slightly different view than someone else.

MS. FARAGLIA: Correct.

JUROR NO. 11: So when we go back to the jury room, we try to say: Well, I thought I heard, and that's one of the reasons why we sent for the judge for evidence to come back so we could actually look at what it was presented.

MS. FARAGLIA: So listening is a really important trait, folks. That's why you have to let us know if you can't hear because the evidence is going to come from that witness stand and they're going to talk into the microphone, some people talk loud, some people talk a little lower, but you have to be able to hear what they have to say, and then you have to use that material to make a determination in the case.

So would you say your experience was a positive experience?

JUROR NO. 11: Yes. Yes, it was.

MS. FARAGLIA: Thank you.

Mrs. Arnold, you work for New York Life?

JUROR NO. 4: Yes.

MS. FARAGLIA: Customer service I believe you said?

JUROR NO. 4: Yes.

MS. FARAGLIA: What kind of things do you use to judge credibility?

JUROR NO. 4: I guess an individual's, like you said, body manners and as far as, like, in my job just their intentions and

the way they go back asking a question or asking for information, whether it's of the norm or something just sort of off.

MS. FARAGLIA: Okay. Mr. Jarmusik, what kind of things do you use to judge credibility? You're a commodities manager; correct.

JUROR NO. 5: Correct.

MS. FARAGLIA: Do you work with other folks?

JUROR NO. 5: Yeah.

MS. FARAGLIA: Do you have to judge credibility every day?

JUROR NO. 5: Yes.

MS. FARAGLIA: On what kinds of things?

JUROR NO. 5: Objective data; stories I always take with a grain of salt until there's numbers behind it to make a decision, and then accuracy with that data as well. If there is inconsistency or inaccuracies, then I lose trust.

MS. FARAGLIA: I'm sorry?

JUROR NO. 5: Then I lose trust in the person.

MS. FARAGLIA: The judge will tell you that here you'll get direct evidence. And then circumstantial evidence is that you all have a beautiful picture window at your house; at night you close your drapes and you go to bed. You wake up in the morning, and there is a nice snowy bed of snow on your grass.

Even though you didn't see it snow, you know it snowed last night. Correct?

JUROR NO. 5: Right.

MS. FARAGLIA: So we will give you circumstantial evidence, and you can infer something based on a fact. Okay? And direct evidence is obviously something you observe, you see, you participate in; fair enough?

JUROR NO. 5: Mm-hmm.

MS. FARAGLIA: Mr. Seidel, you work at the Animal Protective League, so you not only work with animals but you work with folks that come and adopt?

JUROR NO. 6: Yes.

MS. FARAGLIA: Do you have to judge people's credibility, whether or not somebody may be a good dog owner or pet owner?

JUROR NO. 6: Not too much. I work mostly with the animals.

MS. FARAGLIA: So you primarily work with the animals. Do you judge credibility in your everyday life?

JUROR NO. 6: Yes.

MS. FARAGLIA: Whether or not you want to shake somebody's hand, whether or not you're going to say good morning to somebody, whether or not you're going to even approach somebody. Right?

JUROR NO. 6: Mm-hmm.

MS. FARAGLIA: Ladies and gentlemen, the investigation in the case has been done for you. You cannot go on Twitter, Facebook, any type of social media, any type of news reports; you have to steer clear of that until this case is concluded.

Can you all do that?

THE JURY: Yes.

MS. FARAGLIA: How many of you on the panel watch any of those legal TV shows? What show do you watch?

JUROR NO. 4: Anything on ID -- IDTV.

JUROR NO. 5: *Blood.*

JUROR NO. 12: *NCIS.*

MS. FARAGLIA: Ladies and gentlemen, let me tell you one thing. The folks in this courtroom that are the participants in this action are not actors or actresses. We are all advocates for each of our side: The State of Ohio and the defense.

This case isn't going to be solved in a matter of an hour or a day. Nobody is going to come through the back of the courtroom, if you watch *Matlock* and all those old-time movies; that's not what this is about.

This is a case that's probably going to take us about a week, a week or so. We need your undivided attention. Can you give us that?

THE JURY: Yes.

MS. FARAGLIA: Are you willing to do that?

THE JURY: Yes.

MS. FARAGLIA: Can you work with 11 other people that you don't know, Juror Number 1?

JUROR NO. 1: Yes.

MS. FARAGLIA: Juror Number

2?

JUROR NO. 2: Yes.

MS. FARAGLIA: Juror Number 3?

JUROR NO. 3: Yes.

MS. FARAGLIA: Juror Number 4?

JUROR NO. 4: Yes.

MS. FARAGLIA: Juror Number 5?

JUROR NO. 5: Yes.

MS. FARAGLIA: Juror Number 6?

JUROR NO. 6: Yes.

MS. FARAGLIA: Juror Number 7?

JUROR NO. 7: Yes.

MS. FARAGLIA: Juror Number 8?

JUROR NO. 8: Yes.

MS. FARAGLIA: Juror Number 9?

JUROR NO. 9: Yes.

MS. FARAGLIA: Juror Number 10?

JUROR NO. 10: Yes.

MS. FARAGLIA: Juror Number 11?

JUROR NO. 11: Yes.

MS. FARAGLIA: And Juror Number 12?

JUROR NO. 12: Yes.

MS. FARAGLIA: Ladies and gentlemen, one word to describe yourselves, Juror Number 1?

JUROR NO. 1: Happiness.

MS. FARAGLIA: Pardon?

JUROR NO. 1: Happy.

MS. FARAGLIA: Juror Number 2?

JUROR NO. 2: Meticulous.

MS. FARAGLIA: Juror Number 3?

JUROR NO. 3: I was going to say meticulous.

MS. FARAGLIA: Juror Number 4?

JUROR NO. 4: Credible.

MS. FARAGLIA: Juror Number 5?

JUROR NO. 5: Ambitious.

MS. FARAGLIA: Juror Number 6?

JUROR NO. 6: Perfectionist.

MS. FARAGLIA: Juror Number 7?

JUROR NO. 7: Easy-going.

MS. FARAGLIA: Juror Number 8?

JUROR NO. 8: Neutral.

MS. FARAGLIA: Juror Number 9?

JUROR NO. 9: Analytical.

MS. FARAGLIA: Juror Number 10?

JUROR NO. 10: Reliable.

MS. FARAGLIA: Juror Number 11?

JUROR NO. 11: Helpful.

MR. MAREIN: I didn't hear that.

JUROR NO. 11: Helpful.

JUROR NO. 12: I'm also very helpful.

MS. FARAGLIA: Okay.

Mr. Price, are you the type of person that can keep an open mind and an open ear to what 11 other people may share with you in this courtroom if you're so chosen to be a juror in this case?

JUROR NO. 1: Yes.

JUROR NO. 2: Yes, I can.

JUROR NO. 3: Yes.

JUROR NO. 4: Yes.

JUROR NO. 5: Yes.

JUROR NO. 6: Yes.

JUROR NO. 7: Yes.

JUROR NO. 8: Yes.

JUROR NO. 9: Yes.

JUROR NO. 10: Yes.

JUROR NO. 11: Yes.

JUROR NO. 12: Yes.

MS. FARAGLIA: Has anybody on the panel ever testified before? Okay.

JUROR NO. 5: I guess it depends to what level. Not in like a criminal case but I was, like, with a family situation earlier.

MS. FARAGLIA: I'm sorry?

JUROR NO. 5: With my family situation earlier, I had to talk about my brother

and some of the things that he did to me. I don't know if that counts.

MS. FARAGLIA: Did you have to come into a court of law and take an oath?

JUROR NO. 5: No.

MS. FARAGLIA: You just had to talk to somebody about it?

JUROR NO. 5: Yeah.

MS. FARAGLIA: And give a statement?

JUROR NO. 5: Yes.

JUROR NO. 10: Mine was a divorce and a business issue where I had to testify on a sales disagreement.

MS. FARAGLIA: Did you have to take the stand and take an oath and --

JUROR NO. 10: Yes.

MS. FARAGLIA: Okay. Does anybody have any expectations on how somebody testifies in a court of law? Any expectations?

JUROR NO. 10: You would expect them to tell the truth and be open and honest.

MS. FARAGLIA: Very good. Mr. Lovey?

JUROR NO. 11: Expectations -- well, there's always a different point that they're -- I used to be a health inspector, sometimes I would have to take people to court. There is -- their testimony wasn't quite right but I had to prove that so I would, on the back of my violation notices, would be the times that I did the reinspections and the pictures of the violation as it was initially and as it was prior to writing the ticket.

MS. FARAGLIA: Okay.

JUROR NO. 11: So I understand that sometimes the person may not tell all of what they know because it proves that they did everything to keep them out of there and they did not comply and they don't want the judge to know that. So that's why we had the pictures and the written testimony and I had to testify also.

MS. FARAGLIA: All right. So other than the case that you talked about before, you've had to testify in a court of law based on your job that you worked for the health department?

JUROR NO. 11: Yes. I also testified when I got blown up.

MS. FARAGLIA: Right. Which you talked with Judge McCormick about.

But when you testified in your official capacity, what was your job with the health department?

JUROR NO. 11: My job was whatever they told me to do basically.

MS. FARAGLIA: You worked for the Cleveland Public Health Department?

JUROR NO. 11: Yes. I did food inspections, school inspections, pool inspections, sanitation, rat baiting. We did so much it's -- we did a lot of things that nobody else wanted to do.

MS. FARAGLIA: Okay. How then would you find yourself, was it an administrative hearing that you participated in; that you would go in front of a magistrate based on the ticket that you wrote for these people?

JUROR NO. 11: It was actually housing court here in this particular building.

MS. FARAGLIA: Okay. It used to be Judge Pianka?

JUROR NO. 11: Yes. Prior to

that, it was William F. Corrigan.

MS. FARAGLIA: Okay. So you then would go and have to testify based on what you wrote?

JUROR NO. 11: Yes.

MS. FARAGLIA: What the allegation was?

JUROR NO. 11: What the allegation was and what the pictures explain -- explain the pictures and everything.

MS. FARAGLIA: Okay. All right. Thank you.

Mr. Varga-Sinka, you are an attorney?

JUROR NO. 2: Correct.

MS. FARAGLIA: You indicated that you did some criminal defense work back in the day.

JUROR NO. 2: Correct.

MS. FARAGLIA: When was the last time that you actually practiced any type of criminal law?

JUROR NO. 2: It's probably been more than ten years.

MS. FARAGLIA: Okay. And the fact that you did some defense work, are these

fellas and this young lady over here, are you going to be more on their side because you used to be a defense attorney?

JUROR NO. 2: Oh, I understand their position.

MS. FARAGLIA: And you appreciate what the process is about?

JUROR NO. 2: Absolutely.

MS. FARAGLIA: If you're so chosen to be on this panel, this judge will give you an admonition that you are a trained professional like all of us, you went to law school, passed the bar and practiced. And you will adhere to this admonition?

JUROR NO. 2: Absolutely.

MS. FARAGLIA: Mr. Knauss, are you the type of person that can make a decision and stick by the decision that you make?

JUROR NO. 3: Yes.

MS. FARAGLIA: Are you also the type of person that, when Mrs. Arnold says to you, because by the time we've concluded the case you're all going to be friends because you'll be spending so much time together, and Mrs. Arnold is going to say to you: Frank, that's not the

way I heard that, this is the way I heard that. Are you going to listen to Mrs. Arnold and consider what she has to say when you're deliberating?

JUROR NO. 3: Yes.

MS. FARAGLIA: Do you think that's important?

JUROR NO. 3: Yes.

MS. FARAGLIA: All right. Why?

JUROR NO. 3: Well, it's important to consider all the facts before you make a decision. If I've made a decision and there are other facts I haven't considered that would affect that decision, I should modify that decision.

MS. FARAGLIA: Okay. But by the same token, if you believe in your position, can you stick by the decision you make?

JUROR NO. 3: As long as it weighs heavier than other facts, yes.

MS. FARAGLIA: Mrs. Arnold, same question to you but the reverse?

JUROR NO. 4: Yes, I would listen to other people's perspective of what had

occurred or what they heard and consider that with what I had heard and sort of put the two together and determine what I found to be the truth.

MS. FARAGLIA: Okay. And can you make a decision and stick by the decision you make?

JUROR NO. 4: Yes.

MS. FARAGLIA: Can you work with 11 other people you just met?

JUROR NO. 11: Yes.

MS. FARAGLIA: All right. That really should have been my first question. Does anybody on the panel know each other before walking into this courtroom?

THE JURY: No.

MS. FARAGLIA: Okay. Mr. Jarmusik, can you work with 11 other people you just met?

JUROR NO. 5: Yes.

MS. FARAGLIA: Can you keep an open ear and open mind to what your fellow jurors hear in this courtroom?

JUROR NO. 5: If there is an objective reason that I believe that I am right

and they're wrong, then I'll stand by my position.

MS. FARAGLIA: Okay. But can you keep an open ear and an open mind to what they heard and saw in this courtroom?

JUROR NO. 5: Yes.

MS. FARAGLIA: And share your opinion as well, because that's what you do in the deliberation room: You share your opinions, what you hear and see in the courtroom, and you come to a collective -- you've got to come to your own individual decision but then you come to a collective decision.

You understand, folks, your verdict has to be unanimous? The judge will again instruct you about that.

Mr. Seidel, tell me how you would work with 11 other people.

JUROR NO. 6: I would say I work well. I'm willing to listen and if I may have misheard, if I may have misheard something, adjust my decision if it were a factor.

MS. FARAGLIA: Okay. Mr. Woods?

JUROR NO. 12: I think I

could work well with 11 other people. I'm a good listener and I kind of weigh the good, the bad, you know, I've got kids that kind of made it --

MS. FARAGLIA: Yes. As a matter of fact, I believe you told us that you have three children, and grandchildren between the ages of 17 to 26?

JUROR NO. 12: Correct.

MS. FARAGLIA: So you've had a lot of parenting.

JUROR NO. 12: Right.

MS. FARAGLIA: Thank you. Mr. Lovey?

JUROR NO. 11: Yes, I think I could work well with others and listen to what they say and consider my side as well as consider their side and make a decision and adjust it if the -- what they say may have different value than what I heard.

MS. FARAGLIA: Okay. Thank you.

Mr. Mason -- Mrs. Mason, I'm sorry.

JUROR NO. 10: Yes, I think I can work very well with others. I'm the 10th of 11, and we essentially grew up with very little

supervision because my dad died very young and my mom had to take a job from three to 11. I do a lot of consulting and people hire us because they have a problem to be solved or they're going at it and so we have to facilitate and come up with a solution after listening to both sides.

MS. FARAGLIA: You bring up a very good point.

This side of the room is cloaked with the presumption of innocence. Someone is presumed innocent until proven guilty. Have you heard that?

THE JURY: Yes.

MS. FARAGLIA: That presumption of innocence stays right here until the State of Ohio proves its case beyond a reasonable doubt. Fair enough?

THE JURY: Yes.

MS. FARAGLIA: Mr. Lukianowicz --

JUROR NO. 9: You can call me Mr. Luke if you prefer from this point forward.

MS. FARAGLIA: The same question I've been asking everybody else with regard to working well with others.

JUROR NO. 14: I did want to clarify, when I did jury duty before, we did go to deliberations. I mean, I've been in that process. So when I say mistrial maybe I don't know my legalese very well. It was a hung jury.

MS. FARAGLIA: Okay.

JUROR NO. 14: It ended that way but there was days' worth of deliberation that happened, so I have had that experience of being on a jury with 11 other people. I just wanted to clarify that so you know my experience.

MS. FARAGLIA: Okay. Thank you. So you have worked with 11 others?

JUROR NO. 14: I have done that, yes.

MS. FARAGLIA: Thank you. Mr. O'Leary?

JUROR NO. 8: Yes, ma'am.

MS. FARAGLIA: Can you work with 11 other people?

JUROR NO. 8: Yes, I can.

MS. FARAGLIA: And you've done it in the past; right?

JUROR NO. 8: Yes.

MS. FARAGLIA: Okay. Thank you.

And, Mr. Travis?

JUROR NO. 7: (No response.)

MS. FARAGLIA: Mr. Travis?

JUROR NO. 7: Yes.

MS. FARAGLIA: Okay. All right. Thank you. All right.

Folks, starting with Juror Number 1, how did you feel when you got your jury summons in the mail?

JUROR NO. 1: Interesting, like surprised.

MS. FARAGLIA: Why?

JUROR NO. 1: Well, being a first-timer, I was just shocked I was selected.

MS. FARAGLIA: Okay. Mr. Varga-Sinka?

JUROR NO. 2: I was annoyed.

MS. FARAGLIA: Why?

JUROR NO. 2: Because I knew what to expect. I knew it was going to be five days approximately and I had to rearrange everything.

MS. FARAGLIA: Fair enough.

Mr. Knauss?

JUROR NO. 3: I was fine with it.

MS. FARAGLIA: Mrs. Arnold?

JUROR NO. 4: I was at first interested and then somewhat annoyed because I thought the interest would last for a certain amount of time and then it would be more a long day of listening to a lot of things.

MS. FARAGLIA: Okay. But -- I appreciate the honesty; it's important.

But are you going to be able to set that aside if you're chosen as a prospective juror?

JUROR NO. 4: Yes, I mean, I thought -- yeah.

MS. FARAGLIA: And focus on what's going on here. I know the reality, folks, is you all have a different life outside of here. But once you're chosen as a jury, you're our jury for a period of time, and you're saddled with the responsibility to come and deliberate to verdict in this case. You have to come every day, be on your best behavior, be awake, listen and process the information.

Like the judge said, the hardest part,

what we hear from jurors, is you can't talk about the case until it's given to you for deliberation. So you can't discuss this case until the case is given to you for deliberation.

So you just have to be kind of like a sponge; every day you take information in. Okay? Mr. Jarmusik, how did you feel when you got your jury summons in the mail?

JUROR NO. 5: Annoyed. My day job doesn't expect things to slow down; they still expect my work to get done. I know it's just going to pile up while I'm here.

MS. FARAGLIA: Are you going to be so distracted that you can't focus on what's going on in this courtroom?

JUROR NO. 5: Possibly.

MS. FARAGLIA: Okay. Well, possibly; you know, I give this analogy that if I told my husband that I was going to New York City for the weekend and I would try to be faithful, how do you think that would go over? It wouldn't go over very well.

So trying is good. But in this case, if you're chosen to be a juror, you have to -- you'll take an oath to fairly and truly try the

case and true deliverance make between the State of Ohio and these two defendants.

So you have to be honest with us, if you're going to be so distracted that you're worrying about your work piling up at your office, then this may not be a case for you. I mean, that's -- the honesty is the most important part here.

JUROR NO. 5: I'm trying to be honest with you.

MS. FARAGLIA: I appreciate that --

THE COURT: I'll make sure this case moves along; don't you worry. I'm serious, we won't be extended past your one week, I don't think.

MS. FARAGLIA: Mr. Seidel?

JUROR NO. 6: Mostly concerned about money. If I'm not working, I'm not getting any money in. It's a little worrying, I guess.

MS. FARAGLIA: So you don't get paid?

JUROR NO. 6: I get up to ten days. I assume that should be fine. That

was my first concern.

MS. FARAGLIA: I'm sorry?

JUROR NO. 6: My first concern was if it was longer than that and not making any money.

MS. FARAGLIA: Thank you. Mr. Travis?

JUROR NO. 7: I was a bit anxious because it's my first time on jury duty.

MS. FARAGLIA: Okay. Mr. O'Leary, how did you feel when you got that jury summons?

JUROR NO. 8: I was very honored and I consider it my civic duty to be on jury duty.

MS. FARAGLIA: Thank you. Mr. Luke?

JUROR NO. 9: I'd like to use that answer but it wouldn't be true. I felt a bit of anxiety, but I know that I can do this and I've done it before. I know that I can set those things aside like everyone and do what I need to do.

MS. FARAGLIA: Thank you.

Mrs. Mason?

JUROR NO. 10: I figured it was going to be a little bit of an inconvenience, but I work for myself so I don't have those same stressors, and I figured it was about time because it's been about 30 years.

MS. FARAGLIA: Mr. Lovey?

JUROR NO. 11: I was annoyed when I first got it because I've done this before and here we are being chosen again. So that was my first concern. And when I'm down here, I figured that I can listen and understand and give fair judgment to what I'm instructed. I believe I can do all right even though I was annoyed at first.

MS. FARAGLIA: Okay. Fair enough.

And Mrs. Woods?

JUROR NO. 12: Well, at first I was a little curious about why I was selected and then it was okay, it's fine.

MS. FARAGLIA: Well, folks, you were all chosen because you all vote and we get a cross-section of our community that if you're a good registered voter in Cuyahoga

County, your name will come up randomly. So your names were all selected this time around. Okay?

And does anybody have any impending trip or anything of that sort that would preclude you from being here this full week?

THE JURY: No.

MS. FARAGLIA: Okay. Lastly, Mrs. Arnold, what do you think or what do you believe fair and impartial means? What does it mean to you?

JUROR NO. 4: Making a judgment without bias or your own personal feelings based on solely the facts; facts presented to you.

MS. FARAGLIA: Thank you. Mr. Jarmusik?

JUROR NO. 5: Similar; making a decision based on objective facts versus subjective emotion.

MS. FARAGLIA: Mr. Seidel?

JUROR NO. 6: Yeah, I agree with them; using the facts instead of any personal opinions you might have.

MS. FARAGLIA: Mrs. Woods?

JUROR NO. 12: I agree with

them. I think that you should take in the evidence and make a fair judgment.

MS. FARAGLIA: Do you consider yourself to be a fair and impartial person?

JUROR NO. 12: Yes.

MS. FARAGLIA: Mr. Lovey?

JUROR NO. 11: Basically the same. That's about it. I mean, basically saying that you would be a fair and impartial person in judgments.

MS. FARAGLIA: Mrs. Mason?

JUROR NO. 10: I agree with them, and I'm fair and impartial.

MS. FARAGLIA: Mrs. Mason, I did want to address one thing. You have a nursing background?

JUROR NO. 10: Mm-hmm.

MS. FARAGLIA: How long have you been a nurse?

JUROR NO. 10: Since 1984.

MS. FARAGLIA: There may be some medical testimony in this courtroom, so you'll have to take it for what it's worth.

JUROR NO. 10: I haven't been

in a hospital or clinical setting since maybe 1989.

MS. FARAGLIA: Fair enough. Mr. Luke, are you fair and impartial?

JUROR NO. 14: Yes, I am.

MS. FARAGLIA: Mr. O'Leary, are you fair and impartial?

JUROR NO. 8: Yes, I am.

MS. FARAGLIA: What does that mean to you?

JUROR NO. 8: Well, you takes them as you sees them and you study the facts.

MS. FARAGLIA: Thank you. Mr. Travis?

JUROR NO. 7: I would think I am, yes.

MS. FARAGLIA: Mr. Price?

JUROR NO. 1: Yes.

MS. FARAGLIA: Mr. Sinka?

JUROR NO. 2: Absolutely.

MS. FARAGLIA: And Mr. Knauss?

JUROR NO. 3: Yes.

MS. FARAGLIA: Thank you very

much, folks, for your time.

THE COURT: Thank you. Mr. Shaughnessy?

MR. SHAUGHNESSY: Thank you, Judge.

Good afternoon, folks. First thing I'd like to do is thank you. I heard all your reactions when you got that jury summons. Some of it was good, some of it was not so good. I would like to thank you each for coming down here and serving. If you don't do so, then our system can't work. Right?

We need jurors, we need people willing to do it even if it's a sacrifice. Right? So thank you. And I thank you on behalf of Mark and Sierra.

I do hope that you get a benefit out of being here. Maybe those of you who have served in the past have seen that. The benefit isn't the money; right? Right?

THE JURY: No.

MR. SHAUGHNESSY: What do they pay you?

JUROR NO. 14: 27.

MR. SHAUGHNESSY: 27 bucks a

day. You've already figured out that you really can't park and get through that fabulous bistro on the fourth floor for what you get paid. Right? So any benefit you get won't be the money. Right? But hopefully the benefit that you get is that you get to participate in our government. Right?

THE JURY: Yes.

MR. SHAUGHNESSY: Yours, mine, Sierra's, Judge McCormick's; right? All of us; right? And you get an opportunity to come down here and participate and see how our government really works. Right?

I think all too often if you look at Channel 19 news or *cleveland.com*, they want to tell you that your government doesn't work; right? Anybody ever read a good story about the government? Anyone?

JUROR NO. 11: I don't remember any good ones.

MR. SHAUGHNESSY: No. They want to tell that you someone isn't working or they're doing this or that or going home early. Hopefully, the benefit that you get is that you will see that we do have a good system that works

and is fair. I hope when we get done you can say that you did.

Anybody know what the Number 1 complaint about lawyers is? Come on. I know it's late in the day, but come on --

JUROR NO. 8: Too many of them.

MR. SHAUGHNESSY: Yes, sir?

JUROR NO. 8: We got too many of them.

MR. SHAUGHNESSY: What's the number one thing that lawyers do?

JUROR NO. 7: Charge too much.

MR. SHAUGHNESSY: I wish that was true. I can't get away with that.

JUROR NO. 2: I'm going to plead the fifth.

MR. SHAUGHNESSY: A trained lawyer. How about talk too much? Anybody agree with that? You're nodding, ma'am.

JUROR NO. 10: Like he said, I'm lawyered up.

MR. SHAUGHNESSY: Judge McCormick talked to you, Ms. Faraglia talked to

you, now I'm talking to you. I think you heard a movie this morning or you saw a movie and you had another judge talk to you there; right? And are we all telling you the same thing?

JUROR NO. 1: Pretty much.

MR. SHAUGHNESSY: I think the number one complaint is that we talk too much and we say the same thing over and over and over again. Anybody agree, 2:20, on your first day?

JUROR NO. 1: Yes.

MR. SHAUGHNESSY: You've had enough of lawyers?

JUROR NO. 1: Yes.

MR. SHAUGHNESSY: That's okay. Anna told you it's okay to tell the truth. You've had enough of lawyers?

JUROR NO. 1: Yes.

MR. SHAUGHNESSY: I'm going to tell you right now, I plan on being guilty of talking too much in this trial. Anybody know why? Sir?

JUROR NO. 11: You're defending your client, you want to explain their side of the story in a certain way so the evidence is presented and we understand your side

of the story as we will understand Anna's side of the story when she does her thing.

MR. SHAUGHNESSY: I almost couldn't have said it better myself. When I listened to you speak when you answered questions before and you said that about your personal experience as a juror; correct?

JUROR NO. 11: Yes.

MR. SHAUGHNESSY: What we're here for couldn't be more important. There's been some laughs already. And there is going to be some more, but what we're here for again couldn't be more important. A four-year-old child in our community lost her life. Another member of our community, her mother, is on trial for that.

What happens here and for the folks that listen to this evidence and have to make a decision, there can't to be anything more important. There can't be any more important service, and I can't have a more important job.

So as you say, sir, if there's a point I may ask it two ways or three ways or four ways, and I can guarantee you at some point Judge McCormick is going to say: Shaughnessy, enough,

move on, but it's my job to make sure that all 12 jurors got it, that all 12 jurors understood.

So can you bear with me on that?

THE JURY: Yes.

MR. SHAUGHNESSY: Can you all understand why we may do that?

THE JURY: Yes.

MR. SHAUGHNESSY: Can you wait until the end and look me up and say, "Shaughnessy, you were right, you talk too much," sir, can you do that?

JUROR NO. 11: Oh, I don't know that I would do that.

MR. SHAUGHNESSY: That's all right.

Does everybody understand that you're pulling double duty here if selected for this jury? Do you know what I mean? You know, sir, right, Juror Number 2? How come?

JUROR NO. 2: Because of the character of the case.

MR. SHAUGHNESSY: There's two defendants sitting here. You understand, though we're sitting close by, this is really two separate trials, and one doesn't depend on the

other. And you can find one or both guilty of all counts, one or both not guilty of all counts, or any mixture that you determine? Do you understand?

JUROR NO. 2: Sure.

MR. SHAUGHNESSY: Do they get paid double, Judge? What do you think, just for this one?

But it's two separate trials. Do you understand that? Can you all accept that and say: Geez, those tables are almost touching so whatever applies to one applies to the other. Can you all separate that?

THE JURY: Yes.

MR. SHAUGHNESSY: That having been said, when Mark, Sierra, and I walked into this courtroom today, we've got one thing coming. Anybody know what that is? Sir? How about a fair trial?

JUROR NO. 2: That's a good idea.

MR. SHAUGHNESSY: It's a good idea; right? Nice place to start. That's all we're asking for. We don't want any special breaks. We don't want anybody to give us

anything other than that fair trial.

So what I would like to do is briefly, I promise, talk about some of the concepts that ensure that we get that fair trial. Okay? As we do so, I'm going to suggest to you that we kind of ask you to make a 180-degree change or shift in how we normally look at things in our everyday lives. Still with me?

Anna asked you about that phrase presumed innocent. Have you all heard it? Police shows, court shows. I think there is even a book, maybe a movie called that; right?

How many of you drive an automobile? Okay. How many of you have ever driven your automobile on the highway. How many of you have ever been driving down the highway and, far up ahead, you see flashing red and blue lights. Everybody?

How many of you have seen that and as you get closer, you see the car with the flashing red and blue lights is pulled over on the berm of the highway. Still with me?

You get even closer, you see there's not one but two cars and the car with the flashing red and blue lights is behind the other car.

Still with me?

Get a little bit closer, and you see there is a gentleman or a lady in a uniform, they've got a badge and a gun and a pad of paper and they're leaning into that first car writing something down. How many of you have seen that? Okay.

Sir, when you see that, what is the very first thing you do?

JUROR NO. 3: Hit my brakes.

MR. SHAUGHNESSY: Ma'am, what do you do?

JUROR NO. 10: Move over a lane.

MR. SHAUGHNESSY: Ma'am?

JUROR NO. 12: I move over.

MR. SHAUGHNESSY: How many people hit their brakes?

JUROR NO. 11: Slow down, yeah.

MR. SHAUGHNESSY: If you're riding with a friend or family member, what do you say to them?

JUROR NO. 3: Glad it's not me.

MR. SHAUGHNESSY: Juror Number 1, what do you say?

JUROR NO. 1: Same thing, or I gave them a heads-up: Look, cop up there.

MR. SHAUGHNESSY: That means trouble; right?

JUROR NO. 1: Yes.

MR. SHAUGHNESSY: Cop means trouble; right?

JUROR NO. 1: Yes.

MR. SHAUGHNESSY: How many people think seeing a cop means trouble when you're driving your car? Anybody else?

JUROR NO. 11: If the blinkers are on, yes, the cop means trouble; he's stopping people who're going too fast.

MR. SHAUGHNESSY: Somebody did something wrong. Right?

JUROR NO. 11: Yeah.

MR. SHAUGHNESSY: How many people think: Boy, I'm glad that wasn't me. Anybody do that?

JUROR NO. 1: Sure.

MR. SHAUGHNESSY: Okay. Because when we're out there driving on the highway, we

see the police, we see the flashing red and blue lights, we assume that person did something wrong; right?

THE JURY: Yes.

MR. SHAUGHNESSY: Now, when you make this turn in here from the jury room and come into this courtroom, the government is in here, right; they might as well having flashing red and blue lights. Sierra is sitting over here; they have a piece of paper called an indictment, and they're just about leaving it in our car. Right?

They have a detective. She's not in uniform, but she's got a gun. Right? How many people assume that she had to have done something wrong if she's sitting there? Anybody?

JUROR NO. 11: I'll assume that she is being presented as doing something wrong.

MR. SHAUGHNESSY: Okay.

JUROR NO. 11: But not necessarily proved that she did something wrong.

MR. SHAUGHNESSY: Right. What do you say, sir?

JUROR NO. 3: She's innocent until proven guilty.

MR. SHAUGHNESSY: Do you see what we do, though, when we're not in a courtroom? What do you do on the highway when you see the police there and somebody pulled over?

JUROR NO. 3: Pretty much the opposite.

MR. SHAUGHNESSY: You assume they did something wrong; right? Did you ever drive by somebody and say: Boy, those flashing red and blue lights are going, the police is leaning into the car, good thing that person is presumed innocent? Did you ever think that?

JUROR NO. 3: No.

MR. SHAUGHNESSY: Right. Here what we ask you to do is, in your everyday life it's okay to say the government is here, the police are here, that person must have done something wrong and go about your day. But in this courtroom, can you look over at this young lady and say: I presume you to be innocent? Can you do that?

THE JURY: Yes.

MR. SHAUGHNESSY: Can anybody not do that?

How many people have heard the term "the right to remain silent"? What do you think of that, Juror Number 6, when you hear that? What kind of connotation does that give you?

JUROR NO. 6: That anything you say could be brought forth in court as helping or hurting your case.

MR. SHAUGHNESSY: Okay. Right to remain silent; everybody has heard it. I'm going to ask Ms. Arnold, good afternoon.

JUROR NO. 4: Good afternoon.

MR. SHAUGHNESSY: You have a 17-year-old teenager?

JUROR NO. 4: Correct.

MR. SHAUGHNESSY: Does that 17-year-old have a curfew?

JUROR NO. 4: Sort of. She's almost 18, but, yeah.

MR. SHAUGHNESSY: Okay. Well, let's say it's last summer, when she wasn't almost 18. Did she have a curfew then?

JUROR NO. 4: Yes.

MR. SHAUGHNESSY: About what time, say, on Saturday night?

JUROR NO. 4: Saturday, midnight.

MR. SHAUGHNESSY: Okay. Let's say the young lady goes out on Saturday, you don't hear from her. Midnight come and goes; one o'clock comes and goes; two, 2:30. It's three o'clock in the morning, the door opens and the young lady comes in and sits down at the kitchen table, turns her back to you, doesn't say a word. What do you do?

JUROR NO. 4: "Where have you been?"

MR. SHAUGHNESSY: And she turns her back, puts her hand up, waves you off. What are you going to do? You're under oath.

JUROR NO. 4: Ask her again: "Where have you been?"

MR. SHAUGHNESSY: You still aren't getting an answer, what are you going to do?

JUROR NO. 4: Grounded.

MR. SHAUGHNESSY: Consequences?

JUROR NO. 4: Mm-hmm.

MR. SHAUGHNESSY: Grounded until when?

JUROR NO. 4: What time did she come in?

MR. SHAUGHNESSY: Three.

JUROR NO. 4: Three, at least the next week.

MR. SHAUGHNESSY: Lose the car?

JUROR NO. 4: Yeah.

MR. SHAUGHNESSY: Lose the phone maybe?

JUROR NO. 4: Mm-hmm.

MR. SHAUGHNESSY: So in your house there is no 5th Amendment; right?

JUROR NO. 4: No.

MR. SHAUGHNESSY: It's your house; right?

JUROR NO. 4: Mm-hmm.

MR. SHAUGHNESSY: How many people have consequences at their jobs that if they don't make an accounting for themselves, if a project is late or they don't show up, they're in trouble? All right.

How many people if they can't -- like, let's say they go out after court and drink too

much beer, eat chicken wings, and show up late at home, how many people have to account to their spouse or loved one or significant other? Or at least there's consequences?

I won't do it all afternoon but here in this courtroom we don't have to do a darn thing. We can come in at three o'clock and turn our back to you and wave you off, you know; you can't hold that against us. Do you understand that? In our everyday lives we have to make an accounting for our actions or we have to suffer consequences. Everybody agree? Kind of that shift.

THE COURT: Let's come to side bar real quick.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: We're going to take a short recess. Please do not discuss the case.

- - - o0o - - -

(Thereupon, the Jury Panel exited the

courtroom.)

- - - o0o - - -

THE COURT: You sit tight, Number 7.

With no objection from counsel, we're going to excuse Number 7. You've been sleeping all afternoon. Go down to the fourth floor, maybe they have a couch for you.

- - - o0o - - -

(Brief recess had.)

- - - o0o - - -

(Thereupon, the Jury Panel entered the courtroom.)

- - - o0o - - -

THE COURT: We've replaced Juror Number 7 because he was sleeping during the entire voir dire and Juror Number 9 indicated that he would not know what would happen if he had a reaction to the photos. So obviously, that was a concern to all. I'm going to allow Mr. Shaughnessy to continue with his voir dire but I'm going to ask our new Juror Number 7 and new Juror Number 9 right now, anything that you would wish to respond to in particular as to what was asked thus far?

JUROR NO. 15: No.

JUROR NO. 16: I'm fine.

MR. SHAUGHNESSY: I think where we left off was that right to remain silent, where we all get in trouble at home, our school, jobs, where we get in trouble if we don't account for ourselves. Right?

Now that we've figured out who has the burden of proof, and Ms. Faraglia told you that they did, I want to talk briefly about that burden of proof. You've heard proof beyond a shadow of a doubt on TV shows and things.

We know what the burden is here because Judge McCormick read it to you earlier today. Do you remember that?

THE JURY: Yes.

MR. SHAUGHNESSY: A lot of things are getting thrown at you. Do you feel like we just run up to you and yell something at you and expect you to say yes or no? Okay. Slow down a about it.

Beyond a reasonable doubt: Proof of such a character that an ordinary person, any one of us, would be willing to rely and then act upon it in the most important of his or her own affairs. Everybody got that? Maybe? Any English majors?

No?

The burden of proof is defined by our legislature; it has an objective and a subjective part to it. Think about it. The legislature tells you the objective test: Proof of such a character that an ordinary person would be willing to rely and act upon it. Here's the subjective part: In the most important of his or her own affairs.

So we each have what's the most important to us. And that's what the legislature tells you have to use to determine if the government met their burden of proof. Make sense?

THE JURY: Yes.

MR. SHAUGHNESSY: Before I ask you what's the most important of your own affairs, let me ask you this: How many decisions do you think you make a day? Anybody?

JUROR NO. 5: Hundreds.

MR. SHAUGHNESSY: Hundreds? Like what?

JUROR NO. 5: What route you're going to take to work; answer an email, not answer an email; what you're going to have for lunch. Anything.

JUROR NO. 4: My daughter, my family.

MR. SHAUGHNESSY: What kind of decision?

JUROR NO. 4: Their well-being, their safety. Like you said, future.

MR. SHAUGHNESSY: Okay. Not -- I mean, a birthday present might be important but it wouldn't be the most important of your affairs.

JUROR NO. 4: Correct.

MR. SHAUGHNESSY: Okay. Sir, what would be the most important of your affairs?

JUROR NO. 2: Everything to do with the family.

MR. SHAUGHNESSY: Okay. Can you all look over here at this table and say: I'm going to hold you to that burden of proof?

JUROR NO. 10: Yes.

MR. SHAUGHNESSY: That you've got to convince me such as I would be convinced in making decisions in the most important of my own affairs in this case. Right?

THE JURY: Yes.

MR. SHAUGHNESSY: If they meet

it, they got it. Right? But if they miss it by a mile or they miss it by a hair, they still --

JUROR NO. 11: Missed.

MR. SHAUGHNESSY: Still missed it; right. Can you all hold them to that burden of proof?

JUROR NO. 11: Yes.

MR. SHAUGHNESSY: I think Ms. Faraglia said it, and I do think it bears repeating: No room for sympathy or bias here. Right?

JUROR NO. 11: Right.

MR. SHAUGHNESSY: You're going to see things, pictures, if you're selected to be a juror in this case that are going to be uncomfortable. I think Anna said it; you wouldn't be human if you didn't feel that way. Right?

Can you all agree there is a time and a place outside of this courtroom to feel anger at a world where that could happen, sympathy for the people that it happened to, bias against organizations or other things, but that it's not here in this room. Can everybody do that?

THE JURY: Yes.

MR. SHAUGHNESSY: There's been talk about how you judge credibility. Ms. Faraglia asked you how you judge credibility in a fight with your brother or sister, how you judge credibility at work; right?

You understand, ultimately you are the judges of credibility in this case. Right? Do you know why we stand when you come in and out? Anybody?

JUROR NO. 10: Respect.

MR. SHAUGHNESSY: Respect. Ma'am?

JUROR NO. 16: I was saying respect also.

THE COURT: You're equal judges with Judge McCormick in this case. He's the judge of the law; he's going to tell you what the law is and you have to follow it. He's going to tell us what the law is. As Ms. Faraglia said, if we go to a sidebar and we disagree about what the law is, Judge McCormick is going to tell us what it is in his courtroom today. He's going to tell you what the law is.

But nobody can tell you what the facts are. Only you can decide those. So, just like

we stand when Judge McCormick comes in and out, we stand when you do. Because you're 12 judges that judge the facts.

You were all asked how you judge credibility and you said things like eye contact, body language. Right? Things that we use.

Let me ask you: Has anybody ever been so sure of something that you would have bet your last dollar and then you learned you were wrong? You've had that experience?

JUROR NO. 10: Mm-hmm.

JUROR NO. 4: Yes.

MR. SHAUGHNESSY: Can you share it?

JUROR NO. 4: I don't remember a specific incident but, yes, I've had that experience.

MR. SHAUGHNESSY: Ma'am?

JUROR NO. 10: This is personal but I'll share it.

MR. SHAUGHNESSY: You don't have to but if you want to.

JUROR NO. 10: I was married for 14 years, and if anybody had ever asked me anything about my ex-husband's character, I would

say he couldn't hurt a fly, and I found a whole other thing going on.

MR. SHAUGHNESSY: So you took a big decision on that. Anybody else?

Have you ever thought, whether it was a Super Bowl or a marriage or anything that, "I don't care what anybody says to me, you can't budge my opinion, darn it, I'm right, I'm right." And then later on you go: Oh no, boy did I miss the boat. Did that happen to anybody?

Your example took my next question but I'll ask it anyway. I won't know where to go if I don't ask this.

Has anybody had a friend, somebody that you spent a lot of time with, whether a work friend, or school friend, maybe vacation with them, go out to dinner with them, go to movies with them, you think you know this person inside out, and then all of a sudden you're having a conversation them and they say something and it's almost like: Whoa, whoa, something comes over you and you say, "I never really knew that person at all."

Have you ever had that experience, Juror Number 1?

JUROR NO. 1: Yes.

MR. SHAUGHNESSY: Anything that you can share?

JUROR NO. 1: I knew a friend maybe since third, fifth grade, good friends now, in the last week told me something about I never knew about him.

MR. SHAUGHNESSY: It completely changed your mind?

JUROR NO. 1: Yeah, it changed my mind.

MR. SHAUGHNESSY: Obviously, you've had that, Juror Number 10.

Anybody else ever have that where you're sitting there and out of the blue something happens and you say: I thought I knew that person, and you go home and tell your husband or wife: I thought I knew that person.

JUROR NO. 8: I had a friend I thought he was a very nice guy and he was a kleptomaniac.

MR. SHAUGHNESSY: Who knew; right? Who knew. I hope he didn't get you?

JUROR NO. 8: He took a lot of the stuff that I owned, though.

MR. MAREIN: Okay. The reason I say that or bring up those examples is I want you think about the job we ask you to do as the judges of credibility.

Ms. Faraglia told you you're going to meet a witness and you may only know them for 10, 15, 20 minutes, maybe an hour, and we ask you to look at their body language or their eye contact and for you to make a decision in the most important affairs that you have based on that. Right? Right from here.

Yet, there's people that we've known for years and we couldn't read them. Right? Pretty daunting task; right? Right? I mean, that's asking a lot; isn't it?

THE JURY: Yes.

MR. SHAUGHNESSY: I mean, if you met your financial broker for 15 minutes and he didn't show you anything on the computer, would you rely on him?

THE JURY: No.

MR. SHAUGHNESSY: If you -- if the doctor, I think there's that one insurance commercial where the doctor says, "Boy, I hope this goes okay. I just got my license back."

Anybody seen that? Are you going to let that guy cut you or a loved one open?

THE JURY: No.

MR. SHAUGHNESSY: So you see the irony or the difficult task that we ask you to do here. Because you don't get to go to the movies or lunch or vacation with the folks that we bring in, and yet you still have to do that test. As hard as it is, do you think you can do it?

JUROR NO. 5: Can you restate the question?

MR. SHAUGHNESSY: Do you think that you can do that? Look over here and make those tests of credibility under that limited amount of time?

JUROR NO. 5: Based on what they have to back up their story.

MR. SHAUGHNESSY: So you want verification?

JUROR NO. 5: Yes. If it's on body language. I know very intelligent, very credible engineers that can't look you in the eye but they're geniuses.

MR. SHAUGHNESSY: So you want corroboration, you want something to back it up?

JUROR NO. 5: Yes.

MR. SHAUGHNESSY: Okay. Okay. Can you all do that job, though, if called upon?

THE JURY: Yes.

MR. SHAUGHNESSY: Okay. In a moment, I'm going to sit down and, as we said before, this is the only opportunity that we have to speak like this. Okay? Once I'm done here in this voir dire process, I suppose we're permitted to say "good morning" if we ran into you in the coffee line in the cafeteria but, beyond that, it's not permissible.

I can tell you if I see you, I'm probably going to turn the other way just to avoid any contact that could be deemed inappropriate. I don't want you to think it's rude. It's just the rules that we're not allowed to talk or interact with you.

As this is the only time we can do this, is there anything that I've said or anything that you heard earlier in the day that, now that you've thought about it, that you can't be a fair and impartial juror for Sierra? Everybody okay?

THE JURY: Yes.

MR. SHAUGHNESSY: Judge, thank

you. Pass for cause.

THE COURT: Very good. Ms. Longino?

MS. LONGINO: Thank you, your Honor.

Good afternoon, ladies and gentlemen.

THE JURY: Good afternoon.

MS. LONGINO: I'm going to try not to be too long because my colleagues have already talked too much; right?

First I'd like to say that I thank you for your service. I know it's not really something that you would have chosen to do without being asked to do. I have actually been in that seat, and I feel your pain, Mr. Varga-Sinka.

JUROR NO. 2: Yes, ma'am.

MS. LONGINO: I know you guys -- well, I feel all your pain but as an attorney, first you sit in that big room and you wait for your name to be called and then they call your name, and you come up here and then up sit in that little room, and you're back and forth and back and forth, and you're like: Oh,

my goodness. But, it's a very important job and we thank you very much. On behalf of my colleagues and everyone, we thank you very much for taking the time to do it.

Now, I'd just like to give my little expound on the prosecution's burden of proof. The judge already has given you the definition of reasonable doubt. And my own spin on that is that you have to be convinced, firmly convinced, by the proof that is presented to you by the prosecution that the defendant committed the crimes of which they've been charged.

Now, crimes have elements and the judge will tell you all about that as well. And to find someone guilty of a particular crime, the State has the proof -- has the burden of proving each and every one of those elements named in that crime. If there is four elements and they only prove three and they won't prove element number four, then you have to find in favor of the defendant.

Anybody got a problem with that? Anybody? Anybody?

Ms. Arnold --

JUROR NO. 4: Yes.

MS. LONGINO: -- I noticed on the series of questions you didn't respond.

JUROR NO. 4: Where?

MS. LONGINO: Well, let me see. I don't know if I pointed them all out specifically, but I'm just asking you is that because you didn't have an opinion as to an answer or you were just responding in your head?

JUROR NO. 4: Here today?

MS. LONGINO: Yes.

JUROR NO. 4: Responding in my head.

MS. LONGINO: All right. Also I'd like to give my little rendition of circumstantial evidence. You might be able to understand what I'm saying so you might be able to relate to this a little more.

Say, for instance, it's snowing outside, and you left the house and you told your 17-year-old: I don't want any kids in this house while I'm gone, I want no company. Your daughter is 17, she and all her little friends, they got their little cars, so they go visiting everywhere and you say, "I don't want any company in this house."

You come home and you see tire tacks in your driveway and you go in the house and say: Didn't I tell you I didn't want any company in this house. She says, "But, Mom, I didn't have company."

"Yes, you did. Yes, you did. I see the proof beyond a reasonable doubt in my driveway."

"Mom, I didn't have any company," and you don't believe her.

Say you go so far as to call all her little friends with their cars and they say, "No, Ms. Arnold, I wasn't over there today," and then you have an epiphany when you see somebody pull up in your driveway so they can turn around and go in the opposite direction and you say, "Oh, that must be what happened."

Ma'am, is that a reasonable circumstance to you?

JUROR NO. 4: Yes.

MS. LONGINO: Yes. Yes. So it shows that everything is not as it appears. So circumstantial evidence, it's important but it has to be weighed just as heavily as physical evidence.

Everybody understand and agree with that?

Okay.

Now, Ms. -- I'm sorry, Anna, I cannot pronounce your last name. So I'll -- I hope you don't mind me calling you Anna. So Anna took you through different ethnic backgrounds that we all come from. But I didn't hear her say African-American. I'm not saying she did that purpose, I'm sure she didn't but I didn't hear her say African-American, and obviously these defendants are African-American.

So what I want to know is, is there anyone here who would have any problem giving these African-American defendants, or specifically my client, I represent Deonte Lewis, so I want to speak on behalf of Deonte Lewis, is there anyone here who would have any preconceived notions about Deonte Lewis because he is an African-American, and specifically an African-American male?

THE JURY: No.

MS. LONGINO: Okay. Mr. Price?

JUROR NO. 1: Yes.

MS. LONGINO: Would you have any preconceived notions about Mr. Lewis because

he's African-American?

JUROR NO. 1: No.

MS. LONGINO: Mr. Varga-Sinka?

JUROR NO. 2: No, I would not.

MS. LONGINO: Mr. Knauss?

JUROR NO. 3: No.

MS. LONGINO: Ms. Arnold?

JUROR NO. 4: No.

MS. LONGINO: Mr. Jarmusik?

JUROR NO. 5: No.

MS. LONGINO: Okay. You all have to forgive me. I've been doing this over 35 years, I get a little bit dyslexic with these jury sheets, especially when people start moving around and replacing people and everything.

I believe we're at Mr. -- no, he's gone. Mr. Seidel.

JUROR NO. 6: I would not have any issues.

MS. LONGINO: Okay. Number 7, is it now Ms. Scott?

THE COURT: No, it's Nancy Hylnosky.

MS. LONGINO: I'm sorry, I

put it in the wrong spot. Okay.

Now, Mr. O'Leary?

JUROR NO. 8: Yes, I have two grandsons and they're both African-American. And one graduated from Georgia Tech and one graduated from the University of Georgia. I have no problem --

MS. LONGINO: You have no problems with African-Americans?

JUROR NO. 8: No. Okay.

MS. LONGINO: Number 9, Ms. Weatherbie, am I right or wrong?

JUROR NO. 9: Scott.

MS. LONGINO: Okay. Ms. Scott, well, you're African-American yourself, maybe your husband or somebody did something to you to make you mad at black men?

JUROR NO. 9: No.

MS. LONGINO: Ms. Mason?

JUROR NO. 10: No problems.

MS. LONGINO: Mr. Lovey?

JUROR NO. 11: No problem.

MS. LONGINO: And Ms. Woods?

JUROR NO. 12: No problem.

MS. LONGINO: Have you or

anyone in your family had a really bad experience with an African-American person that maybe left a bad taste in your mouth?

JUROR NO. 6: The two people who tried to rob me were African-American but that doesn't affect --

MS. LONGINO: How long ago was that?

JUROR NO. 6: Three years ago.

MS. LONGINO: Were they African-American males?

JUROR NO. 6: Yes.

MS. LONGINO: They tried to rob you but they didn't succeed?

JUROR NO. 6: But they cracked me in the head with a rock.

MS. LONGINO: I'm sorry?

JUROR NO. 6: They cracked me in the head with a rock.

MS. LONGINO: Were they apprehended?

JUROR NO. 6: No.

MS. LONGINO: They got away with it?

JUROR NO. 6: Mm-hmm.

MS. LONGINO: I'm sorry to hear that.

Now, there are just a few other questions I would like to ask. I'm trying not to be redundant; like I said, my colleagues asked a lot of questions already.

Anyone here have a girlfriend or a boyfriend that has children? Okay. And is this your boyfriend?

JUROR NO. 10: No, I'm married. I have a friend --

MS. LONGINO: I'm sorry. A romantic partner. Maybe I should put it like that.

Anyone have a romantic partner that has children? Okay. So, none of you here would have this experience personally but, let me ask you this: Wait -- has anyone here ever worked for a day care center? No.

JUROR NO. 11: I used to inspect day care centers as a health inspector.

MS. LONGINO: Okay.

JUROR NO. 11: Both the industrial type care centers and home day care

centers.

MS. LONGINO: Okay. Now, I thought it was you, Mr. Lovey, but -- oh, yeah, Mr. Lovey, I don't think I remember the judge asking you whether you have any children?

JUROR NO. 11: No, I do not.

THE COURT: How many here has grandchildren? Okay. And how many grandchildren do you have?

JUROR NO. 9: Two.

JUROR NO. 12: I think I have seven.

MS. LONGINO: Okay. And do those grandchildren, are they your son's children?

JUROR NO. 9: My son's children.

MS. LONGINO: Son's children, daughter's?

JUROR NO. 12: Daughter and son. I have a daughter and son with children.

MS. LONGINO: Okay. Do you know if your grandchildren's parents has a significant other to which they are not married?

JUROR NO. 7: You mean that

did not marry?

MS. LONGINO: Yes.

JUROR NO. 7: Yeah.

MS. LONGINO: Now, how do you feel about that person who was not your grandchild's parent watching them?

JUROR NO. 9: Well, I really feel this way, see, you can't feel -- it doesn't bother me -- can I explain?

MS. LONGINO: Absolutely.

JUROR NO. 9: It doesn't bother me because my husband, we've been together for 34 years and my daughter is not his child, he has no kids but he's been with me since my daughter was four.

MS. LONGINO: Okay.

JUROR NO. 9: So no problem.

MS. LONGINO: Okay. So, when you and your husband first got together, you already had your daughter?

JUROR NO. 9: Mm-hmm.

MS. LONGINO: So did your husband, before you got married, would you leave your daughter in his care?

JUROR NO. 9: Yes.

MS. LONGINO: Okay. And did you live together or you lived apart?

JUROR NO. 9: We lived together.

MS. LONGINO: Okay. So you didn't live together when you first got together I would assume.

JUROR NO. 9: No.

MS. LONGINO: How long were you together before you started living together? If I'm getting too personal --

JUROR NO. 9: No, no, you fine. Well, I started letting him be in the house by his self with her, about six months.

MS. LONGINO: Six months.

JUROR NO. 9: Mm-hmm.

MS. LONGINO: So from six months on you guys were together?

JUROR NO. 9: Mm-hmm.

MS. LONGINO: I'll ask this general question of the entire panel: If you have a child and you have a romantic partner who does not live with you, whose responsibility would you say it would be to discipline that child? Yours?

JUROR NO. 9: Mine.

MS. LONGINO: Anybody think that the partner should have that responsibility?

JUROR NO. 5: It somewhat depends on the situation and how closely the relationship with that romantic partner is. I would say if it's over ten years and even though you don't live together but the significant other is watching and your child does something wrong, yeah, they have a right to discipline. But, if it's someone that you have been with for three months and it's something done in your house, then, no, they don't.

MS. LONGINO: Okay. So if it's a short-term relationship, like you said, three months, six months, whatever, then that significant other is not responsible for disciplining your child? Correct? Everybody agree with me?

THE JURY: Yes.

MS. LONGINO: Okay. What if that significant other thought that the parent -- they didn't approve of the parent's disciplining of that child, do they have the responsibility to make them change?

MR. MAREIN: Objection.

THE COURT: Overruled. Go ahead.

MS. LONGINO: Do they have the responsibility to say: Look, I think that you're being excessive with this child?

MR. MAREIN: Objection.

MS. LONGINO: And you should stop.

THE COURT: I'm going to sustain that.

MS. LONGINO: Okay. I'll go back to my original question: If you disapprove of their methods, should you have to make them change? Anybody yes? So I take it that's a no or -- counselor, you look like you're -- you don't really know how to answer that question?

JUROR NO. 2: I always base it upon more information.

MS. LONGINO: Like what?

JUROR NO. 2: Well, I mean, you can always toss out a hypothetical and, you know, I mean, there are details that may affect it one way or the other.

MS. LONGINO: Okay. I'll

accept that.

JUROR NO. 2: Thank you.

MS. LONGINO: All right. What about -- well, I won't ask that either. I think the judge might think I'm being too specific. Okay.

Has anyone ever had a situation where you or someone close to you was accused of something bad that they did not do? Anybody had that experience? Okay. Want to tell us about it?

JUROR NO. 5: Sure. In high school someone called the police on me saying that I threatened to bring a gun into school and police came to my house, interviewed me, interviewed my parents, searched the house. There was no firearm, no evidence. They dismissed it and they went back to who filed the police report and took care of it from there.

MS. LONGINO: Okay. Mr. Knauss, I thought I saw you raise your hand?

JUROR NO. 3: My wife was accused of stealing from Wal-Mart. They arrested her. Bailed her out, talked to them and found out, I can't remember exactly how we found out what they accused her of stealing.

So I went to the store that night. It was flea medicine. I went in there and documented the aisle she was in, aisle she was not in, where the flea medicine was and everything. Come to find out, they had her in two aisles over. She was looking for guinea pig food. I documented everything and it helped in getting it dismissed.

MS. LONGINO: Wonderful. Have you ever been a detective?

JUROR NO. 3: No. Worse, engineer.

MS. LONGINO: Have you ever been in a situation where it was your word against someone else's word; even though you were telling the truth, you were afraid that no one would believe you?

JUROR NO. 10: My divorce trial.

MS. LONGINO: In your divorce trial?

JUROR NO. 10: Mm-hmm.

MS. LONGINO: Okay. Now, I think that you already answered that question for me, Mr. Jarmusik, where you were in a situation

where you or someone else close to you mistakenly suspected someone else of wrongdoing. Okay.

Have you or anyone close to you ever had a bad encounter with a law enforcement officer? Other than the people trying to say your wife was stealing out of Wal-Mart? Okay.

Has anyone ever had a terrible problem with someone who you discovered was a liar?

JUROR NO. 2: Attorney-client privilege.

MS. LONGINO: Have you ever experienced a most difficult situation where you were -- that you were ever in where you had to decide which of two people were telling the truth? Attorney-client privilege again?

JUROR NO. 2: Mm-hmm.

MS. LONGINO: Anyone else? You had two people telling you two different stories and you had to decide who was telling the truth; anybody had that situation? Maybe with your kid? All right. You want to tell me about it?

JUROR NO. 10: I have at work, where two co-workers were complaining about each other.

MS. LONGINO: And you had to decide who was telling the truth?

JUROR NO. 10: Mm-hmm.

MS. LONGINO: How about you, Mr. Lovey?

JUROR NO. 11: It was on a complaint. I went out and the complaint was about dog poop in their yard, and the lady keeps saying the neighbor keeps throwing it over the fence. It turned out she had cats but she did not have dogs but that's how I determined who was doing what. And then I had a little conversation with them and I told the lady with cats to call the police next time rather than the health department, having me come out.

The cats were indoor cats too. So I've got two indoor cats. I know the neighbor, one of my cats looks like the black and white male cat that roams the neighborhood, except mine's a female who has no interest in going out. So he's seen the cat, and my cat being a black and white cat and he talks about it was the black and white cat digging up his yard.

MS. LONGINO: So you had the fact, the circumstances, and your own personal

knowledge, to figure out who was telling the truth and who wasn't?

JUROR NO. 11: Yes.

MS. LONGINO: Common sense comes in as well. I believe you had your hand up?

JUROR NO. 5: Just had two friends that were angry with each other for two different reasons.

MS. LONGINO: Were you able to determine who was telling the truth?

JUROR NO. 5: I stayed out of it but they both came to me.

MS. LONGINO: Did you have an opinion?

JUROR NO. 5: Not really.

MS. LONGINO: Just stayed neutral?

JUROR NO. 5: Yes.

MS. LONGINO: You realize as jurors you cannot be neutral; you have to weigh the evidence, you have to determine the credibility of the witnesses and the evidence, and you have to determine what the facts are. Everyone understands that; correct? Anyone have

a problem with that?

THE JURY: No.

MS. LONGINO: I just have one more thing to say that was touched on but I'd like to say what I have to say about it. Anybody serve on a grand jury before? You did? How did you find that experience?

JUROR NO. 9: I loved it.

MS. LONGINO: You loved it?

JUROR NO. 9: Mm-hmm, I learned a lot. I got to see a lot. It was very interesting.

MS. LONGINO: Okay. But you know in the grand jury all you hear is one side.

JUROR NO. 9: One side.

MS. LONGINO: One side. That's the prosecution's side.

JUROR NO. 9: Mm-hmm.

MS. LONGINO: The defendant is not even allowed in the room, let alone allowed to give a defense. That's why, thank goodness, we have juries to hear both sides because it's easy to come to a conclusion if all you hear is one side. Right?

JUROR NO. 9: Mm-hmm.

MS. LONGINO: That's a no-brainer. All you hear is one side; you're going to come to a conclusion. But then there's a whole other side that you have not heard. Anybody ever heard the expression: You can indict a ham sandwich? I know you have, counsel.

JUROR NO. 2: Yes. Yes, I have.

MS. LONGINO: That's because in a grand jury the defendant doesn't have a chance, but you get to hear both sides. And does anybody here think just because somebody was indicted -- that's a heavy word to me: Indicted. I think it's a heavy word to everybody. It's still a heavy word to me and I been practicing law for over 35 years.

If you hear that someone was indicted, in the back of your mind is there something floating around in the back of your mind, like, oooh, they must have done something? There's a reason these people indicted them? Not even thinking about, because not everyone knows that the grand jury only hears one side. Not everybody knows that. But you guys know it now.

So when you hear about someone being indicted, is there something floating around in the back of your mind: Man, they must have done something if those grand juries indicted them? Anybody? Nobody?

Okay. So everybody understands that an indictment does not equal guilt. Everyone understand that?

THE JURY: Yes.

MS. LONGINO: Okay. All right. Thank you very much.

THE COURT: Thank you. Let's go back to Juror Number 7 and Number 9 very quickly. You work for MWH Constructors?

JUROR NO. 7: Yes.

THE COURT: What do you do for them?

JUROR NO. 7: Accounts payable.

THE COURT: How long have you been there?

JUROR NO. 7: Three years.

THE COURT: Have you always been in that type of work?

JUROR NO. 7: Yes,

construction.

THE COURT: Your spouse is with Custom Guitar Creations. What does he do?

JUROR NO. 7: He's an independent contractor. He's a cabinet maker; he makes guitars.

THE COURT: Ever served on a jury?

JUROR NO. 7: No.

THE COURT: Ever been a victim of crime?

JUROR NO. 7: No.

THE COURT: You or a family member ever been accused of crime?

JUROR NO. 7: No.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 7: No.

THE COURT: You heard a lot of questions, anything you wish to respond to?

JUROR NO. 7: No, not at this time.

THE COURT: Can you think

of any reason why it would be difficult to serve?

JUROR NO. 7: No.

THE COURT: Do you want to serve?

JUROR NO. 7: Sure.

THE COURT: Thank you. Lolita, do you work at Wal-Mart?

JUROR NO. 9: Yes.

THE COURT: How long have you been at Wal-Mart?

JUROR NO. 9: Three weeks. I had just recently started.

THE COURT: Okay. Prior to that, what did you do?

JUROR NO. 9: Worked at Amazon.

THE COURT: Okay. Your spouse is at the Cleveland Clinic?

JUROR NO. 9: Yes.

THE COURT: What does he do?

JUROR NO. 9: He works at the call center; he takes appointments.

THE COURT: Have you ever served on a jury?

JUROR NO. 9: Yes, grand jury.

THE COURT: That's right. I'm sorry. Any other jury service?

JUROR NO. 9: Well, I wasn't on the jury but I was called, I was summonsed so I had to stay a couple days.

THE COURT: Okay. Have you or any family member ever been a victim of crime?

JUROR NO. 9: No.

THE COURT: Have you or a family member ever been accused of committing a crime?

JUROR NO. 9: No.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 9: No.

THE COURT: Can you think of any -- James, James, please.

MR. GAY: Sorry.

THE COURT: Can you think of any reason why it would be difficult to serve?

JUROR NO. 9: No.

THE COURT: Do you want to serve?

JUROR NO. 9: Yes, I do.

THE COURT: I'll bet you do. Very briefly.

MS. FARAGLIA: Good afternoon ladies.

You heard all the questions I asked about burden of proof. Can you hold me to that burden of proof, and that is beyond a reasonable doubt? You can do that?

JUROR NO. 7: Yeah.

JUROR NO. 9: Yes.

MS. FARAGLIA: That burden of proof of beyond a reasonable doubt is in all cases from a theft case to an aggravated murder case. It's the same burden. You understand that?

JUROR NO. 7: Yes.

JUROR NO. 9: Mm-hmm.

MS. FARAGLIA: How did you feel when you got that jury summons in the mail?

JUROR NO. 7: Aggravated.

MS. FARAGLIA: Why?

JUROR NO. 7: It was bad

timing in my life right now. Lot going on.

MS. FARAGLIA: Pardon?

JUROR NO. 7: Lot going on.

MS. FARAGLIA: Okay. But now that you're here, can you give us your undivided attention for a week?

JUROR NO. 7: Yes.

MS. FARAGLIA: The fact that you have a lot going on in your personal life, will that interfere with being here?

JUROR NO. 7: No.

MS. FARAGLIA: Ma'am, do you have children?

JUROR NO. 7: Yes, one.

MS. FARAGLIA: How old?

JUROR NO. 7: 22.

MS. FARAGLIA: All right. Ms. Scott, thank you. Same questions for you, how did you feel when you got that jury summons in the mail?

JUROR NO. 9: I was excited.

MS. FARAGLIA: Excited?

JUROR NO. 9: Yes, for some reason I like being summoned and participating in

things.

MS. FARAGLIA: Okay. And you already got to see one version of it in the grand jury. This is a bit different.

JUROR NO. 9: Yes.

MS. FARAGLIA: And how did you feel in the grand jury? You worked with 11 other people; right?

JUROR NO. 9: Yes.

MS. FARAGLIA: Here you're going to work with 11 other people as well. How do you feel about that?

JUROR NO. 9: I feel fine with it.

MS. FARAGLIA: Okay. Can you keep an open ear and an open mind to what your fellow jurors hear and see in this courtroom?

JUROR NO. 9: Yeah.

MS. FARAGLIA: Make a decision and stick by the decision you make?

JUROR NO. 9: Yes.

MS. FARAGLIA: Same thing with you, Ms. Hylnosky?

JUROR NO. 7: Yeah.

MS. FARAGLIA: Keep an open

mind?

JUROR NO. 7: Yes.

MS. FARAGLIA: What does it mean to you to be fair and impartial?

JUROR NO. 7: Wow, good question. Fair and impartial, not take a side, I guess.

MS. FARAGLIA: Okay. Ms. Scott?

JUROR NO. 9: Listen to all that I can hear and think about and consider it with as a group and not by myself.

MS. FARAGLIA: Okay. Ladies, for both of you, can you follow the law even though you may not agree with the law?

JUROR NO. 9: Yes.

JUROR NO. 7: Yes.

MS. FARAGLIA: You'll pay attention to all the definitions this Court gives you?

JUROR NO. 9: Yes.

JUROR NO. 7: Yes.

MS. FARAGLIA: Thank you. Pass for cause.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: Jurors 7 and 9?

THE COURT: Yes.

MR. SHAUGHNESSY: No questions.

MS. LONGINO: No questions.

THE COURT: First peremptory is to the State.

MS. FARAGLIA: One moment, your Honor.

Your Honor, the State would like to thank and excuse Juror Number 5.

THE COURT: Thank you, sir.

Stacy Weatherbie, you are now Juror Number 5. You work for Kindred Health Care?

JUROR NO. 5: Yes.

THE COURT: What do you do for them?

JUROR NO. 5: I'm a staff physical therapist.

THE COURT: How long have you been with them?

JUROR NO. 5: In October it will be nine years.

THE COURT: Your spouse is

at Hyatt Legal Plans?
JUROR NO. 5: Yes.
THE COURT: What does he do.
JUROR NO. 5: Director of IT.
THE COURT: Do you have any children?
JUROR NO. 5: Three; ten, 12 and 13.
THE COURT: Have you ever served on a jury?
JUROR NO. 5: No.
THE COURT: Have you or a family member ever been a victim of crime?
JUROR NO. 5: No.
THE COURT: Have you or a family member ever been accused of committing a crime?
JUROR NO. 5: No.
THE COURT: Do you have any close friends affiliated with law enforcement?
JUROR NO. 5: No.
THE COURT: You heard a

lot of questions asked by both sides: Burden of proof, presumption of innocence, credibility of witnesses, being fair to both sides. Anything that you wish to respond to?

JUROR NO. 5: No.

THE COURT: Any reason why it would be difficult for you to serve?

JUROR NO. 5: No.

THE COURT: Do you want to serve?

JUROR NO. 5: Yes.

THE COURT: Thank you. You may inquire briefly.

MS. JORDAN: Good afternoon, ma'am. How are you? You heard all the questions, nothing stood out that you need to respond to?

JUROR NO. 5: No.

MS. JORDAN: One of the most important things that we need from a juror is their ability to use their reason and common sense. Can you do that?

JUROR NO. 5: Yes.

MS. JORDAN: You said you have kids. Do any of your kids have a sweet

tooth?

JUROR NO. 5: All three.

MS. JORDAN: All right. Let's say you're at home with your one of your kids; everyone else is outside the house. You're baking chocolate chip cookies for dessert after dinner. You get a call, maybe about one of the other kids, and you have to leave the room.

Let's say your kid is a little tyke, maybe three, and you leave your cookies on the shelf cooling. You go out of the room to take your call. Before you leave, though, your little three-year-old tyke asks, "Mom, can I have a cookie?" You say, like a good mom, "No, not until after dinner."

You leave; come back. There is a chair pushed up to the counter, right, no one else in the house but you and the three-year-old little tyke. There is a trail of cookie crumbs leading from the counter to the little three-year-old's room. There is just a little bit of chocolate right here (indicating) on your three-year-old's face.

Using your reason and common sense, what happened to the cookies?

JUROR NO. 5: My three-year-old got up on the chair and took the cookies and ate them.

MS. JORDAN: Right. You didn't necessarily see your little one eat the cookie but you can use the evidence, the circumstantial evidence, to lead you to the cookie; right?

JUROR NO. 5: Yes.

MS. JORDAN: Now, your baby says, when you ask him or her, "Did you eat the cookie," and they say, "No, Mom. So-and-so's dog from across the street had keys to the house. The puppy unlocked the door, came in, ate the cookies, licked my face, so I went to my room."

Right? Now is it possible that that happened?

JUROR NO. 5: Well --

MS. JORDAN: It's possible.

JUROR NO. 5: Anything is possible.

MS. JORDAN: But is it likely that it happened?

JUROR NO. 5: No.

MS. JORDAN: Do you understand why I ask you if you can use your reason and common sense?

JUROR NO. 5: Yeah.

MS. JORDAN: Is there anything that you think can prevent you from being fair and impartial in this case?

JUROR NO. 5: No.

MS. JORDAN: Thank you.

Nothing further, your Honor.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: You heard Judge McCormick tell you that you can't discuss this case until it's over and you're deliberating; right?

JUROR NO. 5: Yes.

MR. SHAUGHNESSY: And you're not to form an opinion until then. Can you do that?

JUROR NO. 5: Yes.

MR. SHAUGHNESSY: If you hear something, you won't shut down and say: I've got my verdict, I'm done.

JUROR NO. 5: No.

MR. SHAUGHNESSY: If you see these pictures, are you going to say: I'm shut

down, I'm done listening to the evidence, I'm done because of something that I see?

JUROR NO. 5: No, I see a lot of stuff, working in the medical field.

MR. SHAUGHNESSY: So you can wait until the end, listen, and then deliberate?

JUROR NO. 5: Yes.

MR. SHAUGHNESSY: Thank you. Pass for cause.

THE COURT: Ms. Longino?

MS. LONGINO: Thank you, your Honor.

Good afternoon. Now, you've heard all the questions; right? You heard all my questions, I spoke last, so you probably really heard mine. Anything stick out in your mind that I asked about?

JUROR NO. 5: No.

MS. LONGINO: Nothing?

JUROR NO. 5: You mean that you thought I might have a problem with --

MS. LONGINO: Yes. Yes, yes.

JUROR NO. 5: No.

MS. LONGINO: I'm sorry.

What did you say your children's ages were?

JUROR NO. 5: Ten, 12, and 13.

MS. LONGINO: So you got all two-digit babies. Okay.

Do you think that you would be able to follow the law and apply them to the facts in this case even if you disagree with what the law says pursuant to the facts as they are applied to the law?

JUROR NO. 5: Yes. I'm a rule follower.

MS. LONGINO: You're a good follower.

JUROR NO. 5: I'm a rule follower.

MS. LONGINO: Okay. Kindred Health Care, what is that?

JUROR NO. 5: It's a company that either owns nursing homes or contracts physical therapists to provide physical therapy to patients at the nursing homes.

MS. LONGINO: So elders?

JUROR NO. 5: Not necessarily. People in their 20s through their

90s at their homes.

MS. LONGINO: Okay. Is your husband a lawyer?

JUROR NO. 5: No. He has an electrical engineering degree. He is the director of IT. So it's like a benefits-type thing. If I wanted to enroll my benefits I could pay for Hyatt legal services per month to get services, as far as doing your wills or any services that you need. So he's just the director of IT within that company. He has no law degree and he's not a lawyer.

MS. LONGINO: You heard the judge say this trial will go for five days or more. Will that present a hardship for you because of care for your kids or something to that effect?

JUROR NO. 5: No, my husband can take his turn.

MS. LONGINO: Okay. He can step up to the plate?

JUROR NO. 5: Yes.

MS. LONGINO: I know that's right. All right. Have you ever had any bad experiences with any African-Americans?

JUROR NO. 5: No.
MS. LONGINO: Do you work with any?
JUROR NO. 5: Yeah.
MS. LONGINO: Get along?
JUROR NO. 5: Mm-hmm.
MS. LONGINO: For the most part?
JUROR NO. 5: Oh yeah.
THE COURT: Can you -- would you, because you see these two defendants sitting here together, you understand that they are tried -- this is two separate trials for each of them. You understand that. Correct?
JUROR NO. 5: Mm-hmm.
MS. LONGINO: And if you were to -- if you, along with your 11 other jurors, were to come to the conclusion that one is guilty and one is not guilty, can you render that verdict if you think that that would be fair?
JUROR NO. 5: Yeah.
MS. LONGINO: And can you be impartial and treat each one individually and separately?

JUROR NO. 5: Mm-hmm.

MS. LONGINO: And not glump them together because they're being tried together?

JUROR NO. 5: Yes.

MS. LONGINO: Okay. Thank you.

THE COURT: Thank you. Next peremptory is to Defendant A.

MR. SHAUGHNESSY: Judge, we thank and excuse Juror Number 11.

THE COURT: Thank you, sir.

Paul McIntyre, if you could take Juror Number 11's seat, sir.

How are you, sir?

JUROR NO. 18: Good.

THE COURT: Are you presently employed?

JUROR NO. 18: Retired.

THE COURT: What did you retire from?

JUROR NO. 18: University Hospital, pharmacy.

THE COURT: Were you a

pharmacist?

JUROR NO. 18: Yes.

THE COURT: How long have you been retired?

JUROR NO. 18: Three years in May.

THE COURT: How do you like it?

JUROR NO. 18: Love it.

THE COURT: Good. Have you ever served on a jury?

JUROR NO. 18: No.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 18: No.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 18: No.

THE COURT: Do you have close friends affiliated with law enforcement?

JUROR NO. 18: No.

THE COURT: You heard a lot of questions asked by the attorneys. Anything you wish to respond to?

JUROR NO. 18: No.

THE COURT: You heard legal concepts.

JUROR NO. 18: I understood them.

THE COURT: Presumption of innocence, the burden of proof, the cookie monster analogy; all that kind of stuff.

JUROR NO. 18: No problem.

THE COURT: Okay. Do you want to serve?

JUROR NO. 18: Yes.

THE COURT: Thank you. You may inquire briefly.

MS. JORDAN: Thank you, your Honor.

THE COURT: Didn't mean to steal your thunder.

MS. JORDAN: You took my analogy. Now I have to come up with another question.

Being a pharmacist is a really technical field; right?

JUROR NO. 18: Yes.

MS. JORDAN: How do you

work with others when you're working on something not technical?

JUROR NO. 18: I think I work well with others.

MS. JORDAN: If chosen for this case, you will be deliberating with 11 other people. Would you be able to keep an open mind, open ear to listen to the opinions of your fellow jurors?

JUROR NO. 18: Yes.

MS. JORDAN: If you had a firm conviction, based on what you heard and the evidence as you interpreted it, as you will be the judge of the evidence and the facts, would you be able to hold firm to your opinion?

JUROR NO. 18: Well, I would hope I'd be able to. You have to listen to what everybody has to say and take it all into account.

MS. JORDAN: How do you judge someone's credibility? What factors do you use?

JUROR NO. 18: You look at body language, eye contact; things like that. That's one of the most important things.

MS. JORDAN: I know we've asked a ton of questions, is there anything as you sit here you're thinking: I really need them to ask me this so I can share this, or is there something that you wish we would ask you?

JUROR NO. 18: Not that I can think of.

MS. JORDAN: Pass for cause.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: Do you agree that lawyers talk too much?

JUROR NO. 18: Don't we all.

MR. SHAUGHNESSY: Pass for cause.

THE COURT: Ms. Longino?

MS. LONGINO: Mr. McIntyre, how long did you say you've been retired?

JUROR NO. 18: Three years in May.

MS. LONGINO: You're a retired pharmacist?

JUROR NO. 18: Yes.

MS. LONGINO: How long were you a pharmacist?

JUROR NO. 18: Since 1981.

MS. LONGINO: Did you work for a drug store chain?

JUROR NO. 18: No, I worked for University in oncology.

MS. LONGINO: In what?

JUROR NO. 18: In oncology.

MS. LONGINO: Really? I'm a breast cancer survivor.

JUROR NO. 18: Very good. We like to hear that.

MS. LONGINO: You might have administered some drug to me.

JUROR NO. 18: That would be the nurses; I made them.

MS. LONGINO: You heard all the questions. Is there anything that sticks out in your mind about the questions that were asked or questions that I have asked that you have a specific response to or that you would like to elaborate on?

JUROR NO. 18: Not specifically. Within the last three years, speaking of African-Americans, my niece adopted an African-American baby who was -- she was

really sick and they took care of her and she's beautiful. Just absolutely beautiful.

MS. LONGINO: Where did at this adopt the baby from?

JUROR NO. 18: Topeka, Kansas.

MS. LONGINO: What were the circumstances?

JUROR NO. 18: They couldn't have children themselves so they went to the adoption agency and put their name on the list and they got called, went to Topeka and they were able to adopt the baby. The judge in Kansas said this was the fastest adoption he had in his life. They were able to take that baby home to Nashville, and a few months later she had to go into the hospital and have open heart surgery.

MS. LONGINO: The baby did?

JUROR NO. 18: Yes.

MS. LONGINO: So the baby's mother or whoever gave her up for adoption?

JUROR NO. 18: They didn't think they could take care of her.

MS. LONGINO: She was born with this heart issue?

JUROR NO. 18: Yes.

MS. LONGINO: Your niece stepped in?

JUROR NO. 18: My niece and her husband.

MS. LONGINO: Very good for them. Is there any reason that you think you couldn't be fair and impartial in this case?

JUROR NO. 18: No.

MS. LONGINO: You heard it involves -- I'm sure you have a soft heart for babies, as we all do. You heard this involves the death of a four-year-old child. Would that impair your impartiality at all?

JUROR NO. 18: Shouldn't, no.

MS. LONGINO: It should not?

JUROR NO. 18: No.

MS. LONGINO: You think it shouldn't, but you're not sure?

JUROR NO. 18: No, it will not.

MS. LONGINO: It will not?

JUROR NO. 18: No.

MS. LONGINO: Thank you. Pass for cause.

THE COURT: Next peremptory is to Defendant Lewis. Strike that. To the State.

MS. FARAGLIA: The State would like to thank and excuse Juror Number 1.

THE COURT: Thank you, sir. You can go back to the fourth floor.

Benton Godbee, take seat Number 1. How are you, sir?

JUROR NO. 20: I'm fine.

THE COURT: You work at Cleveland Clinic?

JUROR NO. 20: Yes.

THE COURT: What do you do?

JUROR NO. 20: Appointment scheduler.

THE COURT: Prior to that, what did you do?

JUROR NO. 20: Sales rep for AT&T.

THE COURT: Your spouse is not presently employed?

JUROR NO. 20: No, not presently.

THE COURT: What did she do?

JUROR NO. 20: She worked for Fashion Bug.

THE COURT: Have you ever served on a jury?

JUROR NO. 20: Yes.

THE COURT: How long ago?

JUROR NO. 20: 2003.

THE COURT: Civil or criminal?

JUROR NO. 20: Civil.

THE COURT: Without telling us the results, did you reach a verdict?

JUROR NO. 20: No, it was resolved.

THE COURT: Have you or a family member ever been a victim of a crime?

JUROR NO. 20: No.

THE COURT: Have you or a family member ever been accused of committing a crime?

JUROR NO. 20: Yes.

THE COURT: Who would be that?

JUROR NO. 20: My brother.

THE COURT: What would that be for?

JUROR NO. 20: Soliciting prostitution.

THE COURT: How long ago?

JUROR NO. 20: 2011.

THE COURT: What municipality?

JUROR NO. 20: Rogersville, Tennessee.

THE COURT: Do you have an opinion whether he was treated fairly or unfairly?

JUROR NO. 20: He was treated fairly.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 20: No.

THE COURT: You heard a lot of the questions asked by everybody here. Do you have any questions to respond to?

JUROR NO. 20: No.

THE COURT: Do you want to

serve?

JUROR NO. 20: Yes.

THE COURT: Go ahead. Briefly.

MS. JORDAN: Thank you, your Honor.

Good afternoon, sir. How are you?

JUROR NO. 20: Wonderful.

MS. JORDAN: Do you have any children?

JUROR NO. 20: No.

MS. JORDAN: Is there any question that was asked that you think, my gosh, I need to share this?

JUROR NO. 20: I do have a taste for chocolate chip cookies but other than that, no.

THE COURT: Everybody does right now.

JUROR NO. 20: The only thing that I would add in terms of what I would say I think hasn't been said is in terms of judging credibility, I think it's important to consider internal consistency of what people tell you.

MS. JORDAN: When you

received your jury summons, what was your feeling? Excited? Nervous?

JUROR NO. 20: Honestly, I was happy. I get paid from work and I was ready for a few days away.

MS. JORDAN: That's honest. I appreciate that answer. Were you nervous walking into the courtroom?

JUROR NO. 20: No.

MS. JORDAN: Could you see how somebody walking into the courtroom would be nervous?

JUROR NO. 20: Sure.

MS. JORDAN: Different experience talking to a room full of people they don't know. Will you allow a witness who takes the stand who might be nervous, will you factor that into how you judge credibility?

JUROR NO. 20: No.

MS. JORDAN: Understanding that each of us respond differently?

JUROR NO. 20: Correct.

MS. JORDAN: You'll take all that into consideration using your reason and common sense?

JUROR NO. 20: Correct.

MS. JORDAN: How do you work well with others?

JUROR NO. 20: I think I work well with other people.

MS. JORDAN: If you were selected to be a member of this jury, you would have to use your deliberations in conjunction with 11 other jurors. Would you be able to do that?

JUROR NO. 20: Yes, ma'am.

MS. JORDAN: Thank you, sir.

Your Honor, pass for cause.

MR. SHAUGHNESSY: Good afternoon, sir.

JUROR NO. 20: Hi.

MR. SHAUGHNESSY: You may have just answered this; why do you want to serve?

JUROR NO. 20: Above and beyond the fact that I get a few days off from work, I do consider it a valuable service to other people which, you know, having spent almost two decades being a sales rep was something that I missed in my life. So it's something that I

value, doing something worthwhile, and serving on a jury is worthwhile.

MR. SHAUGHNESSY: Thank you very much. Pass for cause.

THE COURT: Ms. Longino?

MS. LONGINO: Good afternoon, sir. What do you do at Cleveland Clinic?

JUROR NO. 20: I'm an appointment scheduler.

MS. LONGINO: How long have you been doing that?

JUROR NO. 20: Four years.

MS. LONGINO: And what did you do prior?

JUROR NO. 20: I was a sales rep for AT&T.

MS. LONGINO: I believe I heard you say that you do not have children?

JUROR NO. 20: No children.

MS. LONGINO: Okay. Do you have a significant other that has children?

JUROR NO. 20: No, ma'am. My wife and I have never had children. We've never had other children in any other scenario; neither

of us.

MS. LONGINO: Okay. I see here none as job, not none wife?

JUROR NO. 20: Right, my wife is currently unemployed although I might tell her you said that.

MS. LONGINO: Is there anything about any of the questions I asked, any of the statements that I made, that has stuck out in your mind that you might want to expound on?

JUROR NO. 20: No, ma'am.

MS. LONGINO: Pass for cause, your Honor.

THE COURT: Next peremptory is to Defendant Lewis.

MS. LONGINO: Okay. Your Honor, we would like to thank and excuse Juror Number 4, Ms. Arnold.

THE COURT: Thank you, ma'am.

Joseph Roberts. How are you, sir?

JUROR NO. 21: Good.

THE COURT: Are you presently employed?

JUROR NO. 21: No.

THE COURT: What was the last job you held?

JUROR NO. 21: Certified occupational therapy assistant.

THE COURT: How long ago was that?

JUROR NO. 21: 1999 was the last year.

THE COURT: Are you retired?

JUROR NO. 21: No, I had some surgery and ended up being the parent who stayed home with my daughter.

THE COURT: Okay. How old is your daughter?

JUROR NO. 21: 21 now.

THE COURT: Your spouse is with the Cuyahoga County Board of Developmental Disabilities.

JUROR NO. 21: Yes.

THE COURT: What does she do?

JUROR NO. 21: She's a support administrator supervisor.

THE COURT: How long has

she been with the county?

JUROR NO. 21: 22 years.

THE COURT: Have you ever served on a jury?

JUROR NO. 21: No.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 21: Yes. A bike was stolen from the garage; bicycle.

THE COURT: How long ago was that?

JUROR NO. 21: Like 15 years.

MS. LONGINO: I can't hear --

THE COURT: Bicycle stolen out of the garage.

Have you or any family member ever been accused of committing a crime?

JUROR NO. 21: My father but I'm not sure what it was; he was in jail.

THE COURT: How long ago?

JUROR NO. 21: 45 years.

THE COURT: Okay. How old were you at the time?

JUROR NO. 21: I was around five, something like that.

THE COURT: Okay. Did you continue to have a relationship with your father?

JUROR NO. 21: No. I lived with him for three years, and that was it.

THE COURT: Okay. Do you have any close friends affiliated with law enforcement?

JUROR NO. 21: No.

THE COURT: Okay. There's going to be some testimony regarding actions by a county agency. The fact that your wife works for a county agency, is that going to skew your thoughts?

JUROR NO. 21: No.

THE COURT: You're not going to -- you can put that aside?

JUROR NO. 21: Absolutely.

THE COURT: Obviously, you're not going to discuss this case with your wife?

JUROR NO. 21: No.

THE COURT: You heard a lot of questions asked by both sides, anything

you wish to respond to?

JUROR NO. 21: No.

THE COURT: You heard some legal concepts. You heard other questions regarding relations with African-Americans. You've heard a whole list of questions, it's now four o'clock so we've heard a lot today. Anything that you wish to respond to?

JUROR NO. 21: No.

THE COURT: Do you want to serve?

JUROR NO. 21: Yes.

THE COURT: Very good. You may inquire.

MS. JORDAN: Thank you, your Honor.

Good afternoon, sir. How are you?

JUROR NO. 21: Good, thank you.

MS. JORDAN: You heard all the questions asked. Is there anything that stands out that you're like, "I just need to tell Prosecutor Jordan about this situation"?

JUROR NO. 21: No.

MS. JORDAN: How do you

judge someone's credibility?

JUROR NO. 21: It depends on the situation. If it's a professional, like, I'm going go to or if it's a person who might -- who might become a potential friend; it depends.

MS. JORDAN: Let's say it's a complete stranger, how would you judge a complete stranger's credibility?

JUROR NO. 21: I would hang out with them. After I hang out with them, maybe see how thing go. You know, experiences; experiences with them.

MS. JORDAN: If you're selected to be a part of this jury, you would have to work with your 11 other jurors. How do you work with others?

JUROR NO. 21: Work well with others.

MS. JORDAN: Can you think of a time or situation where you had to work with others?

JUROR NO. 21: All my jobs that I've had as certified occupational therapy assistant has a lot of different settings, travel, contractor workers; worked in a lot of

different settings, deal with a lot of different professionals. I was a senior bank teller; same thing. Restaurant manager, so I was managing people.

MS. JORDAN: Okay. And you heard my example about reason and common sense. If selected as a juror for this panel, do you think that you will be able to bring your reason and common sense into deliberations, sir?

JUROR NO. 21: Yes.

MS. JORDAN: Pass for cause, your Honor.

THE COURT: Thank you. Mr. Shaughnessy?

MR. SHAUGHNESSY: Thank you, Judge.

Good afternoon, sir. But you have to use that reason and common sense and then apply it to the most important of your own affairs; right?

JUROR NO. 21: Yes.

MR. SHAUGHNESSY: So we want you to use reason and common and then you have to determine if they give you proof beyond a reasonable doubt.

JUROR NO. 21: Yeah.

MR. SHAUGHNESSY: And you heard me talk about that little test, proof of such a character?

JUROR NO. 21: There was quite a few --

MR. SHAUGHNESSY: Right, you're going to get this in writing at the end so don't feel pressure to start writing it on your arm or anything.

Proof of such a character that you would rely and act upon it in the most important of your own affairs. Can you do that?

JUROR NO. 21: Yes.

MR. SHAUGHNESSY: What's the most important of your own affairs?

JUROR NO. 21: Right now family.

MR. SHAUGHNESSY: Okay. So you're going to be instructed not to abandon your common sense and reason. Right?

JUROR NO. 21: Right.

MR. SHAUGHNESSY: But the burden of proof still has to put you up to a point where you would use the character of evidence that they give you in those important decisions about your

family.

JUROR NO. 21: Yes.

MR. SHAUGHNESSY: Does that make sense?

JUROR NO. 21: Yes.

MR. SHAUGHNESSY: Even if it doesn't make sense, can you do it?

JUROR NO. 21: Yes.

MR. SHAUGHNESSY: Pass for cause.

THE COURT: Ms. Longino?

MS. LONGINO: Good afternoon, sir.

JUROR NO. 21: Good afternoon.

MS. LONGINO: You worked as an occupational therapist?

JUROR NO. 21: Certified occupational therapy assistant.

MS. LONGINO: For whom did you work?

JUROR NO. 21: Geez, I worked for a hospital. I worked for -- I had several jobs at once, Warren Harding Clinic. I did some work in private practice and also in the school

systems.

MS. LONGINO: So what did that work entail?

JUROR NO. 21: Well, it depended on the setting. So it's getting people -- figure out what's needed to get people to function as independently as possible. So it depended on where I was at, what setting.

MS. LONGINO: So you worked with people --

JUROR NO. 21: People with disabilities.

MS. LONGINO: Did you have to do things like help them to learn how to walk again? Things like that?

JUROR NO. 21: Not specifically learn to walk again but help them walk more efficiently, set up their environment so that maybe they don't have to walk as much to get things; things like that.

MS. LONGINO: Okay. You have one daughter, 21. Do you have any grandchildren?

JUROR NO. 21: Do not.

MS. LONGINO: Is your

daughter married?

JUROR NO. 21: No.

MS. LONGINO: Do you know if she has a significant other?

JUROR NO. 21: Not this week.

MS. LONGINO: Did last week's significant other have children?

JUROR NO. 21: No.

MS. LONGINO: Okay. Thank you. Pass for cause.

THE COURT: Peremptory is to the State.

MS. FARAGLIA: The State would like to thank and excuse Juror Number 8, Mr. O'Leary.

THE COURT: Mr. O'Leary, thank you. We're going to thank and excuse you. Happy St. Patrick's Day.

Darin Potprocky, how are you?

JUROR NO. 22: Okay.

THE COURT: You work at the Goodwill?

JUROR NO. 22: Yeah.

THE COURT: How long have you been there?

JUROR NO. 22: About four years.

THE COURT: What do you do there?

JUROR NO. 22: Tow motor vehicle driver.

THE COURT: Have you ever served on a jury?

JUROR NO. 22: No.

THE COURT: Ever been a victim of a crime, you or any family member?

JUROR NO. 22: Yes.

THE COURT: What did that involve?

JUROR NO. 22: My cousin and I were assaulted.

THE COURT: How long ago?

JUROR NO. 22: About 30 years ago.

THE COURT: Where?

JUROR NO. 22: In Parma.

THE COURT: Was anybody apprehended?

JUROR NO. 22: Yes.

THE COURT: Did you have

to testify in any proceeding?

JUROR NO. 22: Yes.

THE COURT: Was it resolved to your satisfaction?

JUROR NO. 22: Yes.

THE COURT: Do you have an opinion whether the police did a favorable -- do you have a favorable or unfavorable opinion with respect to the whole process and the police work?

JUROR NO. 22: Favorable.

THE COURT: Okay. Have you or any family member ever been accused of committing a crime?

JUROR NO. 22: No.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 22: No.

THE COURT: You heard a lot of questions here, since 11 o'clock. Anything you wish to respond to?

JUROR NO. 22: No.

THE COURT: Can you think of any reason why it would be difficult to serve?

JUROR NO. 22: No.

THE COURT: Do you want to serve?

JUROR NO. 22: Yeah.

THE COURT: Briefly.

MS. JORDAN: Good afternoon, sir. You heard all the questions asked of you. Anything stand out in your mind that you absolutely think we need to know?

JUROR NO. 22: No.

MS. JORDAN: How do you determine someone's credibility?

JUROR NO. 22: Past history, if you know they've lied to you before, you know; sometimes body language but I don't want to rely on that totally because that's not always a sure tell. That's about it.

MS. JORDAN: If selected to serve as a member on this jury, you will have to work with 11 other panel members. Do you think that you can work well with others?

JUROR NO. 22: Yes.

MS. JORDAN: If you had a firm conviction of something in terms of the facts, would you be able to hold true to that conviction?

JUROR NO. 22: Yes, as long as it's based on fact.

MS. JORDAN: Would you also be able to keep an open mind and listen to the input of other jurors?

JUROR NO. 22: Yeah.

MS. JORDAN: When you received your jury summons and walked into the courtroom, were you nervous?

JUROR NO. 22: Yes.

MS. JORDAN: Could you see how somebody walking into this environment and talking could make you a bit nervous?

JUROR NO. 22: Yes.

MS. JORDAN: But you still want us to listen to you and take the information you're giving you as true despite those nerves?

JUROR NO. 22: Yes.

MS. JORDAN: Anything about this case that makes you so uncomfortable and uneasy to the point you don't think you can be fair and impartial?

JUROR NO. 22: No.

MS. JORDAN: Thank you. Pass for cause.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions. Pass for cause.

THE COURT: Thank you. Ms. Longino?

MS. LONGINO: Mr. Potprocky, I see you have an FDNY shirt on. Does that have any personal significance to you?

JUROR NO. 22: My dad was a firefighter not for New York but he was a firefighter.

MS. LONGINO: Is your dad still alive?

JUROR NO. 22: Yes.

MS. LONGINO: When we say law enforcement, we don't just mean police. We also mean firefighters, people from the DEA, and that sort of thing. Any other -- anyone else in your family in law enforcement other than your dad?

JUROR NO. 22: No.

MS. LONGINO: Okay. You've been working for Goodwill for five years?

JUROR NO. 22: About that, yeah.

MS. LONGINO: Okay. Now, is there anything -- one of the questions specifically I would like to ask, since you do have a relative in law enforcement, does the word indictment make you think that if someone is indicted that they must have done something wrong?

JUROR NO. 22: No.

MS. LONGINO: No?

JUROR NO. 22: No.

MS. LONGINO: So you're willing to accept the fact that an indictment is a one-sided story but you're willing to listen to the entire story and make your judgment?

JUROR NO. 22: Based on the facts, yes.

MS. LONGINO: Based on facts. Okay. Any religious reason why you would not want to sit in judgment?

JUROR NO. 22: No.

MS. LONGINO: Okay. Any children?

JUROR NO. 22: No.

MS. LONGINO: Okay. Significant other with children?

JUROR NO. 22: No.

MS. LONGINO: No, okay. Ever had a significant other with children?

JUROR NO. 22: Yes.

MS. LONGINO: How long ago would that have been?

JUROR NO. 22: About 11 years ago.

MS. LONGINO: About 11 years. How old were the children?

JUROR NO. 22: She had one son when we first started dating, he was eight. By the time we broke up, he was 16 years old.

MS. LONGINO: So that lasted a long time. Were you close to the child?

JUROR NO. 22: Yes.

MS. LONGINO: Do you still have any communication with them?

JUROR NO. 22: Unfortunately not.

MS. LONGINO: Okay. Pass for cause, your Honor.

THE COURT: Thank you. Peremptory is to Defendant Day.

MR. SHAUGHNESSY: We thank and

excuse Juror Number 8.

THE COURT: Thank you, sir.

Eric Hoffman, take Juror Number 8's seat, please. He has a smile on his face.

JUROR NO. 23: Change of scenery.

THE COURT: Are you presently employed?

JUROR NO. 23: Yes.

THE COURT: What do you do?

JUROR NO. 23: I work for the DOD doing accounting.

THE COURT: For who?

JUROR NO. 23: Department of Defense.

THE COURT: How long have you been with them?

JUROR NO. 23: About two years. Prior to that, I worked for the Internal Revenue Service.

THE COURT: How long?

JUROR NO. 23: About a year.

THE COURT: Have you ever

served on a jury?

JUROR NO. 23: No.

THE COURT: Ever been a victim of crime?

JUROR NO. 23: Yes. I was held up at gunpoint at a gas station in Columbus in 2001.

THE COURT: Okay. Did you go to school down there?

JUROR NO. 23: No.

THE COURT: Was anybody apprehended?

JUROR NO. 23: Yes.

THE COURT: Was there a trial?

JUROR NO. 23: Not that I know of.

THE COURT: Was it resolved to your satisfaction?

JUROR NO. 23: They called us down to, I guess, verify the person that they had arrested was the person that robbed us, but it was me and my friend, and gas money to drive down to Columbus was about what we got robbed of so we decided not to pursue that option.

THE COURT: Did the police work leave you with a favorable or unfavorable impression?

JUROR NO. 23: Favorable.

THE COURT: Have you or a family member ever been accused of committing a crime?

JUROR NO. 23: Yes.

THE COURT: Who would that be?

JUROR NO. 23: I was.

THE COURT: What was that about?

JUROR NO. 23: I was accused and convicted of drug possession paraphernalia in 2003.

THE COURT: Where was that?

JUROR NO. 23: That was in Shaker Heights.

THE COURT: What was the result of that; you were convicted?

JUROR NO. 23: Convicted, fine of $450.

THE COURT: Was that in

muni court?

JUROR NO. 23: Yes.

THE COURT: Do you feel like you were treated fairly or unfairly?

JUROR NO. 23: Fairly, absolutely.

THE COURT: Anything about that experience which would affect your ability in this case?

JUROR NO. 23: No.

THE COURT: You heard a lot of questions asked by both sides. Anything you wish to respond to?

JUROR NO. 23: No.

THE COURT: You heard all the legal concepts and --

JUROR NO. 23: Yes.

THE COURT: -- how to judge the credibility of others. You can sit here and judge somebody's credibility?

JUROR NO. 23: Absolutely.

THE COURT: Listen to what they say in relationship to perhaps what other people say?

JUROR NO. 23: Yes.

THE COURT: And whether there is consistencies or inconsistencies?

JUROR NO. 23: Yes.

THE COURT: You may inquire briefly.

MS. JORDAN: Thank you, your Honor.

Good afternoon, sir. How are you?

JUROR NO. 23: Good. How are you?

MS. JORDAN: Good, thank you. As the judge said, none of the questions that you've heard so far speak to you and that you have to respond to? Correct?

JUROR NO. 23: Correct.

MS. JORDAN: Anything you think we haven't asked of you that we should?

JUROR NO. 23: No.

MS. JORDAN: What's your definition of being fair and impartial?

JUROR NO. 23: Fair and impartial, I mean, in this setting is reviewing everything as it's presented to me without any bias I may inherently hold and make the best decision I can with what's presented to me.

MS. JORDAN: If you're selected to be a member of this jury, you will be charged with the responsibility of deliberating with 11 other jurors. Can you work well with that group?

JUROR NO. 23: Absolutely.

MS. JORDAN: Will you be able to hear the viewpoints of your fellow jurors and use those in your deliberations?

JUROR NO. 23: Yes.

MS. JORDAN: If you had a different viewpoint of the case based on the facts and recollections of the evidence, would you be able to hold firm to those viewpoints?

JUROR NO. 23: Absolutely.

MS. JORDAN: In the converse, if your fellow jurors were able to dissuade you based on the facts and evidence, would you be able to change that opinion if necessary?

JUROR NO. 23: Sure.

MS. JORDAN: Thank you, your Honor. Pass for cause.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: What did you

do for the Internal Revenue Service?

JUROR NO. 23: I answered telephones. So any time someone was having an issue, they called and they would be very upset with me. I had to leave the job because I was breaking out in hives it was causing so much stress. It wasn't that great a job.

MR. SHAUGHNESSY: How long were you there?

JUROR NO. 23: Just under a year.

MR. SHAUGHNESSY: Did you have a degree? Did you have something that you were a certified tax person, could you answer questions, or did you just direct the calls?

JUROR NO. 23: You go through like a few-month training, and then it's rigid how the calls have to be guided so you adhere to that.

MR. SHAUGHNESSY: So I'd call you up and say I can't figure out my --

JUROR NO. 23: Filing PIN, or where's my refund; you verify the person and go through the process.

MR. SHAUGHNESSY: You have no

background; you weren't an investigator?

JUROR NO. 23: No, no. I have a degree in criminology and urban studies.

MR. SHAUGHNESSY: Didn't mail out certified letters?

JUROR NO. 23: Correct.

MR. SHAUGHNESSY: What do you for the Department of Defense?

JUROR NO. 23: Accounting, I make sure the Marine Corps pays their bills on time and has enough money in their bank account and can mail out checks.

MR. SHAUGHNESSY: Are they okay?

JUROR NO. 23: 75 percent of the time.

MR. SHAUGHNESSY: Pass for cause, Judge.

THE COURT: Ms. Longino?

MS. LONGINO: I thought I just heard Mr. Shaughnessy ask you how long that you were employed by IRS. I thought you said you were by employed by the Department of Defense.

JUROR NO. 23: Currently.

MS. LONGINO: So you used to be employed by the IRS?

JUROR NO. 23: Yes.

MS. LONGINO: And you said it gave you hives?

JUROR NO. 23: Absolutely.

MS. LONGINO: I believe it. How long have you been working for DOD?

JUROR NO. 23: Almost two years.

MS. LONGINO: Have any children?

JUROR NO. 23: No.

MS. LONGINO: Do you have a significant other with children?

JUROR NO. 23: No, I do not.

MS. LONGINO: Now, what was the ethnicity of the people who robbed you?

JUROR NO. 20: African-American.

MS. LONGINO: Tell me how you feel about that.

JUROR NO. 23: I don't feel any way about it. I mean, they were 12 and 13 years old at the time and it was the height of summer. It was a scary situation when it happened.

I don't hold any grudges toward the

children or African-Americans as a cause of that incident. I mean, it was one of the most terrifying things that ever happened to me but, at the same time, I walked away. So, in retrospect, it's kind of neither here nor there.

MS. LONGINO: They had guns?

JUROR NO. 23: Yeah. I thought it was a joke until the kid fired the gun into the ceiling.

MS. LONGINO: So did you give up your wallet or whatever it was?

JUROR NO. 23: Yes.

MS. LONGINO: And they --

JUROR NO. 23: They took mine and my friend's wallet and money out of the register and a couple other things and left.

MS. LONGINO: So you were --

JUROR NO. 23: Inside the gas station. They intended to rob the gas station and we were the unintended.

MS. LONGINO: They were 12 and 13?

JUROR NO. 23: Yes.

MS. LONGINO: Do you know if they went to juvenile jail?

JUROR NO. 23: I don't know what happened to those kids.

MS. LONGINO: Any family members in law enforcement?

JUROR NO. 23: No.

MS. LONGINO: Any religious convictions that could prevent you from sitting in judgment?

JUROR NO. 23: No.

MS. LONGINO: Do you desire to sit on this jury?

JUROR NO. 23: I mean I wouldn't mind it. I'd love to perform a civic duty. I was interested when I got the summons because it's something that I have no idea how it works so I was curious.

MS. LONGINO: You've never been a juror before?

JUROR NO. 23: No.

MS. LONGINO: But you've heard the definitions of burden of proof, presumption, how the grand jury operates, how the jury operates, what is required of you, and do you have a problem with any of that?

JUROR NO. 23: No.

MS. LONGINO: Okay. Pass for cause, your Honor.

THE COURT: Thank you. Peremptory is to the State.

MS. FARAGLIA: The State is going to thank and excuse Juror Number 2.

THE COURT: Thank you, sir.

JUROR NO. 2: Thank you.

THE COURT: Steven Thompson.

Don't worry there is an end to this soon. You work for Dearborn?

JUROR NO. 25: Yes.

THE COURT: What is that?

JUROR NO. 25: It's a machine shop in Berea.

THE COURT: How long have you been there?

JUROR NO. 25: About 12 years.

THE COURT: Have you ever served on a jury?

JUROR NO. 25: No, sir.

THE COURT: Been a victim

of crime?

JUROR NO. 25: No.

THE COURT: Have you or a family member ever been accused of committing a crime?

JUROR NO. 25: No.

THE COURT: Any close friends in law enforcement?

JUROR NO. 25: No.

THE COURT: You heard a lot of questions asked by both sides. Anything you wish to respond to?

JUROR NO. 25: No, sir.

THE COURT: Do you want to serve?

JUROR NO. 25: Yes.

THE COURT: Thank you. Go ahead.

MS. JORDAN: Thank you. Good afternoon, sir. How are you?

JUROR NO. 25: I'm fabulous. How are you?

MS. JORDAN: I'm good, thank you. Do you have any children?

JUROR NO. 25: Yes, 25 and

24 -- 25- and 22-year-old boys.

MS. JORDAN: Okay. You heard all the questions that have been asked of you. Do any of those questions stand out that you feel like we need to know an answer to?

JUROR NO. 25: No.

MS. JORDAN: Were there any questions that weren't asked that you feel like, "I wish they would ask me this question because they need no to know this information"?

JUROR NO. 25: I don't believe so.

MS. JORDAN: You heard my example of reason and common sense. Will you be able to use your reason and common sense if selected as a juror?

JUROR NO. 25: Yes.

MS. JORDAN: If selected to be a juror on this panel, you would have to deliberate with 11 other jurors. How do you interact with others?

JUROR NO. 11: Well, I got good grades in kindergarten if they asked if I would listen and played well with others.

MS. JORDAN: Wonderful

answer. Could you speak up just a little bit?

MR. MAREIN: What did he just say?

MS. JORDAN: Can you repeat your answer?

JUROR NO. 25: I said in kindergarten I got good grades when I was asked if I listened and played well with others.

MS. JORDAN: Thank you, sir.

How do you determine someone's credibility, what do you use to determine that?

JUROR NO. 25: The same thing we've been saying for hours, that everyone has been saying about body language and all that sort of thing. This is going to be a different experience. I've never had to do it in this setting, but I would imagine I'll give it my best.

MS. JORDAN: Wonderful. Thank you.

Your Honor, pass for cause.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions. Pass for cause.

THE COURT: Ms. Longino?
MS. LONGINO: Mr. Thompson, you say you have two boys, 25 and 22?
JUROR NO. 25: Yes.
MS. LONGINO: Do they have children?
JUROR NO. 25: No.
MS. LONGINO: Are they married?
JUROR NO. 25: The older one is, yes.
MS. LONGINO: Your 22-year-old, does he have a significant other?
JUROR NO. 25: Not that I'm aware of.
MS. LONGINO: Are your children here local?
JUROR NO. 25: Yes, but I mean he hasn't divulged that information if he does have one.
MS. LONGINO: Okay. And I don't see anything in the wife department. You're not married?
JUROR NO. 25: No.
MS. LONGINO: Okay. Were

you married?

JUROR NO. 25: Yes.

MS. LONGINO: Okay. How long have you been single?

JUROR NO. 25: Five years.

MS. LONGINO: Do you have a significant other with children?

JUROR NO. 25: Yes.

MS. LONGINO: And how many children does that person have?

JUROR NO. 25: Two.

MS. LONGINO: What are their ages?

JUROR NO. 25: 12 and 15.

MS. LONGINO: How long have you been in their lives?

JUROR NO. 25: Two years.

MS. LONGINO: Okay. And is that working out for you?

JUROR NO. 25: Sure.

MS. LONGINO: Okay. Is there anything that I may have asked or said that sticks out in your mind that you would like to elaborate on?

JUROR NO. 25: No.

MS. LONGINO: No. Okay. Pass for cause, your Honor.

THE COURT: Okay. Peremptory is to Defendant Lewis.

MS. LONGINO: We would like to thank and excuse Juror Number 2.

THE COURT: Thank you, sir.

Fred Palumbo, how are you?

JUROR NO. 26: I'm all right. Thank you.

THE COURT: You're retired?

JUROR NO. 26: Yes, I am.

THE COURT: What did you retire from?

JUROR NO. 26: City of Brooklyn, under Mayor John M. Coyne.

THE COURT: What did you do there?

JUROR NO. 26: Service department 22-and-a-half-years.

THE COURT: Your spouse is retired?

JUROR NO. 26: Yes.

THE COURT: What did she do?

JUROR NO. 26: She worked for Kaiser for 35 years.

THE COURT: Have you ever served on a jury?

JUROR NO. 26: No.

THE COURT: Have you or a family member ever been a victim of crime?

JUROR NO. 26: No.

THE COURT: Have you or a family member ever been accused of crime?

JUROR NO. 26: No.

THE COURT: Close friends affiliated with law enforcement?

JUROR NO. 26: No.

THE COURT: You heard a lot of questions here. Anything you wish to respond to?

JUROR NO. 26: I don't know if I could put someone's fate in my hands.

THE COURT: Why is that?

JUROR NO. 26: I always question myself, did I make the right decision.

THE COURT: I'm going to

thank and excuse him. Any objection, counsel?

MR. MAREIN: I would object.

THE COURT: Okay. Go ahead.

MS. FARAGLIA: Thank you. Good afternoon, Mr. Palumbo.

JUROR NO. 26: Hello.

MS. FARAGLIA: How strongly do you feel about that?

JUROR NO. 26: Well, I wouldn't hurt anybody ever. And I always, you know, I never give anybody the benefit of the doubt. So I'm that kind of a person.

MS. FARAGLIA: Okay. Would you agree with me you worked for 22 years; right?

JUROR NO. 26: Yes.

MS. FARAGLIA: You paid your taxes for your whole entire life?

JUROR NO. 26: Yes.

MS. FARAGLIA: You appear to be a law-abiding citizen?

JUROR NO. 26: Yes.

MS. FARAGLIA: You answered the jury summons?

JUROR NO. 26: Yes, reluctantly.

MS. FARAGLIA: Okay. But, you feel very strongly that you cannot sit in judgment of others?

JUROR NO. 26: I wouldn't want to do that.

MS. FARAGLIA: Okay. Wouldn't want to do that and doing it are two different things, you know what I mean?

JUROR NO. 26: I understand.

MS. FARAGLIA: You answered your jury summons; how did you feel when you got that jury summons?

JUROR NO. 26: You know, I'll be honest with you, I felt I graduated from high school, I went in the military, I paid my taxes, I did everything by the book; leave me alone. That's -- I'm being honest.

MS. FARAGLIA: Okay. That's what we want. But you also understand that if you didn't come down here today, and I don't mean just you but all you fine folks, our system of justice would grind to a halt because people sit in judgment of others all the time. It's not an

easy task.

I'm sure when this judge said to you that this was an aggravated murder case, it probably turned your stomach; right?

JUROR NO. 26: Absolutely.

MS. FARAGLIA: But, people come down here and make those decisions for us every day.

JUROR NO. 26: I understand.

MS. FARAGLIA: I'm not picking on you, please don't misunderstand but if you tell me: I just can't do it, then I'll respect whatever your answer is. If you're telling me: You can't do it, then you have to tell me.

JUROR NO. 26: Something this important, I can't do it.

MS. FARAGLIA: You can't do it. Thank you.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: Sir, did I hear you correctly, you said you never give anybody the benefit of doubt?

JUROR NO. 26: They have to prove -- you know what I'm saying.

MR. SHAUGHNESSY: I got you. I believe Mr. Marein and I withdraw the objection, Judge.

THE COURT: Do you object, Ms. Longino?

MS. LONGINO: No, I do not.

THE COURT: We'll excuse Juror Number 2.

Richard Kramer. Other than being tired, how do you feel?

JUROR NO. 28: I feel good.

THE COURT: You work at Case?

JUROR NO. 28: Yes, I do.

THE COURT: What do you do there.

JUROR NO. 28: I'm a systems engineer. I work in cloud services. I support the infrastructure, computers. I've done that since 1968. So I've done it for 50 years off and on.

THE COURT: Can't follow up on with any questions on that area.

Have you ever served on a jury?

JUROR NO. 28: Yes, I have.

THE COURT: How long ago?

JUROR NO. 28: It was within the last decade, it was here. I've actually served here two times, both criminal and civil. Luck of the draw.

THE COURT: Have you enjoyed that experience?

JUROR NO. 28: Yes, I have.

THE COURT: Good. How many criminal cases; do you recall?

JUROR NO. 28: Pardon?

THE COURT: How many criminal cases?

JUROR NO. 28: One.

THE COURT: Without telling us the result, did you reach a verdict?

JUROR NO. 28: Yes, we did.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 28: No.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 28: Yes.

THE COURT: Who would that

be?

JUROR NO. 28: My brother.

THE COURT: What was he accused of?

JUROR NO. 28: He was accused of rape. He's been incarcerated for around 28 years.

THE COURT: Was this in the Cleveland area?

JUROR NO. 28: No, it was not. But he's in the Ohio corrections.

THE COURT: Where did this offense occur?

JUROR NO. 28: I forget the name of the county, but it starts with an "H." It's down by Akron.

THE COURT: How old were you when this happened?

JUROR NO. 28: I was 40.

THE COURT: Did you attend any proceeding?

JUROR NO. 28: No, I did not.

THE COURT: Were you close to your brother at that time?

JUROR NO. 28: Yes.

THE COURT: Do you like he was treated fairly or unfairly?

JUROR NO. 28: I'm kind of -- I have difficulty with that. I couldn't believe it, okay. He said he was innocent, and he's never recanted that. I -- it was totally out of his behavior; he wasn't taking his meds at the time. But, you know, I had a hard time with it. I have not seen him since he's been incarcerated. So ...

THE COURT: Do you correspond with him at all?

JUROR NO. 28: I do not. He corresponded with me. I went to see him once, it was a bad experience so I've never repeated it.

THE COURT: Do you have any close friends in law enforcement?

JUROR NO. 28: No. I did have an uncle that's dead that was a reserve policeman.

THE COURT: Okay.

JUROR NO. 28: Family member but he's no longer alive.

THE COURT: I understand.

You heard a lot of questions asked by the attorneys here. Anything that you wish to respond to?

JUROR NO. 28: No. A question that keeps being asked over and over again has to do with credibility: How do you establish credibility, and I think as I have to listen to the testimony, weigh the evidence, and then make a decision upon my beliefs.

THE COURT: That's all we ask of you. Asking in the abstract is sometimes difficult to answer. These are serious charges here.

JUROR NO. 28: Yes, they are.

THE COURT: And your brother obviously was convicted of a serious crime.

JUROR NO. 28: Yes, he was.

THE COURT: Do you feel comfortable sitting on this case?

JUROR NO. 28: Yes, I do.

THE COURT: Do you want to serve?

JUROR NO. 28: Yes, I do.

THE COURT: Thank you. Briefly.

MS. JORDAN: Good afternoon, sir. How are you?

JUROR NO. 28: I'm good, thank you.

MS. JORDAN: I appreciate you answering the questions that have been asked of you so far. One of the questions involved your brother's situation --

JUROR NO. 28: Could you say that again? I couldn't --

MS. JORDAN: Sure. One of the questions involved your brother's situation and you indicated that the outcome of that trial was something that you struggled with?

JUROR NO. 28: Mm-hmm.

MS. JORDAN: Do you hold any bias or thoughts toward prosecutors, defense attorneys, police, as a result of that experience?

JUROR NO. 28: No, I do not.

MS. JORDAN: Will you be able to set your brother's experience aside and

focus on the facts and evidence in this case?

JUROR NO. 28: Absolutely.

MS. JORDAN: I appreciate you answering the question of credibility. So I don't have to ask that of you. It mean you've been listening to our questions. I'm grateful.

I also asked about reason and common sense. Do you remember that question?

JUROR NO. 28: Yes.

MS. JORDAN: If selected for the jury, will you be able to use your reason and common sense in the deliberation process?

JUROR NO. 28: Yes.

MS. JORDAN: You served on a jury previously. Do you have any children?

JUROR NO. 28: Yes, I do. I have a son and a daughter and three grandchildren. My son just got his MBA at Case.

MS. JORDAN: Congratulations. How old are your grandbabies?

JUROR NO. 28: My oldest is a granddaughter, she's in her 20s and gets married next month and the two grandsons are in their 20s.

MS. JORDAN: Pass for cause.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions. Pass for cause.

THE COURT: Ms. Longino?

MS. LONGINO: No questions. Pass for cause.

THE COURT: Next peremptory is to the State.

MS. FARAGLIA: One moment, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. FARAGLIA: Your Honor, the State would like to thank and excuse Juror Number 8.

THE COURT: Thank you, sir.

JUROR NO. 8: Thank you.

THE COURT: Lisa Gossett. How are you?

JUROR NO. 29: I'm very well. How are you?

THE COURT: Good. You work for Hikma, H-I-K-M-A, Pharmaceuticals?

JUROR NO. 29: Correct.

THE COURT: What do you do for them?

JUROR NO. 29: I'm a supply chain manager. I do a little customs compliance, DEA compliance, purchasing, shipping and receiving.

THE COURT: How long have you done that?

JUROR NO. 29: I've done it probably 20 years but I've worked there going on five years.

THE COURT: Your spouse is retired?

JUROR NO. 29: Correct.

THE COURT: What did he do?

JUROR NO. 29: He was, still is, a licensed customs broker.

THE COURT: Have you ever served on a jury?

JUROR NO. 29: I have.

THE COURT: How long ago?

JUROR NO. 29: About ten; eight, ten years ago.

THE COURT: Civil or criminal?

JUROR NO. 29: One was civil, one was criminal.

THE COURT: Criminal case. Did you reach a verdict?

JUROR NO. 29: Yes, we did.

THE COURT: You or family members been victims of a crime?

JUROR NO. 29: No.

THE COURT: Accused of committing a crime?

JUROR NO. 29: No.

THE COURT: Any close friends affiliated with law enforcement?

JUROR NO. 29: No.

THE COURT: You heard a lot of questions. Anything you want to respond to?

JUROR NO. 29: The question about African-Americans and how I feel. I've had friends that are African-Americans that have worked for me. I have African-American friends,

I've got positive feelings.

THE COURT: Anything else you want to respond to?

JUROR NO. 29: No.

THE COURT: Do you want to serve?

JUROR NO. 29: Yes.

THE COURT: Go ahead.

MS. JORDAN: Good afternoon, ma'am. How are you?

JUROR NO. 29: I'm very well. How are you?

MS. JORDAN: Good, thank you. Do you have any children or grandchildren?

JUROR NO. 29: I do not.

MS. JORDAN: You heard the questions asked; anything stand out in your mind that you need to answer or elaborate on?

JUROR NO. 29: I don't think so.

MS. JORDAN: Any question that we haven't asked that you think is information you need to share?

JUROR NO. 29: I don't have any.

MS. JORDAN: And what's your definition of fair and impartial?

JUROR NO. 29: I think it's looking at all the facts, I think that's the most important thing, abiding by the law that the judge hands down. Those are the main things.

MS. JORDAN: What was your initial response when you received your jury summons?

JUROR NO. 29: I thought: Wow, it's been so long. I was expecting it. It was funny, I was thinking about it months ago. So when I saw it, it was ironic.

MS. JORDAN: Thank you. Pass for cause, your Honor.

THE COURT: Talk about irony; I got a summons for jury duty. Imagine that.

MR. SHAUGHNESSY: Your Honor, no questions for this juror. Pass for cause.

THE COURT: Ms. Longino?

MS. LONGINO: Yes. Good afternoon, Ms. Gossett.

JUROR NO. 29: Good afternoon.

MS. LONGINO: So you have no children?

JUROR NO. 29: No children.

MS. LONGINO: And your husband is retired?

JUROR NO. 29: Yes, I married somebody a little bit older.

MS. LONGINO: That's all right. What did he do?

JUROR NO. 29: He was a licensed customs broker and still is. So that means he's licensed by customs and border protection to facilitate importations into the country. So he worked for a company called Steris for a number of years.

MS. LONGINO: How do you judge someone's credibility?

JUROR NO. 29: Past actions, past actions, body language, nonverbal, eye contact.

MS. LONGINO: Okay. Thank you. Pass for cause.

JUROR NO. 29: You're welcome.

THE COURT: Next

peremptory is to Defendant A.

MR. SHAUGHNESSY: Judge, we thank and excuse Juror Number 2.

THE COURT: Thank you, sir.

Kirsten Ellen Bogan, how are you?

JUROR NO. 30: Good. How are you?

THE COURT: Good, thank you. You work for the Great Lakes Science Center.

JUROR NO. 30: Yes.

THE COURT: What do you do for them?

JUROR NO. 30: I'm president and CEO.

THE COURT: How long have you held that job?

JUROR NO. 30: It will be six years in May.

THE COURT: Prior to that, what did you do?

JUROR NO. 30: Worked at the science museum in Minnesota.

THE COURT: Where does

your spouse work?

JUROR NO. 30: Campus International High School.

THE COURT: What does he do there?

JUROR NO. 30: He teaches English.

THE COURT: Have you ever served on a jury?

JUROR NO. 30: No.

THE COURT: Have you ever been a victim of crime, you or a family member?

JUROR NO. 30: House burglarized eight years ago in St. Paul. And then, growing up, a couple times, and a car stolen in Detroit, but that one was 40 years ago.

THE COURT: You or any family member been accused of committing a crime?

JUROR NO. 30: As CEO, I get named in anything against the Science Center, so a slip and fall or wrongful termination, anything like that has my name on it also.

THE COURT: That would be civil actions. Anything criminal?

JUROR NO. 30: No, no.
THE COURT: Do you have any close friends affiliated with law enforcement?
JUROR NO. 30: I work with law enforcement constantly but I wouldn't say close friends.
THE COURT: You heard a lot of questions asked by everybody here. Anything you wish to respond to?
JUROR NO. 30: I am concerned. I cleared my schedule through Tuesday, I'm supposed to be in Toronto on Wednesday running a committee meeting. I did call over lunch to see what arrangements could be made. That might be cutting it close.
THE COURT: Can you make arrangements?
JUROR NO. 30: I have a co-chair, I called her at lunch, I left her a message saying this is going to be longer than I thought. So ...
THE COURT: We're going to thank and excuse you.
JUROR NO. 30: Okay. Sorry.

THE COURT: It's okay.

Karen Shipley. Are you presently employed?

JUROR NO. 32: No.

THE COURT: What's the last job you held?

JUROR NO. 32: Skin care consultant, my own personal business.

THE COURT: Do you have a spouse?

JUROR NO. 32: No, I'm divorced.

THE COURT: Okay. Have you ever served on a jury?

JUROR NO. 32: No.

THE COURT: Have you or any family member ever been a victim of crime?

JUROR NO. 32: No.

THE COURT: Have you or a family member ever been accused of committing a crime?

JUROR NO. 32: No.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 32: No.

THE COURT: You heard a lot of questions asked by both sides, all sides here rather. Anything you wish to respond to?

JUROR NO. 32: No.

THE COURT: Do you want to serve?

JUROR NO. 32: Sure.

THE COURT: Go ahead.

MS. JORDAN: Thank you. Good afternoon, ma'am. I'm almost scared to ask you questions as you're in Seat Number 2. Do you have any children?

JUROR NO. 32: I do.

THE COURT: How old?

JUROR NO. 32: My daughter is 30, my son is 28 and he's a lawyer.

THE COURT: Any grandchildren?

JUROR NO. 32: No.

THE COURT: You mentioned your son is a lawyer. What type of law does he practice?

JUROR NO. 32: Real estate law.

THE COURT: Does he

discuss legal theories or concepts at the Thanksgiving table?

JUROR NO. 32: He does but he does not mention names or anything.

MS. JORDAN: Would you be able to set aside those conversations that you and your son had about the law and listen to the law as Judge McCormick gives to you?

JUROR NO. 32: Yes.

MS. JORDAN: Any question that Judge McCormick asked that you think that you need to respond on?

JUROR NO. 32: No.

MS. JORDAN: Any questions that we failed to ask that you feel like you need to tell us about?

JUROR NO. 32: Only thing is English is second language; I speak Spanish. I was born in Nicaragua. Sometimes accents are a little hard for me to understand when someone has an accent, whatever ethnic accent that might be. Other than that, I think --

THE COURT: Have you had any problem understanding anybody in the courtroom today?

JUROR NO. 32: Sometimes.

THE COURT: Like who?

JUROR NO. 32: Who specifically?

THE COURT: Yes, any of the attorneys or myself?

JUROR NO. 32: No, some of the --

THE COURT: Jurors?

JUROR NO. 32: Yes.

MS. JORDAN: Thank you for sharing that with us. If selected for this panel, do you think that you'd be able to work with the other jury members on the panel in making your decision in deliberations?

JUROR NO. 32: Yes.

THE COURT: How long have you been speaking English?

JUROR NO. 32: Since 1979.

THE COURT: Okay. Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions. Pass for cause.

THE COURT: Ms. Longino?

MS. LONGINO: Yes. Do you

have any relatives in law enforcement or close friends in law enforcement?

JUROR NO. 32: No.

MS. LONGINO: You said your children are 28 and 30?

JUROR NO. 32: Correct.

MS. LONGINO: Do you have any grandchildren?

JUROR NO. 32: No.

MS. LONGINO: Do you know if your children have significant others?

JUROR NO. 32: My daughter has a boyfriend.

MS. LONGINO: Do you know if her boyfriend has any children?

JUROR NO. 32: No.

MS. LONGINO: The 30-year-old is your daughter and the 28-year-old is your son?

JUROR NO. 32: Yes.

MS. LONGINO: Does he have a girlfriend?

JUROR NO. 32: Not that I know of.

MS. LONGINO: Do you know if

they have ever had companions that had children?

JUROR NO. 32: I don't think so, no.

MS. LONGINO: Anything that I may have said or asked that specifically sticks out in your mind or that you would like to address?

JUROR NO. 32: I don't think so.

MS. LONGINO: Have you had -- obviously my client, Deonte Lewis, is African-American. Have you had interactions with African-Americans?

JUROR NO. 32: Oh sure.

MS. LONGINO: Have you had any problems with any African-Americans?

JUROR NO. 32: No.

MS. LONGINO: And you're from where?

JUROR NO. 32: Nicaragua.

MS. LONGINO: How long have you been here?

JUROR NO. 32: I been here 40 years.

MS. LONGINO: Do you think

the language barrier would be a problem with you listening to all the evidence and deliberating with your co-jurors?

JUROR NO. 32: Somehow.

MS. LONGINO: Somehow? Could you kind of elaborate on that for me?

JUROR NO. 32: It's terminology. Since I speak, you know, fluent English, I speak the language but when it comes to legal languages, medical languages, any other type of, you know, terminology within the English language, it's a little challenging for me.

MS. LONGINO: So when the judge is instructing you on the law, you think you might have some problems with that because there are legal terms in there? Of course, he will explain -- define them for you but there are some words within the definition that you may have trouble with?

JUROR NO. 32: Right, I would have to look up --

THE COURT: They'll have a copy of the jury instructions with them.

JUROR NO. 32: Okay.

MS. LONGINO: So if you have

a problem with the language, would you have a problem asking one of your fellow jurors to help to explain to you the meaning?

JUROR NO. 32: No. No, I would not have a problem asking.

MS. LONGINO: Do you think you could work well with 11 other people in trying to come to a decision in this case?

JUROR NO. 32: Yes.

MS. LONGINO: You understand this is an extremely serious case, although I don't know of a criminal case that's not serious, but this involves the death of a four-year-old child. Does that present a problem for you to have to determine the guilt or innocence of my client regarding the demise of this child?

JUROR NO. 32: Can you reword that again?

MS. LONGINO: Would you have a problem trying to deliberate and applying the facts to the law in this case because it is about a four-year-old child? Would you have some issues with that?

JUROR NO. 32: No.

MS. LONGINO: Okay. So do

you have any religious reasons why you would not want to sit in judgment of someone?

JUROR NO. 32: No.

MS. LONGINO: Okay. Pass for cause, your Honor.

THE COURT: Thank you. Peremptory is to the State.

MS. FARAGLIA: State is going to thank and excuse Juror Number Three.

THE COURT: Thank you, sir.

Nicole Murray. How are you, ma'am?

JUROR NO. 33: I'm fine. How are you?

THE COURT: Good. Are you presently employed?

JUROR NO. 33: No.

THE COURT: What was the last job you worked?

JUROR NO. 33: I worked at patient transport at University Hospital and a cashier at Michael's.

THE COURT: How long ago was that?

JUROR NO. 33: That was

2013.

THE COURT: Have you ever served on a jury?

JUROR NO. 33: No.

THE COURT: Have you or a family member ever been a victim of crime?

JUROR NO. 33: Yes, it was myself. It was like rape but the person wasn't apprehended.

THE COURT: How long ago was that?

JUROR NO. 33: That was in 2012.

THE COURT: What municipality was that?

JUROR NO. 33: I don't know what that means.

THE COURT: What city was it?

JUROR NO. 33: It was in Cleveland.

THE COURT: Did you make a police report?

JUROR NO. 33: No.

THE COURT: Is there a

reason why you didn't make a police report?

JUROR NO. 33: I was probably too scared at the time. I didn't really know what to do.

THE COURT: I'm sorry. Anything about that experience that would make it difficult for you to serve here?

JUROR NO. 33: I don't think so, no.

THE COURT: Okay. Have you or any family member ever been accused of committing a crime?

JUROR NO. 33: That would be myself. I was destitute and I got on an RTA bus without paying, so I had to pay a fine for that.

THE COURT: How long ago was that?

JUROR NO. 33: That was last year, I think.

THE COURT: Okay. Do you have any close friends affiliated with law enforcement?

JUROR NO. 33: No.

THE COURT: Heard a lot of questions asked by various attorneys. Anything

you wish to respond to?

JUROR NO. 33: Yes. When it comes to -- I have autism and sometimes it's hard for me to concentrate on complex things. I can make an answer or come up with a conclusion regarding simple things but complex things I might take a little longer in doing that successfully.

THE COURT: Would you rather not serve on this case?

JUROR NO. 33: I want to do my civic duty but I also want to do the best I can with that.

THE COURT: Do you want me to excuse you?

JUROR NO. 33: No. I want to try if it's possible.

THE COURT: Okay. You may inquire.

MS. JORDAN: Good afternoon, ma'am. How are you?

JUROR NO. 33: All right.

MS. JORDAN: Do you have any children or grandchildren?

JUROR NO. 33: I have a

17-year-old daughter.

MS. JORDAN: Okay. You heard the questions I asked and the example I used about reason and common sense. Would you be able to bring your reason and common sense into deliberations?

JUROR NO. 33: Again, it would depend on the situation and how -- kind of how complex the subject matter is.

MS. JORDAN: Okay. I thank you for being open and honest and sharing that with us.

You were present in the courtroom when Prosecutor Faraglia read to you the extensive witness list. Do you think the number of witnesses in this case, which in some way signals the complexity of this matter, would be difficult for you to sit on? Would another case be possibly better for you?

JUROR NO. 33: Maybe. I don't really know.

MS. JORDAN: Again, I'm looking for a fair, honest answer. I appreciate you saying maybe. As Prosecutor Faraglia gave the example earlier, I'll give the same one.

If your significant other goes away for vacation and you tell him: Honey, while you're in Las Vegas, please don't cheat on me, and they say: I'll try not to, I'll do my best; would that be a sufficient answer for you?

JUROR NO. 33: No.

MS. JORDAN: Thank you. In addition, this case will have pictures shown from a medical examiner's office that are graphic in nature. Would that be difficult for you to sit through, ma'am?

JUROR NO. 33: No.

MS. JORDAN: Thank you, your Honor.

THE COURT: Thank you. Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions.

THE COURT: Ms. Longino?

MS. LONGINO: No questions.

THE COURT: Next peremptory is to Ms. Longino.

MS. LONGINO: Your Honor, we would like to thank and excuse Juror Number 6.

THE COURT: Thank you.

Ms. Josselson, how are you ma'am?

JUROR NO. 24: Fine.

THE COURT: You are a retired lawyer?

JUROR NO. 4: No, I'm a legal secretary.

THE COURT: Okay. Who did you work for?

JUROR NO. 34: I worked for the State of Ohio, the Attorney General's office, and I retired from there and I went back to part time for the Chapter 13 trustees office.

THE COURT: Your spouse is retired?

JUROR NO. 4: Yes.

THE COURT: What did he retire from?

JUROR NO. 4: He's a lawyer.

THE COURT: Is that Stan Josselson?

JUROR NO. 34: (Nodding head.)

THE COURT: Okay. Forgive me for asking, is Stan still around?

JUROR NO. 34: Yeah, he's

still around.

THE COURT: I just haven't seen him. Please don't tell him.

JUROR NO. 34: I won't tell him but he's going crazy being home.

THE COURT: I'm sure you're going crazy having him at home. Have you ever served on a jury?

JUROR NO. 34: Yes.

THE COURT: How long ago?

JUROR NO. 34: Long ago. Ten, maybe 15 years ago.

THE COURT: Okay. Have you or any family member ever been a victim of crime?

JUROR NO. 4: No.

THE COURT: Have you or a family member ever been accused of committing a crime?

JUROR NO. 34: Somebody in our family did, but he's dead. Does that count?

THE COURT: Yeah, it does count.

JUROR NO. 34: Okay. He went to prison for drugs.

THE COURT: Who was that?

JUROR NO. 34: Federal prison, my nephew.

THE COURT: How long ago was that?

JUROR NO. 34: Ten years, eight years ago maybe.

THE COURT: Did you ever attend any of the proceedings?

JUROR NO. 34: No, he was in Atlanta, Georgia. Also there is another stepson that was in prison for fraud.

THE COURT: Where was that?

JUROR NO. 4: In Florida.

THE COURT: Stan did criminal law?

JUROR NO. 34: Yes.

THE COURT: How long has he been retired?

JUROR NO. 34: Well, he still takes cases once in a while but he's been retired since November and he hates it.

THE COURT: Are you going to be able to not talk about this case with Stan?

JUROR NO. 34: No, he didn't even know anything I did in my other law jobs.

THE COURT: Certainly doesn't surprise me. You heard a lot of questions. Anything you want to respond to?

JUROR NO. 34: Pardon me?

THE COURT: You heard a lot of questions, anything you want to respond to?

JUROR NO. 34: No, I'm good.

THE COURT: Do you want to serve?

JUROR NO. 34: Oh yeah.

THE COURT: Go ahead.

MS. JORDAN: Good afternoon, ma'am. How are you?

JUROR NO. 4: Fine.

MS. JORDAN: Do you have children or grandchildren?

JUROR NO. 34: Yes, I have two children.

MS. JORDAN: You mentioned that you did previously serve on a jury.

JUROR NO. 34: Yes.

MS. JORDAN: Without telling me the outcome, did you reach a verdict? Did you deliberate together?

JUROR NO. 34: Yes. Yes, we did.

MS. JORDAN: Any question that we've asked that you feel like you need to expound on and answer?

JUROR NO. 34: No, I'm fine.

MS. JORDAN: How do you determine someone's credibility?

JUROR NO. 34: I just size them up and listen to them. What else?

MS. JORDAN: Did your husband ever talk about some of his criminal cases with you?

JUROR NO. 34: Not very much. He's kind of a quiet guy.

MS. JORDAN: Can you set aside any conversation you and your husband may have about his past cases and listen to the law as Judge McCormick gives it to you?

JUROR NO. 34: Of course.

MS. JORDAN: Thank you.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions. Thank you.

THE COURT: Ms. Longino?

MS. LONGINO: A couple questions.

Ms. Josselson, you said you worked for the Attorney General's office. What did you do for them?

JUROR NO. 34: I was a secretary in the criminal section, the unemployment section, and Workers' Compensation section; a little bit of everything.

MS. LONGINO: So you never had any courtroom experience?

JUROR NO. 34: No.

MS. LONGINO: Okay. Did you -- the Attorney General is like the state prosecutor; right?

JUROR NO. 34: Right.

MS. LONGINO: Did you have any opinions or prejudices against the defendants, I don't mean racial, I mean just the fact that they were defendants.

JUROR NO. 34: I don't really

get involved with them, except the prisoners. The prisoners would send crazy stuff in because we dealt with the prison. The prisoners would file lawsuits and then our office defends it, the state.

MS. LONGINO: Okay. Oh, when the prisoners would sue the state?

JUROR NO. 4: That's the kind of work we did. Very little. I did other stuff too.

MS. LONGINO: That office is very prosecutor oriented so, I don't know, I guess --

JUROR NO. 34: Prosecutor oriented? I don't know. I guess.

MS. LONGINO: Who was the Attorney General?

JUROR NO. 34: I worked for Celebreeze, Betty Montgomery, Lee Fisher and Petro.

MS. LONGINO: How long were you there?

JUROR NO. 34: 23 years I retired at.

MS. LONGINO: When was that?

JUROR NO. 34: I retired in maybe '04.

MS. LONGINO: 1984?

JUROR NO. 34: '04. '84; that would make me a hundred. Are you kidding?

MS. LONGINO: You still look young.

JUROR NO. 34: You've got to be kidding me.

MS. LONGINO: Okay. Okay. Any children?

JUROR NO. 34: Yes, two children, a boy and a girl.

MS. LONGINO: What are their ages?

JUROR NO. 34: 50 and 52.

MS. LONGINO: Any great-grand?

JUROR NO. 4: I have grandchildren, two grandchildren.

MS. LONGINO: Is that by one child or one --

JUROR NO. 4: Just one. My daughter has children. My son is a teacher, he doesn't want children.

MS. LONGINO: How many children does your daughter have?

JUROR NO. 34: Two.

MS. LONGINO: How old are they?

JUROR NO. 34: 13 and 16.

MS. LONGINO: Okay. Your son, the teacher, does he have a significant other --

JUROR NO. 34: Yeah. Oh -- that had children?

MS. LONGINO: Yes.

JUROR NO. 34: Let me think. I'm not sure. He lives in California; he doesn't tell me everything.

MS. LONGINO: So you didn't meet those people?

JUROR NO. 4: Some of the women I met.

MS. LONGINO: I gather you didn't approve?

JUROR NO. 34: There were, like, three girls that I met. They were fine.

MS. LONGINO: But they didn't`have children?

JUROR NO. 34: I think the one might have, I'm not sure.

MS. LONGINO: Okay. All right.

JUROR NO. 34: Oh, wait a minute. The one he's dating now, she has a 22-year-old and 24-year-old. So I didn't consider them children; they're adult children.

MS. LONGINO: And do they have children?

JUROR NO. 34: No, they're not married.

MS. LONGINO: No, does the girlfriend's children have children?

JUROR NO. 34: Her children? Her children do not have children. They're still in school.

THE COURT: Let's move this along, please.

MS. LONGINO: You said Mr. Josselson still does cases?

JUROR NO. 4: Very few, but once in a while he'll do something.

MS. LONGINO: Still criminal defense or in another area?

JUROR NO. 34: They're small cases because he doesn't have an office anymore. He does like auto accidents and sometimes speeding tickets. That's all I know about because I don't really know what he is does.

MS. LONGINO: Thank you. Pass for cause.

THE COURT: Very good. Peremptory is to the State.

MS. FARAGLIA: Your Honor, can we approach for a minute?

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Go ahead.

MS. FARAGLIA: Thank you, your Honor. The State would like to thank and excuse Juror Number 3.

THE COURT: Thank you, ma'am.

Let's go to side bar.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: We're going to recess for the day. I'd ask for the jury return at 12:30 to him on the 4th floor. All rise.

Please do not discuss the case. 12:30 tomorrow.

- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

- - - o0o - - -

THE COURT: All right. Don't be late, 12:30 tomorrow.

- - - o0o - - -

(Thereupon, court stood in recess until Thursday, February 28, 2019, at 12:30 p.m.)

- - - o0o - - -