STATE OF OHIO, )
) SS: **TIMOTHY P. McCORMICK, J.**
COUNTY OF CUYAHOGA. )

IN THE COURT OF COMMON PLEAS

CRIMINAL BRANCH

**STATE OF OHIO,** )
Plaintiff, )
vs. ) **CR 626899A**
**SIERRA DAY,** )
Defendant. )

- - - o0o - - -

**STATE OF OHIO,** )
Plaintiff, )
vs. ) **CR 626899B**
**DEONTE LEWIS,** ) **CA 108463**
Defendant. )

FILED
MAY 29 2019
Clerk of Courts
Cuyahoga County, Ohio

- - - o0o - - -

TRANSCRIPT OF PROCEEDINGS
VOLUME II OF V
VOIR DIRE, OPENING STATEMENTS, TESTIMONY

- - - o0o - - -

APPEARANCES:

On behalf of the State of Ohio:

MICHAEL C. O'MALLEY, Prosecuting Attorney, by:
**Anna Faraglia**, Assistant Prosecuting Attorney
**Aqueelah A. Jordan**, Assistant Prosecuting Attorney
**Sean M. Kilbane**, Assistant Prosecuting Attorney

On behalf of Defendant Sierra Day:
**Thomas E. Shaughnessy**, Esq.
**Mark B. Marein**, Esq.

On behalf of Defendant Deonte Lewis:
**Nicole C. Longino**, Attorney at Law
**James A. Gay**, Esq.

Luann Z. Cawley, RPR
Kerry L. Paul, RMR
Mary Jo Baden, RPR
Mary Jean Cooley, RMR
Susan M. Ottogalli, RMR
Official Court Reporters
Cuyahoga County, Ohio

THURSDAY AFTERNOON SESSION

FEBRUARY 28, 2019

PROCEEDINGS

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated. Good afternoon, ladies and gentlemen. We're going to conclude hopefully very shortly with this voir dire process. You're not in the twilight zone.

Mr. Kaplan you're self-employed?

JUROR NO. 36: I am.

THE COURT: What do you do?

JUROR NO. 36: I own a business that manufactures industrial cutting tools.

THE COURT: How long have you been in that business?

JUROR NO. 36: Six years.

THE COURT: Your spouse is

self-employed?

JUROR NO. 36: She is.

THE COURT: What does she do?

JUROR NO. 36: She has a business that imports home decor items.

THE COURT: Have you ever served on a jury?

JUROR NO. 36: I have, 15 years ago, criminal case. I was an alternate, so I did not deliberate.

THE COURT: Have you or a family member been a victim of crime?

JUROR NO. 36: No.

THE COURT: Have you or a family member ever been accused of committing a crime?

JUROR NO. 36: No.

THE COURT: Have any close friends affiliated with law enforcement?

JUROR NO. 36: I do not.

THE COURT: You recall all the questions that were asked yesterday?

JUROR NO. 36: I do.

THE COURT: We don't have

to repeat them?

JUROR NO. 36: No.

THE COURT: Please. Can you think of any reason why you could not serve?

JUROR NO. 36: No.

THE COURT: Do you want to serve?

JUROR NO. 36: Sure.

THE COURT: Thank you. Go ahead.

MS. JORDAN: Mr. Kaplan do you have any children?

JUROR NO. 36: I do, ten and 12.

MS. JORDAN: You heard all the questions from yesterday so I will try to repeat just as few as possible. How would you do in deliberating with your other 11 yours if selected for this panel?

JUROR NO. 36: Collaboratively, I spent a lot of times in groups over the course of my life in school, professional settings. I think I'm good in a group.

MS. JORDAN: What things do you use to determine someone's credibility?

JUROR NO. 36: Background, personal experience with that person, anecdotal information from other people that I trust on that person.

MS. JORDAN: Okay. Thank you, your Honor. Pass for cause.

THE COURT: Thank you. Mr. Shaughnessy?

MR. SHAUGHNESSY: Your Honor, I have no questions for this juror. Pass for cause.

THE COURT: Ms. Longino?

MS. LONGINO: No questions.

THE COURT: Peremptory is to Defendant A.

MR. SHAUGHNESSY: Your Honor, we would thank and excuse Juror Number 8.

THE COURT: No, you. Thank you, ma'am.

Sean De Paula. How are you, sir?

JUROR NO. 37: Good. How are you?

THE COURT: Good. You work for the Oatey Company?

JUROR NO. 37: Yes, sir.

THE COURT: What is that?
JUROR NO. 37: They make cements for like plumbing stuff, plumbing supplies.
THE COURT: How long have you been with them?
JUROR NO. 37: Six months.
THE COURT: Prior to that, what did you do?
JUROR NO. 37: I worked for American Heritage Billiards, in Streetsboro.
THE COURT: How long were you with them?
JUROR NO. 37: Ten years.
THE COURT: Your spouse is at Orange Schools?
JUROR NO. 37: Yes.
THE COURT: What does she do?
JUROR NO. 37: She's a third-grade schoolteacher.
THE COURT: Have you ever served on a jury?
JUROR NO. 37: No.
THE COURT: Have you ever

been a victim of crime, you or a family member?

JUROR NO. 37: No.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 37: Yes.

THE COURT: Who?

JUROR NO. 37: My brother.

THE COURT: What was he accused of?

JUROR NO. 37: I think stalking.

THE COURT: How long ago was that?

JUROR NO. 37: Ten years maybe.

THE COURT: What was the disposition of that?

JUROR NO. 37: He was stalking his ex-wife. I don't know what happened, though. I don't talk to him so --

THE COURT: You don't have any communication with him?

JUROR NO. 37: No. He's a loser.

THE COURT: So you have no opinion whether he was treated fairly or unfairly?

JUROR NO. 37: He's not in jail so he was probably treated fairly.

THE COURT: What municipality did that occur in?

JUROR NO. 37: New Hampshire.

THE COURT: Okay. Do you have any close friends affiliated with lawsuit?

JUROR NO. 37: Yes.

THE COURT: Who would that be?

JUROR NO. 37: My best friend's son is a North Ridgeville police officer.

THE COURT: Do you have occasions to socialize with the son?

JUROR NO. 37: No.

THE COURT: Okay. You heard a lot of questions obviously yesterday, anything you wish to respond to?

JUROR NO. 37: No.

THE COURT: Do you want to serve?

JUROR NO. 37: Yes.

THE COURT: Thank you. Go ahead.

MS. JORDAN: Thank you. Good afternoon, sir. How are you?

JUROR NO. 37: Good. How are you?

MS. JORDAN: Good, thanks. Do you have any children?

JUROR NO. 37: Three of them.

MS. JORDAN: Wonderful. What are their ages?

JUROR NO. 37: Seven, five, and two.

MS. JORDAN: You heard all the questions that were asked yesterday. Anything you feel like we need to talk about or discuss further?

JUROR NO. 37: No.

MS. JORDAN: Okay. How do you interact with working with others?

JUROR NO. 37: I'm the director of the supply chain of a big company. So I do big groups every single day, have

meetings every single day. I presume I work well with others.

MS. JORDAN: Can you think of anything that would prevent you from being fair and impartial in this matter?

JUROR NO. 37: No.

MS. JORDAN: Thank you. Pass for cause, your Honor.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions. I pass for cause.

THE COURT: Ms. Longino?

MS. LONGINO: Briefly, your Honor.

Mr. DePaula, who was it you said is a police officer?

JUROR NO. 37: My best friend's son.

MS. LONGINO: For --

JUROR NO. 37: North Ridgeville.

MS. LONGINO: Do you have a relationship with the son?

JUROR NO. 37: I know him.

MS. LONGINO: Do you have

interaction with him?

JUROR NO. 37: On occasion.

MS. LONGINO: So do you believe that a police officer would be more credible than just a regular person testifying? Do you think that they are more apt to tell the truth than someone else?

JUROR NO. 37: I don't believe that anyone is more apt to tell the truth than any other individual.

MS. LONGINO: Okay. So you don't think that police officers are more credible than someone who is not in law enforcement?

JUROR NO. 37: No. I mean, you've got to judge each individual by their own merit.

MS. LONGINO: How do you test credibility?

JUROR NO. 37: I think you have to listen to their story, put the dots together, make sure the story is plausible and makes sense.

MS. LONGINO: Okay. Now, someone could tell you a story that's not true

and makes sense. So would you use any other criteria to determine that person's credibility?

JUROR NO. 37: You have to determine facts. I mean, I guess through my experiences in life about how you judge people, body language, how they look at people, their past history, if you can figure out what they've done in their past.

MS. LONGINO: Okay. And you are married. How long have you been married?

JUROR NO. 37: Nine years.

THE COURT: Okay. Could you tell me one more time the age of your children?

JUROR NO. 37: Seven, five and two.

MS. LONGINO: Thank you. Pass for cause.

THE COURT: Last peremptory is to the State.

MS. FARAGLIA: Your Honor, the State is satisfied the way this panel is configured at this time.

THE COURT: Thank you. Last peremptory for Defendant Lewis.

MS. LONGINO: Yes, your Honor, we'd like to thank and excuse Mr. DePaula, Juror Number 8.

THE COURT: Thank you, sir.

Karla Rogers. How are you?

JUROR NO. 39: I'm well, your Honor.

THE COURT: You're an attorney?

JUROR NO. 39: Yes.

THE COURT: You do real estate law?

JUROR NO. 39: Yes.

THE COURT: How long have you been an attorney?

JUROR NO. 39: 23 years.

THE COURT: Did you ever, in the course of your law school or right out of law school, did you ever practice any criminal law?

JUROR NO. 39: No, I have not.

THE COURT: Okay. So you've always been on the civil side?

JUROR NO. 39: Correct.

THE COURT: Okay. Your spouse works for the city of --

JUROR NO. 39: Yes, my husband is also an attorney in private practice but he is the City of North Olmsted law director.

THE COURT: Okay. As law director -- he doesn't do the prosecution; does he?

JUROR NO. 39: No, he has a prosecutor that does that.

THE COURT: Has he ever done criminal law?

JUROR NO. 39: He does a general practice, so maybe DUI or something like that, but not --

THE COURT: Okay. Have you or any family member ever been a victim of crime?

JUROR NO. 39: No.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 39: Yes. My

sister, about seven years ago, was I think charged with trespass in connection with a divorce. I'm estranged from her, so I don't know anything about that.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 39: I do not, other than my husband.

THE COURT: You heard a lot of questions.

JUROR NO. 39: Yes.

THE COURT: Anything you wish to respond to in particular?

JUROR NO. 39: No.

THE COURT: Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 39: No, other than I'm scheduled to be out of town starting next Friday.

THE COURT: We'll get you out; that should not be a problem. Do you want to serve?

JUROR NO. 39: Yes, I do.

THE COURT: Thank you. Go ahead.

MS. JORDAN: Thank you. Good afternoon, ma'am, how are you?

JUROR NO. 39: I'm well, thank you.

MS. JORDAN: Do you have any children?

JUROR NO. 39: I do.

MS. JORDAN: How old are your children?

JUROR NO. 39: 17, 15, and 11.

MS. JORDAN: You mentioned that you haven't done any criminal law since law school. Can you put out of your mind any recollection that you might have of criminal law from law school and listen to the law only as Judge McCormick gives it to you?

JUROR NO. 39: Absolutely.

MS. JORDAN: Is there anything that you believe would prevent you from being fair and impartial?

JUROR NO. 39: No.

MS. JORDAN: Do you think

you work well with others?

JUROR NO. 39: Absolutely. I have a staff of associates that I work with, lots of people in my group. So I'm collaborative and I think I'm a good leader.

MS. JORDAN: Thank you. Pass for cause.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: Pass for cause, your Honor. No questions.

THE COURT: Ms. Longino?

MS. LONGINO: No questions. Pass for cause.

THE COURT: We have a jury. Now we need two alternates. Micah Potts take the last seat in the back row, and Zachary Smith take the last seat in the front row.

We're going to select two alternates, your job will be to listen attentively to the evidence. Assuming all 12 were present, we would thank and excuse you at the conclusion of closing argument. In other words, you would not have the opportunity nor -- to participate nor observe the deliberation process. Can you serve in that role?

JUROR NO. 40: Yes.
JUROR NO. 41: I have a conflict. I was expecting to serve this week. My wife has surgery planned for next week. Also I have a trip planned for next week.
THE COURT: You're excused.
Sandra Hobson. How are you, Ms. Hobson?
JUROR NO. 42:
THE COURT: Can you serve as an alternate?
JUROR NO. 42: I don't know.
THE COURT: Why? What's your hesitation?
JUROR NO. 42: Pardon me?
THE COURT: What's your hesitation?
JUROR NO. 42: Just being nervous.
THE COURT: Are you nervous in answering the questions?
JUROR NO. 42: No. Just being nervous.
THE COURT: Okay.
Mr. Potts, you work for the city of Brunswick?

JUROR NO. 41: Yes, sir. I'm a firefighter/paramedic.

THE COURT: How long have you been with the city of Brunswick?

JUROR NO. 41: My 17th year.

THE COURT: Your spouse is at Southwest General.

JUROR NO. 41: Yes, she's a labor and delivery nurse.

THE COURT: Have you ever served on a jury.

JUROR NO. 41: No.

THE COURT: Have you or a family member ever been a victim of crime?

JUROR NO. 41: No.

THE COURT: Have you or a family ever been accused of committing a crime?

JUROR NO. 41: THE COURT:

What was that?

JUROR NO. 41: Physical, failure to control, December 15th of 2005, and public intox in college once.

THE COURT: Where did you go to college?

JUROR NO. 41: Kent State.

THE COURT: 2005; what municipality?

JUROR NO. 41: OSP, I was on 71, so it was through Berea.

THE COURT: Anything about that that would cause you problems here?

JUROR NO. 41: No.

THE COURT: Do you have an opinion whether you were treated fairly?

JUROR NO. 41: I was treated fairly.

THE COURT: Okay. You must have close friends affiliated with law enforcement?

JUROR NO. 41: My sister is a detective with Lakewood PD. My brother-in-law is active police with RTA in Cleveland. My father was 40 years on the job at Olmsted Falls fire, grandfather was PD.

THE COURT: We're going to have officers testify. You're going to give their testimony the same credibility and weight as anybody else.

JUROR NO. 41: Correct.

THE COURT: Merely because they have a position in law enforcement in authority does not entitle their testimony to any greater or lesser weight; correct.

JUROR NO. 41: Yes.

THE COURT: You heard a lot of questions yesterday. Can you think of any reason why it would be difficult for you to serve.

JUROR NO. 41: No, your Honor.

THE COURT: Do you want to serve?

JUROR NO. 41: Yes, sir.

THE COURT: Ms. Hobson, are you presently employed?

JUROR NO. 42: No.

THE COURT: What was the last job you held?

JUROR NO. 42: I can't remember.

THE COURT: Have you had a job in the last 15 years?

.

JUROR NO. 42: No.

THE COURT: Okay. Are you married?

JUROR NO. 42: Yes.

THE COURT: What does your spouse do?

JUROR NO. 42: He's a retired electrician.

THE COURT: Do you have children?

JUROR NO. 42: Yes.

THE COURT: How old?

JUROR NO. 42: The youngest is 27. I have one that's 40; I forgot a lot. I'm sorry.

THE COURT: That's all right. Take your time. How many children do you have?

JUROR NO. 42: I have four daughters.

THE COURT: All adults.

JUROR NO. 42: Yes.

THE COURT: Do you have grandchildren?

JUROR NO. 42: Yes. Six.

THE COURT: What are the

age ranges?

JUROR NO. 42: One through 15 -- 16.

THE COURT: Are all your daughters are they presently married?

JUROR NO. 42: Two of them are and two of them not.

THE COURT: Are two of them single parents?

JUROR NO. 42: Yes.

THE COURT: Do they have live-in significant others, the ones that aren't married?

JUROR NO. 42: The ones that aren't married, no.

THE COURT: Okay. Have you --

JUROR NO. 42: Yes, I'm sorry. One; she has a boyfriend, a fiancee.

THE COURT: How long have they been together.

JUROR NO. 42: Four years.

THE COURT: How old are her children?

JUROR NO. 42: She has none.

THE COURT: Okay. Have you ever served on a jury before?

JUROR NO. 42: Years ago.

THE COURT: So you've done this?

JUROR NO. 42: Mm-hmm.

THE COURT: What type of case was it, a civil or criminal?

JUROR NO. 42: You know, I can't remember. I don't think it was criminal.

THE COURT: How was that experience?

JUROR NO. 42: I think it was okay.

THE COURT: Okay. Have you or any family member ever been a victim of crime?

JUROR NO. 42: No.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 42: No.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 42: Yes.

THE COURT: Who would that be?

JUROR NO. 42: A neighbor around the corner.

THE COURT: What department, Cleveland?

JUROR NO. 42: I'm in Oakwood Village.

THE COURT: So he's with Oakwood?

JUROR NO. 42: Yes.

THE COURT: Do you ever discuss his work with him?

JUROR NO. 42: No, we don't see each other much anymore.

THE COURT: You heard a lot of questions yesterday. Any question that you wish to respond to?

JUROR NO. 42: If I want to be on the trial.

THE COURT: I'm sorry?

JUROR NO. 42: If I want to be on the trial.

THE COURT: Well, I mean

it's a hardship, it's a hardship for everybody but we ask you to do this.

JUROR NO. 42: I know.

THE COURT: You've done it before; right?

JUROR NO. 42: Mm-hmm.

THE COURT: Okay. Mr. Potts, how many kids do you have?

JUROR NO. 40: Four; 19, 17, 12, and ten.

THE COURT: Okay. Go ahead.

MS. JORDAN: Thank you. Good afternoon, Ms. Hobson, Mr. Potts.

Mr. Potts, do you think that you will be able to be fair and impartial as you sit on this jury?

JUROR NO. 40: I believe I'll be fair and impartial.

MS. JORDAN: Can you think of anything that you want to respond to, to all of the questions from yesterday?

JUROR NO. 40: I did serve as a technical SWAT medic for five years in the City of Brunswick. And my neighbor and friend is the

assistant county prosecutor, Kristen So -- Sobieski.

MS. JORDAN: From our office?

JUROR NO. 40: Yes.

MS. JORDAN: Do you believe your experience as a paramedic and your knowledge of someone who works in our office, can you set that aside and fairly and impartially deliberate the facts, if needed as an alternate?

JUROR NO. 40: Yes.

MS. JORDAN: Ms. Hobson, can you tell me what makes you so nervous?

JUROR NO. 42: I have anxiety.

THE COURT: We can't hear you.

JUROR NO. 42: I have anxiety I'm just nervous.

MS. JORDAN: Is there anything that we can do to make you more comfortable?

JUROR NO. 42: No.

MS. JORDAN: Thank you, your Honor.

MR. SHAUGHNESSY: Your Honor, no questions. Pass for cause.

THE COURT: Ms. Longino?

MS. LONGINO: No questions. Pass for cause.

THE COURT: Peremptory? Let's go to side bar, actually.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Ms. Faraglia?

MS. FARAGLIA: The State is going to thank and excuse alternate Number 2, Ms. Hobson.

THE COURT: Thank you, ma'am. You can go back down to the fourth floor. Thank you, ma'am.

JUROR NO. 42: Thank you.

THE COURT: Erin Tisdale.

THE COURT: Ms. Tisdale, you work for the South Euclid Lyndhurst School

District?

JUROR NO. 43: Yes.

THE COURT: What do you do for them?

JUROR NO. 43: Eighth grade science teacher.

THE COURT: How long have you been doing that?

JUROR NO. 43: 13 years.

THE COURT: Your spouse is at Hawken?

JUROR NO. 43: Yes.

THE COURT: What does he do there?

JUROR NO 43: Seventh grade humanities teacher and basketball coach.

THE COURT: Have you ever served on a jury?

JUROR NO. 43: No.

THE COURT: Have you or any family member ever been accused of committing a crime?

JUROR NO. 43: No.

THE COURT: Any close friends affiliated with law enforcement?

JUROR NO. 43: No.

THE COURT: Can you think of any reason why it would be difficult for you to serve?

JUROR NO. 43: No.

THE COURT: Do you want to serve?

JUROR NO. 43: Yes.

THE COURT: You heard a lot of questions asked yesterday, anything that you want to respond to?

JUROR NO. 43: They were asking a lot of questions about race. My spouse is black; I'm in an interracial relationship, marriage. We have two children. They're four and two. I think that's --

THE COURT: I think you covered it all. Thank you. Any questions?

MS. JORDAN: No, your Honor. Thank you.

THE COURT: Questions?

MR. SHAUGHNESSY: No, your Honor. Thank you.

THE COURT: Questions?

MS. LONGINO: No, your

Honor.

THE COURT: Peremptory?

MR. SHAUGHNESSY: Your Honor we thank and excuse alternate number one, Mr. Potts.

THE COURT: Allison Benns, how are you.

JUROR NO. 44: Good.

THE COURT: Who are you employed by?

JUROR NO. 44: A clothing store at Great Northern Mall.

THE COURT: How long have you worked there?

JUROR NO. 44: Almost a year.

THE COURT: Okay. Prior to that, what did you do?

JUROR NO. 44: I've had some college, but right now I'm not currently taking classes.

THE COURT: Have you ever served on a jury?

JUROR NO. 44: No.

THE COURT: Have you ever been a victim of crime, you or a family member?

JUROR NO. 44: No.

THE COURT: Okay. Have you or any family member ever been accused of committing a crime?

JUROR NO. 44: No.

THE COURT: Do you have any close friends affiliated with law enforcement?

JUROR NO. 44: No.

THE COURT: You heard a lot of questions asked yesterday, anything you wish to respond to?

JUROR NO. 44: Not really, no.

THE COURT: Do you have any children?

JUROR NO. 44: No.

THE COURT: Do you want to serve?

JUROR NO. 44: Gladly.

THE COURT: Go ahead.

MS. JORDAN: No questions, your Honor.

MR. SHAUGHNESSY: No, sir.

MS. LONGINO: No, questions, your Honor.

THE COURT: Ms. Longino, you have one last peremptory, if you wish.

MS. LONGINO: We're satisfied with this jury.

THE COURT: Very good. Let's swear in this jury.

THE BAILIFF: Will the jurors in the jury box please rise and raise your right hand.

- - - oOo - - -

(Thereupon, the Jury was duly sworn.)

- - - oOo - - -

THE COURT: Ladies and gentlemen in the back of the courtroom, I want to thank you for your attendance. You can return to the fourth floor.

Ladies and gentlemen, we're going to take a brief recess to allow for counsel to set up whatever they're going to set up for opening statements, and we'll proceed with the trial. All rise. Please do not discuss the case.

- - - oOo - - -

(Thereupon, the Jury exited the courtroom.)

- - - oOo - - -

THE COURT: With respect

to the 404(B) type evidence, I would prefer that you keep it somewhat generic in opening statements because we will address it incident by incident during -- when you go through the examinations.

MS. FARAGLIA: I'm just going to say some various observations. I'll leave it very general.

THE COURT: Very good.

MS. FARAGLIA: Thank you.

- - - o0o - - -

(Brief recess had.)

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated. We're back on the record in Case 626899, State of Ohio versus Sierra Day and Deonte Lewis, Defendants are in court with counsel.

Ladies and gentlemen, we're going to proceed with the trial in this matter. We'll begin with opening statements. Opening

statements are not evidence. Opening statements are what the attorneys believe the evidence will establish. So please keep that in mind.

Since the burden of proof is upon the State of Ohio, they have the opportunity to address you first at every stage of this proceeding: Opening statements, examination of witnesses, and closing arguments.

Whenever reference is made to evidence, we're referring to the testimony of the witnesses from the witness stand and any documents or other tangible objects which may be admitted as exhibits.

As alluded to during voir dire, everybody in this courtroom has different roles. The attorneys have the opportunity to make arguments, examine witnesses. I'm basically the referee here. I rule on evidentiary matters and procedural matters.

You are the judges here. You're the judges of the disputed facts. Use your common sense to judge the credibility or believability of the witnesses. Merely because someone is under oath does not require you to believe their testimony. You're free to believe all, some, or

none of the testimony of any particular witness.

During the course of the trial, there may be objections. Do not hold it against an attorney if I overrule his or her objection. The lawyers are ethically bound to make sure that only proper evidence is admitted. I'm the ultimate arbitrator on those issues.

I advise the lawyers in front of the jury, I do not permit speaking objections. You may object; I will rule. If you wish to discuss a ruling, you can ask to come to side bar.

Once again, at side bar, we are discussing evidentiary issues or procedural matters so please do not attempt to overhear what we're discussing. Obviously that would defeat the purpose of the side bar.

If any time during the trial you need a break, raise your hand and we will accommodate you.

Once, again you cannot discuss this case at any time during the course of this trial among yourselves or with your significant others. Do not try to do any research on your own in this case. Your decision is to be based solely on what you hear in this courtroom and nothing more.

With that being said, you may proceed.

MS. FARAGLIA: Thank you, your Honor.

THE COURT: I'm sorry, let me address something else with you. You will have your note pads. Write your juror seat number on the pads on the back. You cannot share those notes obviously with anybody until you go to deliberate.

So during breaks you'll take them back -- during breaks in the course of the trial, you'll leave them in your seat. At lunch and at the end of the day, my bailiff will come and secure them; nobody will look at them.

Don't let notetaking detract from your attention from the testimony of the witnesses, please.

You may proceed.

MS. FARAGLIA: Thank you, your Honor.

**OPENING STATEMENT ON BEHALF OF STATE OF OHIO**

MS. FARAGLIA: Counsel for the State, Detective Kroczak counsel for the defense, Defendant Day and Defendant Lewis may it please this Honorable Court. Good afternoon,

ladies and gentlemen.

THE JURY: Good afternoon.

MS. FARAGLIA: As the judge has already indicated to you, opening statements are statements that are made to indicate to you what the evidence is going to show in this trial. What the evidence is going to show in this trial is that on March 11th, 2018, this four-year-old child was found dead in her apartment at Cultural Gardens in the possession and care and custody of her mother, Sierra Day, and Deonte Lewis.

Ladies and gentlemen, the evidence is going to show that this little girl was born on September 2nd, 2013, to Mickhal Garrett and to Sierra Day. They were a young couple. The child was born and she moved in with her family. She stayed in her family's home and they helped raise her, wherein Mickhal Garrett could come and visit and spend time, to such an extent that at some point their relationship became closer and they moved in together.

So you will hear testimony from Mr. Garrett about his relationship with Sierra Day and their raising of their child, [redacted].

The evidence and the testimony will show, folks, that this little girl was taken to the doctors; was treated like a normal, ordinary child for a period of her life.

The evidence will show that the relationship between Sierra Day and Mickhal Garrett soured at some particular point in time. And the evidence will show that Mickhal Garrett moved away. He left the apartment that they were living in, and that Sierra Day and [redacted] moved into their own apartment at Harbor Crest.

The evidence is going to show that Mickhal Garrett paid child support, and that Sierra Day was employed at Get Ready, Set, Grow Day care Center. The evidence will show that during this time that they were living in Euclid, Ohio, at Harbor Crest that they, Sierra Day would attend family functions with her brother, Isaiah Day, Erica Johnson who was her sister, mom and dad, Mr. and Mrs. Day, Natalie and Eddy. And that they would have family functions.

And so, [redacted] was one of three grandchildren for the Day family. There are two other children. There is Mackenzie and there is Madison.

And the evidence will show that [redacted] for the most part, would sometimes keep to herself. And the family members didn't quite know why.

The evidence will show that in May of 2017, this little girl was going to a day care. And there will be some various observations from some day care workers that will come in and give you some information about what they saw and what they observed.

The evidence will show too there was a visit, a doctor's visit, and I'd like you to keep note of this; that, at the age of three years old, this child weighed 32 pounds.

In June of 2017, Sierra Day becomes reconnected to Deonte Lewis, a high school chum from her high school days at Shaw. They were in band together. Deonte Lewis was good friends with her brother, Isaiah Day.

So, in that fateful month of June of 2017, these folks get together and they start dating. And for Mr. Deonte Lewis, this was his first real girlfriend. They moved in together at Harbor Crest. Mr. Lewis was gainfully employed. He had left the home of his parents and grandparents and now moved in and set up shop

with Sierra Day.

The evidence is going to show that the three of them lived at Harbor Crest up until February 1st of 2018, when they leave Harbor Crest and they move to Cultural Gardens in Euclid, Shore Cultural Gardens at 22701 Lakeshore Boulevard, where you will hear the 9-1-1 operator tell you that a call comes in on March 11th, 2018, to summon a squad there for a child not breathing.

The evidence will show that during this time and amongst family members, they observed how these two folks just seemed to be very much into each other. And the evidence will show, ladies and gentlemen, that as time went on, there was a change in [redacted]. She became a little less precocious a little less happy. She was a little bit withdrawn.

She was now being taken to a new day care center. She used to be at Harbor Crest but because of certain situations and circumstances, she was now moved to Get Ready, Set, Grow and that's where her mother was working at.

So, as this child is now moved around to a new day care. Mr. Lewis and Ms. Day continue

to have their relationship, and this child is at a new day care now and you will hear from those day care workers at Get Ready, Set, Grow.

The last time they see her is in January of 2018, and she is being held by her mother and she is fully clothed and is never set down, never -- no one can ever indicate whether or not she could walk back in January of 2018. From that point in time, ladies and gentlemen, January 18th -- January of 2018 to March 11th, 2018, this child is seen almost never.

She's not going to the day care. They don't see her at Harbor Crest. They don't see her at Shore Cultural Gardens, the new place that they moved in. And you'll hear one of the neighbors tell you: I didn't even know they had a child in that apartment.

The evidence will show that on March 8th, 2018, there was a situation back at Harbor Crest where these two defendants go back and put up a fuss because they're looking for their mail; they're not getting their mail, so they go back to Harbor Crest. And in the meantime, in January of 2018, the evidence is going to show Deonte Lewis lost his job, and that he and Sierra Day

were living at 22701 Lakeshore Boulevard together with [redacted].

The evidence is going to show, ladies and gentlemen, that on March 11th, 2018, a 9-1-1 call comes in. The paramedics respond along with police officers and they are banging on the door to try to get in to this apartment which called for help. The door is locked; it's not opened. They're banging on the door.

Once they -- once the door is opened, they walk in and they find a child that is clothed from head to toe, underneath an air conditioner. And the air conditioning is running on March 11th 2018.

The evidence is going to show, folks, that these paramedics asked what happened. The child was pulseless. They grab the child, ran downstairs, put her in the squad and cut off her clothes.

Once they cut off her clothes, they see that this four-year-old child is banged up and bruised. She's got a welt on her left side of her face with a laceration that is not bleeding. You can count every rib in her little body. And they try resuscitative measures; knowing full

well, based on their training and experience, that this child was already dead.

Ladies and gentlemen, the evidence is going to show that the next day, the medical examiner does his examination of this child and he finds this four-year-old to weigh 26 pounds at the age of four, and that he finds her cause of death to be blunt impacts to the head with a subdural hematoma, and she is malnourished.

Ladies and gentlemen, the charges before you are that of aggravated murder: Did purposely cause the death of [redacted], who was under the age of 13 years of age at the time of the commission of the offense.

Murder: Did cause the death of [redacted] as a proximate result of the offender committing or attempting to commit an offense of violence, and that felony is of the first or second degree of felonious assault, and/or endangering children, and/or permitting child abuse. Folks, those are the charges.

And, like we said before, this Court is going to give you all those definitions and all those elements. We accept those definitions. We accept those elements. We will prove to you that

both of these individuals killed this child, and the sorry death that she had to suffer. It was a long, prolonged death, and the medical examiner will tell you that. Because, as a result of blunt force impact she suffered a stroke that rendered her incapable of many human abilities of eating, of many things that we do in our common, ordinary, every day lives, folks.

So I ask you to pay close attention to the evidence that we are going to present; to evaluate it, and you will come back with the only fair and just verdict in this case is to hold each one of these individuals equally responsible for killing this four-year-old girl without any remorse.

Thank you.

THE COURT: Thank you. Mr. Shaughnessy?

MR. SHAUGHNESSY: Thank you, your Honor.

**OPENING STATEMENT ON BEHALF OF DEFENDANT DAY**

MR. SHAUGHNESSY: Good afternoon.

THE JURY: Good afternoon.

MR. SHAUGHNESSY: I'm just going to ask you, as we proceed through this trial, to keep the oath that you took earlier this afternoon in mind, to think and keep in mind the things that we talked about yesterday in voir dire. Keep that burden of proof in mind.

Use your tests of credibility that we talked about yesterday and today. Use your common sense and reason as you listen to this evidence.

I'm going to ask you not to jump to any conclusions, as we talked about yesterday. Don't let any single piece of evidence close your mind to everything that you're going to hear over the next several days.

Please withhold judgment. You will see photographs and things that we talked about yesterday. It may be difficult to not reach a conclusion or close your mind when you see some of these things. But I'm just going to ask you to please keep an open mind until you've heard each and every piece of evidence in this case.

And when you're done, you're going to conclude and find that the State of Ohio has not proven beyond a reasonable doubt that Sierra Day

purposely caused the death of her child.

Thank you.

THE COURT: Thank you. Counsel?

MS. LONGINO: Good afternoon, ladies and gentlemen.

THE JURY: Good afternoon.

**OPENING STATEMENT ON BEHALF OF DEFENDANT LEWIS**

MS. LONGINO: First I'd like to echo everything that Mr. Shaughnessy just said. But I'd also like to make some clarifications.

You will hear testimony about circumstances and incidents regarding this child from day care workers. However, they will date back to 2015; not May of 2017. Sierra and Deonte Lewis who is my client, who I am here on behalf of, I will -- the evidence will show regarding him that he and Ms. Day did not hook up until July of 2017. They never really became a couple until around August. By this time, little [redacted] was four years old.

They had been a couple for about seven months before this child lost her life. Now, the

issues between [redacted] and her mother were long before Deonte entered their lives; long before.

The evidence will show that when they first hooked up, the relationship was nice and fine, and, you know, he approved of her parenting practices. But after a while, he started to disapprove of her parenting practices. And when he would speak to her about that, her response would be: This is my child and I discipline her the way I see fit. So he stepped back.

Now, eventually, you know, he fell in love with this woman. Probably still is. But he fell in love with her, and he fell in love with her child.

Now, he did not ever move in with her. He spent time at her house. But what 27-, 28-year-old man, you know, with a girlfriend that's got her own place doesn't hang out at her place? He was living at home with his parents. He never moved from his parents' home on Burnett Avenue on East Cleveland; never. The evidence will show that.

He would spend time at Sierra's house and then would leave and go kick it with his boys or go back to his parents' home or go to his

brother's house. He might spend a few days there, but he was in and out. He was never a resident in her home. So he was never there every day monitoring her behavior toward this child or this child's eating habits.

Yes, he lost his job in January, but the evidence will show he lost his job because she was constantly calling him at his job telling him he needed to come home because something was wrong with the baby. The evidence will show, when she would leave --

MR. MAREIN: Your Honor, may we approach?

THE COURT: Yes, please, do. Mary Jo.

Folks, get to know each other.

- - - oOo - - -

(Thereupon, a discussion was had between the Court and counsel on the record at the bench out of the hearing of the Jury as follows:)

- - - oOo - - -

MR. MAREIN: Unless the co-defendant is going to testify in this case, there is no way that what she is saying is going to come into evidence, and I'm going to move --

THE COURT: Is he taking the stand?

MS. LONGINO: His mother is on my witness list.

THE COURT: Whoa, whoa, whoa, whoa, whoa. You're saying what he said to her and what she said back. No, you can't talk about that if -- you're committed to put him on the stand now. You understand that?

MS. LONGINO: Your Honor, his mother will testify that she would call him all the time and he would have her on speaker phone; that he would -- she would call him all the time, he would have her on speaker phone and she would hear her say these things.

MR. SHAUGHNESSY: So you're going to bring in through the mother the statements of the co-defendant?

MS. LONGINO: Yes.

MR. SHAUGHNESSY: Well, statements of the defendant are inadmissible unless entered by the party opponent, and we're not -- we are party opponents now but we might not have been before. But it's my understanding that this statement of the defendant, under the

rules of evidence, cannot be brought in unless it's introduced by a party opponent. And it's still versus both of us, not us versus you.

So I don't know how -- if this is a point, I'm asking for a mistrial and separation of -- separate trials at this point.

MS. LONGINO: That's my motion --

THE COURT: I'm going to tell the jury to disregard that. We're going to proceed. You're not going that way.

MR. MAREIN: Just move to strike.

- - - o0o - - -

(Thereupon, the following proceedings were had before the Jury in open court:)

- - - o0o - - -

THE COURT: Defense counsel's motion to strike is granted.

Ladies and gentlemen, you are to disregard the last statements by defense counsel with respect to what Ms. Day allegedly said. Disregard it.

Proceed.

MS. LONGINO: Okay.

**CONTINUED OPENING STATEMENT ON BEHALF OF DEFENDANT LEWIS**

MS. LONGINO: The testimony, the evidence will show that, first of all, Mr. Day -- I'm sorry, Mr. Lewis had nothing to do with the demise of this child.

The evidence will show that he had nothing to do with the fact that by the time she was deceased that she was very, very underweight. As a matter of fact, the evidence will show that when Mr. Lewis would take the child and Ms. Day to his house -- his parents' house, the first thing he would do is make sure that this child was fed.

THE COURT: Let's go to side bar.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Go ahead.

MS. LONGINO: As I just said, the evidence will show that when he was in control, when he was at his parents' house, the

first thing he would do was make sure this child was fed.

The evidence will show that -- now, the prosecutor said no one saw this child after January of 2018. I believe that's what she said, if I'm wrong, but the evidence will show that on February 8th, Sierra's twin brother, Isaiah, did see this child. February 8th, 2017, he did see her. He did see her at his sister's house.

At that time, Mr. Lewis was there and the child was laying down and appeared to be fine. He had no issues of her looking malnourished. Now, this was February the 8th of 2018, approximately about a month before this child passed.

Now, the evidence will show that on March the 5th, Mr. Lewis left Ms. Day's apartment; went to his brother's house, spent the night at his brother's house; came back on March the 6th. Then, on March the 7th, he went back to his brother's house; was gone for a while, in and out, in and out, as I said. Then he went back on March the 10th, and on March the 11th this child passed.

When he -- on March the 11th, and you

will hear from the 9-1-1 call that came in on March the 11th, he called 9-1-1; she didn't. He called 9-1-1 because the child was unresponsive. She was unresponsive. The evidence will show that she had a very large black eye that was closed shut with a slit over the top of her eye.

He called 9-1-1 because -- and one of her eyes were open. When he discovered that this child was unresponsive, he called 9-1-1 and told them: She's unresponsive, I don't know what's going on, she's got one eye open, I don't think she's breathing. He said: I tried to give her CPR, and the 9-1-1 operator says don't try to give her CPR. She tries to talk him through it.

Then, the evidence will show that then the mother chimed in and said -- they had a little conversation. And in the conversation, eventually the mother says she's not breathing. The 9-1-1 operator says: She's not breathing? The mother says: No. Just like that. "No."

So then the 9-1-1 operator instructs Mr. Lewis to start chest compressions, chest compressions. He's doing these chest compressions and as he's doing the chest compressions if you listen closely to the 9-1-1

tape, you can hear -- you can hear the child: hunh-hunh-hunh-hunh. So, you know, seemingly from the 9-1-1 tape, seemingly Mr. Lewis thinks that's her breathing, that's her breathing. And he believes he's not -- doesn't realize this child is expired.

So while he's on the phone with the 9-1-1 operator, I think he hears the -- well, you can tell that he hears the police officers or whoever had arrived at that time, the EMS operators who arrived at that time, trying to get in the door. And he says: Okay, they're here, I have to go open the door.

Now, they were down there beating on the door, sure. But he was up there trying to revive this child, and that's why it took him a while to go down and open the door because he's desperately up there trying to revive this child.

The evidence will show, when this child sustained these injuries, he was nowhere around. He had nothing to do with the fatal injury that was inflicted upon this child. He was nowhere around.

The medical examiner, if they read from their report, will say that the child sustained

these injuries days to weeks before she passed. Well, at least five to six days before she passed, he wasn't there. He could not have inflicted these injuries on this child because he was not there.

He got arrested because by the time EMS got there, he was there. He was there with Ms. Day trying to revive her child. He didn't know what happened to that child. He didn't know where she sustained those injuries. He couldn't tell them how she was hurt like that because he didn't know.

The evidence will show that there is no -- from the crime scene pictures, you will see there is absolutely no evidence that he was living in that apartment. You won't see any men's clothing, men's shirts and pants and shoes and things like that hanging up in closets, men's underwear in drawers; no shaving cream, no shaving kits, no razors; no evidence whatsoever that he was living in that apartment, and that's because he was not. He was living with his parents and he never moved out of their home.

The evidence will show that he had nothing to do with her death. He has never

abused her, and he had no hand in her malnourishment. Now, that's what the evidence will show.

Thank you.

THE COURT: Call your first witness.

MS. FARAGLIA: The State's going to call Heidi Hobart.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **HEIDI HOBART**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good afternoon. Please be seated. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not adjust.

THE WITNESS: Okay.

DIRECT EXAMINATION OF HEIDI HOBART

BY MS. JORDAN:

Q Good afternoon, Ms. Hobart Can you please state your name and spell your name for the record?

A It's Heidi Hobart H-E-I-D-I --

Q Ms. Hobart, go ahead. You're a little soft spoken. If you could move the mike so we can hear you a little better. Go ahead, ma'am.

A Heidi Hobart H-E-I-D-I, H-O-B-A-R-T.

Q And ma'am, are you employed?

A I am, yes.

Q Where are you employed at?

A Chagrin Valley Regional Dispatch Center.

Q What do you do at Chagrin Valley Regional Dispatch Center?

A I'm a police and fire dispatcher.

Q How long have you been employed as a police and fire dispatcher?

A Sixteen years.

Q And what sort of training and experience --

MR. MAREIN: Judge, we'll stipulate she's adequately trained, she knows what she's doing, and she can play the tape. Let's move matters along.

MS. JORDAN: Is that a stipulation from both?

MS. LONGINO: Yes.

MS. JORDAN: Thank you.

BY MS. JORDAN:

Q Ms. Hobart, were you working as a dispatcher on March 11th, 2018?

A Yes.

Q What was your assignment that day?

A I was a police and fire dispatcher.

Q Okay. What sort of things did you do as a police and fire dispatcher?

A Answer phone calls for emergency, nonemergency lines.

Q And how are those calls maintained? Are they recorded?

A Yes.

Q Okay. If you were to hear a call, would you recognize your voice?

A I would, yes.

MS. JORDAN: May I please approach, your Honor?

THE COURT: You may, go ahead.

MS. JORDAN: Thank you, your Honor.

BY MS. JORDAN:

Q Ms. Hobart, we're going to play for you a portion of what's been previously marked as State's Exhibit 221.

- - - o0o - - -

(Thereupon, State's Exhibit 221 was played to the Jury.)

- - - o0o - - -

BY MS. JORDAN:

Q Do you recognize the voice on this call?
A Yes, that is me.
Q Is this recording in the same or substantially similar condition to when you first took the call?
A Yes.

- - - o0o - - -

(Thereupon, State's Exhibit 221 was played to the Jury.)

- - - o0o - - -

MS. JORDAN: Pausing the call at 3 minutes and 53 seconds.

BY MS. JORDAN:

Q Ms. Hobart how long is it before you're notified that this victim is not breathing?
A It was at that time where we realized it.
Q Based on -- how is it that you proceed to give someone information as you have them on the call?
A (No response.)

Q Do you go based off of what they inform you?
A Yes.
Q Do you provide different instructions based on whether or not a child is breathing versus not breathing?
A Yes.
Q Why is that?
A If they're not breathing, we need to get CPR started immediately.

MS. JORDAN: Resuming the call at 3:53.

- - - o0o - - -

(Thereupon, State's Exhibit 221 was played to the Jury.)

- - - o0o - - -

MS. JORDAN: Stopping the call at 4:36.

BY MS. JORDAN:

Q Why are you asking someone to go get an AED machine at this point?
A That's protocol.
Q What is the AED machine?
A It's a machine they can hook up to a body to deliver shocks in an attempt to restart the heart.

MS. JORDAN: Resuming the call at 4:36.

- - - o0o - - -

(Thereupon, State's Exhibit 221 was played to the Jury.)

- - - o0o - - -

MS. JORDAN: Pausing the call at 6:42.

BY MS. JORDAN:

Q At this point in time, why are you giving instructions for someone to go open the door?

A Because the ambulance had just arrived on the scene and they needed to be let in.

MS. JORDAN: Resuming the call at 6:42.

- - - o0o - - -

(Thereupon, State's Exhibit 221 was played to the Jury.)

- - - o0o - - -

MS. JORDAN: Stopping at 7:22 in the call.

BY MS. JORDAN:

Q Why do you give an instruction at the point in time when her chest is not rising to keep pumping, Ms. Hobart?

A Because that was an indication she's still not breathing.

MS. JORDAN: Resuming the call at 7:22.

- - - o0o - - -

(Thereupon, State's Exhibit 221 was played to the Jury.)

- - - o0o - - -

BY MS. JORDAN:

Q Ms. Hobart, as this call was occurring, based on your training and experience, was there anything unusual that you noted?

MS. LONGINO: Objection.

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

A Typically when people call in and there's someone not breathing, they tend to be a little bit more excited or panicky. I noticed that they were both very calm.

MS. JORDAN: Thank you. One moment, please, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. JORDAN: Nothing further at this time, your Honor.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions for this witness, your Honor.

THE COURT: Ms. Longino?

MS. LONGINO Yes.

CROSS-EXAMINATION OF HEIDI HOBART

BY MS. LONGINO:

Q Ms. Hobart in your experience would you say that the hunh-hunh-hunh-hunh sound that we heard on the tape was coming from the child?

A (No response.)

Q As the defendant -- as Mr. Lewis was trying to give her compressions as you instructed?

A I don't know.

Q You don't know?

A No, I was not there on scene.

Q Did you hear that when you were on the phone with him?

A Yes, I did.

Q Okay. And you don't know if that sound was coming from -- it was coming in correspondence with the count, your count, and you were telling him to push as you counted; correct?

A Correct.

Q And the hunh-hunh-hunh-hunh was coming at the same time as your count. Would you agree with that?

A Yes.
Q Okay. So in your experience you're saying that, you've been doing this for 16 years, you're saying that you don't know if that sound was coming from the child?
A It could have been. It also could have been coming from someone else. I'm not there to see it.
Q Okay. Like you said, typically people act differently. What -- typically would somebody else be in the back going hunh-hunh-hunh-hunh?
A I don't know.
Q Okay. Now, when you told them that EMS was downstairs, you were still simultaneously instructing Mr. Lewis on how to give these compressions. That's what we heard on the tape; correct?
A Correct.
Q Okay. So he couldn't keep trying to revive this child and go downstairs at the same time. Did you know that their apartment was on the second floor and they had to go down to the first floor to open the outside door in order to get in to come up to the second floor to get in their apartment?
A Yes.
Q Okay. So they were knocking on the downstairs outside door, not knocking on the apartment door; correct?
A I don't know. I was not there.

Q But at some point, he hung up and went downstairs and opened the door because eventually EMS got in; correct?
A Correct.
MS. LONGINO: Thank you.
THE COURT: Redirect?
MS. JORDAN: Briefly, your Honor.

REDIRECT EXAMINATION OF HEIDI HOBART

BY MS. JORDAN:

Q You indicated that you weren't present at the place when this call occurred; correct?
A Correct.
Q Are you able to tell us whether it was the male or female voice on the phone doing the chest compressions?
A Based on the phone, no.
MS. JORDAN: Thank you. Nothing further, your Honor.
THE COURT: Anything?
MR. SHAUGHNESSY: No, your Honor.
MS. LONGINO: No, your Honor.
THE COURT: You may step down.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Call your next witness.

MS. FARAGLIA: We're going to call Nate LapuhTHE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **NATHAN LAPUH**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good afternoon. Please be seated. Speak directly into the microphone; the seat will not move.

Go ahead.

MS. FARAGLIA: Thank you, your Honor.

DIRECT EXAMINATION OF NATHAN LAPUH

BY MS. FARAGLIA:

Q Good afternoon, sir.

A Good afternoon.

Q Please state your full name, spelling your first

and last name for the court reporter.
A Nathan Lapuh, N-A-T-H-A-N, L-A-P-U-H.
Q Mr. Lapuh by whom are you employed?
A Euclid fire department.
Q In what capacity do you work for the fire department in Euclid?
A I'm a firefighter and paramedic.
Q Can you explain to the ladies and gentlemen the training you get in order to be a firefighter and paramedic?
A I had to go through EMT basic school, paramedic school, and fire school to obtain all three of those certifications.
Q All right. How long have you been a paramedic/firefighter for the City of Euclid?
A I've been there for 14 months.
Q All right. And in those 14 months, were you gainfully employed with the City of Euclid fire department back on March 11th, 2018?
A Yes.
Q And when you were working back on March 11th, 2018, what was your designation or what was your title back then?
A I was a firefighter cadet but I was paramedic in charge that day.

Q I'm sorry?
A I was paramedic in charge that day.
Q When you say firefighter cadet, what does that mean?
A It's your probationary period. So, you know, you get employer reviews and you're under a microscope for two years until you're officially sworn in as firefighter first class.
Q Okay. And with regard to the paramedic, had you fulfilled all of your obligations and certifications in order to become a certified paramedic?
A Yes.
Q So, back on March 11th, 2018, you were a certified paramedic, a cadet firefighter?
A Correct.
Q Can you just tell us briefly, what's the protocol in your department once you receive a 9-1-1 call?
A (No response.)
Q Does the fire department also go out with the ambulance?
A We are both; we are the fire department and we are the ambulance. So we have a set group of guys there that day who are assigned to a rig or vehicle, a position on that vehicle. So I was the medic that day. I had a driver for the ambulance that day, and then there were

gentleman on the truck that day as well.
Q All right. So tell me who you were working with that day.
A I was working with Paramedic Rob Swope He was on the squad with me. And I don't know who was on the truck that day.
Q Okay. Fair enough. Just generally speaking, after you go out on a call, do you write down or memorialize your findings in a report?
A After every call.
Q And did you do that back on March 11th, 2018?
A Yes.
Q Did you respond to an address of 22701 Lakeshore Boulevard apartment I believe it's 213?
A Yes.
Q And did you write a report about that?
A Yes.
Q All right.
MS. FARAGLIA: One moment, your Honor.
- - - o0o - - -
(Off the record.)
- - - o0o - - -
MS. FARAGLIA: Your Honor, may I approach?

THE COURT: You may. May I see it, first.

MS. FARAGLIA: Sure. Thank you, your Honor.

BY MS. FARAGLIA:

Q Mr. Lapuh after showing defense counsel and the Court, I'm handing you what's been marked as State's Exhibit 220. Can you take a moment and review that for me.

Did you review State's Exhibit 220?

A Yes, I did.

Q And can you just tell us, what is State's Exhibit 220?

A This is the report for that call at that address you said earlier.

Q Okay. And did you yourself go to that call and make this report?

A Yes.

Q All right. And we'll talk about the report in a minute, though. But tell me, once you arrived on scene, what was the call for when you got the call on March 11th, 2018?

A We were initially dispatched for respiratory distress.

Q All right. About what time was that at?

A We were dispatched at 1525, so 3:25.
Q In the afternoon?
A Yes.
Q All right. Can you please walk me through it; how did you get there, where did you go?
A We left the fire station, started driving to the address. And about halfway there, we were -- received an additional phone call from dispatch saying that the patient is no longer breathing and that they were starting CPR.
Q All right.
A So we continued in, and went about our call as we normally would.
Q All right. So when you get to Cultural Gardens can you explain to the ladies and gentlemen of the jury what -- is this a house, an apartment, a duplex, or an apartment building?
A It is an apartment building, multiple family, multiple story as well. There's three of them back there; A, B, C building. So it's a standard high-rise apartment building.
Q So how did you get in?
A Right through the front door, front lobby.
Q Did anybody have to let you in the front door?
A The front door lobby, no. The front door of the

actual apartment, yes.
Q So let's start; so you were able to go through the front door of this apartment complex?
A Correct.
Q All right. Where did you go next?
A I took the stairs and ran up the stairs to the apartment I was dispatched to.
Q Okay. And was the door opened for you?
A No.
Q What did you have to do?
A Pounded on the door numerous times.
Q All right. Were you there by yourself or were you with somebody else?
A I was there with EPD.
Q Okay. You need to tell us, what is EPD?
A I was there with the police department; they had responded and arrived at the same time as us.
Q Okay. So what are you doing at this point, sir?
A I'm still pounding on the door, waiting for somebody to answer.
THE COURT: Let me interrupt just to clarify. Is this the apartment door or is it a different door?
THE WITNESS: This is the apartment door. We have access to the main

building. Once we get in, we do not have access to each individual apartment. People can change locks as they desire, so we have to wait for somebody to answer the door.

THE COURT: Thank you.

BY MS. FARAGLIA:

Q So as you are in the building now, so who is pounding on the door?

A I am.

Q All right. How long do you pound on the door before you're let in?

A Four, five times, repeatedly yelling: Fire department, fire department, fire department after every time; still with no answer.

Q All right. What happens next?

A Finally someone answers the door. I thought it was odd. I asked is this the right apartment and then, yeah, open the door, and there was the scene.

Q All right. When you -- when the door is opened, who opens the door for you?

A The male.

Q All right. And do you come to learn that that's Deonte Lewis?

A Yes.

Q All right. And is he sitting here in this

courtroom?
A Yes.
Q Can you tell me where he's sitting and what he's wearing?
A He's sitting right there with the vest and white shirt.
MS. FARAGLIA: Your Honor, let the record reflect that the witness has identified Deonte Lewis?
THE COURT: May so reflect.
MS. FARAGLIA: Thank you.

BY MS. FARAGLIA:

Q When the door is first opened, what are your first observations?
A I notice a child on the ground, and a female administering CPR to the child at that time. I noticed the room was really cold; she was underneath an air conditioner at the time. That was it.
Q So what do you do?
A I immediately walk over to the patient, I check for a pulse and I start asking questions to the male and female on scene as to what had happened prior and why she is the way she is, and we go from there.
Q All right. And were you able to obtain any

information for purposes of trying to help this child?
A Yes. I had a kind of broken story from both parties, but the story I was told is that the patient had trouble breathing, she had fallen earlier that day, hit her head, and that they had come home, and the patient got sick and then that's how they found her. So I didn't really get anything else from that.
It was very quick in and out of the room. At that point, after seeing her like that, I made a decision to get the patient up and out of the room. That's when I picked her up.
Q Okay. And so what do you do then? You pick up this child and where do you go?
A I start running down the stairs to the ambulance.
Q Okay. Once you run down the stairs, where do you go?
A Right back down into the lobby, right out the front door we came in, and right back into the ambulance which is right out front.
Q Okay. When you went to the ambulance, where did you put the child?
A Right on the cot that was in there, and --
Q What did you start to do?
A We started to cut her clothes off so we could get access to her.

Q When you cut her clothes off, Mr. Lupah, what did you notice?
A Burns in different stages, cuts in different stages of healing, multiple contusions across her body. Very skinny, I could see all her ribs, bones. She looked very malnourished. She was cold; stiff.
And at the time we just made the decision to keep working. I mean, it was a kid.
Q Okay. And Mr. Lapuh when you say she was stiff, what do you mean by that?
A From my education, when you're working on somebody like that and they're stiff, they had not just recently gone into cardiac arrest. They had been in --
MS. LONGINO: Objection.
THE COURT: Overruled. Go ahead.
THE WITNESS: They had been in cardiac arrest for some time.
THE COURT: Go ahead.
THE WITNESS: When somebody is that stiff they had not just gone into cardiac arrest, they had been in cardiac arrest for some time; not just recently.
MS. LONGINO: Objection.
THE COURT: Overruled.

MS. LONGINO: Your Honor, may we have a sidebar?

THE COURT: Yes, you may. Mary Jo.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel on the record at the bench out of the hearing of the Jury as follows:)

- - - o0o - - -

THE COURT: Go ahead.

MS. LONGINO: He's testifying in his education that this child had cardiac arrest. First of all, that was not what she died from, she didn't have cardiac arrest. And he's not a doctor; he can't diagnose.

THE COURT: Go ahead.

MS. FARAGLIA: He is a trained paramedic. He went on scene for a child that's not breathing. He indicated when he got there she didn't have a pulse.

MS. LONGINO: Okay. He can say that.

MS. FARAGLIA: He testified to that.

MS. LONGINO: But he can't

say she was under cardiac arrest.

MS. FARAGLIA: Yes, he can. He's a trained professional; he's been educated in that.

THE COURT: You can cross-examine him on that. Objection overruled.

- - - o0o - - -

(Thereupon, the following proceedings were had before the Jury in open court:)

- - - o0o - - -

THE COURT: Go ahead.

MS. FARAGLIA: Thank you, your Honor.

BY MS. FARAGLIA:

Q All right. Mr. Lapuh you indicated that you started some life-saving measures?

A Yeah, initially. Those are basic measures, like I talked about earlier, CPR, in an attempt to ventilate the patient. But at the time, I made the decision to pick up the patient and move to an environment I was more comfortable with and I knew the rest of my materials were at. I don't have everything with me right there at the scene.

Q Okay. Were you able to intubate her?

A Negative; no, no.

Q Okay. Why is that?
A Her jaw was extremely stiff. Like I had mentioned earlier, her body was stiff and I couldn't get the jaw open to actually attempt the intubation.
Q Okay. And were there other members of your team in the ambulance with you?
A Yes.
Q Okay. And during that time, were you able to obtain a pulse?
A No.
Q All right. Did you try to obtain a pulse?
A Yes.
Q Okay. What did you do? Just tell us what steps you took to obtain a pulse.
A We continued CPR. We attempted intubation. When we noticed we could not intubate her, we bag valve mask, which is ventilation through a bag.
Q Just take a deep breath. It's all right. It's all right.
Mr. Lupah was this your first scene with a child?
A For a child like this, yes.
Q Okay. All right. When we talk about a bag valve mask, what are we talking about?
A It's a device that we use to breathe for people who're unable to breathe for themselves. It's a mask

that creates a seal over your nose and your mouth. Every time we push, we introduce air into your lungs. We essentially breathe for you when you are not breathing. And when she was talking about intubation earlier, that's a more advanced form of ventilation that we do.

Q Were you successful in using that bag valve mask in trying to obtain any pulse or breathing from this child?

A I'm sorry. Could you repeat?

Q When you were using the bag valve mask, were you able to get any breathing, any air, anything that was coming out of the child?

A No, everything we were doing was just us doing it.

Q Okay. And how long were you on scene?

A We were on scene for a total of four minutes.

Q All right. And all these measures that you have talked about, now -- now you also provided us with a report; correct?

A Yes.

Q Did you write down everything that you did in your report, sir?

A Yes.

Q Okay. Now, starting with page 1 of State's Exhibit 220, what kind of information do you provide in

this report?
A It's a detailed report: Where we went, who was on the call, the times, and what we did.
Q All right. Can you tell me who was on the call with you?
A Myself, Paramedic Rob Swope, Paramedic Chris Wilson.
Q Okay. And what kind of a call was this dispatch?
A It was initially dispatched as respiratory distress, difficulty breathing.
Q All right. When you go there, is it a call that you -- that would require lights and sirens?
A Yes.
Q All right. That's memorialized in your report?
A Yes.
Q All right. Does it also provide us information of the time that the call was received, when you're dispatched, when you arrive, and when you leave?
A Correct. Yes.
Q And then does it also provide information about what you did when you were on scene?
A Yes.
Q Okay. And so starting on page 1, what kind of condition did you find when you arrived on scene?
A The condition of the patient?

Q Yes. What your description is, in your report.
A Under seen information?
Q Yes.
A Cardiac arrest, nontrauma to our patient, our inability to determine the actual cause of the cardiac arrest.
Q All right. What is the next topic or area?
A Chief complaint.
Q Okay. And what is the information that you provide?
A Unresponsive female; location was general global, entire body. And my -- I completed my ALS assessment for that unresponsive female.
Q I'm sorry? I didn't hear the end of that.
A An ALS assessment was completed for that unresponsive female.
Q What is an ALS assessment, sir?
A It's a detailed assessment from a paramedic going everything from their airway, breathing, circulation, down to what meds they've taken, what history they have, anything of that sort; just getting a generalized history of the patient and the efforts going on.
Q Okay. And then what is the next topic?
A The history of present illness.
Q All right. And what information do you provide

there?
A I provide what I saw, what happened when I arrived on scene, and then a couple statements I had.
Q And what was that?
A I wrote down upon arrival, I met the EPD at the doors to the building because like I said EMS and EPD, so us and the cops, were at the apartment. I wrote down I knocked multiple times on the door to attempt to get someone to open it. I wrote what I saw; upon entry I saw the child on the ground underneath the air conditioner with the female, mother, trying CPR. I noted the apartment was in normal condition; that the child was severely emaciated and has facial injures, no blood was on scene, though.
The mother states that the child has no medical history. The mother states that the child fell off the toilet last night and hit her head but was okay and went to dinner. And no other information was given.
Q Okay. All right. And then we move onto page 2 of your three-page report. What were your findings as to your neurological exam?
A Her level of consciousness was unresponsive; did she lose consciousness, yes; pupils dilated, yes; is she paralyzed, no; intermittent status present was unresponsive. Her Glasgow coma Scale was a 3.

Q I'm going to stop you. What's a Glasgow coma Scale?
A Glasgow coma is what we use to determine the patient's state, everything from the eye movement to motor skills to their verbal ability: can they talk to us, are they talking in complete sentences, is it broken up; are their eyes open, closed; are they responding to us; movement: are they moving, are they still, are they partially moving. It's a scale that we use to determine a treatment method for her.
Q Okay. And you also indicate to us in this report that the pupils of the eyes were dilated?
A Yes.
Q Okay. And that the motor and sensory -- the motory was flaccid Can you tell me what that means?
A Nothing there, there is no muscle tone, it's just completely --
Q Muscle tone in the body, sir?
A Yes. There was nothing -- there was just like dead weight, there is nothing there, everything is let loose, flaccid.
Q Okay. Thank you. And then you also provided more information about cardiovascular and cardiac arrest?
A Yes.
Q Okay. And what information do you provide us

there?

A Just that her cap refill is greater than two seconds which means her tissues are not perfusing adequately.

Q I'm sorry. You have to keep your voice up, sir.

A That her cap refill was greater than two seconds; that tells me right way that her tissues are not perfusing adequately, that there is not blood circulating to those tissues.

Q Okay. And so as a result of that, what do you do?

A That's when we start CPR.

Q Okay. And did she have any rhythm?

A I'm unable to determine a rhythm, that's -- a monitor that determines rhythm, but there was no pulse.

Q All right. What does asystole mean?

A Asystole means there is no electrical activity going on in the heart. That's flat line asystole that's what that is.

Q All right. Then you do an initial physical finding. So what were your physical findings that you observed yourself, sir?

A There was a contusion and a laceration on her head. She had a one-inch laceration on her forehead. There were multiple cuts and bruises in different stages of healing all across her body.

There was burn blistering to her ankles. There was a one-inch burn to her right ankle, burn blistering on her right lower leg; burn redness on her right lower leg. Her right lower leg showed a five-inch second degree burn to her right shin.

Her left eye had a contusion and swelling and a two-inch laceration above her left eye as well. Her mental status was still unresponsive.

Q Sir, when you're looking for that and you look at the laceration, do you see any blood?

A No.

Q Can you tell the ladies and gentlemen of the jury what a laceration is?

A Laceration is a cut. Cut yourself with a knife, that's a laceration.

Q All right. And finally, on page 3 of your report, are these like your final comments or are these a continuation of your activity that you --

A I'm sorry. On the third page?

Q Yes.

A That page right there is a time-stamped of what happened, what we saw, what we did.

Q And that is everything that you just testified to sir, correct?

A Correct.

Q Once you care for the patient in the ambulance, then what do you do with the patient?
A After we've already cared for the patient, immediately begin transport.
Q All right. And when you get to the hospital, do you give the hospital a report of the condition of the child?
A Correct.
Q All right. And do you do anything else at the hospital with this child?
A All we do is we transfer care to the nurses and the doctor at the hospital.
Q And do you provide them the information of any potential -- excuse me. Strike that.
Do you provide to them information of all the things that you did, life-saving measures, for this child?
A Yes.
Q And any type of treatment that you gave to this child?
A Yes.
Q Mr. Lapuh, let's just go back to the beginning for a moment, okay.
When you first arrived to the apartment, where was this child located?
A In the room straight ahead from the door, right

underneath the air conditioner.

Q Was the air conditioner on or off?

A It was on.

Q What was the room like?

A It was pretty cold. I remember that. I remember thinking this is odd because it's cold outside, why is it cold in here.

Q It was March 11th of 2018?

A Yeah.

Q Okay. And did you question anybody about that?

A At the time, no.

Q All right.

MS. FARAGLIA: Thank you. No further questions.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: One second, please.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MR. SHAUGHNESSY: Good afternoon, sir.

THE WITNESS: Good afternoon.

CROSS-EXAMINATION OF NATHAN LAPUH

BY MR. SHAUGHNESSY:

Q You talked to us about, first of all, when you were banging on the door; correct?

A Yes.

Q I think you indicated that four times you very quickly pounded on the door, and yelled: Fire, fire, fire?

A Correct.

Q Was it about as long as I just did it?

A I don't know.

Q I mean, you weren't timing that; right?

A No.

Q I mean you came in, you bang on the door, yell: Fire, fire, fire, fire?

A Yes.

Q Okay. And then the door was opened?

A Correct.

Q Okay. You indicated to us or talked about the child's -- stiffness on the child; correct?

A Yes.

Q Are you familiar with rigor mortis?

A Yes.

Q And rigor mortis can set in -- are you suggesting this was rigor mortis?

A I didn't know what this was at the time, I noticed that the child was stiff.
Q You're familiar that rigor mortis can set in rather quickly?
A Yeah.
Q Let me ask you this: Are you the right person to ask about that? Are you an expert in how long it takes for rigor mortis to occur?
A No.
Q Or how long it lasts or anything of that nature?
A No.
Q You're not trained in that?
A No.
Q So you're just testifying here today as to your observations?
A Yes, my observations.
Q Okay?
MR. SHAUGHNESSY: Thank you.
THE COURT: Ms. Longino?
MS. LONGINO: Yes.

CROSS-EXAMINATION OF NATHAN LAPUH

BY MS. LONGINO:
Q Now, you said you had been working for Euclid EMS for 14 months at the time, by March 11th, 2018?
A No. At the time, she had asked me how long I had

worked for the City of Euclid. Currently 14 months.
Q Okay. How long had you been a paramedic?
A My career or for the city?
Q Career.
A Four years.
Q Okay. Now, you testified that it was -- first of all, all you're really trained to do is make clinical observations. You're not a medical doctor; correct?
A I'm not a doctor, correct.
Q You cannot do diagnosis; correct?
A Correct.
Q And when I say clinical observations, what I mean is what you can see; you make certain determinations by what you see?
A Yes.
Q Correct?
A Yes.
Q So, in your report, you put that the child had several burns. She had several -- multiple cuts and bruises in different stages of healing and burns and blistering. But are you aware that what you were looking at were actually not burns?
MS. FARAGLIA: Objection, your Honor.
THE COURT: Overruled.

MS. LONGINO: Are you aware of that?

THE WITNESS: What I was looking at was not burns?

BY: DEFENSE3:

Q Was not burns.

A At the time, that's what we thought they were.

Q Well, would it surprise you if I told you that the medical doctors, the coroner, the medical examiner, said they were not burns? Would that surprise you?

A Yes.

Q Okay. So what that means is that you're really not qualified to make these type of determinations; correct?

A Determinations of what?

Q That what you were looking at were burns?

A I'm qualified to make an observation of what I see. And at the time, I saw what I had determined to be burns on her body. And with the paramedics on scene, we had all talked to each other and determined that's what we thought it was.

Q That's what you thought it was, okay.

Now, also, I think I heard you testify that you inquired about what happened and you were getting different stories and that you wrote down everything you saw

and everything that happened. But actually in your report you say, "Mother states child fell off the toilet last night and hit her head but was okay, and went to dinner. No other information given."

A Uh-huh.

Q Uh-huh. So if you got different stories from both parties then why would you put in your report that you only got one story from one party?

A I put down exactly what I could remember. I wasn't going to put down something I didn't remember.

Q You didn't remember it then at the time but you remember it now?

A I remember that what was in this report is what I put.

Q You couldn't remember what you just testified to then but you remember it now? Page one, at the bottom, history of present illness?

A Yes. I put down there that the "Mother states the child has no medical history. Mother states that the child fell off the toilet last night, hit her head, was okay, went to dinner. No other information was given."

MS. LONGINO: Thank you.

THE COURT: Any redirect?

MS. FARAGLIA: Yes, your Honor.

REDIRECT EXAMINATION OF NATHAN LAPUH

BY MS. FARAGLIA:

Q Mr. Lapuh, is it fair to say that you are a trained paramedic?

A Yes.

Q As a trained paramedic, your obligations are to your patient?

A Yes.

Q And you make observations and try to obtain information from the people that are around the alleged patient that is before you?

A Yes.

Q And based on your training and experience, have you ever seen rigor mortis before?

A Yes.

Q And based on your training and experience, have you ever seen a lifeless child before?

A I had never seen a lifeless child before.

Q Thank you.

MS. FARAGLIA: No further questions.

THE COURT: Any --

MR. SHAUGHNESSY: Nothing on that, Judge.

THE COURT: Ms. Longino,

anything?

MS. LONGINO: Nothing on that, Judge.

THE COURT: Thank you very much. You may step down.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Call your next witness.

MS. FARAGLIA: State calls Robert Swope.

THE COURT: Everybody all right? Good.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **ROBERT SWOPE**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Make sure you speak directly into the microphone; the seat will not adjust.

You may inquire.

MS. FARAGLIA: Thank you, your Honor.

DIRECT EXAMINATION OF ROBERT SWOPE

BY MS. FARAGLIA:

Q Good afternoon, Mr. Swope.
A Good afternoon.
Q Please state your name and spell your last name for the court reporter.
A Robert Swope S-W-O-P-E.
Q Sir, by whom are you employed?
A City of Euclid fire department.
Q How long have you been so employed by them?
A Thirteen years.
Q What are your primary duties and responsibilities with the fire department in Euclid?
A Firefighter/paramedic.
Q How long have you been a paramedic, sir?
A Seventeen years.
Q Are you also employed elsewhere?
A Yes.
Q Where else are you employed?

A I work at University Hospital in Cleveland at the trauma center.
Q What do you do at University Hospital at the trauma center?
A I'm a paramedic/quarterback for the emergency department.
Q All right. Sir, were you gainfully employed by the City of Euclid fire department as a firefighter and paramedic back on March 11th, 2018?
A Yes, I was.
Q Can you explain to the ladies and gentlemen of the jury, were you also called to 22701 Lakeshore Boulevard Apartment 213?
A Yes, I was.
Q Can you tell me, sir, what you did when you went to that apartment?
A Initially we got there, I was the squad driver. I sent Nate up to get the patient or try to gain access to the apartment as quickly as we could. I brought equipment up, met him at the door. He was hitting the door, yelling: Fire department, trying to make entry through the door, and then we proceeded into the apartment.
Q All right. Now, how many calls have you gone on, sir?

A I couldn't tell you. A lot.
Q And in that time when you go specifically to Shore Cultural Gardens are you able to gain access with the entrance door to this complex?
A Yes, we have a set of keys called Knox keys that enable us to enter the building and work certain rooms inside the building, but not individual rooms.
Q Individual apartments?
A Yes, not individual apartment.
Q So this key, nobody had to come down and let you in?
A No.
Q So you have this particular key; you gain access?
A Yes.
Q All right. And when you go to this apartment, is the door opened or closed?
A It is closed.
Q All right. Approximately how long do you stand there before that door is opened?
A It's hard to say because of the type of thing, but it's longer than normal in a situation like that.
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled.
BY MS. FARAGLIA:
Q All right. And so, what happens? What are your

observations when access is gained --

MR. MAREIN: Judge, may we approach for one moment?

THE COURT: Sure.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Continue.

MS. FARAGLIA: Thank you, your Honor.

BY MS. FARAGLIA:

Q Mr. Swope you can continue. You said you had the bag of equipment?

A Yes.

Q What does that mean?

A I was carrying medical equipment. He had one bag and I had multiple -- I had a monitor and another bag that has other stuff in it.

Q Okay. And so when you get there, what's your observation, sir?

A To the door inside the apartment.

Q Well, the door is closed you indicated to us

already?
A Yes.
Q So when the door is open, who opens the door?
A The gentleman does.
Q All right. Is that gentleman in this courtroom?
A Yes, he's right there. (Indicating)
MS. FARAGLIA: Will the --
Q Right there?
A He's wearing a white shirt with a black vest.
MS. FARAGLIA: Your Honor, let the record reflect this witness has identified the defendant.
THE COURT: May so reflect.

BY MS. FARAGLIA:

Q Go ahead, Mr. Swope.
A And then he came to the door, we entered quickly, noticed a child laying on the ground underneath the air conditioner, face up, head toward the window, and the mother doing CPR.
Q All right. And, sir, what did you do?
A We went in immediately, Nate got down on the ground, started providing care, and then I started asking them questions immediately.
Q Okay. Who did you ask questions to, sir?

A I was asking them general questions, to both.
Q To both of them. Were they able to provide you answers?
A They provided me some answers, yes.
Q Who did you talk to and what questions did you ask and what were their responses?
A I believe it was the female that stated that she had fallen off the toilet, they went out to dinner, and later she was like this.
Q Did the male provide you any explanations?
A They were both kind of talking to me while Nate was getting stuff together with the patient. I was trying to field as much information at once. We're in a rush here.
Q When you say you're fielding information and you're in a rush, what do you mean by that?
A Well, this is a life-threatening emergency, and we try to gather as much information as quickly as we can to get everything expedited to get the patient the best care they can get.
Q All right. So what happens with the child at this point?
A Nate -- Firefighter Lapuh takes the child, exits the apartment. I pick up the bags and follow him out.
Q All right. And how long had Mr. Lapuh been with

you folks?
A As of right now, I'm guessing around three years.
Q Okay. Back then?
A Probably -- he was on a very brief time.
Q All right. And so where is the child brought and where do you go?
A We go down the steps, we go out the front door into the ambulance.
Q All right. And sir, you're a paramedic?
A Yes.
Q So what happens in this squad now?
A I was actually outside of the squad initially, I put the bags in and I just was getting stuff situated because I was the driver of the squad. And then I went in the back and I observed them cutting the clothing off and performing an assessment.
Q All right. What were your observations?
A My observations were the child had probably been deceased for a while, and that was what we observed.
Q Okay. Why do you say that, sir?
A I say that, I mean, from my experience as a paramedic, and she had multiple injuries without bleeds that should be bleeding and bruising in multiple stages of healing. And it was -- and she had no signs of life and had obvious signs that she had passed.

Q And what was her general overall health?
A Poor.
Q Can you describe what --
A She was emaciated; very thin. I mean, I'm going to guess 20 to 25 pounds. She was way thinner than she should have been for a child her age. I could see all the bones in her body. She was extremely thin in the face and she appeared to have been abused at multiple stages.
Q And so what do you do at that point? Is somebody responsible for making the call to the hospital?
A It was a general thing; we had some experienced paramedics in there. We made the call to the hospital and advised them what was going on, but we decide that on scene.
Q All right. When you say you collaborated with the other paramedics, was somebody else with you as well?
A Yes, Firefighter Lapuh and Lieutenant Christopher Wilson.
Q Who had been on the department -- which three -- which one of you has been on the department the longest?
A Lieutenant Chris Wilson.
Q All right. And yourself?
A Yes.
Q Okay. And based on your training and experience

and what you observed in that ambulance, was there any sign of life to this child?
A No.
Q Did you try to revive her?
A In our opinion, she was beyond resuscitation efforts.
Q And what was the reason for calling the hospital?
A We have to give a report to advise them of what kind of patient that we are bringing in and also it was to give them a heads-up of the type of call it was.
Q All right. And did you do that?
A I did not personally. But, yes, we did do that.
Q Somebody else did that?
A Yes.
Q And after your treatment and care of this child, did you go to the Euclid police department and write out a statement with regard to what you had observed and what you had done in this case?
A Yes, I did.
Q Now, Mr. Swope you said when you went there, you found the male you identified. Did you see a female?
A Yes.
Q Did you speak to that female?
A Yes.
Q Is that female in --

MR. SHAUGHNESSY: We'll stipulate.

THE COURT: So noted.

MS. FARAGLIA: Thank you for the stipulation, counselor.

BY MS. FARAGLIA:

Q Did you also memorialize in your statement what she had told you?

A Yes.

Q Do you remember exactly what she said to you?

A Not verbatim, but --

Q That's okay. If I were to show you your statement to refresh your memory, would that help your memory?

A Yes.

MS. FARAGLIA: May I approach, your Honor?

THE COURT: You may.

MS. FARAGLIA: Thank you.

BY MS. FARAGLIA:

Q After having shown defense counsel and the judge, I'm handing you what's been marked as State's Exhibit 222. Just take a moment and read that.

Did you review that, sir?

A Yes.

Q Is that your handwriting?

A Yes, it is.
Q Is that your signature?
A Yes.
Q And does that refresh your memory as to what the defendant said to you?
A It does.
Q Can you tell me, specifically identify, which person told you what?
A The man told me the most, as a matter of fact, and the woman was very reluctant to give any information.
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled.
MS. FARAGLIA: Go ahead.
BY MS. FARAGLIA:
Q What did the woman tell you?
A I actually had to --
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled.
A I actually had to raise my voice to try to elicit answers from them.
BY MS. FARAGLIA:
Q Forgive me. You had to raise your voice for whom?
A For the female.
Q Why, sir?

A She was not giving me --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

A She was not giving me answers that I thought were appropriate --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

A -- at the time.

BY MR. KILBANE:

Q All right. Why was that, sir?

A She was talking in a very roundabout way.

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

A And not giving me pertinent information to the patient or what had happened.

BY MS. FARAGLIA:

Q Okay. And what about the male; did the male provide you information?

A Very little information.

Q All right. And did you memorialize that in your report?

A Yes, I did.

Q Okay. So what did you note to have happened to this child?

A As far as I had known from them, she had fallen

off the toilet and became like this. That was basically the extent of the information that I had gotten. I had tried to ask a few questions pertaining to why the child was so thin, like, does she have an illness or something like that while Nate was starting to leave. And, as they were being more hesitant to give me information --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

A -- I just left.

BY MS. FARAGLIA:

Q All right. Why did you ask about an illness, sir?

A Because of her condition.

Q All right. Did you think she was suffering from a condition?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

A I did not know at the time because she was -- the appearance of the child was not that of a normal child, and I just wanted to get as much information on her as I could.

BY MS. FARAGLIA:

Q And in these types of situations, is it imperative that you obtain as much information as possible?

A As much as we can, yes.

Q Mr. Swope when you go in and you saw this child,

where was she? Was she on a couch, was she on the bed?
A She was laying on the ground with her head facing the outward side of the building, away from the door, and underneath an air conditioning unit.
Q So where was the air conditioning unit? On top of her?
A No, it was mounted in the wall, below the window, so almost at ground level, and the wind was blowing on the patient.
Q All right. And the head was facing the window?
A Yes. She was supine, which means laying face up, and her feet were toward the door and her head was toward the wall.
Q On the ground?
A Yes.
Q This air conditioning unit is not a window unit; is it, sir?
A It was not a window unit.
Q Can you describe it for me?
A In apartment buildings, a lot of times instead of having a central air system, they have individual units so they can be monitored for electrical use. And this was mounted in the wall below the window.
MS. FARAGLIA: Thank you. No further questions at this time.

THE COURT: Cross?

MR. SHAUGHNESSY: I have no questions for this witness, your Honor.

THE COURT: Ms. Longino?

MS. LONGINO: Yes.

CROSS-EXAMINATION OF ROBERT SWOPE

BY MS. LONGINO:

Q Mr. Swope, the prosecutor keep saying this child was on the ground. She was actually on the floor; correct?

A Sure.

Q Grounds are outside; floors are inside?

A Okay.

Q Okay. Now, you're not a medical doctor, are you, sir?

A No.

Q And you're a trained EMS to make clinical determinations as to a person's physical state?

A Am I trained in that?

Q You are -- I'm sure you are --

A Yes, ma'am, I am trained in that.

Q So you are not really qualified to give a diagnosis as to a person's time of death; correct?

A That is correct.

Q It's your job to take this person to the hospital

so the medical doctors can do a proper diagnosis and can determine a time of death; correct?

A Yes.

Q So it's fair to say that you really cannot say how long this child had been deceased?

A Yes.

Q And you said that when you went to the -- took the child to the truck, she appeared to be nonresuscible or whatever the word is?

A Mm-hmm, yes.

Q All right. So -- but, you are not trained to make that determination because that is a diagnosis of death; correct?

A We are trained to make that determination.

Q You're trained to determine whether or not a person has expired? You can make that exact determination?

A We make the call and then we call medical control and they advise us of the time of death.

Q No, you take the child to the hospital and the doctors determine the time of death; correct?

A Yes.

Q All right. Now, so when -- what equipment did you take -- you said that you took the equipment upstairs. What equipment did you take?

A I took a Life Pack 12 heart monitor, which is a cardiac monitor. I took all the medical drugs, the oxygen, the glucometer. There is a bag with all our paramedic stuff to travel outside of the ambulance with.
Q Now, you all had already been dispatched that this child was not breathing; correct?
A Yes.
Q So why didn't you take the, I guess, the bag valve mask --
A That was in one of our bags.
Q You took the portable one up there?
A Yes.
Q And you administered it there or in the truck?
A In the truck.
Q Why didn't you administer it there in the apartment?
A Because it was a -- we call it a grab-and-go situation; get the patient downstairs to the ambulance where we can work and that's what we do.
Q Well, if you have this bag right there at your disposal and someone isn't breathing, I'm not a paramedic, it makes sense to me that you would administer the breathing apparatus immediately.
A The patient was pulseless and apneic and cold to the touch.

Q So you made the determination not to put her on the breathing machine until you got to the truck?
A We grabbed the patient and we get her to the best environment that we can work on them. Yes.
Q Okay. Now, you know, you all keep saying that you had to bang on the door. Actually, you banged on the door in rapid succession and that's when it was opened; correct?
A False.
Q What if I tell you that's what your partner testified to: Fire, fire, fire, fire; then the door was opened?
A That's not -- we banged on the door more than that.
Q Okay. How many times did you bang on the door?
A I don't know exactly but it was --
Q How long did it take them to open the door?
A In emergency situations sometimes time goes fast. If I had to guess, I would say 30 to 45 seconds.
Q Thirty to 45 seconds?
A Yes.
Q Fire, fire, fire, fire; one, two, three, four; that's four seconds. So you're saying 31 more seconds went by before the door was opened? That's your testimony?

A I would say probably, yes.
Q Thank you.

REDIRECT EXAMINATION OF ROBERT SWOPE

BY MS. FARAGLIA:

Q Mr. Swope with regard to your training and experience, have you gone on scenes where people have been pulseless and you've had to call in and say they had expired?
A Yes, I have, many times.
Q Okay. When you went to 22701 Lakeshore Boulevard and you banged on the door, did you find that to be a little different, when a call came in for a child not breathing?
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled.
THE WITNESS: Yes.

BY MS. FARAGLIA:

Q Why?
A It took to me what seemed to be an unreasonable amount of time to get to the door which, in my experience, if you have a sick kid on the ground or someone not breathing --
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled. Go ahead.

THE WITNESS: -- they get to the door as fast as they can, and they're usually very upset or waiting in the hallway for you.

BY MS. FARAGLIA:

Q Okay. Did you have any of those things in this particular situation?

A No, I did not.

Q And lastly, when you yourself observed this child, whether it be in the apartment or on the stretcher, was there any sign of life?

A No.

MS. FARAGLIA: Thank you. No further questions.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions on that.

THE COURT: Ms. Longino?

MS. LONGINO: No questions, your Honor.

THE COURT: You may step down. Thank you.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Anybody need a

break? We'll take a very short recess. Please do not discuss the case. All rise.

- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

- - - o0o - - -

(Brief recess had.)

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated. Your next witness.

MS. FARAGLIA: State calls Christopher Wilson.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **CHRIS WILSON**, who, being first duly

sworn, was examined and testified as follows:

- - - oOo - - -

THE COURT: Good afternoon. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MS. FARAGLIA: Thank you, your Honor.

DIRECT EXAMINATION OF CHRIS WILSON

BY MS. FARAGLIA

Q Good afternoon, Mr. Johnson?
A Good afternoon.
Q Please state your name and spell your last name for the court reporter.
A Chris Wilson, C-H-R-I-S, W-I-L-S-O-N.
Q Sir, by whom are you employed?
A Euclid fire department.
Q How long have you been so employed by them?
A Nineteen years.
Q What are your primary duties and responsibilities, sir?
A I'm a lieutenant, which means I'm a company officer; I'm in charge of a five-man crew.
Q Are you also a paramedic?

A I'm also a paramedic.
Q How long have you so been a paramedic?
A 21 years.
Q In those 21 years, have you had the requisite training and certifications in order for you to maintain your position?
A Yes.
Q Were you so gainfully employed by the Euclid fire department and as a paramedic back on March 11th, 2018?
A Yes.
Q Did you have an occasion to go to the area of 22701 Lakeshore Boulevard Apartment 213?
A Yes.
Q Can you tell us, sir, what did you do when you arrived? What were you responsible for on that day?
A I was the company officer, and I was on the ladder truck. And when there is an advanced life support call that comes in, we dispatch an ambulance and a fire truck for manpower so there is more hands because it's a more serious call. I was the officer on the ladder truck, and we were trailing the ambulance.
So the ambulance arrived on scene first and then we arrived second. And then when I got on scene, I immediately went into the apartment building.
Q All right. And did you have any problems getting

in?

A No.

Q Was the door open or closed?

A Door was open.

Q I mean the door for the building.

A Yes, the exterior door for the building was open, I was able to walk in.

Q Where did you go and what did you do?

A The squad crew was already upstairs. I walked in, I went to the -- toward one of the hallways and then it was radioed to me that they were already on their way downstairs. So I just turned around. And when I turned around, Firefighter Lapuh was walking around the corner holding the patient.

Q What did you do?

A Followed Nate right into the back of the ambulance.

Q All right. And as a trained paramedic yourself, what did you do to assist Nate? Or what did you do in addition to Nate?

A I had asked Nate if the patient was breathing; he said no. I said: Do you have a pulse; he said: No. I said: Okay. So we put the patient on the cot in the back of the ambulance.

And it's protocol that we just start exposing

the patient, starting to perform CPR and breathing -- you know, bag valve masks, ventilations and things like that, heart monitor.

Q Okay. And so once you started to expose the patient, what did you have to do? Was the patient clothed or unclothed?

A She was clothed She had a winter coat on. So we just started, you know, unzipping her coat, so her face and things like that.

Q What were your observations, sir?

A Patient had a very large hematoma over her left eye that had a laceration on it, a lot of bruising around her face.

Q When you say hematoma, sir, what do you mean? What color was her eye?

A It was black, severely bruised, black and blue; very swollen, almost swollen shut. And that was -- across that had the laceration, and it wasn't bleeding or anything like that.

Q Okay. And based on your training and experience it wasn't bleeding, what does that mean to you?

A Which part, the hematoma --

Q The laceration.

A The laceration, that it happened a while ago. It's not a recent finding if there is a laceration like

that. It should be bleeding; it wasn't bleeding. And the color of her hematoma over her eye, it's been a while.

Q All right. And what else do you notice on this child?

A When we exposed her, she was extremely thin, malnourished. Going through her chest she had -- you could see her ribs, her arms, bones through her skin; lot of bruising. We call it various stages of healing, meaning the bruising was darker in color, lighter in color, that kind of thing. Toward her legs, it looked like she had burns to her lower legs.

Q What you say burns, what do you mean by that? What were your visual observations of these things you were indicating were burns?

A Her skin was bright red, it was blistered. Like when you open up a blister, it was bright red; you could tell the skin had come off.

Q Where did you observe that? What part of her body had that?

A Shins, ankle area, lower legs.

Q All right. And what else did you observe, sir?

A Those were the major points. After that we just kind of started CPR, going through, you know, what we're trained to do when somebody is in cardiac arrest.

Q All right. So in your efforts to do CPR, what did you do and what did you observe?
A We just started doing CPR, we started using the bag valve mask to breathe, you know, for the patient, you know. There was an odor that came, you know, when you kind of get a blow-back, some air comes out of her chest, it smelled like, kind of like a decomp smell that, you know, that decomposition smell that came back out of her mouth when we were breathing into her mouth.
Q Did you yourself smell that, sir?
A Yes.
Q Had you smelled the decomp before in other patients?
A Yes.
Q And you've been a paramedic 21 years?
A Yes.
Q All right. How often or how much of the bag valve mask did you do to try to revive this child?
A From the moment we were in the back of the squad, we started bagging the patient, doing CPR, the only -- you know, we would switch back and forth depending on who was closest to a piece of equipment. I was doing compressions while Firefighter Lapuh was doing the cardiac monitor. When he applied that, we switched back; when I was doing the bag valve mask by her head, then I

was, you know, toward her head, kneeling down, closer to her face.

Q So you were over her?

A I was leaning over top of her, yes.

Q Okay. So this scent or odor, is it a pungent odor?

A It was noticeable. There's not many other things that smell like that, that's why it was noticeable.

Q And, sir, with regard to the monitor, were you able to hook her up to a monitor?

A Yes.

Q What were you able to see on that monitor?

A She was in asystole; she did not have a heart rhythm. She was flat-line they call it, so she was in asystole.

Q So you did try those efforts by putting her on a monitor?

A Yes, we had her on a monitor.

Q What else did you do, sir?

A CPR, bag valve mask, the monitor. I phoned the hospital to let them know we were coming.

Q You were the one who phoned the hospital?

A Yes.

Q What is your purpose in phoning the hospital?

A To allow them to prepare for the patient that

we're bringing in. So we call the hospital, tell them what we have, what we've done so far, and give them an rough ETA of when we're going to get there so they can prepare for the type of patient that we're bringing in.

Q At this point in time that you're in the ambulance trying to revive that child, do you ever obtain a pulse?

A No.

Q When you bring that child to the hospital does she arrive at that hospital with a pulse?

A No.

Q Did you have any interaction with the parents, sir?

A No.

Q Lieutenant Wilson, how many calls have you gone on where the patient was a child?

A Over my career, a lot. I mean, 20 years, so ...

Q In this particular situation, was this Mr. Lupah's first time out?

A He was very new, I couldn't tell you how long he had been on the job but it had only been a couple of months, but he was very, very new.

Q So in your efforts to try to resuscitate, were you also trying to resuscitate and trying to teach Mr. Lapuh and trying to maintain some type of semblance based on the gravity of the situation?

A In training, yes, because he needs to learn. He's starting his career; he needs to learn, you know, that regardless of the situation, that there's a job to do and we have to do it, and as hard as sometimes things are, there's still a job to do.

Q Based on your training and experience, Lieutenant Wilson was there any life to this child at all when you were treating her?

A No.

MS. FARAGLIA: Thank you. No further questions.

THE COURT: Cross?

MR. SHAUGHNESSY: Your Honor, I have no questions for this witness. Thank you.

THE COURT: Ms. Longino?

MS. LONGINO: I have no questions for this witness. Thank you.

THE COURT: You may step down. Thank you.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Call your next witness.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. FARAGLIA: Patrolman Jeffrey Herold.

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **JEFFREY HEROLD**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good afternoon. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MS. FARAGLIA: Thank you, your Honor.

DIRECT EXAMINATION OF JEFFREY HEROLD

BY MS. FARAGLIA:

Q Good afternoon, Officer. Please state your name, spelling your last name for the court reporter.

A Jeffrey Herold H-E-R-O-L-D.

Q And sir, by whom are you employed?
A City of Euclid.
Q How long have you so been employed by them?
A Approximately six years.
Q And what do you do for the City of Euclid?
A I'm a patrol officer for the police department.
Q What kind of training and experience have you had in order to maintain your position?
A I have several certificates, passed the police academy, and also graduated the police academy in 2004.
Q All right. Do you have all your certifications that are necessary in order for you to perform your job?
A Yes.
Q Were you so gainfully employed back on March 11th 2018?
A I was.
Q And what shift were you working that day?
A Day shift, what we call day shift, seven to three.
Q During that time, do you work a one-man car or two-man car?
A Sometimes it differs but that day I was a one-man car.
Q All right. Is your city broken up into sectors?
A Yes.

Q Were you responsible for one sector of the city?
A I was the accident car that day but I floated from different zone to zone, if needed.
Q What does an accent car mean?
A We mainly take the accidents that happen throughout the day. But I'm also a patrol officer so I will also take criminal calls in needed.
Q You mean accident? I didn't hear you.
A Yes, accidents, car accidents.
Q That's what you're responsible for?
A For that day, yes.
Q Sir, did you have an opportunity to receive a call or go to a call at 22701 Lakeshore Boulevard, # 213?
A I did.
Q And can you explain to us what the call was to, and what you yourself did at that time?
A A broadcast came out over the dispatch radio that there was a call for an unresponsive child at the address. I immediately made my way there as quickly and as fast as possible.
Q All right. Once you arrived, what --
A I exited my vehicle and ran into the apartment complex. The elevator was being held open for the medics. I ran up the stairwell to the second floor. As I got to the second floor and entered the hallway, I had

observed that the paramedics already had the child in their hands, so I continued to follow them right down the stairs as they ran down the other set of stairs in the hallway.

Q All right. And what were your observations?

A As they exited the apartment, one of the firefighters had a child in their hands who appeared to be lifeless and her limbs were dangling, who appeared to have no function or was even moving or breathing.

Q Okay. And were there any adults there with her?

A Yes.

Q All right. And what did you do?

A As I passed the apartment, I observed the -- who I assumed were the parents or the guardians locking the door. I then followed the paramedics down the stairwell.

Q All right. And where do you go after that?

A I exited through the front doors of the apartment complex. When I looked at one of the firefighters, he had told me that we needed to follow him, that she had had some burn marks on her.

Q All right. And as a result of this information that was provided to you, Officer Herold, what do you do you?

A I followed the paramedics to the hospital. I advised the other officer, Patrolman Officer Edington to

stay with who I assumed were the parents. And I followed the paramedics to the hospital.
Q All right. And so when you follow them to the hospital, where do you go then when you go to the hospital?
A I exited my car and was helping open the doors for the paramedics. I asked one of them was she still alive and he had shook his head no, giving me the answer of no and we walked into the hospital. I followed the gurney into the hospital room.
Q All right. When you then go into the hospital room, sir, what is your next responsibility or what do you do next?
A I had spoke to the doctor, was kind of listening to what was going on to confirm whether or not she was alive or she had passed away.
Q All right. And did you come to learn that she had passed away?
A Yes.
Q Upon learning that she had passed away, what did you do?
A I immediately called my shift supervisor and advised him that we needed a detective here due to the looks of her and how tiny she was and it looked suspicious.

Q And Officer Herold can you tell me what your observations were of this child?
A She was very tiny, skin and bones is what I would suggest. You can -- her body was already stiff and she was cold to the touch. And when I say cold, like you sat out with no shirt in, like, 30-degree weather cold. It was not warm. She was lifeless.
Her facial features, you could see every bone in her face. She had a large, I call it a bruise, but it was almost black to one of her eyes that had a laceration on the inside of it. And the other eye was just open. I knew something was very wrong.
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled.
BY MS. FARAGLIA:
Q And so once you do your observations, then, are you responsible for doing anything as part of being a patrolman to assist the detectives?
A I stayed in the room until they had arrived --
Q Until who had arrived?
A The detectives.
Q Okay.
A I did go and get my camera out of my cruiser and began taking pictures.
Q Was anybody -- before you take pictures, was

anybody allowed in the room with the child?
A The -- there was one nurse that helped me place bags over her hands and feet, per the coroner's request. Other than that, I didn't let anybody in there. It was strictly me.
Q Okay.
A Unless they had requested medical to do something, but once they pronounced her deceased, nobody else was in there.
Q Okay. Now, you indicated you went to your car.
A Mm-hmm.
Q What did you do?
A I retrieved my camera from my cruiser so I could take pictures of the child.
Q Did you do that, sir?
A I did.
Q And when you were taking -- what you were taking pictures of?
A I started with taking pictures of her body, and then I learned that she had clothing as well and took pictures of the clothing. The detectives also did the same thing. And once they arrived, I told them what I had started taking and gave my card over to them to include that.
Q Now, when you say your card, what do you mean by

that?
A My SD card, my storage card for our cameras. Sorry.
Q Okay. And so with regard to your initial photographs, were they solely of the child?
A Yes.
Q And of the injuries that you had observed?
A Yes.
MS. FARAGLIA: Your Honor, may we approach?
THE COURT: You may.
- - - o0o - - -
(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)
- - - o0o - - -
THE COURT: What Exhibit Numbers are these photos?
MS. FARAGLIA: 151, 152, and 155.
MR. MAREIN: Anna, again please.
MS. FARAGLIA: 151, 152, and 155.

MR. MAREIN: Thank you.

MS. FARAGLIA: You're welcome.

BY MS. FARAGLIA:

Q Officer Herold you indicated to us that you took a series of photographs and that you shared those photographs and you gave them to the detectives?

A I did.

Q I'm going to hand you just three photographs, I'm sure you took more, but having shown defense and the Court, State's Exhibits 151, 152, and 151, I just want you to just take a moment, look at those.

Do your recognize those photographs, sir?

A I do.

Q Did you take those photographs?

A Yes.

Q Do they fairly and accurately represent what you saw that day March 11th, 2018?

A They do.

Q Looking at State's Exhibit 151, can you tell me what we're seeing in this photograph?

A That's inside the hospital room. That's how she was brought in and placed on the gurney and that's how she stayed.

Q All right. State's Exhibit 152.

A That's a picture of her head with the -- what I consider a black bruise with the laceration to her eyelid.
Q All right. That's what you described to us before?
A Yes.
Q And State's Exhibit 155?
A Those are the burn marks that I believe the paramedics were talking about. They look like a blister had already popped and had started to heal.
Q All right. Are those your observations as well, sir?
A Yes.
Q All right. Go ahead.
MS. FARAGLIA: Take that off.
BY MS. FARAGLIA:
Q Now, after you took the photographs, Officer Herold, did you have any more participation in this investigation?
A After the detectives that responded to the hospital were done, they had asked me to go back to this apartment and assist detectives with the search warrant that they had gained.
Q All right. And did you assist in the search warrant, sir?

A I did.
Q Okay. And who did you respond there with?
A I responded with my cruiser and I was met by Officer Blakemore, Detective Caruso and Detective Tschetter.
Q Did you obtain a search warrant to enter the premises?
A The detectives did.
Q Once you entered the premises, sir, what was your responsibility in executing the search warrant?
A It was basically to just kind of assist them with whatever they needed and kind of be their security guard, to make sure nobody came in the apartment or attempted to gain access while they were conducting the search warrant.
Q Did you enter the apartment yourself, sir?
A I did.
Q What were your observations of this apartment?
A The apartment was very, very, like extremely clean.
Q All right. And what was in the apartment, if you recall?
A There was a leather couch and a television stand in the living room, is what I would consider it. It was a small kitchen area, one bedroom, and a bathroom.

Q All right. Were there any items for children?
A In the one bedroom, there was a small princess bed, I believe like a Disney princess bed, one of the toddler beds. And they used three-drawer plastic carts or crates as a dresser for kid's clothing and a small box of children's toys.
Q All right. Was there any adult beds in there?
A No.
Q Was there any food?
A The refrigerator was very light in food, especially for children's food. There was some leftovers. There was a couple frozen dinners in the freezer.
Q All right. Did you notice any trash or any diapers or anything that would relate to a child?
A No. There was a small garbage can in the living room, like foyer area, but it was mostly papers and receipts.
Q Okay. How long did you stay at the location?
A We were there for several hours, I believe. I could easily say two hours or more.
Q All right. Did you collect any evidence, sir?
A I mainly assisted the detectives if they needed bags to put stuff in or anything like that.
Q And with regard to the apartment, you indicated

that it was clean?
A Yes, it was very clean, like immaculate is what I would say.
Q You use the word immaculate. Did it have any scent or any odor?
A No.
Q Did you also go into the laundry rooms or did you check trash cans or trash bins for any type of evidence or information?
A I did. Detective Tschetter did ask me to check all the floors, the laundry rooms, to check for anything of note and I don't believe I found anything or located anything.
Q Now, when you were at the apartment, did you also look in the microwave?
A I did.
Q What did you find in the microwave, sir?
A A half-eaten bowl of a Chipotle bowl.
Q And, sir, did you memorialize all your findings in a police report?
A I did.
Q Did you share that police report with the detectives that were assigned to this case?
A I did.
MS. FARAGLIA: One moment.

BY MS. FARAGLIA:

Q Officer Herold you indicated at the hospital you were also, in addition to taking photographs, you were responsible for taking her clothing?

A I did.

Q All right. Can you tell me what you took?

A I took a coat, a hat. The medics I believe cut off her pants and shirt and socks, and I placed them into a brown paper bag and held them until detectives arrived.

Q Once a detective comes, what do you do with those items?

A I believe I handed it to them and they entered it into our property room. I believe we took pictures of them as well.

MS. FARAGLIA: Thank you. No further questions.

THE COURT: Cross?

MR. SHAUGHNESSY: Your Honor, no questions for this witness.

THE COURT: Ms. Longino?

MS. LONGINO: Couple questions, your Honor.

CROSS-EXAMINATION OF JEFFREY HEROLD

BY MS. LONGINO:

Q Officer Herold did you at any point come to learn

that the red marks that were on this child's legs were not burns?
A I did not learn whether they were or weren't.
Q Okay. So you just made a clinical determination that they were burns?
A My own observations, yes.
Q Okay. Now, with regard to the contents of this apartment building, did you search -- did you look at the entire apartment?
A I helped the detectives if they needed something, helped them move a couch or moving something out of the way.
Q Okay. Did you make observations of all the contents in the apartment?
A Not all the contents, no.
Q Not all the contents. Did you make an observation of any male adult clothing in the apartment?
A I could not say if there was male clothing in there or not.
Q Did you observe any male items in the bathroom, like razor, shaving cream, that sort of thing?
A I don't recall. I don't believe I did.
Q Okay. Did you look in the drawers?
A I did not.
Q Okay. How about the closets?

A The closet in the bedroom had several boxes, I believe, that had shoes and hats, and on the door was hanging several women's purses.

Q Okay.

MS. LONGINO: Okay. Thank you. Nothing further.

THE COURT: Any follow-up?

MS. FARAGLIA: Nothing further, your Honor.

THE COURT: You may step down.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Ladies and gentlemen, that will conclude our day today. We'll start tomorrow at nine o'clock; if you could be downstairs at quarter to nine. I expect everybody to be on time.

Please do not discuss this case. All rise.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Oh wait.

Tomorrow, for your information, we will be concluding at two o'clock.

Okay. Thank you.

- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

- - - o0o - - -

(Thereupon, court stood in recess until Friday, March 1st, 2019 at nine a.m.)

- - - o0o - - -

FRIDAY MORNING SESSION

MARCH 1, 2019

PROCEEDINGS

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel on the record out of the hearing of the Jury as follows:)

- - - o0o - - -

THE COURT: Good morning.

MR. KILBANE Good morning, your Honor.

THE COURT: Go ahead.

MR. KILBANE: Your Honor, Officer Edington from Euclid police department is anticipating that he will testify today. He was one of the first officers on the scene; he's the one who took the statement from both defendants in this case.

While he's at the residence, something pops up in his head that: I've been here before; he goes back to the station, does a CAD history looking for any prior police reports, and discovers a police report that was made on February 9th of 2018 at that apartment complex involving Sierra Day and Deonte Lewis for a

domestic dispute. Himself, Detective Catalani, who is also going to testify, both respond to the scene.

We're not going to use any statements that were made; we're not going to get into the specific details of the incident. However, I think it's important to note that, during this domestic dispute, Sierra Day kicked Deonte Lewis out of the apartment and threw his clothes out of the apartment and told him to leave.

This issue was brought up -- has been brought up in opening statements that Defendant Deonte Lewis never resided at the residence, that he was residing with his parents. I think this fact tends to prove that he was, in fact, living at the residence. And we think it's relevant and we would ask that we be allowed to --

THE COURT: First of all, do you have a copy of that report?

MR. KILBANE: The report was referenced in, I know, Detective Kroczak's report where she, verbatim, puts down Officer Catalani's report. Detective Catalani is the writing officer in the case and verbatim puts down -- Detective Kroczak puts down his report in her

supplement.

THE COURT: Has defense counsel seen that report?

MR. KILBANE: Yes.

THE COURT: The report of the February incident?

MR. KILBANE: Have you seen it?

MR. SHAUGHNESSY: I don't believe we have the February report. I believe it's quoted, as you said, it's quoted in the detective's report.

THE COURT: Is anything different than what was quoted in the detective's report?

MR. KILBANE: My observation is no, but we can obviously let them review the report.

THE COURT: Let them review it. Is it the 10th?

MR. KILBANE: It's February --

MS. FARAGLIA: 9th.

MR. SHAUGHNESSY: We're fine with it.

THE COURT: Is it verbatim?

MR. KILBANE: It's verbatim.

THE COURT: So it's nothing new?

MR. KILBANE: It's verbatim.

THE COURT: Is our missing juror here?

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: We're missing Number 12.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. LONGINO: Can we go on the record with this, your Honor?

THE COURT: Do you want to waive your client's presence?

MS. LONGINO: I'll waive.

THE COURT: Go ahead.

MS. LONGINO: Your Honor --

THE DEPUTY: Folks, quiet

down.

MS. LONGINO: The fact that they had a fight in February has nothing to do with the facts surrounding this case. This report says she gathered his belongings and threw them out in the hallway. Gathered his belongings; that could be his coat and his hat.

If they're trying to use this to say that he had clothes there and he lived there, we object to this.

MR. KILBANE: We're not using it for the purpose of anything but the domestic dispute. All we're using it for is the fact that he had clothes over there that were gathered by Sierra Day and she kicked him out of the apartment.

That issue was brought up in defense opening statements. So she's opened the door to it so we would ask that we be allowed to use it.

THE COURT: That objection is overruled. You can cross-examine as to the extent of whatever personal belongings he had there and what was thrown out. Overruled.

MR. KILBANE: Your Honor, the second issue, if I may, Officer Edington,

also during his CAD search, found a report dated sometime in May of 2017 that was made by Harbor Crest day care, and the title of the report was abuse of a minor. Sierra Day was mentioned in that report.

Officer Edington obviously didn't respond to that call; doesn't know anything other than that report. He is not going to testify to anything specifically in that report, but we would ask that he be allowed to testify that there was a report in May of 2017 involving Sierra Day.

THE COURT: Is he going to come in?

MR. KILBANE: Your Honor, this is also part of the fact that we've given you the 404(B) summary, and we haven't yet received a ruling on whether we're going to be allowed to use that.

THE COURT: It's going to almost have to be on a case by case -- issue-by-issue basis with respect to the various incidents.

My question to you is: Do you intend to have a representative from Harbor Crest day care

come in to testify?

MR. KILBANE: Yes.

THE COURT: Why shouldn't we just rely on their testimony, if I allow it, rather than the officer's? Basically, it's hearsay.

MR. KILBANE: I understand that, your Honor. This is just the beginning of the case where they first discover that Sierra Day has past prior police reports involving a minor. So we would ask that this is the first time that the Euclid police department found --

THE COURT: Go ahead.

MR. SHAUGHNESSY: Judge, we would object to that. Obviously, it falls in our general 404(B) objection. And also, I mean, we talked about the three-prong test and we'll go back through it on 404(B), but right here we're going to have an officer say: I saw a report that says Sierra Day is accused of abusing a child. Period.

Now, there is no proof that that happened. There is no proof that any abuse ever occurred. This is certainly more prejudicial than probative of everything at that point. It's

going to leave an impression on the jury that she actually did some type of abuse in that case.

There is nothing to back it up. Without a report, without a photograph, mere allegations in this case are more prejudicial than probative of anything.

THE COURT: What does the report say? Can I see the report?

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Do you intend to call Tamika Robinson?

MR. KILBANE: Yes.

THE COURT: What do you intend to ask this police officer? Did he take the report?

MR. KILBANE: He didn't take the report. All we intend to ask him is he found there was a report of abuse of a minor. This is the first time that --

THE COURT: Limit it to that; not the substance. Your objection is noted.

MS. FARAGLIA: Right. That's

exactly what we were going --

THE COURT: Just to explain how his investigation proceeded.

MS. FARAGLIA: Right. That's all.

THE COURT: Let's get the defendants out. We've got our last juror here.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated. Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: You may call your next witness.

MS. FARAGLIA: Thank you, your Honor. The State calls Alexis Logan.

THE COURT: Raise your

right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **ALEXIS LOGAN**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning. Be seated. Speak directly into the microphone. You can adjust the microphone; the seat will not move.

THE WITNESS: Okay.

THE COURT: Thank you. You may inquire.

MS. FARAGLIA: Thank you.

DIRECT EXAMINATION OF ALEXIS LOGAN

BY MS. FARAGLIA:

Q Please state your name and spell the first and last name for the court reporter.

A Alexis Logan, A-L-E-X-I-S, L-O-G-A N.

THE COURT: You're going to have to slow down. Take a deep breath and speak slowly.

THE WITNESS: A-L-E-X-I-S, L-O-G-A-N.

BY MS. FARAGLIA:

Q Ms. Logan, where do you reside?

A 26901 Gary Avenue.

Q Are you gainfully employed?

A Yes.

Q Where do you work?

A Rainbow Terrace Apartments.

Q Back in March of 2018, where did you reside?

A 22701 Lakeshore Boulevard.

Q Okay. And what is -- is that a house, an apartment building?

A An apartment.

Q Does it have a name?

A Cultural Gardens.

Q How long had you lived at Cultural Gardens in March of 2018?

A A little over a year.

Q Who did you live there with?

A My daughter and my husband.

Q Okay. How old is your daughter?

A Eight.

Q And back in March of 2018, what apartment building did you live in?

A A, Apartment 215.

Q All right. And did you have an opportunity to

know your neighbors that you lived next to?
A Just the guy that lived across the hall.
Q Who was the guy that lived across the hall?
A I don't know his name.
Q Had you seen him before?
A Yes.
Q Had you seen him at the library?
A Where?
Q At the library?
A He does the landscaping for the building.
Q Did you know any of your other neighbors?
A My babysitter lives on the first floor.
Q Did there come a point in time that the police officers knocked on your door on March 11th, 2018?
A Yes.
Q All right. And did you provide them with a statement about your neighbors who you didn't know?
A Correct.
Q At that time, did you know the folks that were living in apartment 213?
A No.
Q Had you seen them before?
A Yes.
Q Okay. And who did you know to live in those apartments, in that apartment?

A A woman and a man.
Q All right. And did you know their names?
A No.
Q Did you socialize with them?
A No.
Q What was the occasion that you would see this woman and this man?
A In passing, like if I was leavin' or comin' in.
Q And would they be together or separate?
A Together.
Q And did you notice any children?
A No.
Q How long did they live there in comparison to you?
A Probably since like January, not long.
Q Okay. And other than that interaction, did you have any other interaction with them?
A No.
MS. FARAGLIA: One moment.
BY MS. FARAGLIA:
Q Do you recognize anybody in this courtroom that used to be your neighbor?
A Yeah, they're right there.
Q Okay. Tell me -- well, the man or the woman?
A Both.
Q Both --

A The man and the woman.
Q All right. Can you tell me where the woman is sitting and --
MR. SHAUGHNESSY: We'll stipulate she can identify her.
THE COURT: So noted.
BY MS. FARAGLIA:
Q And the man?
A A suit.
Q Well, there's seven suits --
MS. LONGINO: We'll stipulate to identification.
THE COURT: So stipulated.
MS. FARAGLIA: Thank you, your Honor. Thank you, counsel.
Thank you. No further questions.
THE COURT: Mr. Shaughnessy?
MR. SHAUGHNESSY: Your Honor, I have no questions for this witness.
Thank you.
THE COURT: Ms. Longino?
MS. LONGINO: Yes. Not yet, ma'am.

CROSS-EXAMINATION OF ALEXIS LOGAN

BY MS. LONGINO:

Q Ms. Logan, how many times would you say you saw the defendants coming and going in the apartment?

A When they moved in, I was actually gettin' home so I saw the U-Haul, so I kind of waited until they got stuff in. Other than that, maybe like three or four times.

Q Okay. You say when they moved in, you saw them moving furniture into the apartment or something?

A Yeah, mm-hmm.

Q When was that?

A I don't remember.

Q Okay. So did you see Mr. Lewis physically taking furniture to the apartment or what did you see to make you think they were moving in?

A The only one I saw was the girl. I didn't see him initially.

Q Okay.

A I saw him later on that day.

Q Okay. So while she was moving in, you didn't see Mr. Lewis; correct?

A No.

Q All right. And you said you saw them coming and going, but you didn't see them on a daily basis; did you?

A No.
Q And you didn't see Mr. Lewis going to that apartment on a daily basis or very frequently; did you?
A I work a lot, I don't get off work until six o'clock. So by the time I come home, it's pretty dark. The couple times I did see them, I saw them together.
Q But you can't say with exact certainty that he actually lived there?
A No, other than a couple, like, arguments that I heard, it was both of their voices.
Q Okay.
MS. LONGINO: Thank you.
THE COURT: Any redirect?

REDIRECT EXAMINATION OF ALEXIS LOGAN

BY MS. FARAGLIA:

Q You said you saw them when they -- when Ms. Day was moving in. What did you see being moved?
A It looked like they was pretty much already done. It was pretty straggly things. It was like a dresser; there wasn't a lot of stuff left on the truck.
Q You indicated to Ms. Longino that you didn't see them every day but you heard them arguing?
A Mm-hmm.
Q What did you hear?
A There was a argument one day that led out to the

hallway. It sounded like they might have been fightin' because somebody might have been hittin' my door. But, I heard a lot of voices, so I don't know if it was just two people; I don't know how many. I just know it was comin' from next door because the door kept slammin'.

Q Okay. Do you know about when that was?

A No.

MS. FARAGLIA: Thank you. No further questions.

THE COURT: Any follow-up on that?

MR. SHAUGHNESSY: No, sir.

MS. LONGINO: No.

THE COURT: You may step down. Thank you very much.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MS. FARAGLIA: Scott Bailey, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your

right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **SCOTT BAILEY**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning. Please be seated.

Speak directly into the microphone. You can adjust the microphone; the seat will not move.

You can inquire.

MS. FARAGLIA: Thank you, your Honor.

DIRECT EXAMINATION OF SCOTT BAILEY

BY MS. FARAGLIA:

Q Please state your full name and spell the last name for the court reporter.
A Scott Frank Bailey, B-A-I-L-E-Y.
Q And sir, where do you reside?
A Cultural Gardens, Euclid, Ohio.
Q What apartment are you in?
A Right now 213 -- 214-A.
Q When you say A, how many buildings are at Cultural

Gardens?

A Three.

Q All right. And are you employed?

A Yes.

Q By whom are you employed?

A Euclid Public library and I also take care of the gardens at the apartment.

Q How long have you been doing that, sir?

A It will be 24 years this month at the library and about 12 years at the apartments.

Q And how long, sir, have you lived at the apartment?

A Fifteen years.

Q And were you living in the apartments back on March 11th, 2018?

A Yes.

Q Did there come a point in time that the police officers knocked on your door to question you about some of your neighbors?

A Yes.

Q All right. Were you able to provide those officers with some information?

A Yes.

Q Did you know the neighbors that were living in apartment 213?

A Met them once.
Q Okay. Can you tell me the circumstances of your meeting?
A I had -- I helped him move a couch in the day they were moving in, and the young lady was there when I helped him move the couch in.
Q All right. So do you know what their names were?
A I didn't at the time.
Q Okay. Do you see the person that you helped move the couch in this courtroom?
A That gentleman over there, I do believe.
Q Can you tell me where he's sitting and what he's wearing?
A At that table, jacket, tie.
MS. LONGINO: We'll stipulate, your Honor.
THE COURT: Very good. So noted.
MS. FARAGLIA: Thank you, your Honor. Thank you, counsel.
BY MS. FARAGLIA:
Q So you helped him. Was he moving the couch by himself or was somebody else helping him before you?
A He was trying to get the couch in the door by himself.

Q All right. So did you offer to help?
A Yes.
Q All right. Were there other people in the apartment?
A Just the young girl. That's the only other person that was there at the time.
Q Okay. About how old was this young girl?
A Not sure, maybe eight. I'm not sure.
Q Okay. And what was she doing?
A Just standing off on the side quietly.
Q I'm sorry?
A Standing off on the side quietly.
Q All right. Did she have any clothes on?
A Yeah, she had a jacket on.
Q All right. Did you have any interaction with the girl?
A Just to say hello when we brought the couch in.
Q All right. After this incident that you helped with putting a couch in the apartment, did you see them again?
A No.
Q Did you have any other interaction with them?
A No.
MS. FARAGLIA: Thank you. No further questions, Mr. Bailey.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions for this witness.

THE COURT: Ms. Longino?

MS. LONGINO: No questions for this witness, your Honor.

THE COURT: Thank you. You may step down.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness?

MR. KILBANE: Your Honor, the State calls Officer Edington to the stand.

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **NICHOLAS EDINGTON**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning. Please be seated.

Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MR. KILBANE: Thank you, your Honor.

MR. KILBANE: Good morning, Officer.

THE WITNESS: Good morning.

DIRECT EXAMINATION OF NICHOLAS EDINGTON

BY MR. KILBANE:

Q Can you state your full name and spell the last name for the court reporter.

A Nicholas Edington, E-D-I-N-G-T-O-N.

Q Are you employed, sir?

A I am.

Q Where are you employed?

A City of Euclid as a patrolman.

Q How long have you been a patrolman with the City of Euclid?

A Five years.

Q Do you have any prior law enforcement experience prior to joining Euclid?

A I do.

Q What was that?
A I was a police officer in Norfolk, Virginia, for four years.
Q Any prior experience to that?
A No.
Q And you indicated that you're a patrol officer?
A Yes.
Q What do you do as a patrol officer?
A I would respond to calls for the community, enforce traffic violations.
Q Do you have any training or receive any certifications that allows you to become a police officer?
A Yes. I attended a basic police academy, both in Virginia and Ohio, and then continuing professional training throughout the five years I've been here.
Q Officer, did you have an opportunity to respond to 22701 Lakeshore Boulevard on March 11th of 2018?
A Yes.
Q All right. And do you know why you responded?
A Yes. The call came in over 9-1-1 of a child not breathing.
Q And do you recall what time you got to 22701?
A It was roughly 3:30. I was on afternoon shift that day and the call came at 3:30 p.m.
Q What time does afternoon start?

A Three p.m. is roll call for early cars.
Q Was this your first call of the day?
A It was.
Q When you get to 22701, what do you observe?
A When I pulled up on scene, officers from the day shift were already on scene as well as paramedics. As I was parking my vehicle, the paramedics came out of the building carrying a small child dressed in winter clothing, took her right on to the ambulance.
Q Did you come to learn who that child was?
A I did. I learned her name was [redacted], [redacted].
Q And what did you observe about [redacted] when you got to the scene?
A So when the paramedics took her to the ambulance, they went in the back main door; I went to the side main door. There is two doors on an ambulance. I went to the side door to speak with them to determine, A, what her status was, if she was breathing and responding to whatever treatment they've been giving her.
And when I opened the door, I could see that she was fully dressed. She was dressed in a winter coat, hat, pants, and socks. Her hands and face were exposed, the only two parts of her body I could see. Her hands, I could see each individual joint on her fingers they were so thin. I could see the individual joints on her fingers. And the

skin on her face was pale, lifeless, gray, no color whatsoever.

The medics stated she was not breathing and they were going to transport her to the hospital right away, so I got off the ambulance.

Q Okay. And after you made these observations to Aniya, what did you do?

A Like I said, I got off the ambulance, I turned around and there were two adults standing outside of the apartment complex. I later learned that that was her mother, Sierra Day, and a male named Deonte Lewis who identified himself as the stepfather at that time.

Q Where were they standing when you observed them?

A They were just outside of the apartment complex, maybe 10, 15 feet away from the ambulance. I approached them, identified who they were; realized that probably it was going to be more to this than just a child not breathing.

I spoke to them outside and they asked where she was going. I stated she was going to the hospital, but I needed them to step back inside so I could gain some information about what happened and how she ended up this way.

So we walked back into the lobby of the apartment complex. There is a small seating area with a

couple of chairs and a couch. I asked them to sit down there and we spoke there.

Q Okay. And to your knowledge, are you the first officer to sit down with them and ask them questions?

A Yes, to my knowledge.

Q All right. And did you ask them questions while they were together or did you separate them?

A Because of the environment, they were together; they sat together. We didn't really have a whole lot of officers that day. Like I said, the early cars were leaving for the day and later cars were just getting on. So we didn't really have the resources to separate them or the area to separate them at that time, and I didn't have a reason to. All I had was there was a child not breathing and we needed to get a little information before taking them to the hospital.

Q Okay. Did you have an opportunity to interview the mother?

A I did.

Q And what is her name?

A Sierra Day.

Q Is she in the courtroom today?

A Yes, she is.

MR. SHAUGHNESSY: We'll stipulate that this officer can identify

Sierra.

THE COURT: So noted.

BY MR. KILBANE:

Q Did she give you an oral statement?

A Yes, she did.

Q And do you recall what she told you?

A Yes. When I asked her what had happened, she began by telling me that the family had gone to Red Lobster last Thursday; she couldn't give me the exact date of the Thursday, just last Thursday. She stated that after that outing, [redacted] hadn't been acting the same; she wasn't eating, she was weak and sick.

She stated that at some point during that period, she had contacted a 24-hour nurse's hotline to ask because [redacted] wasn't eating and was not normal. They told her -- I believe she said they told her to keep giving her liquids.

So she stated that on the morning of the 11th, [redacted] had asked to use the restroom, and that she had helped to place her on the bathroom to go poop; she placed her on the toilet. She said she walked out of the bathroom, and after a short period, she heard a loud thud and came in and found [redacted] on the ground and unresponsive.

She helped her up. She fell again, [redacted] fell again, and then she stopped responding altogether and

they contacted emergency services.

Q Okay. Did she give you -- other than what you just testified to, did she give you any other specific information about how [redacted] was acting on March 11th of 2018?

A So when I asked her to repeat the story, because the timeline didn't match up, she couldn't really tell me what day they went to the Red Lobster. I asked her to repeat the story. She then stated that the reason that Aniya was in the bathroom was [redacted] woke up that day, she was weak, not acting normal.

The apartment was hot, so she thought -- she turned on the air conditioner thinking that that would help, and then she drew a bath for Aniya and gave her a bath. And Aniya kept asking to just lay down while in the bath. So when she got out of the bath is when Sierra told me that [redacted] had then fallen. She stated again that she got up, fell again and became unresponsive, and then she contacted paramedics.

Q All right. So now this is her second oral statement that she gave you?

A That's correct. It's a second version.

Q In her first oral statement, did she mention anything about the air conditioner?

A No.

Q Did she mention anything about [redacted] possibly being hot?
A No.
Q Did she, in her first oral statement, did she mention anything about drawing a bath for [redacted]?
A No.
Q After you get these two oral statements from Sierra Day, what do you do?
A I ask her to provide me with a consent to search form to check the apartment for other people and other things; she does so. I then ask her to fill out a written statement, just in her own words what she had just told me verbally.
Q And did she complete a written statement?
A Yes, she did.
Q If you were to see that statement, would you be able to recognize it?
A Yes.
MR. KILBANE: Your Honor, may I approach?
THE COURT: You may.
BY MR. KILBANE:
Q Officer, I'm handing you what has been previously marked as State's Exhibit 401, do you recognize that document?

A Yes, I do.
Q What is that?
A This is the written statement that Sierra provided at the scene.
Q Okay. And does that statement form indicate who was providing the actual statement?
A Yes. Handwritten at the top is Sierra Day's name and she also signed down at the bottom.
Q Okay. And at the top of the page where her name is at, does she fill in that information or do you fill --
A I'm sorry?
Q At the top of the statement where it indicates her name, does she fill out that information or do you fill out that information?
A Yeah, she fills out the area of information, and the top section is the incident location and time it was provided. And the time of the incident, that's the section I would fill out normally.
Q What is the date and time listed on that written statement?
A The date and time for the statement is 3-11-18, at 1550 hours.
Q What does that translate into in Eastern Standard Time?
A 3:50 p.m.

Q Does she provide her address on that statement form?
A She provides the numbers only. I then completed the address of the incident using the apartment that she provided to me. But she just provides 22701.
Q All right. And can you read for the jury what she put in her statement?
A You want me to read the statement?
Q Yes.
A "Family went to Red Lobster. Daughter ate food. Got home, started acting really weird. Noticed she didn't want to go to the bathroom or eat. Every time we feed her, she threw it up. Gave her" -- I can't really read what that word is.
"She threw it up. Put daughter on toilet to use it. Daughter wasn't responding at all for a min. Heard a boom in bathroom, daughter was on the floor. Picked her up, did CPR, she started to respond back. Led (sic) her down. Few hours went past, daughter still acting weird, gave her more," I can't read that word.
"Threw it back up. Tried to give her more food. Threw it back up. Gave my daughter Tylenol. Threw it back up. Daughter stopped breathing. Did CPR."
Q Did she, in any of her statements, mention whether she was giving [redacted] any liquids?

A Her verbal statements?
Q Yes.
A She had mentioned that she had given her some Tylenol in one of the versions and that she had thrown it back up, and ginger ale.
Q In that written statement, she indicates that she provided the child with CPR?
A Yes. It states, in her written statement, she never told me this verbally, but her written statement said she gave her CPR, she responded and then she laid [redacted] down for a while.
Q And she never told you that in any of the oral statements?
A No.
Q Based on that information, what do you do?
A I contacted the OIC and officers at the hospital. While they were providing their statements and after we had searched the apartment for other victims, using the consent form and a key provided by Mr. Lewis, we entered the apartment, searched, and found no one.
Q Before you did that, did you have an opportunity to interview Mr. Lewis?
A I did.
Q Is Mr. Lewis in the courtroom?
A Yes.

Q Can you point to him and describe what he's wearing?

A He's seated --

MS. LONGINO: Stipulate to the identity.

THE COURT: So noted.

MR. KILBANE: Thank you, counsel.

BY MR. KILBANE:

Q And he gave you an oral statement?

A Yes, he did.

Q What did he tell you in his oral statement?

MS. LONGINO: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: He stated that the family had gone to Red Lobster and that [redacted] hadn't been acting the same since and that she was weak and not eating.

BY MR. KILBANE:

Q Okay. And did he ever mention in his oral statement whether she was responsive or unresponsive on March 11th of 2018?

A Yes, he stated that she became weak and unresponsive so they contacted paramedics.

Q Okay. And did he also provide you with a written statement?
A Yes, he did.
Q If you were to see that statement, would you recognize it?
A Yes.
MR. KILBANE: May I approach, your Honor?
THE COURT: You may.
BY MR. KILBANE:
Q Officer, I'm handing you what has been marked as State's Exhibit 402, do you recognize that document?
A Yes, I do.
Q And can you tell us what it is?
A It's the written statement that Deonte Lewis provided at the scene.
Q And is his name on the top of that form?
A Yes. Once again it's written Deonte Lewis under "statement of," and he provides an address.
Q What address does he provide?
A 1887 Burnett Avenue.
Q And can you read for the ladies and gentlemen of the jury what he wrote in his written statement?
A Yes. "Family went to Red Lobster. After that, started to act weird. Acted like she couldn't walk,

didn't want to eat. She just started acting nonresponsive today. Before today, she talked. She would eat, but when she wouldn't eat, we gave her Tylenol and she didn't want it."

Q And did he sign that document?

A He actually did not sign this.

Q Did you sign that document?

A I did.

Q Did you observe him write that document?

A Yes, I handed him the paper and got him through the start of it.

Q And, sir, how long do you think you were interviewing both Deonte Lewis and Sierra Day?

A Maybe 30 minutes.

Q All right. And this whole time it was in the lobby of the apartment complex?

A Yes.

Q And let's start with Sierra Day, can you tell us what her demeanor was like as she was giving you her two oral statements and her written statement?

A Yes, she was very calm, collected, not emotional, not upset; just as if this was normal --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

BY MR. KILBANE:

Q And did she ever ask you what hospital [redacted] was being taken to?
A I don't remember if she had asked that question or not.
Q And what was the demeanor of Deonte Lewis, if you know?
A He was also calm. He seemed a little more nervous, just like, once again, not emotional, just --
Q Were either Deonte Lewis or Sierra Day crying?
A No.
Q After you get these verbal statements, the written statements, what do you do next?
A Like I said, I also obtained the consent to search form from Sierra. She stated she was the one on the lease. Deonte was the one that provided us with the key to the apartment. We went and unlocked the apartment. Myself and another officer checked for any other people who may be in there; didn't find any.
While in the apartment, I noticed it smelled a lot like cleaning supplies like a bleach or chemical smell. We then backed out of the apartment, locked it. Another officer stood by and awaited detectives for a search warrant, if necessary.
I then went and contacted the OIC, detectives and officers at the scene -- at the hospital, I'm sorry, at

the hospital, and I learned that [redacted] had been pronounced. And then we placed Deonte Lewis and Sierra Day under arrest for child endangerment.

Q Okay. And you indicated a consent to search?

A Yes.

Q Who did you ask for the consent to search?

A Sierra Day.

Q Did you also ask Deonte Lewis?

A They were both sitting together, but he stated he wasn't on the lease, Sierra was the only one on the lease.

Q Did you ask him if he resided at the apartment?

A I don't remember asking that question.

Q Okay. Did he indicate whether he lived at that apartment?

A He did not. He provided a different address on the statement. He did say that he was [redacted] stepfather at the time.

Q And when you walked to their apartment, do you attempt to open the door and you find it locked?

A I learned from paramedics that the door was locked after paramedics walked out.

Q Okay.

A So I knew prior to going up there that the door was already locked.

Q Who provided you the key to the apartment?
A Deonte Lewis.
MR. KILBANE: May I approach, your Honor?
THE COURT: You may.
BY MR. KILBANE:
Q Officer, I'm handing you what's been marked as State's Exhibit 403. Do you recognize that?
A Yes, I do.
Q What is that?
A This is the voluntary consent to search form that Sierra had provided.
Q Can you go through that form?
A It reads, "I, Sierra Day, having been advised of my right not to consent to a search of my premises/vehicle without a warrant and of my right to refuse to consent to such a search, do hereby authorize Officer Edington and detectives of the Euclid Police Department to conduct a search of my premises/vehicle, namely 22701 Lakeshore Boulevard Apartment 213, Cultural Gardens, located at 22701 Lakeshore Boulevard Apartment A-213. The aforementioned officers are authorized to seize from my premises/vehicle any items of contraband or property that they deem necessary."
At the bottom, it says, "Name: Sierra Day;

Address: 22701 Lakeshore Boulevard, Apartment A-213," dated March 11, 2018, and the time was written at four p.m; signed by myself, Badge 88, of the Euclid police department.

Q Okay. I'll take that back from you.

Officer, you mentioned that you entered the apartment?

A Yes.

Q Were you the first officer to enter the apartment, to your recollection?

A I -- I don't believe so. I believe day shift cars that were there before me had been inside the apartment with paramedics.

Q Okay.

A But I was the first officer to go back in after it would have been locked.

Q You mentioned what you smelled in the apartment. Did you make any other observations about the apartment?

A It was very clean and orderly, everything was in its place, there was no mess; there was no items out of place. Everything was very detailed and, along with the smell of bleach, it smelled a little bit like rotting meat, if you will, but the chemical smell was very, very, very strong.

Q Did you observe anything in regard to the temperature of the apartment?

A A -- it felt cool inside. I mean, it wasn't too warm. It just seemed like a normal temperature to me.
Q And did you see any children's toys in the apartment?
A I don't recall seeing any toys. I did see a small child's bed in one of the bedrooms, it was like a character, I don't know what type of character like a cartoony-type bed frame.
Q Okay. Did you collect any evidence?
A I did not collect any evidence.
Q After you do your cursory search of the apartment, what do you do next?
A We exit the apartment and secure it again; place an officer there because at that point, I wasn't sure if we were coming back with a search warrant for any additional information.
Q Do you attempt to speak with any other residents in the apartment complex?
A Not at that time.
Q Okay.
A At that time, I contacted officers at the hospital and learned that [redacted] had additional injuries and that she had been pronounced dead. I spoke with the boss and detectives and determined that Sierra Day and Deonte Lewis were going to be placed under arrest.

They were placed under arrest and transported to Euclid police department to the county jail side and held there for detectives. After doing that, I went back to the apartment complex.

Q All right. Did you transport any of the defendants to the jail?

A I did.

Q Do you recall who you transported?

A I do not recall which one I transported to the jail.

Q And then you said you went back to the apartment complex?

A Yes. I responded back to start a canvass of the neighbors, which is basically where we knock and talk to people.

Q Did you speak with any of the neighbors?

A I did speak with two of the neighbors -- I spoke with several neighbors, only two of them remembered the couple.

Q All right. And do you recall who you spoke with who remembered the couple?

A I don't remember their names. I know their apartments were located to the left, which I believe was 215, and directly across the hallway, which I believe was 214.

Q And did you obtain written statements from these two individuals?
A I did.
Q After you do a canvass of the apartment, what do you do?
A I respond back to the station with the written statements that I have, confer with detectives, and I realized while I was at the apartment that I had actually been there before. So I did a CAD search, which is our computer system, for any previous incidents with either Deonte Lewis or Sierra Day or that apartment.
Q Okay. And were your suspicions confirmed that you had been there before?
A Yes, they were.
Q Do you recall when you last went to that apartment?
A It was, I believe it was February 9th, so about one month prior to that incident.
Q So in 2018?
A 2018; February 9th, 2018.
Q And what was the purpose of that call?
A We got a call to dispatch that there were -- there was a male and a female arguing and that items were being thrown out into the hallway.
Q And who do you respond with?

A I believe Officer Catalani responded with me.
Q Do you recall what time this was?
A I remember it being in the evening. I don't recall the exact time. It was dark outside, I know that.
Q Okay. And what did you observe when you get there?
A Mr. Lewis, Deonte Lewis, was standing in the hallway with a bag of belongings on the floor and he was knocking on the door trying to talk to somebody inside the apartment.
Q When you say a bag of belongings, what do you mean?
A Like a trash bag full of clothes and shoes and items.
Q Do you know whose clothes and shoes and items those were?
A They were his; he stated those were his.
Q You stated they were in a garbage bag?
A Yes.
Q Do you know the amount of clothes that were in that garbage bag?
A I don't remember. I know it was -- I don't remember the size of it. It wasn't overly big, it wasn't like a lawn bag or anything like that, but it was a sizeable amount of clothes.

Q Was that bag full?
A Yes.
Q Where was Mr. Lewis standing when you get to the apartment complex on February 9th?
A He was just outside of the apartment door, standing right in front of the door.
Q When I say Mr. Lewis, is that the same individual that you identified earlier in court?
A Yes, it is.
Q Was anyone else present on the scene on February 9th, 2018?
A Sierra Day was inside of the apartment.
Q Did you have any interactions with Sierra Day?
A Very limited. She answered the door. I saw her in the apartment, but I didn't really speak with her. Officer Catalani entered the apartment and spoke with her. I stayed in the hallway with Deonte.
Q Based on that incident, what did you do?
A We learned that Deonte was not on the lease there; Sierra didn't want him there, so she asked that we escort him off the property. He was advised that he wasn't allowed to be there.
She stated that she didn't want him trespassed; she just wanted him gone for the night. So we provided him that information. He seemed relatively

understanding, but he was upset about the incident and wanted to work it out. But he said he would leave and he was respectful with us.

Q Did you escort him out of the building?

A We walked out with him, yes.

Q Do you know if he had a vehicle there?

A I don't recall how he got off the property.

Q You mentioned these CAD searches. Did you discover anything else in these CAD searches?

A Yes. I learned that in May of 2017, Sierra Day --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: -- was involved in a report for abuse of a minor.

BY MR. KILBANE:

Q And do you know who made that report?

A From our police department?

Q No. Who was the complaining -- do you know who the complaining witness was?

A Yes, the complaining was a day care at Harbor Crest where [redacted] attended.

Q And you didn't respond to that report in May of 2017?

A I did not; I simply read it.
Q Okay.
MR. KILBANE: Can I have one moment, your Honor?
THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

BY MR. KILBANE:

Q I just have a couple more questions, Officer.
Officer, did, in any of the statements that Deonte Lewis gave you, did he refer to [redacted] -- how did he refer to [redacted]?
A As his stepdaughter.
Q And in the second oral statement that Sierra Day gave you, you testified that she, [redacted], took a bath?
A Correct.
Q After Sierra Day told you that she put [redacted] in the bath, what was specifically the sequence of events that Deonte Lewis told you that [redacted] did?
A I would have to refer to my report. I'm not sure what you're asking me.
Q Did you memorialize in your report what Sierra Day told you in her second oral statement to you?
A I did.

Q Would it refresh your recollection to see that report?
A Yes.
MR. KILBANE: May I approach, your Honor?
THE COURT: You may.
BY MR. KILBANE:
Q Officer, I'm handing you what has been previously marked as State's Exhibit 404. Do you recognize that document?
A Yes, I do.
Q And what is it?
A It's the Euclid police report that I completed for this incident.
Q Okay. And you indicated that Sierra Day's second oral statement is contained in your report?
A Yes.
Q Okay. And can you quietly, to yourself, flip to that page in your report, read it to yourself, and then look at me when you're done.
A Okay.
Q Okay. Officer, did you have an opportunity to review your report?
A Yes.
Q And has it refreshed your recollection as to what

Sierra Day told you in her second oral statement?

A Yes.

Q And can you go through carefully the sequence of events, what she told you in her second oral statement?

A She stated that [redacted] woke up and wasn't acting right; that she thought it was hot in the apartment so she turned on the air conditioner thinking the heat was affecting her. She then stated she put her in the bath and that [redacted] was asking to lay down during the bath. She then got her out of the bath and [redacted] asked to use the restroom, that's when she fell down and became unresponsive.

Q Okay. Did you ask Sierra Day whether at this point when she fell, if [redacted] had any clothes on?

A I did not ask.

Q Okay. But what were your observations of [redacted] when you saw her when you first got on the scene?

A She was carried out in the arms of a paramedic wearing a winter hat, a coat, pants, and socks. Her entire body was covered in clothing except for her hands and face.

Q So she was fully clothed?

A Yes.

Q One last question, Officer.

MR. KILBANE: May I

approach, your Honor?

THE COURT: You may.

BY MR. KILBANE:

Q Officer, I'm handing you what's been marked as State's Exhibits 401 and 402, which you previously identified. Can you go through those statements and tell us whether either Deonte Lewis or Sierra Day ever mentioned [redacted] by her name.

A They never did in the written statements.

MR. KILBANE: No further questions, your Honor.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: Your Honor, we have no questions for this officer.

THE COURT: Ms. Longino?

CROSS-EXAMINATION OF NICHOLAS EDINGTON

BY MS. LONGINO:

Q Okay. Officer, in Exhibit 402, State's Exhibit 402, witness statement by Deonte Lewis, does it read thusly, "Family went to Red Lobster. After that, started to act weird, acted like she couldn't walk. She didn't want to eat. She just started acting nonresponsive today. Before today, she talked, she would eat, but when she wouldn't eat, we gave her the Tylenol and she didn't want it."

A Yes.
Q So in that statement, nowhere in that statement does he refer to her as his daughter; does he?
A Not in the written statement.
Q Okay. Or does he refer himself as the stepfather?
A Not in the written statement.
Q Now, did you take the pictures of the crime scene?
A I did not.
Q All right. And you said that the apartment smelled of rotted meat?
A Chemical smell and rotted meat, yes.
Q So the chemical smell was more prevalent than the rotted meat smell?
A Yes.
Q But, didn't you observe that -- I mean, I've heard the testimony, even from you, that this house was just immaculate. Didn't you observe that there were dishes in the sink?
A I don't recall seeing dishes in the sink.
Q You don't recall that?
A No.
Q Okay. And you did not take the pictures; right?
A I did not take the pictures.
Q All right. Now, with regard to this plastic bag that had Mr. Lewis's items in it, did you inspect that

bag?
A I did not.
Q So you don't know if there were shoes in there or not; do you?
A I could see the outprint of shoes in the plastic bag.
Q You could see the outprint of shoes?
A Yes, when you pick up a plastic bag and it stretches, the contents can be seen inside from the outside.
Q This is a trash bag for a kitchen trash can; correct?
A Something like that.
Q About this high?
A That seems about right.
Q Okay. And in that bag there is about two outfits in there?
A I don't know what was inside that bag other than, like I said, the outprint of the shoes.
Q How many pair of shoes did you see?
A I saw an outprint of one shoe.
Q One shoe?
A Yes.
Q Okay. So you don't really know how many items was in this small kitchen trash bag; correct?

A That's correct.
Q Okay. All right. Now, in this report that you spoke of May 2017, there was absolutely no mention of Mr. Deonte Lewis in that report; was there?
A I don't recall.
Q You don't recall or you didn't see it?
A I don't recall. I didn't write the report. I didn't respond. I just mentioned it in my report.
Q Mm-hmm, that you read it?
A I don't think that I read it in its entirety.
Q If you didn't read it, how could you talk about it in your report?
A Because I saw that there was a report involving Sierra Day and [redacted] and --
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled.
THE WITNESS: -- I simply notated it in my report and included the report number.
BY MS. LONGINO:
Q Okay. Now, going back to the State's Exhibit 404, on line number one, it says on February 9th -- first of all, this report was -- you didn't sign this report, did you?
A I'm sorry?

Q You did not sign this report?

MS. LONGINO: May I approach, your Honor?

THE COURT: Yes.

BY MS. LONGINO:

Q That's not your signature; is it?

A This is the investigative follow-up section for the report. This is not my section of the report.

Q Okay. But in this investigative follow-up section of the report, it says that on February 9th, you guys were called to this apartment; February 9th, 2018, you were called to Ms. Day's apartment --

MR. KILBANE: Your Honor, I'm going to object to this.

THE COURT: Let's go to side bar.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: I'm going to sustain the objection.

BY MS. LONGINO:

Q Okay. So when you responded to the call on February 9th and you saw these few items in this little trash bag, did you see any items belonging to Ms. Day out there?

A In the hallway?

Q Yes.

A No.

Q All right. Now, you said that she also told you that she did not want Mr. Lewis put on the trespass list for her apartment; correct?

A That was told to Officer Catalani who then told me and Deonte Lewis in the hallway.

Q Oh. That was told to you by someone else?

A By Officer Catalani, yes.

Q Mm-hmm. Okay.

MS. LONGINO: Nothing further.

THE COURT: Any follow-up?

MR. KILBANE: Your Honor, briefly.

REDIRECT EXAMINATION OF NICHOLAS EDINGTON

BY MR. KILBANE:

Q Does Deonte Lewis refer to [redacted] as anything in his oral statement?

A He identified himself as the stepfather and said

that it was his stepdaughter, but that was at the very beginning of the interaction.

Q In this bag, that's been referred to on February 9th, Deonte Lewis is eventually escorted out of the building; correct?

A Yes.

Q What happens with that bag when he's escorted out of the building?

A He takes it with him.

Q So it's his property?

A Yes.

MR. KILBANE: Nothing further, your Honor.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: Nothing on that, Judge.

THE COURT: Ms. Longino, anything on that?

MS. LONGINO: No.

THE COURT: You may step down.

THE WITNESS: Thank you, sir.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Call your next witness.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MR. KILBANE: State calls Officer Catalani to the witness stand.

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **LOUIS CATALANI**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MR. KILBANE: Good morning, Officer.

THE WITNESS: Good morning.

DIRECT EXAMINATION OF LOUIS CATALANI

BY MR. KILBANE:

Q Can you state your full name and spell your last name for the court reporter.

A Louis Catalani, C-A-T-A-L-A-N-I.

Q Are you employed, sir?

A Yes.

Q Where are you employed?

A The City of Euclid with the police department.

Q And what do you do at the police department?

A I am a patrol officer.

Q And how long have you been a patrol officer with the City of Euclid?

A I've worked with the City of Euclid since August of 2016. I was previously employed with the Cuyahoga County Metropolitan Housing Authority and the Village of Waynesburg police departments.

Q So how long have you been a law enforcement officer?

A Since November of 2009.

Q And what are your basic duties as a patrol officer?

A Answer calls for service, enforce city codes, state codes, traffic laws; things of that nature.

Q Do you have any training and/or certifications in

order to become a police officer?
A Yes. I attended the basic police academy. Additionally, after becoming a police officer, I have attended various advanced training courses.
Q And on March 11th of 2018, did you become involved in an investigation involving the death of [redacted]?
A Yes.
Q And when did you become involved in that investigation?
A My initial involvement, I was requested to respond to the scene to assist in transporting two individuals back to the station. After assisting in the transport, I was approached by Detective Kroczak who requested that I call Children and Family Services, 696-KIDS.
Q I'm going to stop you there. You said you transported someone to the station; is that what you testified to?
A Yes.
Q Do you recall who you transported?
A I don't recall if it was Ms. Day or Mr. Lewis. It was one of the two.
Q Do you recall where you transported them from?
A The Shore Cultural Gardens.
Q Then, you had an opportunity to speak to Detective

Kroczak; is that correct?
A Yes.
Q You called 696-KIDS?
A Yes. At her request, I called 696-KIDS.
Q And did you speak with anyone?
A Yes, the intake worker; her name was Venita Wiggins.
Q Okay. What did you ask Ms. Wiggins?
A I inquired if either Ms. Day or Mr. Lewis had any open cases --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: If they had any open cases or any past history.

BY MR. KILBANE:

Q Okay. Without giving me the information that she told you, how long did you speak with her for?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

THE WITNESS: Approximately ten, 15 minutes.

BY MR. KILBANE:

Q Okay. And after you talk with this individual, what do you do?

A After speaking with her on the phone, gathering information, I authored a supplement to the original report.
Q Okay. Did you ever go back to Detective Kroczak?
A I went back to Detective Kroczak, just verbally informed her of what I had been told and what was going to be in the supplement to the report.
Q And this was on March 11th of 2018?
A Yes.
Q Officer, did you have an opportunity to respond to 22701 Lakeshore Boulevard on February 9th of 2018?
A Yes.
Q And what was the purpose of that call?
A It was a broadcast call to respond referencing a domestic disturbance.
Q And who did you respond with?
A Officer Edington.
Q And do you recall what time you got to the scene?
A I'd have to refer to my report for the specific time.
Q Was it in the evening?
A I believe it would have been late afternoon.
Q And what did you observe when you got there?
A Upon our arrival, I had briefly spoke with the caller, an uninvolved female, who advised us that the

parties were up on the second floor. We responded up to the second floor apartment where we located Mr. Lewis out in the hallway.

I knocked on the door of Ms. Day's residence. Officer Edington stayed outside with Mr. Lewis while I stepped inside to the apartment to speak with Ms. Day.

Q All right. So Mr. Lewis was outside of the apartment and the door was closed when you arrived?
A Yes.
Q All right. Did Mr. Lewis have anything on him?
A He had a bag of belongings.
Q Okay. Do you know whose belongings those belonged to?
A After speaking with Ms. Day, she said those were his belongings that she had gathered and put outside. She no longer wanted him there.
Q So you did have an opportunity to speak with Sierra Day?
A Yes.
Q And did you enter the apartment?
A I did.
Q Do you recall what the apartment number was?
A I'd have to refer to my report.
Q Okay.

MR. KILBANE: Your Honor,

may I approach?

THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

BY MR. KILBANE:

Q Officer, on February 9th of 2018, did you actually author that report?

A Yes, sir.

Q And if you were to see the contents of that report, would you be able to recognize the contents of the report?

A Yes, sir.

Q And would it refresh your recollection to see what apartment you entered?

A I believe so.

MR. KILBANE: May I approach?

THE COURT: You may.

MR. SHAUGHNESSY: Judge, we have no problem agreeing that the time in the report states that it was at 1522 hours.

MR. KILBANE: The apartment number.

THE COURT: He was trying

to confirm the apartment number.

MR. SHAUGHNESSY: Yes, we can --

THE COURT: He couldn't remember. He wanted to refresh his recollection.

MR. SHAUGHNESSY: We've seen the report; we've read it. We agree that's what the report says.

MR. KILBANE: Can I get the same stipulation from the other defendant?

MS. LONGINO: Yes.

BY MR. KILBANE:

Q Do you agree, Officer, that the apartment you entered was apartment number 213? Does that sound correct?

A That sounds correct.

Q Did you have an opportunity to enter that apartment?

A I did.

Q What did you observe when you got into the apartment?

A Stepping inside the doorway to speak with Ms. Day, I observed what I would refer to as her living room area; seemed very organized and clean. I don't remember too much about it, nor did I go through the rest

of the house.
Q Okay. Did you see any children there?
A No.
Q And after you speak with Sierra Day, what do you do?
A After speaking with Ms. Day, I advised her I would be authoring a report; I gave her the report number. And at her request, I went back out to the hallway, spoke with Mr. Lewis for a short time and then advised him that she was requesting that he leave. And Mr. Lewis grabbed his belongings and we escorted him out of the building.
MR. KILBANE: Could I have one moment, your Honor?
THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

BY MR. KILBANE:

Q Officer, briefly, did you ask Sierra Day whether she ever wanted Deonte Lewis to come back to the apartment?
A I had asked her if she wanted to sign what we refer to as a trespass form. Generally, a trespass form bars somebody from coming back to a business or a

residence at the request of the owner. She stated she didn't want to sign that form.

MR. KILBANE: I have no further questions, your Honor.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions for this witness, Judge.

THE COURT: Ms. Longino?

MS. LONGINO: Just briefly, your Honor.

CROSS-EXAMINATION OF LOUIS CATALANI

BY MS. LONGINO:

Q You responded to the apartment on March 11th, 2018, as well; correct?

A I responded to the building, I never made it up to the apartment.

Q Never it made it to the apartment, okay.

You are aware that Mr. Lewis gave a written statement?

A I'm not aware.

Q You're not aware?

A Huh-uh.

Q Okay. Well, when Ms. Day said that she didn't want to put Mr. Lewis on the trespass list for her apartment, she never stated that he resided there; did

she?

A I -- I can't recall.

Q Okay. And the clothes that were in the hallway, did you inspect the bag that the clothes were in?

A No.

Q But it was a small kitchen trash bag, black plastic bag; correct?

A I remember it as a trash bag. I don't specifically remember color or size or anything.

Q But you don't know how many outfits were in that bag or if there were shoes in that bag? You don't know any of that; do you?

A No.

MS. LONGINO: Nothing further.

THE COURT: Any follow-up?

MR. KILBANE: No questions, your Honor.

THE COURT: All right. Thank you. You may step down.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Call your next witness.

MS. JORDAN: Thank you, your Honor. At this time the State would call Stephanie Millam.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Please step forward. Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **STEPHANIE MILLAM**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Make sure you speak directly into the microphone. You can adjust the microphone; your seat will not move.

You may inquire.

MS. JORDAN: Thank you, your Honor.

DIRECT EXAMINATION OF STEPHANIE MILLAM

BY MS. JORDAN:

Q Good morning, ma'am. Can you please state your name and spell your name for the record.

A My name is Stephanie Millam, M-I-L-L-A-M.
Q And ma'am, are you employed?
A I am.
Q Where are you employed?
A At the Cleveland Clinic, Euclid Hospital.
Q And what is your position at the Cleveland Clinic Euclid Hospital?
A I'm a registered nurse in the emergency room.
Q How long have you been a registered nurse?
A A little under six years, it will be six years in June.
Q Has all your time been spent at Euclid Hospital?
A Yes, ma'am.
Q What are some of your duties as a registered nurse at the Euclid Hospital in the emergency room?
A Mostly patient care. Taking ambulance calls, booking squads, taking care of patients coming in through the front door.
Q What sort of training and experience do you have to have for that position?
A You have to have your nursing license. And to work in the emergency room you have to be ACLS certified, which is Advanced Cardiac Life Support; PALS certified, Pediatric Advanced Life Support; stroke certified, and there is other optional certifications you can get.

Q Were you employed at the Euclid Hospital emergency room in your capacity as a registered nurse on March 11, 2018?
A I was.
Q What was your assignment for that day?
A I was the charge nurse.
Q What does the charge nurse do?
A The charge nurse just facilitates flow through the ER, helps out when needed, handles any problems going on.
Q Did you have the occasion to respond to a room where a four-year-old victim was brought in on that day?
A I did.
Q Can you describe the room, the hospital room, when you first walked in?
A We had a -- we were notified prior to that patient coming in, so we were prepared and we were waiting outside the room.
Q Let me stop you there. When you say you were notified prior to; what steps did you have to take to be prepared?
A We were notified of a four-year-old in full arrest, so we have specific things that we need to do. We have machines that we need to get; certain carts, such as a Broselow cart which is a pediatric advanced life

support cart with all the supplies and medications and everything that are needed. We have -- just supplies that we need to gather, monitors; stuff like that.

Q When you received this call, are you meeting the patient outside the hospital or are you inside when she's brought in?

A We were inside the hospital.

Q Tell me the first thing that happens when she's brought inside.

A When she's brought inside, the EMS ambulance driver/paramedics give us report as, usually, as they're working. We're kind of giving report back and forth so we can take over care.

Q At this point in time, do you know the individual's name that you're working on?

A No.

Q Okay. What's the next thing that you do?

A We transfer the patient from EMS's cot to our bed; get them hooked up to our monitoring.

Q At the point in time, when you are transferring the patient from the EMS cot to the hospital bed, what are your observations of her?

A Little girl who is skinny; skin and bones. Her eyes are wide open, her mouth was open. Bruised. Fragile. Stiff, cold.

Q What do you do next after she is transported to the hospital bed?

A We put her on our monitoring, meaning like cardiac monitor to evaluate cardiac activity.

Q Okay. As you were putting her on the monitor to evaluate cardiac activity, what, if anything, are you noticing?

A Nothing. We have no cardiac activity. I don't really know --

Q What is it that you do next?

A The doctor -- we have to wait a certain amount of time to make sure, we're watching the monitor and the doctor has to pronounce the patient based off of what they see on the cardiac monitor.

Q At this point in time, do you have a name yet for this patient?

A At this point in time -- so there was several nurses in the room during the time. I believe that one of the paramedics had given the primary nurse for that assignment the patient's information and that nurse had arrived with that patient. I was still working on getting report and basically patient care.

Q So you're still managing patient care?

A Mm-hmm.

Q After she is pronounced, what are the next steps

that you take?

A It was --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

BY MS. JORDAN:

Q You can answer.

A What was the question?

Q After she is pronounced, what are the next steps that you take?

A This is a little bit of a different case because -- it was different.

Q Well --

MR. MAREIN: Objection.

THE COURT: Overruled.

BY MS. JORDAN:

Q You say this is a little bit of a different case. What do you mean when you say that?

A There was police; there was police in the room. Our -- it was just different. So we -- we weren't as hands-on as we would have been if police weren't in the room and if the patient didn't present the way that she did.

Q When you say present the way that she did, what do you mean by that?

A The signs of injury and the way that her body looked and felt.
Q What were the signs of injuries that you observed?
A She had obvious bruising to the left side of her face. She was missing a tooth, left front tooth. She had abrasions on both of her legs, around her ankle area. She had scabbing on her back. She was emaciated; you could see every bone in her body. She had a scratch or abrasion near her left eye.
Q So what are the next steps that you took?
A The next steps that I took as the charge nurse was after our attending provider pronounced her dead, I called the coroner's case -- or the Cuyahoga County Coroner and made them aware. We then call Life Bank as well, it's the same process for every patient that we pronounce in the ER.
Q By the time you had called the Cuyahoga County coroner's office, had you learned the victim's name?
A Yes.
Q And what was her name?
A [redacted].
Q After you called the coroner's office for [redacted], what was the next thing that you did?
A The coroner asked me to put paper bags and rubber bands around her hands and feet, so I did that.

Q If you were to see a picture of the paper bags on her hands and feet, would you recognize that picture?
A Yes.
MS. JORDAN: May I approach, please, your Honor?
THE COURT: You may.
- - - o0o - - -
(Off the record.)
- - - o0o - - -
MS. JORDAN: May I approach, your Honor?
THE COURT: You may.
BY MS. JORDAN:
Q Ms. Millam, I'm handing you what's marked for identification purposes as State's Exhibit 211. Can you take a moment to review that item. Do you recognize State's Exhibit 211?
A I do.
Q Can you tell us what it is, please?
A It's [redacted] body with paper bags rubber-banded to her hands and feet.
Q Is it a fair and accurate depiction of the manner in which you affixed the paper bags to [redacted] hands and feet?
A It is.

Q Now, Nurse Millam, what was the process through which you took, or the procedure, to affix these paper bags to [redacted] hands and feet?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

THE WITNESS: When you call and report a death to the coroner, after you have given all of the necessary information, they ask you if there are any signs of foul play. And if you express that there is, then they ask you to put on the paper bags.

BY MS. JORDAN:

Q Do you have to secure gloves or anything of that nature before placing these bags?

A Yeah, you always wear gloves.

Q Okay. As you're placing the bags on [redacted] hands and feet, what, if anything, did you notice about [redacted] body?

A How fragile and cold, light it was. Just her limbs and --

Q In your experience, have you ever encountered a child's body that presented that way before?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

BY MS. JORDAN:

Q In your time as a nurse?
A I have not.

MS. JORDAN: Thank you. One moment, please, your Honor.

Nothing further, your Honor.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: Your Honor, I have no questions for this witness.

THE COURT: Ms. Longino?

MS. LONGINO: No questions.

THE COURT: You may step down. Thank you.

THE WITNESS: Thank you.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Who is going to be your next witness?

Anybody need a break? Okay. We'll take a very short recess. All rise. Please do not discuss this case. All rise.

- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

- - - o0o - - -

(Brief recess had.)

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated.

Call your next witness.

MS. JORDAN: Thank you, your Honor. The State calls Sergeant Murowsky.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **CRAIG JOHN MUROWSKY**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Make sure you speak into the microphone. You can adjust the

microphone; the seat will not move.

You may inquire.

MS. JORDAN: Good morning, Sergeant Murowsky.

THE WITNESS: Good morning.

DIRECT EXAMINATION OF CRAIG JOHN MUROWSKY

BY MS. JORDAN:

Q Would you please state your full name and spell it for the record?

A It's Craig John Murowsky, M-U-R-O-W-S-K-Y.

Q Sir, are you employed?

A Yes, I am.

Q Where are you employed?

A I'm employed with the City of Euclid police department.

Q What is your position with the City of Euclid police department?

A Currently I'm assigned as the sergeant in the detective investigation's bureau.

Q How long have you been employed by the City of Euclid police department?

A 24 years.

Q What sort of training and experience, briefly, do you have for that position?

A I obviously completed the basic training academy

of the Ohio State Ohio Patrol in 1995. And throughout the years, I've attended numerous seminars, trainings in different areas of police work, traffic investigations, impaired drivers, criminal investigations; just basically maybe three or four classes a year.

Q Sergeant, what are some of your assignments and basic duties as a supervisor?

A As sergeant of the detective bureau, I'm basically assigned investigations. I monitor investigations that are being completed by the detectives. I keep the command staff appraised of the status of investigations.

I also assist as-needed in the investigations, roles such as maybe take photographs, test-firing weapons, handling evidence, transporting to and from the lab. I'm also in charge of making sure the detectives have proper training, in-service training as well as outside training, as well as administrative functions such as payroll, scheduling; things of that nature.

Q Sergeant, how are cases typically assigned to detectives?

A Typically, if it's a normal investigation, the patrol division will complete their initial report and it will be forwarded. If it's a felony, it will be forwarded back to our bureau on what we call a detective

clipboard. And I take those reports, I read them, and I determine whether or not they actually need to be followed up for further investigation. I then assign it to a specific detective.

Q Sergeant, were you working with the City of Euclid police department on March 11th, 2018?

A Yes, I was.

Q And what was your assignment on that date, sir?

A Actually, I was employed but I was off duty. That would have been a Sunday on March 11th, 2018, so I was actually off duty.

Q Did there come a point in time on Sunday, March 11th, where you got to be called on duty?

A Yes.

Q Can you explain to me how that occurred?

A Yes. I received a phone call from I believe it was initially Detective Kroczak. She had contacted me and said they were investigating a possible suspicious death or a serious children endangering incident that was occurring on Lakeshore. I determined at that point that we would put together an investigative team; I would call in other investigators, create a team. I also advised Detective Kroczak that she would be the lead investigator.

Q Sergeant, why was a team formed at that point?

A Well, there's a lot of functions that need to happen in the initial stages, so I need at least three or four investigative detectives there to make sure all our initial bases are covered.

Q Who was that team that you assembled?

A Along with Detective Kroczak, I also contacted Detective Caruso, I called him in from off duty, as well as Detective Tschetter. So those two, myself responded to the station to meet Detective Kroczak.

Q And upon responding to the station to meet with Detective Kroczak, what was the next thing that you did, Sergeant?

A We had a brief meeting to determine what assignments were going to be delegated. We determined that we needed to get immediate photographs of the victim at the hospital. We had already had the scene secured by patrol officers, and we made a determination that a search warrant was going to be required.

So I had Detective Tschetter draft a search warrant, and myself and Detective Caruso would go to the hospital with the initial photographs. And Detective Kroczak would stay at the station to begin the process of victimology and developing suspects and things of that nature.

Q Why was a determination made to respond to the

hospital to take photographs?
A We want to obviously document things as soon as possible. We do need photographs and things of that nature for the search warrant and also just to determine the severity of the crime.
Q And who was it that responded to the hospital to take the photographs, Sergeant?
A Myself and Detective Caruso responded to Euclid Hospital.
Q When you responded to Euclid Hospital, what was the first thing you observed?
A First thing I observed was an extremely emaciated young child, appeared to be a female; she was laying on the hospital bed. She had bags on both hands as well as both feet, and she was laying on her back.
Q At this point in time, did you know the individual's name?
A I do not believe I knew her name at the initial time that I was speaking with Patrolman Herold who was at the hospital with who was determined to be [redacted].
Q As you were in the hospital room with [redacted], what was the first thing you did, Sergeant?
A First thing I did was take initial photographs as I found her in bed. We then removed the bags from her hands and feet to make sure that we fully document any

and all bruising, any injuries that may have been on her body.

Q What were the next steps you took after you took the initial photos?

A After we take the initial photos, we then introduce a scale. We introduce the scale to the photographs to provide a frame of reference. That way we get a more accurate idea of the size and -- of the injury itself.

Q What were the next steps you take when you are taking photographs, Sergeant?

A We photograph each injury individually, from a distance as well as up close. We try to document, with and without the scale, the size, the shape, the location of all the different injuries.

Q Sergeant, if you were to see these photographs, would you recognize them?

A Yes.

MS. JORDAN: May I approach, please, your Honor?

THE COURT: You may.

BY MS. JORDAN:

Q Sergeant, I'm handing you what has been marked for identification purposes as State's Exhibits 150 through 212. Can you take a moment to review all of those and

look up when you're done, Detective Caruso?
A (Witness complies.)
MR. MAREIN: What exhibits were those?
MS. JORDAN: 150 Through 212.
BY MS. JORDAN:
Q Sergeant, after reviewing State's Exhibits 150 through 212, do you recognize those items?
A I do.
Q How are you able to recognize them, Sergeant?
A These are the photographs -- this is the condition the child was in when we had arrived at the hospital.
Q Do those photographs fairly and accurately depict [redacted] as you viewed her at Euclid Hospital on March 11th, 2018?
A Yes, they do.
Q Sergeant, I want to go through a couple of those photographs. Can you go to State's Exhibit 154. Can you please describe to us what is depicted, without showing it, in State's Exhibit 154?
A It's a photograph of the young child's right lower leg and foot area. There is a scale applied and there is -- there looks to be three areas where the skin

is missing and there is redness, some type of, like -- like, almost like a skin slippage a little, like a blister or a burn.

Q Sergeant, why was this image taken?

A Just to accurately document how we found it at the time.

Q Why was the scale used in this image?

A Again it shows relationship; it shows the actual size with a scale.

Q And State's Exhibit 155, can you explain what is depicted in that image?

A It's the same area, the child's lower right leg and upper foot area with a scale. Again, showing the size of the blister or the burn.

Q And State's Exhibit 157, Sergeant.

A This is a photograph of the face and the head of the young child, [redacted]. It's a scale introduced here, there is a deep bruise over her left eye, swollen shut, approximately a one-inch laceration above her eyebrow -- I'm sorry, her eyelid. Also, her head is tilted to the right and she appears to be missing a tooth in the front top left area.

Q Sergeant, how are you able to determine that a tooth appeared to be missing from that image?

A I believe there is a photograph in here later

that depicts where I actually pulled her lips down and apart.

Q Okay. State's Exhibit 164?

A This is a photograph when we turned the child onto her right side. It's a photograph of her back; there is no scale introduced in this photograph. It was basically taken to show the state of emaciation of the child.

Q Why was [redacted] turned on her right side for that photograph, Sergeant?

A I believe she was turned onto both sides. I think this was just within the process of taking the photographs.

Q What was the reason for turning [redacted]?

A Just to make sure that we could properly document any bruising or injuries or the state of her body.

Q Were there bruising and injuries visible in State's Exhibit 154?

A Yes.

Q What are those?

A There's multiple discolorations along her back area. There is a specific, looks to be two parallel abrasions that appear to be later in the healing process on her lower back area.

Q And Exhibit 165?

A Again this is a photograph of the child's face. This is the one I earlier mentioned where I pulled down her lower lip that would show where a tooth was missing on the upper portion.
Q State's Exhibit 170?
A This is a photograph, we turned the child onto her right side and we lowered down the diaper or the pull-up that she was wearing to document the state of emaciation. Again you can see where her hip bone articulates. It's extremely skinny. You can see the sagging of her buttocks.
Q When you say the sagging of her buttocks, what do you mean by that?
A It appears on the picture here on the right you can see the skin, it looks really flaccid.
Q And State's Exhibit 174, Sergeant?
A This again is a photograph of the child, she's turned onto her right side. A scale is introduced into this photo here. It shows again multiple discolorations. There is a specific bruise, maybe even a scar or a bruise later, at a later time of healing, on her lower back. There also appears to be bruising along her spine area.
Q And State's Exhibit 200, Sergeant?
A I'm sorry, what number?
Q 200.

A This is a photograph of the child. She's again tilted towards -- on her right side; she's kind of pushed toward the left. It shows an area of discoloration around the upper portion of her arm, and her back again depicts her state of emaciation.
Q And State's Exhibit 211, Sergeant.
A This is a photo of the young child as we found her when we arrived at the hospital. She's laying on her back in a pull-up that is clearly way too big. She's very skinny. She has bags on both hands secured by rubber bands as well as both feet. You can see her ribs, the articulation of her knees, her shoulders; yeah.
Q Sergeant, why take so many different pictures of [redacted] in this state?
A Well, we wanted to accurately document her condition and her state of emaciation and the number of bruises that we located on her person.
Q Based on your training and experience, is there a reason why it was so important to document all the injuries that you could?
A Sure, absolutely.
Q What was that?
A Again, when we look at the child, there was bruises that appeared to be in different states of healing, we wanted to make sure we documented all of

those injuries, try to get the best documentation we could as far as color, injuries, and the locations. It's very important.

Q Sergeant, as you were working with [redacted] body to take these images, was there anything that you noticed as you were touching her?

A She was cold, and rigor had set in, she was stiff. When I would roll her from side to side, her body would maintain that position.

Q Sergeant, as you were taking these photos, was anyone else in the room?

A Yes.

Q Who was present in the room with you?

A Detective Caruso actually assisted with some of the photographs and the scales, and I believe Patrolman Herold may have been in the back of the room at the time.

Q Officer, as you were working with [redacted] on March 11, 2018, was there anything else that you observed that was noteworthy?

A Other than her obvious state of emaciation and the bruising, I noted that her left eye was still open. Other than that, no.

Q Okay.

MS. JORDAN: One moment, please, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. JORDAN: Nothing further at this time, your Honor.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: Your Honor, I have no questions for this witness.

THE COURT: Ms. Longino?

MS. LONGINO: No questions, your Honor.

THE COURT: You may step down. Thank you.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Call your next witness.

MS. JORDAN: Yes, your. Honor. At this time the State would call Laura Shook Storm.

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain

the issues on its part to be maintained, called as a witness, **LAURA STORM**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Thank you. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MS. JORDAN: Thank you, your Honor.

DIRECT EXAMINATION OF LAURA STORM

BY MS. JORDAN:

Q Good morning, ma'am. Can you please state your name and spell it for the record.

A Laura Storm, L-A-U-R-A, S-T-O-R-M.

Q Are you employed?

A I am.

Q Where are you employed at?

A I'm employed at Residence at 668.

Q And what does Residence at 668 do?

A It's an apartment complex.

Q Was there a point in time when you were working for Harbor Crest Apartments?

A There was.

Q And when was that?
A From March of 2014 to November of 2018.
Q And what were your job duties when you worked for Harbor Crest Apartments?
A I was the property manager.
Q Did you have interaction with the residents at Harbor Crest as the apartment manager?
A I did.
Q Where are Harbor Crest Apartments located at?
A 24453 Lakeshore in Euclid.
Q Having worked at Harbor Crest Apartments, did you have the opportunity to know or interact with a Sierra Day?
A I did.
Q Do you see that person in the courtroom today?

MR. SHAUGHNESSY: We'll stipulate that she can identify Ms. Day.

MS. JORDAN: Thank you, counsel. Thank you, your Honor.

BY MS. JORDAN:

Q Ms. Storm, was there anything in your interactions with Ms. Day that called your attention to her?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: Yes.

BY MS. JORDAN:

Q Directing your attention to March 8th of 2018, was Ms. Day still a resident of Harbor Crest on that day?

A She was not.

Q Did she return to the property on that day?

A She did.

Q Did an incident occur when she returned to the property?

A Yes.

Q Was anyone else with her?

A Yes.

Q Who else was present with her?

A Mr. Lewis.

Q Do you see that person that was present with Ms. Day on March 8th of 2018 in the courtroom today?

A I do.

Q Can you please identify him and describe him for the record?

MS. LONGINO: We'll stipulate, your Honor.

THE COURT: Very good.

MS. JORDAN: Thank you, counsel. Thank you, your Honor.

BY MS. JORDAN:

Q Ms. Storm, what were your observations of the defendants on March 8th, of 2018 at Harbor Crest Apartments?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

A They had came into the property to pick up some mail that had been delivered in her box after she had left. They became impatient; they did not want to wait for someone --

Q Ms. Storm, you're talking a little bit fast. If you could slow down just a bit for me, please.

A They had came into the property to pick up some mail that was left in her previous mailbox. I had to wait for someone to escort them over. She became impatient, began yelling overtop my leasing agent.

I came out to calm down the situation. An argument started between myself, her, and Mr. Lewis where I finally had to ask them to leave the property.

Q Had you encountered Ms. Day prior to March 8th of 2018 from working at Harbor Crest?

A I had no encounters with her prior to that date.

Q Had you seen her prior to that date?

A I had.

Q Had you seen Mr. Lewis prior to that day at Harbor Crest?

A I had not.

Q Okay. The argument between you and Ms. Day escalated on March 8, 2018, you said?

A Correct.

Q As the argument escalated, what was Mr. Lewis doing?

A He was arguing right along with her.

Q So both of them were present together on March 8th engaging in an argument with you?

A Correct.

Q What did you do in response to their actions?

A I asked them several times to leave the property, which they refused. I then called Euclid police department.

Q Why were you asking them to leave the property at this point in time?

A Because they were causing a scene in the office and refused to calm down.

Q Okay. What was it that you did next?

A I called Euclid police department.

Q Why were the police contacted?

A To escort them off the property.

Q When you contacted the police, what did Ms. Day and Mr. Lewis do next?

A They stayed in the office for a few minutes after

the fact, proceeded to argue, call names, so on and so forth, and then they exited the property.

Q During this time on March 8th when Mr. Lewis and Ms. Day were --

THE COURT: Let's go to side bar for a second.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

BY MS. JORDAN:

Q Ms. Storm, when Mr. Day -- I'm sorry, when Ms. Day and Mr. Lewis were in your presence on March 8th, was anyone else with them?
A No.
Q Did you see a child with them?
A No.
Q Did they leave the apartment -- did they leave the building after police were contacted?
A They left after police were contacted, yes.
Q Thank you.

MS. JORDAN: One moment, please, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

BY MS. JORDAN:

Q Do you recall about what time of day it was that you interacted with them?

A I don't recall exactly; I want to say it was early afternoon, but I'm not sure.

MS. JORDAN: Thank you. Nothing further at this time, your Honor.

THE COURT: Cross?

MR. SHAUGHNESSY: Your Honor, I have no questions for this witness.

THE COURT: Ms. Longino?

MS. LONGINO: Just a couple questions, your Honor.

CROSS-EXAMINATION OF LAURA STORM

BY MS. LONGINO:

Q You said early afternoon, would that be like maybe around 12?

A I don't recall exactly.

Q Okay. How far do you consider afternoon to be early afternoon?

A I would say my guesstimate would be somewhere between noon and two, but I don't know for sure.

Q Okay. All right. And you said that when you -- when Ms. Day lived at Harbor Crest, you encountered her, not with an argument, but you saw her?
A I knew that she lived there, yes. I had no encounters with her.
Q Okay. But you did not see Mr. Lewis there?
A I had never seen him before that day.
Q Before March 8th?
A Correct.
Q Okay. And so none of this mail that they came to pick up was addressed to Mr. Lewis; was it?
A I would have no idea. I didn't go into the mailbox.
Q You did not?
A No.

MS. LONGINO: Okay. Thank you. Nothing further.

THE COURT: Any follow-up?

MS. JORDAN: Nothing further, your Honor.

THE COURT: All right. You may step down. Thank you.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MR. KILBANE: State calls Sherrie Litvak to the witness stand, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **SHERRIE LITVAK**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MR. KILBANE: Thank you, your Honor.

Good morning, ma'am.

THE WITNESS: Good morning.

DIRECT EXAMINATION OF SHERRIE LITVAK

BY MR. KILBANE:

Q Can you state your name and spell the last name for the court reporter.
A Sherrie Litvak, L-I-T-V-A-K.
Q Are you employed, ma'am?
A I am.
Q Where are you employed?
A By SPCG Properties.
Q Okay. And what do you do for SPCG Properties?
A I'm a property manager.
Q And how long have you been a property manager at that company?
A Ten years.
Q What does SPCG Properties do?
A They're the management company who owns Cultural Gardens Apartment.
Q Is Cultural Gardens located at 22701 Lakeshore Boulevard?
A Yes.
Q Okay. And as part of your responsibilities as a property manager, do you enter into lease agreements with tenants who would stay -- enter into an agreement with a tenant who would stay at Cultural Gardens?
A Yes.

Q Did you have an opportunity to enter into a lease agreement with an individual by the name of Sierra Day?

A I did.

Q Did you meet with her in person?

A I did.

Q Is she in the courtroom today --

MR. SHAUGHNESSY: We'll stipulate that this lady can identify Ms. Day and she entered into a contract, the lease agreement, that I believe the State is going to present.

MR. KILBANE: Thank you, Mr. Shaughnessy.

BY MR. KILBANE:

Q If you were to see that lease agreement, would you recognize it?

A I would.

MR. KILBANE: May I approach, your Honor?

THE COURT: You may. What Exhibit Number is it?

MR. KILBANE: 406.

BY MR. KILBANE:

Q Okay. Ma'am, I'm handing you what has been previously marked as State's Exhibit 406. Do you recognize that document?

A I do.
Q What is that?
A It's the lease agreement.
Q Okay. Is that lease agreement dated?
A It is.
Q What is the date of the lease agreement?
A It's dated January 30th, 2018.
Q And does it indicate the location that is subject to the lease agreement?
A It does.
Q What location is that?
A 22701 Lakeshore Boulevard, Apartment 213-A, in Euclid, 44123.
Q Okay. And is there a lease term described on the first page of that lease agreement?
A There is.
Q What is the lease term?
A It was a 13-month lease starting February 1st, 2018, ending at the last day of February of 2019.
Q And on that first page of the lease agreement, is there rent outlined as to what the expected rent would be from the tenant to your office?
A Yes.
Q And what was that?
A $610 a month.

Q All right. And I want to draw your attention to page 5 of that lease agreement, if you can.

MR. KILBANE: May I approach, your Honor?

THE COURT: You may.

BY MR. KILBANE:

Q Do you recognize this document?

A I do.

Q Is there a signature on page 5 of that lease agreement?

A Yes, there is.

Q And whose signature is on the lease agreement?

A Sierra Day signed as the resident and I signed as the property manager.

Q And what is the date of that signature?

A January 30th, 2018.

Q Okay. I want to turn your attention to page 12 of that lease agreement. Can you describe for the ladies and gentlemen of the jury what you're looking at on page 12 of the lease agreement?

A It's an updated resident information form.

Q Okay. And what is that form?

A We put it in our leasing file so we know who is in the apartment along with phone numbers, email addresses, car, and a person in case of an emergency.

Q And does page 12 indicate who was living in the apartment?
A Yes.
Q And who is named on page 12?
A Sierra Day was the resident and as an occupant was [redacted].
Q Okay. And on page 12 is there also an emergency contact information given?
A There is.
Q And who is listed as the emergency contact on page 12?
A Deonte Lewis.
Q And did Sierra Day fill out page 12 of the lease agreement?
A Yes, she did.
Q And would that be on January 30th?
A Yes.
Q If you can flip to the next page, page 13. Can you describe to the jury what page 13 entails?
A It's -- when we give people the keys, we have them sign that we give them a key fob that gets you into the building, a key to the suite, and a key to the mailbox.
Q Okay. And on page 13, does it indicate how many keys were given to Sierra Day when she entered into the

lease agreement?
A Yes, she got one set of keys.
Q Okay. And that would be one set to this particular apartment, 213?
A Correct.
Q And when you enter into a lease agreement with a potential tenant, do you ask for any income verification?
A Yes, we do.
Q And did Sierra Day provide you with any income verification?
A She did.
Q Is it provided in the lease agreement?
A Yes.
Q All right. And did she provide you with pay stubs?
A Yes.
Q From her employer?
A Yes.
Q And can you tell us, go through one of the checks that's provided in the lease agreement, who her employer was?
A It's from Get Ready, Set, Grow; it's a check for Sierra for $501.46.
Q Okay. And is that -- is there a date on that check?

A November 3rd, 2017.
Q And did she provide you with multiple pay stubs?
A Yes, she did.
Q And did she have any different employer listed on any of her pay stubs?
A No. They're all from Get Ready, Set, Grow.

MR. KILBANE: Can I have a moment, your Honor?

THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

BY MR. KILBANE:

Q Ma'am, did you ever have any interactions with an individual by the name of Deonte Lewis?
A No, I did not.
Q Other than entering into the lease agreement with Sierra Day, did you have any other interactions with Sierra Day?
A Yes, I did.
Q And what interactions were those?
A I believe it was in early March she came with a check for six months of rent and proceeded to pay six months of rent. A week later, she asked for her money back because she said she wanted to buy a car.

Q Okay. And do you recall what date she came back and asked for her money back?

A I do not. It was about a week later maybe.

Q And is it typical for a resident or a tenant to pay their rent six months in advance, in your experience?

A Not typical but occasionally. It's nice when somebody pays up front but not typical.

Q On occasions when it does happen, have you ever had an instance where somebody comes back and asks for the money back?

A No.

MR. KILBANE: No further questions, your Honor.

THE COURT: Any cross?

MR. SHAUGHNESSY: No questions for this witness, Judge.

THE COURT: Ms. Longino?

MS. LONGINO: Briefly, your Honor.

CROSS-EXAMINATION OF SHERRIE LITVAK

BY MS. LONGINO:

Q Ms. Litvak?

A Yes.

Q Now, on page 5 where Ms. Day's signature appears as a resident, is hers the only signature there as a

resident?
A Yes.
Q Okay. And on page 12, where Ms. Day is listed as the lessee, name of occupants in the suite, [redacted]. Those are the only two occupants listed on this sheet; is that correct?
A Correct.
Q Okay. And at the bottom, Deonte Lewis is listed as a contact name, and relationship to her is listed as boyfriend; correct?
A Correct.
Q And the purpose of the emergency information is in case there is an emergency at the apartment you need to know the name of a third person that you can contact to come to the apartment and see about the emergency that's there; is that correct?
A Correct.
MS. LONGINO: Okay. Thank you.
THE COURT: Anything?
MR. KILBANE: Nothing on that, your Honor.
THE COURT: Mr. Shaughnessy?
MR. SHAUGHNESSY: Nothing.
THE COURT: Thank you.

You may step down. Thank you.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MS. JORDAN: Yes, your Honor. The State would call Detective Tschetter.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **PHIL TSCHETTER**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning. Make sure you speak directly into the microphone. You can adjust the microphone but the seat will not move.

You may inquire.

MS. JORDAN: Thank you, your

Honor.

DIRECT EXAMINATION OF PHIL TSCHETTER

BY MS. JORDAN:

Q Good morning, sir. Could you please state your name and spell your name for the record.

A Yes. I'm Detective Phil Tschetter, T-S-C-H-E-T-T-E-R.

Q Detective, are you employed?

A Yes.

Q Where are you employed at?

A Euclid Police department.

Q In what capacity, sir?

A I'm a detective.

Q What sort of training and experience do you have to be a detective in the Euclid Police department?

A Advanced training in crime scene management. I'm a certified evidence technician. I'm also a latent fingerprint examiner.

Q How long have you been employed at the Euclid police department?

A Since 2000.

Q Has that been your full-time employment in law enforcement or did you have a job previously?

A I've had many jobs, and the only police department I've worked for is the City of Euclid's.

Q And Detective, what was your -- what are, generally speaking, your assignments and duties?
A I'm assigned felony case investigations and those are as they appear every day, different incidents of all variety from theft to homicide, depending on the case.
Q Okay. Were you working on March 11th, 2018?
A Yes.
Q What was your assignment on that day?
A I was contacted by our unit supervisor, Sergeant Murowsky, and ordered to respond to the police station in reference to a potential homicide investigation.
Q Do you recall about what time you were called to respond to the scene in your department?
A It was in the evening, I'm not sure exactly what time I received the call. Some time perhaps around five o'clock.
Q When you responded to Euclid police department, what was the first thing that you did?
A I came directly to the detective bureau. I was briefed on the situation, and I was asked to draft the search warrant.
Q What were the steps you took to draft the search warrant?
A I coordinated with the investigators that were already on scene to include Detective Kroczak. I read

the initial police report that had been prepared by the patrol division, and I collected data about the location of the search warrant.

Q And what was the search warrant for?

A The search warrant targeted on an apartment within our city. The apartment was located at 22701 Lakeshore Boulevard Apartment 213.

Q And what city, county, and state was this search warrant drafted for?

A It was within the City of Euclid which is within Cuyahoga County which is within the State of Ohio.

Q After obtaining the search warrant for the residence at 22701 Lakeshore Boulevard, Apartment 213, what did you do next, Detective?

A I executed the search warrant.

Q Who was with you when you executed the search warrant?

A I was accompanied by Detective Mike Caruso.

Q And what were your -- when you responded to the scene, who was present?

A There were two patrol officers who had been standing by.

Q What were your first observations once you responded to the scene, Detective?

A We were escorted to the apartment itself,

Apartment 213, the door was locked and secured; there were no signs of forced entry. We had been provided keys to the apartment so we could open the door and enter.

I entered the apartment, observed that it was empty, there were no occupants therein, there was no people. The apartment itself was very, very clean.

Q When you say the apartment was very, very clean, what do you mean, Detective?

A I mean it was practically immaculate. It was very, very tidy, neat, there was no disarray of any kind.

Q Did you notice any odor when you entered the apartment?

A Yes, I did.

Q What was that?

A The apartment smelled strongly of bleach.

Q Upon entering the scene and making your initial observations, what was the first thing that you did?

A I photographed the scene in order to document its condition.

Q Would you recognize those photos if you saw them again, Detective?

A Yes, I would.

MS. JORDAN: May I please approach, your Honor?

THE COURT: You may.

Let's go to side bar.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: We're going to take a lunch break until 12:30. Do not discuss the case.

Go downstairs and get a quick snack. We're going to be breaking at two o'clock.

- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

- - - o0o - - -

(The lunch recess was had.)

- - - o0o - - -