STATE OF OHIO, )
) SS: **TIMOTHY P. McCORMICK, J.**
COUNTY OF CUYAHOGA. )

IN THE COURT OF COMMON PLEAS

CRIMINAL BRANCH

**STATE OF OHIO,** )
Plaintiff, )
vs. ) **CR 626899A**
**SIERRA DAY,** )
Defendant. )

- - - o0o - - -

**STATE OF OHIO,** )
Plaintiff, )
vs. ) **CR 626899B**
**DEONTE LEWIS,** ) **CA 108463**
Defendant. )

- - - o0o - - -

TRANSCRIPT OF PROCEEDINGS
VOLUME III OF V
TESTIMONY

- - - o0o - - -

FILED
MAY 29 2019
Clerk of Courts
Cuyahoga County, Ohio

APPEARANCES:

On behalf of the State of Ohio:

MICHAEL C. O'MALLEY, Prosecuting Attorney, by:
**Anna Faraglia**, Assistant Prosecuting Attorney
**Aqueelah A. Jordan**, Assistant Prosecuting Attorney
**Sean M. Kilbane**, Assistant Prosecuting Attorney

On behalf of Defendant Sierra Day:
**Thomas E. Shaughnessy**, Esq.
**Mark B. Marein**, Esq.

On behalf of Defendant Deonte Lewis:
**Nicole C. Longino**, Attorney at Law
**James A. Gay**, Esq.

Luann Z. Cawley, RPR
Kerry L. Paul, RMR
Mary Jo Baden, RPR
Mary Jean Cooley, RMR
Susan M. Ottogalli, RMR
Official Court Reporters
Cuyahoga County, Ohio

FRIDAY AFTERNOON SESSION

MARCH 1, 2019

PROCEEDINGS

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated. You may proceed.

MS. JORDAN: Thank you. May I approach, your Honor?

THE COURT: Yes.

CONTINUED DIRECT EXAMINATION OF PHIL TSCHETTER

BY MS. JORDAN:

Q Detective, I'm handing you what was previously marked for identification as State's Exhibits 3 through 131. Would you quickly go through those and look up when you're done.

A (Witness complies.)

Q Detective, you previously reviewed all those photos; is that correct?

A Yes, ma'am.

Q Are these the photos that you took when you

responded to execute your search warrant?
A They are.
Q Are they in the same or substantially similar condition to when you took them?
A Yes.
Q Are they also published currently on the screen?
A Well, one is.
Q We're going to go quickly through some of them.
MR. SHAUGHNESSY: Judge, we would stipulate that State's Exhibits 3 through 131 are accurate and true copies of the things that Detective Tschetter observed, and that he took the photographs.
THE COURT: Thank you.
MS. JORDAN: Ms. Longino or Mr. Gay?
MS. LONGINO: We would like to view the photographs, your Honor.
THE COURT: Are you going to stipulate that they accurately and correctly portray what's represented in those photographs at the time they were taken?
MS. LONGINO: Yes, your Honor.
THE COURT: Go ahead.

BY MS. JORDAN:

Q Detective, we'll skip to some of the more relevant photos.

State's Exhibit 7, does this just give a general overview of when you first entered the apartment?

A Correct.

Q And Exhibit -- I'll stand a little closer or my prescription needs to be stronger.

Exhibit Number 9, what is depicted in Exhibit 9?

A It is a coat closet.

Q State's Exhibit 11, Detective, paying attention to the middle of the screen, what is it that we see there?

A It's a large, apparently, leather sofa.

Q And right behind the leather sofa? If you need to look at your picture to see it a little better.

A Looks like a window-mounted air conditioner.

MS. LONGINO: I can't see.

THE COURT: Could you move over perhaps a little bit.

BY MS. JORDAN:

Q State's Exhibit 15, what is depicted in this exhibit?

A It is a closet with hanging clothing.

Q State's Exhibit 17, Detective, it appears to be

some paperwork. What was the reason you took a picture of this?

A It had documentation on it that was pertinent to the scene itself; apartment information, address information, name information.

Q State's Exhibit 21, why was a picture taken of this, Detective?

A This is a vacuum cleaner that was adjacent to the kitchen. The home itself was extremely clean, and I had planned to recover the drum from the vacuum cleaner as potential evidence.

Q State's Exhibit 22, Detective?

A It's a child's bedroom.

Q State's Exhibit 25, Detective, why was this image captured?

A This is a child's bed in the center of the bedroom. I wanted to document its condition when I first observed it.

Q Why were you documenting the condition of the child's bed when you first observed it, Detective?

A I observed that it had no sheets, no pillow, no other bed clothing on it apart from a single fleece blanket which I believe is in the upper left corner of the bed.

Q State's Exhibit 26, what's depicted in this image,

Detective?

A They are stacked plastic tote containers.

Q State's Exhibit 30, Detective?

A It is a child's table and chair.

Q What was the significance of this table and chair?

A It was present in the center of the child's bedroom. I examined all items within this bedroom; specifically for potential trace evidence, and I did take swabs from these locations.

Q State's Exhibit 35, Detective, what's depicted in this image?

A It's an upper shelf of a closet and there are numerous boxes stacked on that shelf.

Q What type of boxes?

A It looks like they are primarily shoe boxes.

Q State's Exhibit 42, what's depicted in this image, Detective?

A This is a kitchen countertop.

Q And Detective, when you entered the scene, did you rearrange or move anything, or is this what you actually observed?

A This is as I encountered it.

Q State's Exhibit 43?

A This is another kitchen countertop to include the stove.

Q State's Exhibit 47, Detective?
A This is the interior of the apartment's refrigerator.
Why is this being photographed, Detective?
A To document the contents of that item.
Q State's Exhibit 48?
A The freezer which is also part of this refrigerator.
Q Why is this being photographed?
A Again, to document the contents of that item.
Q State's Exhibit 52, why was this image captured, Detective?
A This is also a broom within the apartment. Since the apartment appeared to be carefully cleaned, I intended to collect the head from the item as potential evidence.
Q State's Exhibit 58, Detective, why was this image taken?
A This is the bathtub within the bathroom of the apartment. I wanted to document its condition.
Q State's Exhibit 61, what's depicted here, Detective?
A This is the interior of the wall-mounted medicine cabinet within the bathroom.
Q And why was this image captured, Detective?

A I wanted to document the contents of this item.
Q What are the contents of this item?
A None.
Q State's Exhibit 62, Detective?
A This is a storage cabinet.
Q State's Exhibit 65, Detective?
A The surface of a smaller leather couch.
Q Why was this picture taken, Detective?
A To document the items that were arranged on the surface of this couch.
Q State's Exhibit 69?
A It is a document.
Q State's Exhibit 72?
A It's a torn document, fragments of a document.
Q Where was this document located or recovered from?
MR. SHAUGHNESSY: Objection.
A Within that trash can.
THE COURT: Overruled.

BY MS. JORDAN:

Q I'm sorry, what was that? Where was the document recovered from?
A Within that trash can.
Q State's Exhibit 85, Detective, what's depicted in this image?
A It is a plastic set of drawers and clothing

folded within one drawer.

Q State's Exhibit 89, what's depicted in this image, Detective?

A This is the mattress of the child's bed.

Q Has it been memorialized in this picture?

A Yes.

Q Why is that?

A I wanted to document the under-side of the mattress.

Q State's Exhibit 91, what's being depicted in this, Detective?

A That is my hand. I am collecting a swab from the surface of the mattress, in the center of that surface.

Q Why are you taking a picture of you collecting the swab, Detective?

A This particular location of the mattress was unusual, it had a large defect or tear in the center of it. I wanted to collect the surface swab of that area in case there was evidence located on that surface.

Q State's Exhibit 94?

A Similarly, I am collecting swabs from the surface of a support leg in order to potentially collect evidence located on that surface.

Q State's Exhibit 96?

A This is a microwave that is on a kitchen counter

in the apartment and its contents.

Q What appears to be the contents of this microwave, Detective?

A It appeared to be remnants of take-out food.

Q And State's Exhibit 99, Detective?

A Again, I am collecting swabs from the surface of a support bar on the child's folding table and chair.

Q State's Exhibit 101, Detective, what is exhibited in this image?

A A countertop with numerous cleaning products in an array.

Q Why was this image captured, Detective?

A The cleaning products were neatly lined up, prominently organized, and they looked like they could have been recently used.

Q What were the cleaning products in this image?

A Well, from left to right there is a bottle marked bleach. There is a spray bottle, I do not know what the contents of that are. There is a shake bottle, apparently a carpet deodorizer. There is apparently a spray aerosol bottle that appears to be starch. There is an unknown product called Glade, a spray bottle that is some form of window cleaner, and last there is a Mr. Clean bottle.

Q State's Exhibit 102, what is depicted in this

image?
A This is a close-up of the contents of the microwave, and it's taken to document the take-out food that was resting inside of that item.
Q Exhibit 103?
A Again, this is a close-up of the take-out food that was located in the microwave.
Q Were there two different take-out food containers located inside the microwave, Detective?
A Yes, ma'am.
Q Can you see both of those depicted, one in the middle of 103 and one in the bottom, left-hand corner?
A Yes, ma'am.
Q State's Exhibit 105, can you tell what's being depicted there, Detective?
A I'm using a sterile scalpel to slice a portion of the child's mattress physically off of that item.
Q Detective, why are you slicing a portion of the child's mattress?
A I wanted to preserve a cutting from this item that had several layers, or strata, in case there had been evidence deposited on it which had soaked through that surface and then collected in underlayers.
Q Was there anything that you noted about this area of the mattress, Detective?

A Yes.
Q What was that?
A It smelled strongly of urine.
Q And what is being shown in State's Exhibit 106, Detective?
A This documents the process by which I sliced a section of the mattress up, I peeled it away, and it was separately packaged in just that orientation.
Q State's Exhibit 113?
A It is an image of the medicine cabinet in the bathroom.
Q What's contained in the medicine cabinet?
A Nothing.
Q State's Exhibit 118?
A The open kitchen cupboard.
Q What's contained inside the cupboard, Detective?
A Nothing.
Q State's Exhibit 122?
A An open kitchen cupboard.
Q Anything contained within inside the cupboard, Detective?
A No.
Q State's Exhibit 124?
A It is an open freezer door and items therein.
Q State's Exhibit 129?

A This is the interior of the refrigerator and a small plastic tray containing items of food.
Q And State's Exhibit 131, Detective?
A This is a copy of the search warrant itself which is on the left, and the search warrant inventory which is on the right.
Q Why is that picture taken, Detective?
A To document that the search warrant was appropriately executed and a copy of the inventory was left at the scene.
Q Why do you leave those items at the scene, Detective?
A We are required to do so by law.
Q Detective, you completed a thorough review of the scene, correct, including bathroom and medicine cabinets?
A Yes.
Q Was any Tylenol or children's Tylenol located on scene?
A No.
Q None in the bathroom?
A No.
Q No children's Tylenol anywhere in the living room?
A No.
Q Nowhere on scene?
A No.

Q Detective, how many bedrooms were in this apartment?
A There was one bedroom.
Q Any beds located in the apartment other than the child's bed?
A No.
Q Anything to indicate where anyone else slept other than the child?
A No.
Q Detective, after photographing the scene, what did you do next?
A The items of evidence were sealed in individual containers and they were logged into EPD property.
Q Why were the items of evidence collected, sealed, and logged, Detective?
A In preparation for potential lab analysis.
Q If you recall, how many items did you collect and seal?
A 20.
Q Did you memorialize those in your report and would you recognize those items if you saw them again?
A Yes.
MS. JORDAN: May I approach, please, your Honor?
THE COURT: You may.

MS. JORDAN: Your Honor, do you want to see --

THE COURT: I don't, thank you.

MS. JORDAN: Okay.

BY MS. JORDAN:

Q Okay, Detective, I'm handing you what's been marked previously for identification purposes as State's Exhibits 500, 501, and 502. Can you take a moment to review those items, Detective.

A (Witness complies.)

Q What are they, starting with Exhibit 500?

A Yes. State's Exhibit 500 is marked in red Item Number 7, "Court papers found in purse." State's Exhibit 501, also marked in red Item Number 2 "Court papers, TV tray living room." And State's Exhibit 502, item three, "Torn paperwork, court documents, trash can in living room."

Q And can you open State's Exhibit 502 and see if you can tell anything about what that torn document is, Detective?

A Yes, ma'am.

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

BY MS. JORDAN:

Q Go ahead, Detective. What is that torn document, Detective?

A It appears to be several pages associated with --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

BY MS. JORDAN:

Q Go ahead.

A -- paperwork marked, "To the attention of the Court of Common Pleas, County of Cuyahoga County, Juvenile Division."

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

BY MS. JORDAN:

Q Thank you, Detective. And where was that recovered from, Detective?

A It was recovered from the trash can in the living room of Apartment 213.

Q Can you place those items back in and reseal it, please.

A Sure.

Q Okay. Detective, State's Exhibits 503, 504, and 505, do you recognize those items, Detective? Starting first with 503, please.

A Certainly. State's Exhibit 503 is marked in red pen, "Item 4, tan towel, bathroom doorknob, within white

bag garbage, damp when pulled from trash bag."

And Exhibit 504, in red, Item 5, Azpen tablet serial number Adam Zebra Paul 16 Adam 745154602-654. And State's Exhibit 505, marked in red, Item 6, RCA tablet serial number Union John 102 David Lincoln 2 Barney 0532.

Q State's Exhibits 506 and 507, Detective.

A All right. State's Exhibit 506 is marked in red Item 7, HP Laptop, serial number 5 Charlie David 712 Barney David Mary Zebra. And State's Exhibit 507, marked in red, item 8, "Second tan towel from garbage bag on bathroom doorknob."

Q Detective, State's Exhibits 508, 509, 510, and 511.

A Okay. State's Exhibit 508, marked in red, "Item 9, plastic cup, bathtub, damp upon recovery."

THE COURT: What was that word?

THE WITNESS: Which one, sir? Damp upon recovery.

THE COURT: Okay. I couldn't hear you.

THE WITNESS: Yes, sir.

A State's Exhibit 509, written in red, "Item 10, blanket, (fleece) child's bedroom."

BY MS. JORDAN:

Q Detective, let me stop you at that item 510. Is that the fleece blanket that we saw depicted in the image previously that was recovered from the child's bed?
A To be specific, 509?
Q 509. Thank you.
A Yes.
Q Going on to 510.
A Item -- State's Exhibit 510, evidence tag typewritten, two swabs, child's bed, right leg.
Q Is that one of the swabs that you were depicted taking earlier in the images, Detective?
A That is correct.
Q Okay. 511?
A State's Exhibit 511, typewritten evidence tag, two swabs, child's bed, left leg.
Q Exhibits 512, 513, and 514, Detective.
A State's Exhibit 512, written in red, item 13 underneath surface, child's mattress, two swabs. State's Exhibit 513, written in red, item 14, upper surface, child's mattress, two swabs.
Q Are those the swabs we saw you depicted taking in the pictures, Detective?
A Yes.
Q Okay.
A And State's Exhibit 514, written in red, item 15,

bottom support bar, child's bed, two swabs.
Q Exhibits 515, 516, and 517, Detective.
A State's Exhibit 515, written in red, item 16, vacuum drum, located adjacent to bathroom and kitchen.
Q And is that the drum from the vacuum cleaner that was depicted in the previous State's Exhibit, Detective?
A Yes, it is.
Q Okay.
A State's Exhibit 516, a typewritten evidence tag, two swabs, child's folding table leg.
And State's Exhibit 517, typewritten evidence tag, two swabs, child's folding chair leg.
Q State's Exhibit 519, Detective.
A State's Exhibit 519 written in red on this bag Number 20, broom head, kitchen, initials PT and MC.
Q State's Exhibit 518, Detective, what is depicted in this item?
A State's Exhibit 518, written in red, item 19, cut sample, off top of mattress, child's bedroom. It says here cutting of mattress.
Q Detective, was this the cutting of the mattress that you indicated had an odor to it?
A Yes.
Q What was that odor that the mattress had?
A It smelled strongly of urine.

Q Detective, State's Exhibit 518 that you're holding in your hand now, is there still an odor associated with that?
A Yes.
Q What is that odor, Detective?
A It smells strongly of urine.
Q Detective, after you collected the physical exhibits from the scene, what did you do next?
A Each item of evidence was individually labeled and sealed and prepared for lab analysis.
Q What was the purpose of individually labeling the bag of each item?
A So the items of evidence could remain discrete and there was no cross-contamination between them.
Q Detective, what do you do next?
A After I submitted the evidence to the property room after they were appropriately tagged, I documented my observations in a report.

MS. JORDAN: One moment, your Honor.

Thank you. Nothing further.

THE COURT: Thank you, cross?

MR. SHAUGHNESSY: We have no questions, your Honor.

THE COURT: Ms. Longino?

CROSS-EXAMINATION OF PHIL TSCHETTER

BY MS. LONGINO:

Q Detective, in all of these pictures that have been shown here, none of the pictures were of any male clothing; were they?
A No.
Q None of them were of any male cosmetics like shaving cream, razors, clippers, male deodorant; none of that stuff?
A No.
Q Now, in State's Exhibit 101, which was the cleaning agents, you said that they looked like they had been recently used. How can you look at a bottle of cleaning agents and tell when they were used?
A That answer was based on their orientation in the kitchen.
Q You mean the way they were lined up?
A That's correct.
Q So, the way they were lined up: Bleach, Awesome, Carpet Fresh, starch, Glade, Windex, and Mr. Clean, what was used first?
A I don't know.
Q Just like you don't know what was used when; right?

A Correct.
Q Okay. Thank you.
THE COURT: Anything further?
MS. JORDAN: Very briefly, your Honor.

REDIRECT EXAMINATION OF PHIL TSCHETTER

BY MS. JORDAN:

Q In regard to State's Exhibit 101, does it look like any of those items are brand new and the bottle completely filled?
A No.
Q So you could tell liquid or fluid or cleaning product had been used from those bottles; correct?
A Yes.
MS. JORDAN: Nothing further, your Honor.
THE COURT: Any follow-up on that?

RECROSS-EXAMINATION OF PHIL TSCHETTER

BY MS. LONGINO:

Q Just that you can tell that they were used but just not when; correct?
A Yes, ma'am.
THE COURT: You may step

down. Thank you.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MR. KILBANE: State calls Detective Michael Caruso to the witness stand.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Please step forward. Raise your right hand.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **MICHAEL CARUSO**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Make sure you speak directly into the microphone. The chair doesn't move but you can adjust the microphone.

You may inquire.

MR. KILBANE: Thank you, your Honor.

DIRECT EXAMINATION OF MICHAEL CARUSO

BY MR. KILBANE:

Q Can you state your name and spell it for the court reporter.
A It is Michael Caruso, C-A-R-U-S-O.
Q And are you employed, sir?
A Yes, I am.
Q Where are you employed?
A I'm a detective with the City of Euclid police department.
Q And how long have you been a detective with the City of Euclid?
A Approximately ten years.
Q And prior to that, do you have any law enforcement experience?
A I was a patrol officer for 12 years. I served three years in narcotics, four years as a deputized marshal with the U.S. Marshal Service.
Q All that law enforcement experience, is that all with the City of Euclid?
A Yes.
Q And do you have any additional training or certifications which allow you to be a police officer?
A Yes, I do. I went through the Lakeland Community College basic police academy back in 1990, '91.

Q And, sir, on March 11th of 2018, did you become involved in an investigation involving the death of a four-year-old by the name of [redacted]?
A Yes, I did.
Q And when did you become involved in that investigation?
A It was in the early afternoon -- well, late afternoon, about four p.m. I was contacted by Sergeant Murowsky; I was advised that there was a dead child. I responded to the station accordingly.
Q All right. And when you got to the station, did you speak with anyone?
A We met with Detective Kroczak, Sergeant Murowsky, I believe Detective Tschetter was on his way in. At that time, we were forming a game plan.
Q Okay. And after you had a conversation with these various detectives and sergeants, what did you do?
A Once we gathered some information from the patrol officers, Sergeant Murowsky and I responded to Euclid Hospital to photograph the child.
Q And do you recall what time you got to the hospital?
A No, I don't recall exactly what time. It was maybe an hour after I arrived at the station.
Q You went with Sergeant Murowsky to the hospital?

A That is correct.
Q All right. And you did observe the child?
A Yes.
Q And what observations did you make?
A The child was extremely emaciated, the ribs -- her ribs were protruding through her body. I recall a severe -- a severe bruise to her left eye. She had what appeared to be burn marks or blisters on her legs. Very, very disturbing.
Q Did you speak with any doctors or nurses at the hospital?
A I believe we spoke with some staff, yes.
Q And did you collect any evidence from the hospital?
A We collected her clothing. We returned to the station with [redacted] clothing and separated and bagged it for future analysis.
Q Okay.
MR. KILBANE: May I approach, your Honor?
THE COURT: You may.
BY MR. KILBANE:
Q Detective, I've handed you what's been previously marked as State's Exhibits 520 to 524. Do you recognize those exhibits?

A Yes.
Q Let's start with State's Exhibit 520, can you tell the ladies and gentlemen of the jury what State's Exhibit 520 is?
A This is [redacted] winter coat, or a child's coat, pink child's coat.
Q You collected that from the hospital?
A Yes, I did. It has my initials and the seal on the bag.
Q State's Exhibit 521?
A This is [redacted] pink T-shirt, once again it was sealed by me with my initials on the bag.
Q State's Exhibit 522?
A This is jeans that were collected from [redacted]. My initials are on the back and on the seal.
Q State's Exhibit 523?
A It's a pink hat, collected from the hospital from [redacted], once again my initials are on the seal.
Q And State's Exhibit 524?
A Theses are green and orange children's socks, collected from [redacted] at the hospital, sealed by me with my initials.
Q And after you collected these exhibits, or these pieces of evidence from the hospital, what did you do next, if anything?

A We returned to the station and logged them into the evidence room.
Q Evidence room at the Euclid police department?
A Yes.
Q After you logged the evidence, what do you do?
A At that time, I believe Detective Tschetter was in the process of drafting a search warrant for the apartment. After the search warrant was completed and signed by the judge, I assisted with the service of the search warrant.
Q Do you recall who you went to serve the search warrant on? Or with, I apologize.
A Detective Tschetter and Patrol Officer Blakemore was there, I believe.
Q Do you recall the location?
A It was the Cultural Gardens Apartment, I believe the address is 22701. The apartment number I don't recall off the top of my head.
Q Does apartment Number 213 sound right?
A It sounds correct.
Q What was your primary duty in conducting the search warrant?
A Being it's a smaller unit, I sat on the couch and was documenting the search inventory.
Q So you didn't collect any physical evidence from

the apartment?
A No, I didn't. No.
Q After you conducted the search, documented the inventory of the items taken, what did you do next, if anything?
A We returned to the station with the evidence. I recall the next day my lieutenant met with the family members to kind of explain how the course of the investigation was going to go.
Q When you say family members, do you know whose family members?
A I believe it was Sierra Day's family.
Q And did you participate in any of those interviews?
A At the beginning, we were in a police conference room. One of the family members began to -- acted as if she was going to pass out, she was beginning to hyperventilate. I helped her, assisted her out of the room. We got her a bottle of water; assessed her condition, whether or not she needed medical attention. We gave her a bottle of water, and she did eventually calm down.
Q And do you know who that individual's name is?
A I don't recall the name, I believe it was a mother -- the mother of Sierra Day.

Q And you mentioned other family members, do you recall their names?

A I don't recall, specifically, names. I believe it was several members of the Day family.

Q Do you know what the relationship was, what these individuals had with Sierra Day if you recall?

A I don't recall.

Q Okay. After you assisted with this female, did you further participate in any of the interviews?

A No.

Q Did you have any more involvement in the investigation in this case?

A No.

MR. KILBANE: Could I have one moment, your Honor?

THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MR. KILBANE: We have no further questions, your Honor.

THE COURT: Cross?

MR. SHAUGHNESSY: No questions, your Honor.

THE COURT: Ms. Longino?

MS. LONGINO: Just one question, your Honor.

CROSS-EXAMINATION OF MICHAEL CARUSO

BY MS. LONGINO:

Q Are you familiar with State's Exhibit 505?

MS. LONGINO: Could I show him?

Q Are you familiar with this exhibit?
A (No response.)
Q It's labeled RCA tablet?
A Yes.
Q Could you just tell me, what is an RCA tablet?
A I would -- well, an iPad.
Q Okay. All right. I just didn't know what that was.
A Made by RCA.
Q Okay. Thank you.

MS. LONGINO: No further questions.

MR. KILBANE: Nothing on that, your Honor.

THE COURT: You may step down. Come up to the side bar.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Okay. That's it for the day, ladies and gentlemen. Please do not discuss the case.

I ask that you report to the 4th floor at quarter of nine Monday morning. Please do not discuss the case. Have a good weekend.

- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

- - - o0o - - -

(Thereupon, court stood in recess until Monday, March 4, 2019, at 9:00 a.m.)

- - - o0o - - -

MONDAY MORNING SESSION

MARCH 4, 2019

PROCEEDINGS

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel on the record out of the hearing of the Jury as follows:)

- - - o0o - - -

THE COURT: We're on the record in State of Ohio versus Day and Lewis. We're in chambers. Defense counsel is going to waive their clients' presence.

MR. SHAUGHNESSY: Yes, your Honor.

THE COURT: Go ahead. You were discussing other acts evidence.

MS. JORDAN: Yes, your Honor. The purpose of other acts being presented through the day care workers as well as medical workers is not for the issue of identity. As we said when we argued our motion, we relied on the motion that was submitted that also talked about intent, opportunity, and plan.

Our intention today with the day care workers is to have them discuss their general

observations of [redacted]. Now, some of the day care workers did receive statements from [redacted] that we believe would be admissible as well but we want to begin with just the observations that they had of her, your Honor, which they documented in detail and kept in the ordinary course of business as part of their records.

In terms of the medical professionals, your Honor, we believe a hearsay exception is in place that allows medical professionals to talk about statements that were made to them. We will have two medical professionals testify today in regard to the May 18th, 2017, hospital visit in which [redacted] went to Euclid Hospital to receive treatment for injuries that were observed once she was dropped off at Harbor Crest Day Care.

Those statements that [redacted] made specifically to Mr. Lutz who will be testifying today will not only be covered under the intent, opportunity, and plan purpose of 404(B) but the medical treatment exception would apply in terms of hearsay, your Honor.

THE COURT: Response?

MR. SHAUGHNESSY: Thank you, your Honor. On behalf of Ms. Day, we would

object, as we have continued to, to any of the other acts evidence.

First of all, I believe it was argued last week that identity was a major component of this 404(B). It sounds like we're just going to document past injuries and then, from what we've talked about off the record, the prosecution is going to say that the baby was only in Ms. Day's custody so she must have done those acts. That might be a plausible argument in trial if you wanted to use the fact that the mother may not have been -- the child may have only been with the mother and there's an inference that she did it but here we're trying to say that she has a propensity to harm the child. You're trying to bring in on prior occasions she harmed the child.

We believe it's inadmissible, it's not relevant, it's more prejudicial than probative. It doesn't satisfy the aspects of 404(B) or the procedure to do it. They're not linking Ms. Day to these other injuries in a sufficient manner to allow them to be presented to this jury.

If we're going to allow hearsay testimony in, we have no basis that this hearsay declarant is a competent witness, and is therefore presumed

incompetent.

THE COURT: I'm going to deny it -- allow it. Identity is a major issue in this case. The facts of the crime, there was a crime, we know that; there was injuries. What we don't know is who did it. So identity is a major issue.

Additionally, the background of this -- the scheme, plan, or system, the other acts testimony must concern events which are inextricably related to the alleged act. These are all wrapped up in who caused harm.

I'm going to allow it in under 807, the child's testimony. You can have a standing objection on those other acts.

MR. SHAUGHNESSY: Just so I'm clear, you're denying my objection?

THE COURT: Yes.

MR. SHAUGHNESSY: And granting their motion?

THE COURT: Yes.

MS. JORDAN: I know we talked about the stipulations, but we haven't put them on the record.

THE COURT: Go ahead.

MS. JORDAN: Do you want to put on the record the stipulations that we all discussed? The phone records of Sierra Day, the phone extraction reports of Sierra Day, Deonte Lewis; the MetroHealth medical records, not Cleveland Clinic, the MetroHealth records from September 2013 through July of 2017, the March 24, 2018, BCI report; the March 8th Chipotle surveillance video; the dental records from June 21st --

MS. LONGINO: What was the second one?

MS. JORDAN: The phone records and the phone extraction report.

MS. LONGINO: Okay.

MR. SHAUGHNESSY: I don't have any objection to stipulating to the authenticity of all of those things, and I have no problem stipulating to the fact that they are what they say they are and you do not need a records custodian. I do, however, reserve the right to object to the admissibility of some of the content of those, depending on how the trial goes, at the appropriate time.

THE COURT: That's fine.

MS. LONGINO: I have the same objection.

THE COURT: Very good.

- - - o0o - - -

(Thereupon, the following proceedings were had before the Jury in open court:)

- - - o0o - - -

THE COURT: Mary Jo.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel on the record at the bench out of the hearing of the Jury as follows:)

- - - o0o - - -

THE COURT: Go ahead.

MR. KILBANE: We want to be clear that the statements that the child victim made at the hospital we're asking that those come in under the hearsay exception of medical diagnosis or treatment, not under 807.

THE COURT: Okay.

MR. SHAUGHNESSY: I still object.

THE COURT: Objection noted.

- - - o0o - - -

(Thereupon, the following proceedings were had before the Jury in open court:)

- - - o0o - - -

THE COURT: Let's get the defendants in here.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated.

Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: Call your next witness.

MR. KILBANE: State of Ohio calls Officer Nathaniel Reed to the witness stand.

THE COURT: Please step forward. Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **NATHANIEL REED**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning.

THE WITNESS: Good morning, your Honor.

THE COURT: Make sure you speak directly into the microphone. You can adjust the microphone; the seat won't move.

You may inquire.

MR. KILBANE: Thank you, your Honor.

DIRECT EXAMINATION OF NATHANIEL REED

BY MR. KILBANE:

Q Good morning, sir.
A Good morning.
Q Can you state your name and spell the last name for the court reporter?
A Nathaniel Reed, R-E-E-D.
Q Are you employed?
A Yes.

Q Where are you employed?
A By the City of Euclid.
Q In what capacity?
A Patrolman.
Q And how long have you been a patrolman with the City of Euclid?
A 2015.
Q What do you do as a patrol officer with the City of Euclid?
A Routine patrol, traffic stops, reports, domestics, you know.
Q Did you have any prior law enforcement experience before joining the City of Euclid?
A I started my career in Lake County in 2005.
Q What did you do with Lake County?
A I was with the City of Kirtland, I was in patrol.
Q How long did you do that for?
A 2005 to 2015 until I came to Euclid.
Q Did you have any training or have you received any certifications that allows you to become a police officer?
A Yes. The Ohio Police Officer Academy.
Q What's that?
A Ohio Police Officer Academy is the academy that everyone attends to become a certified police officer in the State of Ohio.

Q When did you complete that?
A 2004.
Q Officer, I want to turn your attention to February 11, 2018. Do you recall that date?
A Yes.
Q Were you working on that date?
A I was.
Q Were you dispatched to Euclid Hospital on that date?
A Yes.
Q What was the nature of the call?
A The call was someone was at the ER --

MS. LONGINO: Objection. May we have a sidebar?

THE COURT: Rephrase your question. You had the wrong date, I believe. You said 2-11.

MR. KILBANE: That's correct, your Honor.

THE COURT: Oh, okay. Let's go to side bar.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in

open court:)

- - - o0o - - -

THE COURT: Objection overruled. Go ahead.

BY MR. KILBANE:

Q Officer, what was the nature of the call that you responded to on February 11?

A It was a call that there was a subject that was in the ER that had just been chased there. I believe they were described they were chased by two black males in hoodies into the ER. So we responded to the ER to see what was going on.

Q What time did you respond to the ER?

A I want to say I was dispatched approximately 4:26 a.m., I arrived around 4:30 a.m.

Q What did you observe when you got there?

A I met two parties at the exit/entrance area, the little turn-around, and had a conversation with them about what was going on and who chased them in the ER. Those two parties, a male, female, a Deonte Lewis and a Sierra Day, I spoke mostly with the male. I had a partner with me, he spoke mostly with the female.

After speaking with Deonte, we -- the truth came out that they weren't really chased --

MR. SHAUGHNESSY: Objection.

MR. MAREIN: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: -- that they weren't really chased to the ER. It was a cold evening, they were looking for a ride home. I offered them that ride, put them in my patrol car and drove them home.

BY MR. KILBANE:

Q Do you recall who told you that?

A That they weren't really chased to the ER --

MS. LONGINO: Objection.

THE COURT: Overruled.

A I was speaking with Deonte. So it was Deonte who told me they weren't chased to the ER.

BY MR. KILBANE:

Q And you indicated that they were looking for a ride home?

A Correct.

Q Did you take them home?

A I did.

Q Where did you take them to?

A I took them to their apartment off Lakeshore, I believe Cultural Gardens.

Q Is that at 22701 Lakeshore Boulevard?

A Yes.
Q Did you transport one of the parties or both?
A I transported both.
Q Did either party tell you where to go?
A I don't recall who told me where to go. It's just the address they told me to go. I don't remember who told me.
Q Did you eventually transport them to Cultural Gardens?
A I did, I dropped them off right in front of the building.
Q Did you observe anything after you dropped them off?
A No, I let them out of the police car and that was it.
Q All right. You mentioned you had a conversation with a male that you later dropped off at Cultural Gardens. Is that male in the courtroom?
A Yes.
Q Can you point to him and describe what he's wearing?
A He is sitting at the table to my left here in a green shirt and --
MR. GAY: We'll stipulate.

THE COURT: So noted, stipulation as to identification.

THE WITNESS: -- orange vest.

BY MR. KILBANE:

Q And you indicated that you saw a female there as well --

MR. SHAUGHNESSY: We'll stipulate that the officer can identify Sierra Day.

THE COURT: So noted.

BY MR. KILBANE:

Q Did you have any other involvement in this investigation?

A I did not.

MR. KILBANE: Could I have one second, your Honor?

THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MR. KILBANE: No further questions, your Honor.

THE COURT: Cross?

MR. SHAUGHNESSY: I have nothing

on that.

THE COURT: Cross?

MS. LONGINO: Yes.

CROSS-EXAMINATION OF NATHANIEL REED

BY MS. LONGINO:

Q Officer, you said initially they told you that someone was chasing them and they needed a ride home?

A Initially, the call was that someone had chased them into the ER. I believe the call was two black males in hoodies.

Q So prior to your graciously giving them a ride back to Ms. Day's apartment, Deonte just told you the truth; correct?

A He did.

Q And you still gave them a ride back to the apartment?

A I did.

Q And the apartment was located in Euclid?

A Correct.

Q If Deonte had told you he lived in East Cleveland and he wanted you to drop Ms. Day off at her apartment and take him home to East Cleveland, would you have taken him to East Cleveland?

A Depending on the distance, maybe.

Q East Cleveland from Euclid is quite a distance;

correct?
A From Lakeshore, that area, yes.
Q From Lakeshore in Euclid to Burnett, which is off of Euclid Avenue, in East Cleveland, that's quite a distance?
A Yes.
Q And East Cleveland is basically outside of your jurisdiction; correct?
A Correct.
Q So chances are you would not have taken him to East Cleveland; correct?
A I couldn't say.
Q Okay.

MS. LONGINO: Thank you.

MR. KILBANE: I have nothing on that, your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you, your Honor.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MR. KILBANE: State calls Officer Matthew Rhodes to the stand.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **MATTHEW RHODES**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning.

THE WITNESS: Good morning, your Honor.

THE COURT: Make sure speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MR. KILBANE: Thank you, your Honor.

DIRECT EXAMINATION OF MATTHEW RHODES

BY MR. KILBANE:

Q Good morning, Officer.
A Good morning.
Q Can you state your name and spell your last name for the court reporter.
A Matthew Rhodes, R-H-O-D-E-S.
Q Are you employed, sir?
A I am.
Q Where at?
A As a full-time police officer with the City of Euclid.
Q How long have you been a police officer with the City of Euclid?
A Approximately two-and-a-half-years.
Q What is your specific assignment with the City of Euclid?
A Patrol officer on the midnight shift, midnight to eight a.m.
Q Do you have any prior law enforcement experience before joining the City of Euclid?
A I do. I was --
Q Who was that with?
A I was a part-time police officer with the Village of Kirtland Hills for three-and-a-half-years, and a full-time patrol officer with the City of Maple Heights for five.

Q Do you have any training and/or received any certifications that allow you to be a police officer?
A I have. I went to the Cleveland Heights Police Academy, I graduated in 2008. And I've been to several other training classing since then.
Q I want to turn your attention to February 11th of 2018. Do you recall that date?
A I do.
Q Were you working that day?
A I was.
Q Were you dispatched to Euclid Hospital?
A Yes.
Q Why were you dispatched to Euclid Hospital?
A We received a call from a person stating that they were being followed from the bus stop at 185 and Lakeshore, and they were scared for their safety.
Q Do you recall what time you got to the hospital?
A It was sometime after four in the morning. I don't remember the exact time.
Q What did you observe when you got there?
A When I got to the entrance of the ER, there was a couple there. I approached them and started speaking with the female.
Q Do you recall the female's name?
A Sierra.

Q Do you recall her last name?
A Sierra Day.
Q Did you have a conversation with Sierra Day?
A I did.
Q What did she tell you?
A She stated that they were trying to get home, she needed to get home to her child. I asked who was at home with the child, and she stated that her little sister was watching the child. I forget how old she told me her sister was but it was old enough to where I felt it would be an appropriate age to watch a child.
Q So you didn't ask any additional follow-up questions based on the information that she gave you?
A Correct.
Q Do you eventually -- well, after you speak with Sierra Day, what do you do next?
A Officer Reed had responded with me; he spoke to the male half. We determined that -- Officer Reed had spoke to the male and found out that they were just cold --
MS. LONGINO: Objection.
THE COURT: Overruled. Go ahead.
THE WITNESS: Officer Reed advised me that the male told him he was cold and

they wanted a ride back to the apartment. And we did give them a ride back to the apartment.

BY MR. KILBANE:

Q What apartment was that?

A It was at Cultural Gardens, the first building. I forget what the exact address is off the top of my head.

Q Is it 22701 Lakeshore Boulevard?

A I believe that is it.

Q And what did you observe when you got to 22701 Lakeshore Boulevard, if anything?

A When we got there, Officer Reed let them out of his vehicle and they walked into the apartment building.

Q Who walked into the apartment building?

A Both the male and female, Sierra Day and Deonte Lewis.

Q You actually observed Deonte Lewis walk into the apartment building?

A I did.

Q That female that you spoke to, is she in the courtroom?

MR. SHAUGHNESSY: We stipulate that this officer can identify Sierra.

THE COURT: So noted.

BY MR. KILBANE:

Q The male that you observed, is he in the courtroom?
A He is.
Q Can you point to him and describe what he's wearing?
A He's sitting at the table over here --
MR. GAY: We'll stipulate to the ID.
THE COURT: So noted.
BY MR. KILBANE:
Q Did you have any other involvement in this investigation?
A No.
Q Did you ever enter into the apartment complex?
A I did not.
MR. KILBANE: Could I have one moment, your Honor?
THE COURT: Yes.
- - - o0o - - -
(Off the record.)
- - - o0o - - -
MR. KILBANE: No more questions, your Honor.
THE COURT: Cross?
MR. SHAUGHNESSY: No questions

on that, Judge.

THE COURT: Cross?

MS. LONGINO: No questions, your Honor.

THE COURT: You may step down.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MS. JORDAN: Your Honor, the State will call Tamira Finley.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Please step forward. Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **TAMIRA FINLEY**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning.

Make sure you speak directly into the microphone. You can adjust the microphone, but the seat will not move.

You may inquire.

MS. JORDAN: Thank you, your Honor.

DIRECT EXAMINATION OF TAMIRA FINLEY

BY MS. JORDAN:

Q Good morning, Ms. Finley. Can you please state and spell your full name for the record.

A Tamira Finley, T-A-M-I-R-A, Finley, F-I-N-L-E-Y.

Q Ms. Finley, are you presently employed?

A Yes.

Q Where are you employed at?

A Carnival Child Development Center, Mayfield and Lander Road.

Q What training do you have to be employed in child care?

A I have over 15 years in early childhood development. I work for CEOGC, Carnival Child Development Center, preschool teacher.

Q Ms. Finley, I note that you're a little bit soft spoken. If you can just make sure that you adjust that mike so I can hear you all the way back here. Okay?

A Okay.

Q Thank you. Now, Ms. Finley, was there a point in time where you worked at Harbor Crest Day Care?
A Yes.
Q Can you tell me when you worked at Harbor Crest Day Care?
A December 2016 to February 2017.
Q And Ms. Finley, what were your job duties at Harbor Crest Day Care?
A My job duties were to take care of children between the ages of three and five years old, from six a.m. to midnight some days; make sure that they get -- was in the proper care when they was dropped off, changed, lunch time, one-on-one, free play, things of that nature, just making sure they are safe while their parents are at work.
Q Where was Harbor Crest Day Care located at?
A 240th and Lakeshore.
Q How many children were in your class?
A At that time I think we had like 14 -- between 14 and 15 children, but it was two teachers available at that time.
Q Okay. While you were working at Harbor Crest Day Care, did you have the opportunity to meet Sierra Day?
A Yes.
Q Do you see her in the courtroom today?

A Yes.
Q Would you please identify her and describe her for the record?

MR. SHAUGHNESSY: We'll stipulate that she can identify Sierra.

THE COURT: Thank you.

MS. JORDAN: Thank you, counsel. Thank you, your Honor.

BY MS. JORDAN:

Q When was your first interaction with Sierra Day?
A My first interaction, I met Sierra because [redacted] attended -- was one of the students in my classroom. Me bein' the teacher that I am, I do gain a relationship with my parents. Me bein' new, I did, you know, introduce myself so she could get a better feel for me because I was a new teacher and, like, a little friendship went on.
Q Why, as a day care teacher, is it important for you to get to know the parents of the children in your class?
A So that I can actually get to know what's goin' on with the child. If there is some behavior that's not normal, we can redirect it so I can communicate with the parent.

If there is any concerns from the parent, if

they're goin' through something, we just try to make ourselves available so that we can be on a one-on-one basis so the child is gettin' the proper care fundamentally, you know, developmentally while they're in our program.

Q Initially, how were your interactions with Sierra?

A Initially they were fine.

Q What were some of your first observations of [redacted]?

A Sweet, soft-spoken, energetic, outgoing, just like her smile, her presence was -- she just was a little, sweet little angel.

Q How long was [redacted] in your classroom for?

A The two months that I was there.

Q Okay. Outside of your classroom, did you ever see or interact with [redacted] and Sierra?

A Yes.

Q Can you tell me about that.

A Outside of being a preschool teacher, I have a -- I do babysitting services after school and on weekends. And at the time, Sierra was working and she was looking for, you know, babysitting services after our hours. So I would get [redacted] some days I would take her home with me and I would watch her while she worked.

Q Okay. What were some of your general observations of [redacted] while you were in class together?

A When I first met her, she was a little whiny and I would ask them, you know, like why. It's always a reason a child is whiny. Sometimes if they cry because mom drops them off, usually it doesn't last long.

But some days she would just cry and I would just, you know -- I took to her a little bit more because everybody would be like that's the cry baby and I would be like, no, that's the baby. Once she got a feel to me and got comfortable with me, it was like no problems. But the things that I observed that weren't sitting with me well was --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: Some things were bruises, scratches. Little bit thin, you know, just the way she would talk to me and, you know, I -- you don't -- kids are kids and she's only three. So, you know, they're not going to have a conversation like you're talking to an adult, but some of the things she would say to me would, like, pierce my heart.

BY MS. JORDAN:

Q You say you started observing bruises and scratches on [redacted]?

A Yes.
Q Tell me what it was you saw.
A The very first initial one that I seen and I just thought it was like a baby because I did ask her, she had like some -- like a little bruise --
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled. Go ahead.
THE WITNESS: She had some bruises on her arm.

BY MS. JORDAN:

Q When you say she --
A [redacted].
Q -- you're referring to [redacted], correct?
A [redacted]. [redacted] had some bruises on her arm. When I asked her, she said --
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled.
THE WITNESS: "I fell." And I said okay. And then another teacher asked her. And then she came back to me and she sat on the side of me --
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled. Standing objection on this testimony with respect

to any statements made by the child.

MR. SHAUGHNESSY: Thank you, your Honor.

THE WITNESS: She stood next to me and she wanted to sit on my lap, so I let her sit on my lap. And then I said, "Does that hurt?" She said: Yeah. She said, "Mommy did it but Mommy said I fell."

BY MS. JORDAN:

Q As [redacted] was sitting on your lap with a bruise on her arm and told you "Mommy did it but Mommy said I fell," what thoughts were going through your mind at that point in time?

A A million things, but I couldn't -- I can't just go off my assumptions. As a mandated reporter, I had to do an incident report. So at that time, me and another co-worker we started jotting down notes, and we observed and it became kind of lengthy.

Q Okay. You said a couple things there. At Harbor Crest, was there a process in place for reporting observations that you had with the child?

A Honestly, we don't have to have a process, I don't even have to go through a director to do an observation or make a call. By being a mandated reporter, I can do it whenever I feel it's needed. And

that's what I did.

Q Were there observation forms in regards to what you saw in regards to injuries to [redacted] that you would completed?

A Yes.

Q And if you saw one of those forms, would you recognize it?

A Yes.

MS. JORDAN: May I approach, please, your Honor?

THE COURT: You may.

MR. MAREIN: What exhibit number?

MS. JORDAN: 812.

BY MS. JORDAN:

Q Ms. Finley, I'm handing you what's been marked for identification purposes as State's Exhibit 812. Do you recognize that item?

A Yes.

Q And how are you able to recognize it, Ms. Finley?

A Because I wrote it.

Q And is that State's Exhibit 812 a fair and accurate depiction of the observation form you completed on October 25th of 2016?

A Yes.

Q And Ms. Finley, what information is typically included on an observation form?
A Basically where it's located, how it looks, if it's any concern to us, if there's any medical attention, are we going to contact the parents, what we did.
Q Okay. In term of State's Exhibit 812, what, if anything, did you note on this child observation form?
A Excuse me, can you repeat that?
Q On State's Exhibit 812, what, if anything, did you note on this child observation form?
A The bump on the head.
Q Okay. Who was this child observation form in regards to?
A [redacted]
Q Why was this form completed?
A This form was completed because it was one of the very first ones that I seen. So it really didn't stand out as a real concern because it happens. It wasn't -- it was basically every time I seen something I jotted down.
Q Okay. Why were you tracking what it was you saw?
A Because after I start noticing too many bruises or too many bumps and just conversations with her, I started to have some concern. So I wanted to have it notated in an observation form so that if we did need it,

we had it.
Q When you say conversations with her, is --
A [redacted].
Q Okay. What about your conversations with [redacted] were concerning to you?
A "Mommy hits me"; she would always say when you ask her what happened, she would laugh with her little smile and say: "I fell but -- I fell but Mommy -- I did this but Mommy said I fell." Or: "I fell at the park but Mommy said I fell." You know, it's like she always said what her mom said happened to her.
Q Okay. I want to turn -- you completed these forms, and you only worked at Harbor Crest for two months; correct?
A Yes.
Q Are you still seeing [redacted] after you stop working for Harbor Crest?
A Yes.
Q Tell me in what way are you still interacting with her?
A Once again, I did do babysitting services for her when she worked and she didn't have a sitter. And as I said, I would take her home some days straight from work because of her work schedule. I know how it is to be a single mom. So I just extended my hand out so she could

make it to work and be able to take care of [redacted].

Q Okay. What were your observations of [redacted] when you babysat her at your home?

A This was actually the last time I seen her, [redacted] came to my home and she had a black eye, and that was it for me. And I asked [redacted] and she just was straightforward: "Mommy hit me."

At this time, my daughter was home. I was kind of -- when she came, when Sierra came to pick up [redacted], most children, when their parents come, are happy that their parents are there. Well, in this case she didn't, she ran to my room and she didn't want to leave.

At this time, my daughter, I didn't know that they knew each other, asked her what happened to [redacted] face. And her response was: Oh, you know, [redacted] is just rough. Well, we wasn't buying it.

At that time, she left with [redacted]. I could hear her in the hallway because the apartment building walls are so thin, fussing, but we can't really hear what she's saying. So I'm just thinking they're leaving. She knocks back on my door --

Q Who is she?

A Sierra. She knocks back on my door, and she says, "See, [redacted] said you hit her." I said, "Girl, [redacted] didn't say nothin' like that."

She said, '[redacted] just be lyin'." That was the last time.

Q After that incident, when you saw [redacted] with the black eye and [redacted] says, "Mommy did it," did you ever see [redacted] again?

A Actually, yes. Outside of me havin' her, I was driving up Lakeshore Boulevard goin' to the grocery store and it was cold and it was snowin' and it curves. And my daughter said, "Ma, is that Sierra," and I got disturbed because as she's walkin', mind you, the traffic is comin' her way.

She's walking in this direction but her child was behind her instead in front of her. She's not walking on the sidewalk, she's not walking close; she's in the street with her. So I turned around, and I asked her did she want a ride; she agreed, and I dropped them off.

Q Where did you drop them off at?

A I don't remember if it was Dave's or the Dollar Tree but it was -- I believe it was Dave's.

Q Okay.

MS. JORDAN: One moment, please, your Honor.

- - - oOo - - -

(Off the record.)

- - - oOo - - -

MS. JORDAN: Nothing further at this time, your Honor.

THE COURT: Cross?

MR. SHAUGHNESSY: No questions at this time, Judge.

THE COURT: Ms. Longino?

MS. LONGINO: Yes.

CROSS-EXAMINATION OF TAMIRA FINLEY

BY MS. LONGINO:

Q Ms. Finley, you said you worked at Harbor Crest from December of 2016 to February 2017?
A Yes.
Q You also said you used to babysit [redacted]?
A Yes.
Q Do you remember how late into 2017 you babysat her?
A Like February -- yeah, I left in February. So it was like the beginning of February.
Q So, you babysat her in February. You didn't babysit her at all after that?
A Actually, I don't remember the time frame from all of this, but I know that I had her at least once after I finished.
Q Okay. Would that have been in the month of February or later?

A I'm not sure.

Q Okay. Now, at any time during the time you worked for the day care or during the time that you babysat [redacted], did she ever say to you: Deonte, or Noodles, hurt me?

A He was nowhere in the picture. He was -- I never seen him. I never seen him, I never heard of him. I got wind of him after this. They all went to school with my daughter, so I did not even know of him. I know -- just from getting history on him, he was a good person. I did not -- he was nowhere to -- he wasn't -- they weren't in no relationship when I was dealin' with Sierra and [redacted].

Q Okay. So to your knowledge he was nowhere around when these injuries were occurring to this child?

A No. No.

Q Okay.

MS. LONGINO: Thank you.

THE COURT: Anything further?

MS. JORDAN: Nothing further from the State, your Honor.

THE COURT: You may step down. Thank you very much.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MS. FARAGLIA: The State calls April Goode, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Please step forward, raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **APRIL GOODE**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning.

THE WITNESS: Good morning.

THE COURT: Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

THE WITNESS: Okay.

THE COURT: Thank you. You may inquire.

MS. FARAGLIA: Thank you, your Honor.

DIRECT EXAMINATION OF APRIL GOODE

BY MS. FARAGLIA:

Q Good morning, Ms. Goode.
A Good morning.
Q Please state your full name, spelling your first and last name for the court reporter.
A April, A-P-R-I-L, Goode, G-O-O-D-E.
Q Ma'am, what industry are you employed in?
A The child care industry.
Q How long have you so been employed in that area?
A Thirty years.
Q And what kind of training and experience do you possess in order for you to maintain your position?
A A CDA, infant and child; CPR, infant and child; communicable diseases and child abuse.
Q What is CDA, ma'am?
A Child Development Associate.
Q All right. Are you presently gainfully employed?
A Yes.
Q Where are you employed?
A Loving Cup Academy.

Q Prior to working for Loving Cup, where did you work?
A Brightside Academy.
Q And prior to Brightside Academy?
A Harbor Crest.
Q What years did you work at Harbor Crest?
A 2016 to 2017.
Q Okay. During your time at Harbor Crest, what were your duties and responsibilities?
A I was the main closer; caring for the children, putting them down on cots.
Q All right. What time was your shift?
A From two to close.
Q All right. And how old were the children that you took care of?
A They were six weeks to 12 years.
Q And during this time, did you work by yourself in the second shift or did you have a colleague that worked with you?
A I had a colleague that worked with me.
Q Who was that colleague?
A Tamira Finley.
Q And Ms. Goode, did there come a point in time that you met a Sierra Day and [redacted]?
A Yes.

Q Can you tell me the circumstances of that, ma'am?
A I met them upon her enrolling her child to come to child care and starting to work at Harbor Crest, meeting all the parents and children.
Q Okay. Is Sierra Day here in this courtroom today?
A Yes.
Q Can you tell me --
MR. SHAUGHNESSY: We stipulate she can identify Sierra, your Honor.
THE COURT: So noted.
MS. FARAGLIA: Thank you, your Honor. Thank you, counsel.
BY MS. FARAGLIA:
Q So you met Ms. Day; on the same day, did you meet her daughter?
A Yes.
Q What were your observations of her daughter?
A She was a very happy little girl upon meeting her.
Q Okay. And was she in your class?
A Yes.
Q How often would you see this child?
A Every day.
Q All right. And did you have a routine in your class with the children?

A Yes.
Q What was your routine?
A Well, the routine was we would come in, wash our hands, and at that time we would be preparing for PM snack. We would eat snack; have a little activity, you know, and then we would go from there to a different activity.
And after about a couple hours, we would be having dinner. And then after dinner, we would go down for the evening, waiting for the parents to pick up.
Q And during this time, did you have interaction with [redacted]?
A Yes.
Q All right. And what were your observations of [redacted]; what was her interaction with other children?
A She interacted fine with other children.
Q Okay. And would she interact with the staff?
A Yes, she sure would.
Q Was she able to tell you when she needed to go to the bathroom?
A Yes.
Q Or when she needed something?
A Yes.
Q So she was a verbal child?
A She was a verbal child.

Q All right. And did there come a point in time that you started to notice a change in this child?
A Yes.
Q Can you tell me the circumstances of that, ma'am?
A We -- I started to notice a change about after a couple days she started acting out and she didn't -- she wouldn't even lay down on her cot.
Q What do you mean by acting out?
A She would just cry and just cry, and it was like, well, we couldn't figure out what was wrong.
Q So as a means of solace, what did you do to assist her when she would cry?
A I would pick her up and hold her and let her know it's going to be okay.
Q Were you bothered by that?
A Yes, very bothered.
Q Did you call -- or what was your process? Did you contact the mother or father about her behavior?
A No. Protocol is we are to fill out observation reports.
Q All right. So back in December of 2016, did you fill out an observation report?
A Yes, I did.
Q Okay. And do you recall, when you fill out an observation report, did you also sign it?

A Yes.
Q And how many observation forms did you file for Aniya Day?
A I recall two.
Q If I were to show you them, would you recognize them?
A Yes.
MS. FARAGLIA: Your Honor, may I approach?
THE COURT: You may.
MS. FARAGLIA: State's Exhibits 806 and 814.
BY MS. FARAGLIA:
Q Ma'am, handing you what's been marked as State's Exhibits 814 and 806, I'd like you to take a moment and look at that document.
Do you recognize State's Exhibit 814?
A Yes.
Q And what date appears on that?
A The date is December 2nd, 2016.
Q And does your name and signature appear on this document?
A Yes.
Q And where does that appear?
A At the bottom, second page.

Q All right. And with regard to your observations of December 2nd of 2016, what were your observations of [redacted]?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: My observations were there was a dark red mark on the left side of her face.

BY MS. FARAGLIA:

Q Okay. And do you memorialize that in the back with your comments?

A Yes.

Q What do you write down in the back?

A I write down, "Dark red mark on the left side of the face. [redacted] stated that Mom had been hitting her."

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

BY MS. FARAGLIA:

Q And, Ms. Goode, with regards to that, do you talk to the mom about this on December 2nd, 2016?

A No, I didn't.

Q Okay. And what is the date on that?

A (No response.)

Q December 2nd, 2016. Okay.

Now, moving on to State's Exhibit 806, do you recognize that document?

A Yes.

Q All right. What do you notice about that document?

A That this is a second observation report.

Q Okay. And what were your findings about that?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: "Bruises on the left side of the face, very dark colored bruise."

BY MS. FARAGLIA:

Q All right. Do you go on and write down more findings in the back?

A Yes.

Q And what were your additional comments?

A "[redacted] has a dark-colored bruise up under her left eye. I asked her what happened to her eye. She" --

MR. SHAUGHNESSY: Objection.

A "-- She stated her mom did this to her. Also I have noticed bruises on her every day when she comes to day care."

THE COURT: Overruled.

BY MS. FARAGLIA:

Q All right. Now, Ms. Goode, we come to February now of 2017. In addition to writing this down, do you ever take it upon yourself to contact the mom?

A No.

Q And after you noticed these injuries to this child, would you talk to the child and console her?

A Yes.

Q And about how long did you care for this child, in your capacity as a day care worker?

A I cared for this child two years.

Q All right. And in that two years, how would you describe your relationship with her; how did she treat you, how do you treat her?

A She treated me with respect, and I treated her with the most respect and just loved her.

Q And during this time, did you also meet with the mother on any occasion?

A I met with the mother upon dropping her child off and leaving.

Q All right. Did you ever talk to her about what you observed?

A No.

Q Did you share your information with other members --

A Yes, I shared it with my direct supervisor.
Q Did you ever have any contact with the father of this child?
A No.
Q Did -- who would come to pick this child up or who had permission to pick this child up?
A The only person that had permission to pick this child up was her mom, Sierra.
Q And you said you worked the afternoon shift?
A Mm-hmm.
Q So about what time during the day would she be picked up?
A Inside of seven and eight o'clock in the evening.
Q And would Sierra be by herself or would she be with someone else?
A She would be by herself.

MS. FARAGLIA: One moment, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. FARAGLIA: Thank you. No further questions at this time.

MR. SHAUGHNESSY: No questions, your Honor.

THE COURT: Ms. Longino?

CROSS-EXAMINATION OF APRIL GOODE

BY MS. LONGINO:

Q Ms. Goode, you said you worked for Harbor Crest for two years?

A Yes.

Q That was from 2016 to 2018?

A Yes.

Q And within those two years -- okay. You said that you noticed a change of the child days after. Are you saying days after she was enrolled?

A Yes, days after she was enrolled.

Q In 2016?

A Yes.

Q Okay. And could you tell us again what that change was?

A The change was at the point of her not being that happy little child to somebody who was always saddened.

Q Okay. During your time there where you made these observations of [redacted] from 2016 to 2018, and you were observing these injuries to her, she was telling you: Mommy did it?

A Mm-hmm.

Q Does she ever say Deonte, or Noodles, did it?

A No.

Q Did she ever say Deonte, or Noodles, hurt me?
A No.

MS. LONGINO: Okay. Thank you.

THE COURT: Thank you. You may step down.

\- - - oOo - - -

(Thereupon, the witness was excused.)

\- - - oOo - - -

THE COURT: Call your next witness.

MS. JORDAN: Your Honor, the State will call Michelle Marshall.

\- - - oOo - - -

(Off the record.)

\- - - oOo - - -

THE COURT: Please step forward. Raise your right hand, please.

\- - - oOo - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **MICHELLE MARSHALL**, who, being first duly sworn, was examined and testified as follows:

\- - - oOo - - -

THE COURT: Good morning. Please be seated. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

THE WITNESS: Okay. Thank you.

THE COURT: You may inquire.

MS. JORDAN: Thank you, your Honor.

DIRECT EXAMINATION OF MICHELLE MARSHALL

BY MS. JORDAN:

Q Good morning, ma'am.

A Good morning.

Q Could you please state and spell your name for the record.

A Michelle Marshall, M-I-C-H-E-L-L-E, M-A-R-S-H-A-L-L.

Q And Ms. Marshall, are you employed?

A I am not at this moment.

Q Was there a point in time that you were employed at Harbor Crest Day Care?

A Yes.

Q When were you employed at Harbor Crest Day Care?

A I'm sorry, you said when?

Q Yes.
A March 7th, 2017.
Q When did you stop working at Harbor Crest?
A August 8th, 2017.
Q How -- did you have prior experience working in child care?
A Yes.
Q How many years of experience do you have working in child care?
A For 25 years, I was a certified home child care provider for the county, Cuyahoga County.
Q What steps did you have to take to become a certified child care provider?
A At that time, it was come down for classes, just with the county. And then go through training, different steps of training: Communicable disease, neglect and abuse, so on and so forth. And I did go on and obtain my Associate's degree in early childhood education.
Q With your 25 years of experience in child care, can you just give me a few other locations that you worked at other than Harbor Crest.
A Harbor Crest was the first day care center that I worked outside of my home.
Q So you had essentially your own child care facility?

A Correct.
Q All right. During your course of working at Harbor Crest Day Care, did you have the opportunity to interact with Sierra Day?
A Yes.
Q Do you see that person in the courtroom today?
A Yes.
Q Could you please identify her and describe her for the record?
MR. SHAUGHNESSY: We stipulate that the witness can identify Sierra.
THE COURT: So noted.
MS. JORDAN: Thank you, counsel.
BY MS. JORDAN:
Q When you first interacted with Sierra, what were your initial observations of her?
A Well, our first interaction was, as other parents, I was a new teacher coming into the center and I just came in with a structured plan, and so it kind of took some of the parents aback for a minute.
Q When you say you had a structured plan, explain to me what you mean by that.
A Well, when I started at Harbor Crest, I guess it was a free-for-all. Parents would come in at whatever

time after breakfast and bring food in for their kids and sit them down for breakfast. So when I started there, I kind of changed things saying: Breakfast is at this time, if your child is not here for breakfast, they can eat but they can't come into the classroom because we started our lessons.

Q What sort of lessons and activities did you have with the children?

A Circle time; we went over classroom rules. I taught them the address and phone number of the day care center; ABCs. We learned safety rules; if someone was trying to abduct them; just a curriculum lesson plan. There really wasn't one there. So you had to kind of construct your own. So I kind of adapted what I did at home into the center.

Q Was [redacted] one of the students in your class?

A Yes.

Q What age range did your class cover?

A It was pre-K, so it was three to five, getting reading for kindergarten.

Q What were your first observations of [redacted] when you first met her?

A Well, we had a love-hate relationship at first. Again I believe it was because I -- it was several teachers coming into the center. So, I think just

adjusting to different teachers. So it was -- if she -- she came in and if I took her coat off, she'd cry because she wanted it on. If I tied her shoe, she'd cry. So I just started saying like: Do you want to leave your coat on or do you want to take it off? And just let her just run it.

After a minute, I was just sitting at the desk and she would just come and climb in my lap. That's how, kind of, we started our bond.

Q You said you would ask [redacted] if she wanted her coat off or her shoes on, things like that. Was she able to communicate with you what she wanted or what she needed?

A Yes.

Q How long was [redacted] is in your class?

A She was in my class from March until May, and briefly interrupted in May. And then she returned back for two days in June.

Q Are we still in the year 2017?

A Yes, ma'am.

Q Was there a point in time in your interactions with [redacted] from March of 2017 through May of 2017, did you start seeing a change in her behavior?

A I would probably say in April, maybe the middle of April.

Q Tell me what it was that you started to observe.

A When I first started there, she had a black eye that was healing. So I didn't -- I talked to the director briefly about that but let it go.

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

A In April, toward the beginning of April, she came in with a busted lip. I asked what happened, and she told me --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Note an objection for any statements made by the child.

MR. SHAUGHNESSY: Thank you, your Honor.

BY MS. JORDAN:

Q Continue.

A And she told me. And I talked to the director about it. And then from there, it was like, I guess, like an opening, like I said, she just started coming to me and just hugging me, crying when I would leave early or when Sierra would come pick her up, to stay with me. So I just started seeing that behavior then when she started saying: Ms. Marshall, can I stay with you. So

for me that was a red flag, a change.

Q You mentioned Sierra Day, did you ever find out if [redacted] had another adult involved in her life, another parent?

A No. Just besides her father, Mickhal.

Q Her father, Mickhal, was around?

A Yes, he would come to the day care to pick her up. And then Sierra put in a stop from him picking her up so we had to honor that because they weren't married. But he would come and I would sneak him into the day care to see her but tell him that he couldn't take her out of the day care -- out of my classroom, because she would cry for him. She would say: Ms. Marshall, I want my daddy. She would cry for him.

He would come and sit in a corner. And the exchange made me cry to see the exchange and the bond between them. When he left, she cried, he cried. And -- that happened on two occasions.

Q Okay. As part of your job at Harbor Crest Day Care, did you complete observation forms if you observed anything unusual with the children?

A Yes. An incident report.

Q Incident report. Did you complete incident reports in connection with [redacted]?

A Yes.

Q Would you recognize those if you saw them again?
A Yes.
MS. JORDAN: May I approach, please, your Honor?
THE COURT: You may.

BY MS. JORDAN:

Q Ma'am, I'm handing you what's been marked for identification purposes as State's Exhibits 807, 808, and 809. Can you take a moment to review those items and look up when you're done.
A Yes.
Q And Ms. Marshall, are these child observation forms you completed on March 14th of 2017, May 15th of 2017, and May 18th of 2017?
A Yes.
Q Are they in the same or substantially similar condition to when you completed them?
A They are the same, yes.
Q Is your signature on the second page of each of these forms?
A Yes.
Q Okay. Beginning with State's Exhibit 807, is this child observation form in relation to [redacted]?
A Yes.
Q What were your observations of [redacted] on March 14th

of 2017?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

THE WITNESS: She had a cut on her lip.

BY MS. JORDAN:

Q Okay. And why was that noteworthy to you?

A Because from the black eye when I first started, obviously that was already taken care of because it was clearing up. So anything that a child came in with, a scratch, anything, I just noted it because it was what I was trained to do.

Q Okay. Turning your attention to May 15th of 2017, did you complete another observation report labeled State's Exhibit 808?

A Yes.

Q Okay. Was this also in relation to [redacted]?

A Yes.

Q And what were your observations on [redacted] on May 15th of 2017?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

THE WITNESS: She came into the center and her -- from her chin straight up her face was scraped off; her skin was scraped

off.

When I asked Sierra what happened, because again I have to do an incident report, she was in a haste and she said that [redacted] fell at the park. And she was adamant about making sure her shoe strings was tied or if she had sandals change her into her sneakers to go outside because she had fallen.

BY MS. JORDAN:

Q So on May 15th of 2017, you had a conference with Sierra about the injuries to [redacted]?

A Yes.

Q In fact, on the second page of this form, did Sierra make a notation?

A Yes.

Q Okay. Can you read for us, and slowly because sometimes we talk faster when we read, I want to make sure the court reporter can accurately depict it. Can you read for us what it was Sierra put on your observation form in regards to the injuries to Aniya on May 15th, of 2017?

A Yes. "[redacted] came in with mark on nose from park, from running. Caring for her at home. Sierra Day, May 16th, 2017."

Q Ms. Marshall, after seeing [redacted] injured on May 16th of 2017, and having a conversation with Sierra, did

you have any concerns at that point in time?
A Yes, because Sierra left, so she didn't have a chance -- she had to complete this when she came back to say what happened on the incident report. So when I write the incident report, I asked [redacted], I said, "Sweetie, did you fall off the slide, off the swing? Like, what happened?"
And she said, "Mommy pushed me," and I said, "Mommy pushed you?" She said, "Mommy pushed me."
I said, "Down the slide?" And she said, "Down some steps, Mommy pushed me."
Q What [redacted] told you, "Mommy pushed me, Mommy pushed me down some steps," what did you do?
A I told the director. I went to the director and I said, "Look at [redacted]; she said her mommy pushed her. We need to call 696-KIDS."
Q What happened after you had that conversation with the director?
A It was Ms. Temika Robinson. She was just taking over the day care as a new owner. She said, "Ms. Marshall, let me call and find out what I need to do."
I said, "I'm telling you what you need to do. You need to call 696-KIDS or 9-1-1."
She said, "Ms. Marshall, please let me find

out what I need to do and I'll handle it." At that time, I said okay.

Q Turning your attention to May 18th of 2017, State's Exhibit 809, did you complete an observation report in regard to May 18th of 2017?

A Yes.

Q Okay. What was it that caused you to complete an observation report from May 18th of 2017?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

A It was recess time so the kids were getting ready to go outside. There was another assistant in the classroom, Ms. Laquita, and she was taking the kids outside. So as the kids are going out, I'm standing in my doorway watching, it's a very small center, and [redacted] was saying that her head hurt, and Ms. Lakita said, "Okay. Go outside."

I said, "Wait, wait. What's wrong, [redacted]? Come back."

BY MS. JORDAN:

Q Let me stop you there. Why would, when [redacted] says her head hurts, you say: Wait, come back? Why would you say that?

A Because I was just protective over her. Again, a

bond was formed. She had my heart, so I was just very protective of her.

Q Does [redacted] listen to you and come back?

A Yes.

Q Tell me what happens next.

A She came back and said, "My head hurts," and she was holding her head. And I said, "What happened," and I looked down. As I look at her head, I see the blood -- I see patches of blister -- blood blisters in her scalp.

Q What happened next?

A At that time, I brought her back into the classroom and I said, '[redacted] what happened?" And she said, "Mommy hit me, Mommy hurt me," and she was doing that. (Indicating) She just kept saying over and over, "Mommy hit me, Mommy hurt me."

Q Take a deep breath, Ms. Marshall.

THE COURT: Do you want a moment?

THE WITNESS: I'm sorry. I'm fine. I'm fine.

BY MS. JORDAN:

Q What did you do next?

A I went to the director, Ms. Tameka, she was sitting at the desk and I said, "Ms. Tameka, you need to see [redacted] " I sent [redacted] to the desk.

At that time, I came back into the classroom because I just wanted to get myself together, and she said -- she yelled from the desk, and she yelled, "Ms. Marshall, did you see the blood that's in her ear?"

I said no. I could hear her say, "[redacted], go show Ms. Marshall."

[redacted] came in the classroom and I looked and I seen dried blood in her ear. I picked her up and I held her. I said to her, "No more. It ends now."

I went to the hallway, right by my door, I can see the desk with Ms. Tameka, and I said, "Either you call the police now, or I'm leaving the center with [redacted] and I can't promise you that I'm going to the police."

She said, "Ms. Marshall, I'm calling now." And I stood there and she called. I brought [redacted] back into the classroom, and I had her on my lap and I was just rocking her and telling her, "No more, you won't be hurt no more."

Q Ms. Marshall, did you have the opportunity to observe the scratches on [redacted] on that day and the blood on the inside of her ear?

A Yes. It wasn't really scratches, it was blisters on her scalp.

Q If you were to see images of those injuries, would you recognize them?

A Yes.

MS. JORDAN: May I approach, please, your Honor?

THE COURT: Is everybody all right? You need a break? I know you're passing -- you need a break? How much longer are you going to be with this witness?

MS. JORDAN: Maybe ten or 15 minutes.

THE COURT: Let's take a short break right now. Please do not discuss the case with each other. All rise.

- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel on the record outside the hearing of the Jury as follows:)

- - - o0o - - -

MR. SHAUGHNESSY: Judge, I wanted to note our continuing objection to all the 404(B) prior acts evidence. I know I've continued to object at each witness several times to preserve the record. I would ask that we have an ongoing objection to any and all prior acts

begin admitted under 404(B), to any exhibits, any testimony regarding those observations, and any statements related to those prior other acts.

THE COURT: You can have a standing objection. We've already -- I've already given my ruling back in chambers when we had the arguments.

MR. SHAUGHNESSY: Thank you, sir.

- - - o0o - - -

(Brief recess had.)

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated. You may continue.

MS. JORDAN: Thank you, your Honor.

BY MS. JORDAN:

Q Ms. Marshall, I'm handing you what has been marked for identification purposes as State's Exhibits 601 through 606. Could you take a moment to review those

items, please. Take a deep breath. Take a couple deep breaths for me, Ms. Marshall.

A Okay.

Q Do you recognize what's depicted in those images?

A Yes. Yes.

Q And how are you able to recognize it?

A Because this is the way that she came into day care, and I'm also in the image with her at the hospital.

Q Okay. Starting with State's Exhibit 601, is this [redacted] ear that we see?

A Yes.

Q Okay. State's Exhibit 602, turning your attention to the middle of the screen, what's depicted on the inside, is that the dried blood you were describing?

A Yes. That is the blood, the dried-up blood that's in her ear.

Q State's Exhibit 603, could you tell us what it is we are observing here?

A The blood blisters that was in her scalp.

Q State's Exhibit 604, could you tell us what it is we see in this picture?

A That is -- from what I described on the 15th where her face, it was healing up.

Q So those were the scratches that you had described previously?

A Yes.
Q State's Exhibit 605, what is it that we see here?
A That is still the scratches on her face.
Q And then State's Exhibit 606, what is depicted here?
A That is [redacted] and myself at the hospital; I went with her.
Q Now, Ms. Marshall, before we got to the pictures, you guys were still at the day care; correct?
A Yes.
Q How do you get to the hospital? Explain to me the steps that happen after you go to your supervisor at the day care.
A When the police and paramedics arrived, [redacted] was sitting there talking with them. And I had to go back into the classroom. But she wasn't talking; they were asking her questions and she wasn't talking, she was crying. So I came out and kneeled beside her and held her hand. I said, "They're here to help you, so you have to talk to them. They're here to help you."
Q Now, why did you come out and kneel beside [redacted] and hold her hand?
A Because it was all men in uniforms, and I wasn't sure if she had experienced that before, if she was comfortable. I just know that, if I was a child, I would

want someone familiar with me to comfort me.
Q What happened after you knelt down and took [redacted] hand?
A She started talking.
Q Okay. What did you hear [redacted] say?
A She -- excuse me. She just start telling them that -- the same thing: Mommy hurt me, Mommy hit me. The same thing over and over.
Q Tell me what happened next, Ms. Marshall.
A They got all the paperwork. They said they were going to take her to the hospital. A police officer looked at me and said, "Are you going to come with us," and I said yes.
Ms. Tameka said, "Ms. Marshall, you can't go." I said "Why?" She said: Because the laws and so on and so forth, you can't go. I said, "Then I quit because I'm going with her."
Q Tell me what happens after you told her you quit because you're going with [redacted]
A The police officer looked at me and looked at her, and then she said, "Okay, Ms. Marshall, you can go but you can't ride with her. You have to go in your own vehicle," I said, "That's fine."
Q Ms. Marshall, tell me what about what was going on with [redacted] that was so important to you that you would

quit your job to go to the hospital?
A I would do that for any child. I'm just passionate about kids but, again, she just -- it was just something that -- I don't know. I wanted to quit the day care so many times and leave there. I kept saying, "Lord, why am I here?"
My job was not to be a preschool teacher. I wanted to be around kids but not actually in the classroom with them, I was over that, like done. I wanted to be a director and he just kept me there, he wouldn't let me leave, and it was for her. And I just loved her so much. I did.
Q Take a couple deep breaths, Ms. Marshall. Take a moment.
The police allow you to follow in your car to the hospital. Which hospital do you go to?
A Euclid General on Lakeshore Boulevard.
Q Tell me what happens once you get to Euclid Hospital.
A We were in the hospital room, seems like forever. The nurse, the doctor comes in, asks what happened. I didn't say anything, I just let [redacted] talk to them and tell them. It was the same thing over and over. Her story never changed.
Once the doctor came in, the doctor examined

her, and she said, "Oh, this is probably because her braids are too tight."

I said, "No, ma'am. No, ma'am."

And she said, "Well, what do you think happened?"

I said, "I don't have to think what happened. She's telling you, she's talking." Again, I said, "[redacted] tell them what happened," and she said it again. She said it over and over.

Q About how long were you at the hospital?

A I can't even say, for hours. For hours.

Q You stayed the whole time?

A Yeah, I stayed the whole time. I left out with [redacted], Sierra, and the social worker.

Q You mentioned some new names. You mentioned Sierra and a social worker?

A I'm not sure if the social worker that was there at the time, I'm sorry, I can't recall her name.

Q That's okay. We have two more people that come into this equation of being at the hospital, right. After the medical staff looks at [redacted] can you tell us what happens next?

A The medical staff looks at her, the social worker comes in, and then Sierra comes in.

Q Okay. Is Sierra in the hospital room immediately

or --

A No.

Q -- is there a delay in time?

A It was a long time. They told me that she was in the hospital, she was in the waiting room, but they was not allowing her back until the social worker I guess got there.

Q When you're saying social worker, are you referencing a hospital social worker or a social worker from Cuyahoga County Department of Children and Family Services?

A Yes. Cuyahoga County Department of Children and Family Services.

Q Did you speak with a social worker from the Cuyahoga County Department of Children and Family Services?

A Yes.

Q Did you relay to them your concerns regarding Aniya?

A Yes.

Q Approximately how long were you and the social worker from the Cuyahoga County Department Children and Family Services speaking for?

A She came in; [redacted] wouldn't talk to her. She said, "If I had some candy, would you talk to me"; [redacted]

nodded yes.

She was looking and she said, "I have nothing. I usually keep peppermints. I have nothing."

I said, "I have fruit snacks." I gave [redacted] some fruit snacks. She ate one fruit snack and she started talking. She just talked -- she didn't really engage with me. Only thing, she apologized because she said she had to go find a relative or somewhere for [redacted] to go, and that's what took so long. And after that, she didn't really talk with me, she talked with [redacted].

Q You mentioned Sierra arrived at the hospital?

A Yes.

Q Do you interact with Sierra?

A I do, when she comes into the hospital room.

Q When Sierra comes into the hospital room, what are your observations of her demeanor?

A She was just plain-faced, no emotion. She came in, and she handed [redacted] a cell phone or a tablet to start watching something.

Q What's the interaction between Sierra and [redacted] while they're in the hospital room?

A There is no interaction; [redacted] stayed close with me.

Q Even after her mom arrives at the hospital?

A Yes.

Q Tell me what happens next, Ms. Marshall.
A I -- I don't know -- I can't recall if I hugged Sierra, but I know I was cordial to her even after a police officer came in and said that she was trying to say it happened in the classroom. But I knew, and the officer said: We already know you're fine.

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled, go ahead.

THE WITNESS: So when she came in, like I said, she gave [redacted] a tablet or cell phone, something to almost like take her attention away. And she started talking to the social worker. I said hi, she said hi, and that was pretty much it until, like the tension broke in the room, and I asked if I can pray with her, and she said yes, and I prayed with her and [redacted]

BY MS. JORDAN:

Q Before we get to praying with Sierra and [redacted] what, if anything, do you hear Sierra saying?
A I really can't recall her saying; I know she was saying something about [redacted] was with her grandfather before coming to day care, and I -- there was nothing, I'm sorry, I can recall her saying.

Q You asked Sierra if you could pray with her and [redacted]. And she allowed you to; correct?
A Correct.
Q Explain to me what happened next.
A The social worker talked and said --
MR. SHAUGHNESSY: Objection.
THE COURT: Sustained.
BY MS. JORDAN:
Q Without telling me what the social worker said.
A I'm sorry.
Q That's okay. Can you tell me what happened next?
A They spoke and then we were preparing to leave out.
Q Okay. When you are preparing to leave out, where is everyone in the hospital room at this point in time when you leave?
A To the relative's house.
Q Okay. When you say to the relative's house, was Sierra and [redacted] going to the relative's house together?
A I wasn't sure of that with -- again, that's what she was saying, but I wasn't sure if it was just [redacted] or both.
Q Okay. After being in the hospital with [redacted] on May 18th of 2017, did you see her again?
A I do.

Q Okay. When do you next see [redacted]?
A I saw her on June 6th.
Q Okay. Tell me your interactions the next time you see [redacted]
A I walk into the -- I'm sorry. I'm sorry. I see her before then. I apologize.
I see her before when she -- I called Sierra and asked her if [redacted] was coming back, we were doing roll call and opening up enrollment and if she was going to be coming back, then I wanted to leave it open for [redacted] to return. Sierra stated that they had both been sick so she had just kept her home but, yes, she would be back.
Q Let me stop you there. Why are you, after the trip to the hospital, inquiring about whether [redacted] is coming back to your classroom?
A Because I wanted to know if she was okay.
Q Sierra tells you that they had just been sick and she's coming back?
A Yes.
Q Tell me the next interaction that you have.
A With [redacted]?
Q Yes.
A On June 6th, when I walk into the day care center, into the classroom, and [redacted] is there and she runs to me. I dropped everything, and just knelt down

and just hugged her.

Q Did [redacted] stay in your class on June 6th of 2017?

A Yes.

Q What sort of things did you all do that day?

A Oh my God, I can't recall. I think I just gave her lots of candy. But, yeah, it was just like a typical day. I mean, all the kids were happy to see her. And it was a typical day. She didn't act strange or anything.

I examined her from head to toe. I did; I examined her from head to toe, and it was a typical day. She was just back.

Q You say you examined her from head to toe; why?

A Just to make sure she was safe.

Q After that time when she comes back, you hug her, you give her lots of candy, when is the next time you see [redacted]?

A At the funeral home at the church when she was laying in the casket.

Q After June of 2017, does [redacted] ever return to Harbor Crest Day Care?

A No.

Q After you contact the police, got Children and Family Services involved, gone to the hospital, you only see [redacted] one more time?

A Yes.

Q And then her mom does not bring her back to the day care?

A No.

Q Does Sierra call with any explanation --

A No.

Q -- about why [redacted] did not return to the day care?

A No.

Q So after you report, as you're required to do, what's going on with [redacted] you don't have an opportunity to see her after June of 2017?

A No.

MS. JORDAN: Thank you. One moment, please, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. JORDAN: Nothing further at this time, your Honor.

THE COURT: Cross?

MR. MAREIN: One moment, Judge.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MR. SHAUGHNESSY: No questions.

Judge.

THE COURT: Ms. Longino?

CROSS-EXAMINATION OF MICHELLE MARSHALL

BY MS. LONGINO:

Q Ms. Marshall, did you continue to work at Harbor Crest after June 6th?
A Yes.
Q So you're saying it was -- [redacted] last day in day care was June 6th of 2017?
A Yes.
Q Now, when the children are at day care, first of all, what time of the day was [redacted] brought to the day care?
A It could be early. It varied, but mostly before breakfast, I would say, or during breakfast.
Q Okay. So in the day care, you all typically feed the children? What meals do you feed them?
A Breakfast, a snack, and lunch. And if they stayed after that, they would have a p.m. snack.
Q If they stayed after until what time?
A Until six. We opened at six in the morning, closed at six p.m.
Q Okay. So when the children are brought to day care, you make sure they eat properly?
A Correct.

Q All right. Now, during the time -- when did you -- when would you say [redacted] started coming to the day care?

A She was already attending when I started in March.

Q Okay. You started in March of 2017?

A Yes.

Q Okay. So from the -- from March of 2017 to June of 2017, when you observed all these injuries to this child and you had these conversations with her, did she ever say to you: Deonte, or Noodles, hurt me?

A No.

Q Did she ever say: Deonte, or Noodles, hit me?

A No.

Q And when you would go to any specific injury that you observed on this child, did she ever say Deonte, or Noodles, did it?

A No.

MS. LONGINO: Thank you.

THE COURT: You may step down. Thank you.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next

witness.

MS. JORDAN: State of Ohio calls officer Cory Screngi to the witness stand.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO, to further maintain the issues on its part to be maintained, called as a witness, CORY SCRENGI**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning. Make sure you speak directly into the microphone. You can adjust the microphone; the seat won't move.

You may inquire.

MR. KILBANE: Thank you, your Honor.

DIRECT EXAMINATION OF CORY SCRENGI

BY MR. KILBANE:

Q Can you state your full name and spell your last name for the court reporter.

A Cory Screngi, S-C-R-E-N-G-I.
Q Are you employed, sir?
A Yes.
Q Where are you employed?
A City of Euclid Police Department.
Q What do you do for the City of Euclid Police Department?
A Patrol officer.
Q How long have you been a patrol officer for the City of Euclid?
A Eight years.
Q What do you do as a patrol officer?
A Answer basic radio calls, traffic enforcement.
Q Do you have any prior law enforcement experience before you started at the City of Euclid?
A No.
Q And did you receive any training and certifications in order to become a police officer?
A Yes, I went to the basic police academy.
Q When was that?
A 2010.
Q Sir, I want to direct your attention to May 18th of 2017. Do you recall that day?
A Yes.
Q And were you working on that day?

A I was.

Q Were you dispatched to the Harbor Crest Day Care Center in Euclid, Ohio, on that date?

A Yes.

Q And what was the nature of the call?

A A worker from the day care was reporting a child abuse incident.

Q When you arrived at the day care center, what happened?

A When I arrived, there was a Euclid fire department paramedic already on scene attending to the child. I identified the child as [redacted]. My observations at point was she had dried blood in one of her ears, her nose was mostly covered in scabs, and she had abrasions to the top of her head, between her braids.

Q Did you attempt to speak with [redacted]?

A I did, but she wouldn't speak with me; she was shy.

Q Did you notice anything else about her demeanor on that day?

A She was just scared and really reserved, really didn't want to talk to anybody other than the staff at the day care.

Q And did [redacted] eventually be transported to the hospital?

A Yes.
Q What hospital was that?
A Euclid Hospital.
Q After [redacted] was transported to the hospital, what do you do?
A I responded to the hospital as well, spoke with the hospital social worker. Cuyahoga County Children and Family Services were called and notified; they sent a social worker out to the hospital. And I also spoke further with -- or spoke with Sierra in the lobby of the hospital.
Q Okay. Before we get to the conversation you had with Sierra, did you speak with anyone at the day care center when you first arrived at the day care center?
A Yes, I spoke with the -- well, she identified herself as the owner of the day care.
Q Do you recall what her name was?
A I believe her first name was Tameka. I can't remember her last name.
Q And you had a conversation with Tameka?
A Yes.
Q And did you gather any evidence from the day care center?
A She provided me with, I believe, 14 copies of internal incident reports from the day care, documenting

various injuries that [redacted] has come into the day care with over a period of about two years.

Q Did you make copies of those observation reports?

A I did.

MR. KILBANE: May I approach, your Honor?

THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

BY MR. KILBANE:

Q Officer, I have handed you what's been marked as State's Exhibits 801 to 815. Can you take a minute and let me know if you recognize those documents?

A I do.

Q And what are those documents, sir?

A These are their internal incident reports from the day care. It's their policy to make such a report if a child comes in with an injury.

Q Okay. And I want to turn your attention to State's Exhibit 801. Can you read for the ladies and gentlemen of the jury the top of the page on State's Exhibit --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

Let's go to side bar just real quick.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

BY MR. KILBANE:

Q Officer, can you tell us who you received those documents from, 801 through 815?

A I received these from Tameka, the director of the day care.

Q Okay. And 801 through 815, do those all pertain to a child by the name of [redacted] or [redacted]?

A Yes.

Q Can you briefly go through 801 through 815 and tell us the date of each incident?

A 801 occurred on September 17th, 2015. 803 occurred on 10-22-2015. 804 occurred on 12-27-2016. 805 occurred on 1-18-2017. 807 occurred on March 4th, 2017. 806 is dated February 10th, 2017. 808 is dated 5-15-2017. 809 is dated 5-18-2017. 810 is dated 9-21-2016. 811 is dated 9-12-2016. 812 is dated 10-25-2016. 813 is dated 12-1-2016. 814 is dated 12-2-2016. And 815 is dated 12-6-2016.

Q After you collected all these incident reports from Harbor Crest Day Care, did you speak with any of the other day care workers at the center?
A Yes. I can't remember her name. I think it was Michelle was the first name.
Q Did you take a statement from Michelle?
A I did.
Q Did you take a written statement from Tameka?
A I did.
Q After you collect all these observation reports concerning [redacted] and getting statements from day care workers, what do you do next?
A I respond to the hospital; spoke with hospital staff as well as Sierra and the county social worker.
Q When you get to the hospital, what's the first thing you do?
A I spoke with nursing staff to find out if they had finished the evaluation with [redacted] if there is any further injuries for me to document.
Q Okay. Then, did you have an opportunity to speak with a female by the name of Sierra Day?
A I did.
Q Is Sierra Day in the courtroom today?
A She is.
MR. SHAUGHNESSY: We'll

stipulate that this officer can identify Ms. Day.

MR. KILBANE: Thank you, counsel.

THE COURT: Very good.

BY MR. KILBANE:

Q What did Sierra Day tell you?

A I first spoke with her at the day care. She had responded after [redacted] had left in the ambulance. At that point, she had suggested that the day care caused the injuries.

I had asked her if anyone else was with the child recently before that day. She stated that her great-granddaddy had watched her the night before until about 11 p.m. I asked her to identify the great-granddaddy and she identified him as a Michael Laird but she was unable to give me any further contact information for him such as address or phone number. She could only tell me that he resided on the west side.

She then told me that he's not really the great-granddaddy. He's just the father of one of her friends. She had identified the friend but also couldn't provide me with any further contact information for that friend.

Later I performed searches through databases for further information on those two individuals; I was

unable to locate anything.

Q Okay. What databases did you use to search for these individuals?

A I used our internal databases in the department as well as the LEEDS system.

Q And the two names she provided you, you were not able to find any information on those individuals?

A Correct.

Q Did you ever ask her specifically about the apparent injuries to [redacted]?

A Yes, but she just denied there being any abuse at home.

Q Did you ask her if she ever observed any blood in the child's ear?

A I did. She stated that when she had dropped off [redacted] that morning she did not notice any injuries to her.

Q And this conversation that you just testified to with Sierra Day, that occurred at the day care center?

A Correct.

Q And you eventually go to the hospital; correct?

A Yes.

Q And what do you do when you get to the hospital?

A After speaking with the staff and social workers, I spoke again with Sierra in the waiting room of the

emergency department.

Q And did you speak with Sierra again?

A Yes.

Q What did she tell you?

A She again suggested that the day care caused the injuries. She had stated that in the past, [redacted] had indicated to her that day care workers hit her but she didn't take it as credible because she stated that [redacted] lies.

Q After you spoke with Sierra Day at the hospital, what did you do next?

A I photographed [redacted] injuries.

Q So you observed the child at the hospital?

A I did.

Q What observations did you make of [redacted] at the hospital?

A She seemed a little calmer. She was talking with social workers.

Q Okay. And you took photographs of [redacted] injuries?

A Yes.

Q If you were to see them, would you recognize them?

A Yes.

Q Officer, I'm showing you what's been marked as State's Exhibit 601. Do you recognize this photograph?

A Yes.
Q Did you take this photograph?
A Yes.
Q What does it show?
A It shows the right ear of [redacted]
Q Any observations to her right ear?
A Looks like there's dried blood inside the canal.
Q State's Exhibit 602?
A Yes.
Q Do you recognize this picture?
A Yes.
Q Did you take this photograph?
A I did.
Q What do you observe here?
A Lots more dried blood in that ear.
Q Is that the same ear as you observed in State's Exhibit 601?
A No -- I'm not sure, actually. Yes, yes, it is.
Q State's Exhibit 603?
A Yes.
Q Did you take this photograph?
A I did.
Q What does it show?
A It shows the top of [redacted] head, her scalp, between her braids.

Q What do you see between her braids?
A A bunch of abrasions, some dried blood.
Q 604?
A Yes, I took that photo.
Q What does it show?
A It shows [redacted] face, more importantly her nose that had scabs covering the majority of it.
Q State's Exhibit 605?
A Just an overall profile of [redacted]
Q And 606?
A Just another profile picture of [redacted]
Q Are all these photographs fair and accurate depictions of how you saw [redacted] in the hospital on May 18th of 2017?
A Yes.
Q After you take photographs of the child, what do you do next?
A I collected all statements and paperwork, and I completed an incident report.
Q The observation forms that you received --
A Yes.
Q -- from the day care center, did you do anything with those observation forms?
A I attached them to my report as well as made copies for the county social worker.

Q Do you recall who the social worker was that you provided those observation forms to?
A I don't remember her name.
Q Does the social worker work with the Cuyahoga County Department of Children and Family Services?
A Yes.
Q And she was at the hospital that day?
A Yes.
Q Officer, you earlier testified that Sierra Day indicated that she did not observe any injuries on [redacted] when she dropped her off at the day care on May 18th; is that correct?
A Yes.
Q Did you ask her about the abrasions on her nose?
A No.
Q Okay. Did Sierra Day mention anything about the abrasions on [redacted] nose?
A No.

MR. KILBANE: Could I have one moment, your Honor?

THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MR. KILBANE: No further

questions, your Honor.

THE COURT: Cross?

MR. SHAUGHNESSY: No questions, Judge.

THE COURT: Ms. Longino?

MS. LONGINO: No questions, your Honor.

THE COURT: Thank you. You may step down.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness, please.

MS. FARAGLIA: The State would call Michelle Moyer, your Honor.

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **MICHELLE MOYER**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

DIRECT EXAMINATION OF MICHELLE MOYER

BY MS. JORDAN:

Q Good morning, ma'am. Could you please state and spell your full name for the record?
A Michelle Moyer, M-O-Y-E-R.
Q Ma'am, are you employed?
A Yes.
Q Where are you employed at?
A Cleveland Clinic Foundation, emergency medicine services.
Q Okay. And which location are you employed at?
A Euclid Hospital emergency department.
Q And how long -- in what capacity are you employed there?
A Physician assistant.
Q And how long have you been a physician assistant?
A Approximately 22, 23 years.
Q And how much time has been spent at Cleveland Clinic in that capacity?
A At that hospital over 20 years.

Q Okay. And what sort of training and experience do you have as a physician assistant?

A I have an Associate's Degree in physician assisting and a Master's degree also in physician assisting.

Q All right. Turning your attention to May 18 of 2018 -- I'm sorry, May 17th of 2018, were you employed that day?

A Yes.

Q Where were you employed at?

A Euclid Hospital emergency department.

Q Did you have occasion to interact with a patient by the name of [redacted]?

A I did.

Q How did [redacted] first come to your attention?

A She was brought by a day care worker.

Q When you first walked into the hospital room with [redacted] and the day care worker, what were your general observations?

A A small child on a bed, and a concerned day care worker that spoke to me directly.

Q Was there anything unusual from your years in training and experience about a day care worker being present as opposed to a parent?

A Yes, because typically the parent comes with the

child immediately, even from a day care setting. Because the child didn't outwardly appear injured at first, it was -- it wasn't an urgent situation where she had a broken arm or something. It was more of a concern of the day care worker that she was brought.

Q Tell me the first steps you take in terms of your examination and treatment of [redacted].

A Every child, and [redacted] was undressed fully in the presence of myself and the nurse who was also at the bedside with me, and we do a head-to-toe exam of her, and every child, including constitutional symptom -- constitutional appearance, how she's acting, her physical outward appearance, heart, lungs, skin, abdomen; a complete physical exam.

Q And what is the purpose of the physical examination being completed?

A To determine the health of the child.

Q Okay.

A And the physical status.

Q What did you observe from your physical examination of [redacted]?

A She was well appearing. She did not appear distressed, although timid, but she was three years old and that's appropriate for her age. She had no gross physical abnormalities, but there were findings of an

older abrasion across her nose, some blood around one of her ears, and I think a scrape -- yes, a scrape on her scalp.

Q When you say no gross physical abnormalities, what does that mean?

A Her arms and legs were all pointed in the right direction and moving appropriately and didn't look abnormal.

Q Okay.

A Not deformed in any way.

Q So what injuries, if any, did you observe?

A The abrasion across the nose which appeared to be healing, so it was of an indeterminate age. A scalp abrasion and some blood around one of her ears.

Q Okay. Were all these findings and observations documented in a report?

A Yes, they're in the medical record -- my medical record.

Q Are your medical records kept in the ordinary course of business?

A Yes.

Q Would seeing those medical records refresh your recollection as to which ear the blood -- the injury -- the blood was found in?

A Yes.

MS. JORDAN: May I approach, your Honor?

THE COURT: You may.

MS. JORDAN: 901.

THE COURT: I'm sorry?

MS. JORDAN: 901.

BY MS. JORDAN:

Q Ma'am, I'm handing you what has been marked for identification purposes as State's Exhibit 901. Could you take a moment to review that item, please.

A I don't have my glasses with me.

Q Where are your glasses?

A They're out in the waiting room.

Q Okay. We're going to go retrieve your glasses. Sorry, ma'am.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

BY MS. JORDAN:

Q Ma'am, the medical records depict that the blood was in her right ear, would that be accurate?

A I can see the drawing and that's probably accurate.

Q Okay.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE WITNESS: Got it.

BY MS. JORDAN:

Q All right.
A It's in the right ear.
Q Why are these drawings and the location of the injuries documented within the medical records?
A To help refresh your memory and to document the locations.
Q Okay. After reviewing State's Exhibit 901, do you recall which ear now the blood was seen in?
A Yes, it was the right ear.
Q Okay. What, if anything, was unusual or was there anything unusual about the scraping to [redacted] nose, the blood in the right ear, and the abrasions on her scalp?
A It would be a combination of things that make these injuries unusual for a three-year-old.
Q Okay. Based on your 25 years of training and experience, what were the combination of things that made this unusual?
A Three-year-olds don't typically get abrasions across the bridge of their nose, because they don't have things across the bridge of their nose. It comes from striking it on something. They usually fall on their

face and have a cut on their forehead or a bump on their chin, but not across their nose, or on the side of their head because they typically fall straight forward or backwards unless they're struck with something from an object.

Q Based on your observations of [redacted] what did you do next?

A Completed the physical exam and completed an interview with the day care worker who had brought her in there.

Q Why did you complete an interview with the day care worker that had brought [redacted] in?

A The day care worker's initial concern was possible abuse of the patient. The patient had reported to the day care worker that it was her mother who inflicted injury to her.

Q What did you do with that information which you received?

A I conferred with my nurse, in private outside, and also with the social worker who was on duty in the emergency room and KIDS was contacted.

Q You mentioned you had a nurse there that day, who was the nurse there with you?

A Matt -- I don't know Matt's last name.

Q Why did you confer prior to contacting 696-KIDS?

A Well, he did the examination with me and it's just good medical practice to confer with my team about, first of all, my plan, because ultimately I'm in charge of the patient.
Q Okay. And you mentioned that 696 was contacted. Is that the number that you called to report --
A Yes. It's Children and Family Services. We call it KIDS in the ER.
Q Understood. Did you in fact make that report to Children and Family Services?
A I did not directly; the social worker did.
Q Okay. And why was the social worker directed to make that report -- or was the social worker directed to make the report to Children and Family Services?
A I told her that I would, but she is the social worker and case manager in the emergency department, and as part of her job she took over that duty.
Q Why was it that you were willing to make the referral to Children and Family Services?
A It's my job not to just care for the physical well-being of the child but to be her advocate in every way and she had vocalized, the patient, [redacted] had vocalized that she had been injured by her mother. So as her voice and her advocate, I determined that we needed to get the proper authorities involved to investigate it.

Q You're indicating that [redacted], the three-year-old, informed you --
A She did not inform me; she informed the day care worker.
Q And that is the information that you proceeded on?
A Yes.
Q After talking with your team and deciding a call would be placed to the Department of Children and Family Services, did you have any further interactions with Aniya?
A I did not.
Q Okay. Did you do anything else associated with this matter after you logged your reports into the medical records?
A I did not.
Q Are those medical records maintained in the ordinary course of business?
A Yes.
MS. JORDAN: One moment, please, your Honor.
THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. JORDAN: Nothing

further at this time, your Honor.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions, Judge.

THE COURT: Ms. Longino?

MS. LONGINO: No questions, your Honor.

THE COURT: You may step down. Thank you very much. Have a good day.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness, please.

MS. JORDAN: Matthew Lutz, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Please step forward. Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **MATTHEW LUTZ**, who, being first duly

sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good morning. Please be seated. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

DIRECT EXAMINATION OF MATTHEW LUTZ

BY MS. JORDAN:

Q Good morning, sir. Could you please state your name and spell your name for the record?

A My name is Matthew Lutz, L-U-T-Z.

Q Sir, are you employed?

A Yes, I am.

Q Where are you employed at?

A I work at Euclid Hospital for the Cleveland Clinic.

Q What is your job at Euclid Hospital?

A I'm a registered nurse in the emergency department.

Q How long have you been a registered nurse?

A I have been a nurse for four years.

Q What sort of training and experience do you have as a registered nurse, sir?

A I have a Bachelor's Degree in nursing. I have --

I'm -- I have ACLS training, BLS training, standard floor nursing requirements. I have a license to practice.

Q Has all your four years as a nurse been at Cleveland Clinic Euclid branch?

A Yes, all four years have been in the ER.

Q Turning your mention to May 18th of 2017, were you working on that day?

A Yes, I was.

Q And what was your responsibility or position on that day?

A I was a registered nurse.

Q And did you have occasion to come into contact with [redacted] on May 18th of 2017?

A Yes, I did.

Q And what time did [redacted] present to the emergency department?

A I don't know the exact time of day.

Q Did you complete a report or medical record entry in regard to your interaction with [redacted] an May 18th of 2017?

A Yes, I did.

Q Would seeing that report refresh your recollection as to the time that you interacted with [redacted]?

A Yes, it would.

MS. JORDAN: May I

approach, please, your Honor?

THE COURT: You may.

MS. JORDAN: 902.

BY MS. JORDAN:

Q I'm handing you what's been marked for identification purposes as State's Exhibit 902. Could you take a minute to review that, sir?

A It says [redacted] arrived in the ER at 12:27.

Q P.m. or a.m.?

A P.m.

Q And what was [redacted] weight on that date?

A 32 pounds 12.8 ounces.

Q And did you obtain [redacted] initial vitals, like height, weight?

A Yes, I did.

Q And what were the first things you observed about [redacted] in terms of your evaluation?

A Initially she was very timid. She presented with abrasion to her nose. Also on assessment she had dried blood to her ears and a scratch to the back of her head, abrasions to her head.

Q Were you working with anyone else during your interaction with [redacted]?

A Yes, I was working with PA Michelle Moyer.

Q Okay.

A As well as a social worker.

Q Who brought [redacted] into the emergency department?

A [redacted] was brought in by Euclid EMS accompanied by a worker from the day care.

Q Okay. Were either of [redacted] parents present with her when you first encountered her in the emergency room?

A No.

Q Just the day care worker; correct?

A Correct.

Q Based on your years being a nurse, is it typical for a child to come into the ER with those type of injuries without a parent?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: No.

BY MS. JORDAN:

Q What about that is unusual, not typical?

A Every time that a minor has to come into the emergency room, we have to get contact information to treat from the parent, whether they're at school or, you know, at home, we contact the parents before any kind of treatment is done.

Q What were your initial interactions with [redacted] when she was at the emergency?

A First I did a normal triage on her, went over any kind of allergies, you know, does she have -- is she safe at home; we have standardized questions that we ask. And then after I did that, I write a triage note as to why she got here, and then we would go and do our assessment, and things like that.

Q What were your general observations about [redacted] demeanor?

A She was very passive and timid initially, kind of reminded me of like a scared animal, you know, very close to the worker, you know, didn't look you in the eyes, just very soft spoken and really wasn't answering anything that I was trying to say. I think she was a little scared and timid definitely.

Q Okay. Did you continue to interact with [redacted]?

A I did.

Q What were the next steps you took in your treatment or evaluation of [redacted]

A After we got the care team together, including me, the PA and social worker, we went in again and reinterviewed her. And she eventually did warm up and, you know, would leave the side of the worker and became a little more comfortable with us in the situation.

Q Okay. What, if any, information did [redacted] provide you in regards to her injuries?

A During the evaluation with me, the PA and social worker, when asked what happened to her she head, she said that: Mommy, Mommy hit me.

Q What did you do after [redacted] reported to you that "mommy hit me," in reference to her head?

A That is when we as a team decided it was time to call 696-KIDS and get protective services involved.

Q When you say 696-KIDS, are you referring to the Cuyahoga County Department of Children and Family Services?

A I am.

Q Okay. Who placed the call to the Department of Children and Family Services?

A That was done initially by our social worker.

Q Okay.

A In the ER.

Q Why was the decision made to report [redacted] visit to the emergency room on that day to Children and Family Services?

A Me personally, any kind of slight inkling of any kind of abuse warrants a call to the state to be as best a patient advocate as I can as a nurse.

Q After you completed that assessment and made the determination to contact the Cuyahoga County Department of Children and Family Services, did you have any further

involvement with [redacted]?

A I took care of her up until her discharge, yes.

Q How long did [redacted] stay at the hospital?

A [redacted] was discharged that day at 5:15 p.m., so she was there roughly about five hours.

MS. JORDAN: One moment, please, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. JORDAN: Nothing further at this time, your Honor.

THE COURT: Cross?

MR. SHAUGHNESSY: No questions for this witness, Judge.

THE COURT: Ms. Longino?

MS. LONGINO: No questions for this witness, your Honor.

THE COURT: You may step down. Thank you very much.

THE WITNESS: Thank you.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MR. KILBANE: State of Ohio calls Officer Anthony Malone to the witness stand.

\- - - o0o - - -

(Off the record.)

\- - - o0o - - -

THE COURT: Raise your right hand, please.

\- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **ANTHONY MALONE**, who, being first duly sworn, was examined and testified as follows:

\- - - o0o - - -

THE COURT: Good morning.

THE WITNESS: Good morning.

THE COURT: Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

THE WITNESS: Yes, sir.

THE COURT: You may inquire.

MR. KILBANE: Thank you, your Honor.

DIRECT EXAMINATION OF ANTHONY MALONE

BY MR. KILBANE:

Q Good morning, Officer.

A Good morning.

Q Can you please state your name and spell the last name for the court reporter.

A Anthony Malone, M-A-L-O-N-E.

Q Are you employed, sir?

A Yes.

Q Where are you employed?

A Euclid police department.

Q And what do you do with the Euclid police department?

A I'm a patrol officer.

Q And how long have you been a patrol officer?

A About nine years.

Q All with the City of Euclid?

A No.

Q Who else have you been a police officer for?

A East Cleveland.

Q How long were you a police officer in East Cleveland?

A About six years.

Q What do you do as a patrol officer with the City of Euclid?

A Excuse me?
Q What do you do as a patrol officer with the City of Euclid?
A Respond to calls, patrol.
Q And do you have any training and/or certifications that qualify you to become a police officer?
A Yes.
Q What is that?
A The Ohio peace officer training.
Q Okay. When did you do the Ohio peace officer training?
A About ten -- nine years ago.
Q I want to turn your attention to February 21st of 2018. Were you working that day?
A Yes.
Q And do you recall responding to an incident at 22701 Lakeshore Boulevard or Cultural Gardens?
A Yes.
Q What was the nature of the call?
A Theft, report of a theft.
Q Who was the complaining witness?
A Sierra Day.
Q When you responded to Cultural Gardens, did you speak to Sierra Day?
A Yes.

Q Is Sierra Day in the courtroom?
A Yes.
Q Can you point to her and describe --
MR. SHAUGHNESSY: We'll stipulate this officer can identify Ms. Day.
THE COURT: So noted.
BY MR. KILBANE:
Q You said you responded to a theft?
A Yes.
Q What were the items that were subject of the theft complaint?
A A laptop computer and a tablet.
Q All right. And after you spoke with Sierra Day, did you have an identified suspect as to who took the laptop or tablet?
A Yes.
Q Who was that?
A Her boyfriend or ex-boyfriend, Deonte.
Q When you went to Cultural Gardens on that day, was Deonte there?
A No.
Q Was any male there?
A No.
Q When you spoke with Sierra Day at Cultural Gardens on February 21st, did you see any children in the

apartment?
A No.
Q Did you see any evidence that a child even lived there?
A I did not.
Q You didn't see any toys?
A No.
Q Did you interview Sierra Day inside of her apartment?
A Yes.
Q Did you go inside any bedrooms?
A No, I did not.
Q Did you see if there were any bedrooms?
A Yes.
Q And was the door open or closed?
A The one was closed.
Q So you saw one bedroom that was closed?
A Yes.
Q Did you have any other involvement in that investigation for February 21st of 2018?
A No.
Q Now, I want to turn your attention to March 8th of 2018. Did you have an opportunity to respond to Harbor Crest Apartments on that day?
A Yes.

Q And what was the nature of that call?
A It was a disturbance; two parties were at the leasing office causing a disturbance.
Q And do you know who those parties were?
MR. SHAUGHNESSY: Objection.
THE COURT: Overruled. Go ahead.
BY MR. KILBANE:
Q Do you know who those parties were?
A Yes.
Q And who were they?
A Sierra Day and Deonte Lewis.
Q When you respond to Harbor Crest Apartments, who do you speak with, if anyone?
A The leasing manager, Ms. Storm.
Q Was Sierra Day and/or Deonte Lewis on the scene when you responded?
A No.
Q Did you eventually have an interaction with Sierra Day and Deonte Lewis?
A Yes.
Q On that same day?
A Yes.
Q Tell us about that.
A I was leaving the apartment leasing office, I was

no longer needed, police were not needed. The initial call said that the parties called in a disturbance, one was wearing pink clothing. I was leaving the apartment complex and saw a female with pink clothing across the street coming from a gas station, Shell gas station, stopped and pulled next to the two individuals and spoke to them, and they said they were leaving and that they had been at the leasing office.

Q And did you speak with a male?

A Yes.

Q And did you get the male's name?

A Yes.

Q What was his name?

A Deonte Lewis.

Q Is he in the courtroom today?

A Yes.

Q Can you point to him and describe what he's wearing?

A He's wearing an orange vest --

MS. LONGINO: Your Honor, we'll stipulate that this officer can identify Deonte.

THE COURT: So noted.

BY MR. KILBANE:

Q Do you recall what time this was at?

A It was in the morning.
Q What was your shift that day, do you recall?
A Seven a.m. to three p.m.
Q So this happened sometime in the morning?
A Yes.
Q Was there a child with them?
A No.
Q Do you know what the dispute was over at Harbor Crest apartments?
A It was a mailbox key.

MR. KILBANE: Could I have one moment, your Honor?

THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MR. KILBANE: No further questions, your Honor.

THE COURT: Cross?

MR. SHAUGHNESSY: Judge, no questions on that. Thank you.

THE COURT: Ms. Longino?

MS. LONGINO: Yes, your Honor.

CROSS-EXAMINATION OF ANTHONY MALONE

BY MS. LONGINO:

Q Officer, was there any follow-up on this complaint about a stolen laptop?

A Not other than me contacting the possible suspect which is Mr. Lewis.

Q Okay. And Mr. Lewis denied stealing the laptop at the time?

A I never made contact with him. I left a few messages on his voice mail, never got contact.

Q There was no formal charges, no follow-up; nothing?

A No.

Q Just her saying he stole her computer?

A Yes.

Q Okay.

MS. LONGINO: Thank you.

MR. KILBANE: Nothing on that, your Honor. Thank you.

THE COURT: You may step down. Thank you.

MR. KILBANE: Could we approach, your Honor?

THE COURT: Yes, you may.

- - - o0o - - -

(Thereupon, a discussion was had between

the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Ladies and gentlemen, we're going to recess for lunch. The next witness will be a little more lengthy. Please do not discuss this case.

I'd ask you to report to the fourth floor at five to one.

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

- - - o0o - - -

(The lunch recess was had.)

- - - o0o - - -

MONDAY AFTERNOON SESSION

MARCH 4, 2018

PROCEEDINGS

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated. Good afternoon.

THE JURY: Good afternoon.

THE COURT: Call your next witness, please.

MS. FARAGLIA: Thank you, your Honor. The State calls Chelsea Lilly.

THE COURT: Step forward. Please raise your right hand.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **CHELSEA LILLY**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good afternoon. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MS. FARAGLIA: Thank you, your Honor.

DIRECT EXAMINATION OF CHELSEA LILLY

BY MS. FARAGLIA:

Q Good afternoon, Ms. Lilly.
A Good afternoon.

THE COURT: Speak into the microphone.

Q Like the judge said, the chair doesn't move, you can get closer to the microphone.

Please state your name, spelling your first and last name for the court reporter.
A Chelsea Lilly, L-I-L-L-Y.
Q And Ms. Lilly, by whom are you employed?
A Cuyahoga County Division of Children and Family Services.
Q How long have you so been employed by them?
A Three years.
Q All right. And what kind of undergraduate work

did you do in order for you to maintain your position?
A I have a Bachelor's in law, prelaw, and forensic science.
Q What university did you go to, ma'am?
A Purdue University.
Q All right. When were you hired into Children and Family Services?
A In September of 2016.
Q And what position were you hired into?
A I was hired as a Social Worker 3, child protection specialist.
Q All right. Can you tell me what kind of training you obtained initially before you got your case load? How does it work at Children and Family Services?
A We go through a two- to three-month training. It ranges doing all aspects of child welfare. We learn about the different -- we learn about the different varieties of child abuse. We learn about case planning, family assessments, safety assessments.
We learn about the legal aspects, what our supportive services are, what we can offer families. We also shadow during our training process. And then we eventually go into a transition process where we begin to get our own caseloads.
Q All right. Let's talk about a shadowing process.

What do you mean by that?
A We get assigned to a seasoned worker and we shadow them, whether it's for a day to two to three days.
Q And with regard to, you've indicated this type of abuse -- these things that you are trained in, how long does that process take?
A Ummm --
Q The training, your initial training.
A Initial training in regard to each aspect?
Q Yes.
A It can range anywhere from two to three days or sometimes a week or two.
Q All right. And how many modules do you go through?
A Eight.
Q After you've completed your eight modules that you've just spoken about, what is the transition unit?
A The transition unit is that we are assigned to one of three units under three seasoned supervisors. Like I said, we get -- we get our own caseloads; they're very small, usually under five.
Q All right. This transition unit, which particular units could you be assigned to if you're put into the transition unit?
A Well, you don't get assigned directly to a unit

right away, but you can be put in short-term investigation or our extended services unit.

Q I'm sorry. I didn't hear the last part.

A Our extended services unit.

Q Okay. What is extended services unit?

A Extended services is after a case is deemed ready to be transferred, the family is either court-involved or deemed needed more service, they would be transferred to a worker that would work with the family longer term.

Q And during this transition, are you also involved with any specific cases?

A (No response.)

Q Once you go into the transition unit, do you start obtaining your own cases?

A Yes.

Q Okay. How are they assigned to you?

A They're assigned randomly when they get called into the hotline. When it's your unit, your supervisor's turn, they will get assigned to you by their discretion.

Q Okay. And just, Ms. Lilly, just so we can understand, just generically speaking, we're not going to talk about this case yet, but just say you're in this new position now and there is an initial call or a referent, what do you do?

A Whenever we receive our original intake, our

original referral, we place a call to the referent, if they decide to leave their information, to follow up and get further information in regard to any concerns that they have that may have been left out.

Q All right. And referents, are they the mandatory reporters or people that may call in anonymously to your agency?

A There are mandated reporters but they can also be called in anonymously where they are to remain confidential.

Q All right. Once you obtain a referral, what do you do initially, generally speaking, ma'am?

A Generally speaking, we follow up with the referent if they leave their information, and then we have a certain time period where we are to dispatch and make contact with the family, whether it is within an hour's time period or 24-hour time period.

Q All right. Can you tell me about, are those two particular categories or priorities that calls are categorized in?

A Yes. The hour-time period is a priority 1 which means it's an emergency referral, and the category 2 is the 24-hour mandate.

Q All right. And what do you have to do within the 24-hour mandate?

A We follow up with the referent and we attempt to make contact with the family; we go out to their home unannounced. If that is unsuccessful, we also try to make a phone call to the family. If that is unsuccessful, we continue to go out to the home daily until face-to-face contact is made.
Q All right. And in addition to that then, what's your next process? What do you do next?
A We attempt to engage the family. If we have successful contact with the family, we meet with them, we discuss the allegations of the referral. We speak with all individuals in the home, whether it's adults or children, individually. If there are -- we gather collateral contact information as well, which would be schools, day care, hospitals, relatives, friends of the family.
And then we, if we see immediate concerns in the home, that's when we would contact our supervisor, discuss those concerns, but if we -- we would also speak with the family if there were immediate needs that we felt needed services. We would speak with the family about various services that we can offer them and go from there.
Q And what kind of other services could you offer these families?
A It depends on the situation. We can offer

in-family counseling if there happens to be parenting conflict in the home; if the family is going through a divorce situation. We can also offer intense counseling such as MST, and Tapestry service which focuses on the child but also helps the parents, helps guide the parent in their parenting practice.

We also offer early childhood mental health Help Me Grow services. We offer a wide range.

Q All right. And just generally speaking, after you've done all that, ma'am, and you still have some concerns, do you have a staffing?

A Yes. We have -- we speak with our supervisor about the concerns. We decide to go forward and have a staffing.

Q Okay. Can you explain to us, what is a staffing?

A A staffing is when the agency still has concerns or there are immediate concerns regarding the family. If there are still concerns and we go forward with the staffing, there is a wide range of options that we can introduce to the family.

Q And who participates in the staffing, ma'am?

A Myself, my supervisor; the facilitator, who is just an unbiased person, a third party who kind of dictates the staffing. Sometimes their supervisor participates. And then you will invite the mother, the

father, and then any of their relatives, any of their support systems.

Q And are there occasions where you don't have any concerns but that you still put some services into the home?

A Yes.

Q Can you explain that to us?

A Yes. When that occurs, that's usually designated for short-term services which can range anywhere from 45 days to a three-month time period, and that's when we would make sure that the family is engaging in services, whether it's counseling or if they need to complete an AOD, which is an alcohol and drug assessment. If there is recommendations, we make sure they're compliant with that.

Q And Ms. Lilly, were you gainfully employed at the Department of Children and Family Services back in February, February 14th, 2017?

A Yes.

Q And how long had you worked for Children and Family Services at that point?

A Six months.

Q Okay. And what was your -- what position were you in at the agency after the six months?

A I was a Social Worker 3, short term service

investigator.
Q Were you getting your own referrals?
A Yes.
Q Okay. And back on February 14th, 2017, did you become involved in an emergency referral with regard to an [redacted]?
A Yes.
Q Could you please tell us how you became involved and what you initially did?
A We became involved, we received an emergency referral on February 14th, 2017, regarding [redacted]. There were concerns that [redacted] had bruising under her left eye. And when we received that referral, we followed up with the reporter, gathered other collateral information, and in the end dispatched immediately to where she was, which was Harbor Crest Day Care.
Q When you say we dispatched, who went out to Harbor Crest Day care?
A Myself.
Q Okay. And did you go there by yourself or with somebody else?
A Myself.
Q Okay. When you arrived, what did you initially do?
A When I arrived, I initially spoke with the center

director who reported her --
Q You can't tell me what the director told you.
A Okay.
Q As a result of the information that the director provided to you, what did you do -- what steps did you take?
A I requested to meet with [redacted]
Q And did you meet with her?
A Yes.
Q Okay. Where did you meet with her?
A I met with her in a classroom, in an empty classroom with myself and the center director.
Q Okay. For the record, can you tell me, do you remember what the center director's name was?
A Ms. Dawson.
Q When you and Ms. Dawson met with [redacted] what was your purpose in meeting with [redacted], ma'am?
A To address her safety and to see if she needed medical attention.
Q Okay. What were your observations, and what did you do?
A My observations was that she did have a -- she did have bruising under her left eye and I did examine the rest of her body, but she had no other marks and bruises. I attempted to engage [redacted] in conversation to

see what happened.

Q And did you engage her in conversation?

A Yes.

Q Okay. And was [redacted] able to provide to you some information?

A Yes.

Q And what information did [redacted] provide to you?

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: [redacted] reported at first that her mother did it and then she reported that her father did it. [redacted] story was inconsistent.

BY MS. FARAGLIA:

Q Okay. So as a result of meeting with [redacted] what else did you do at the time?

A I placed a call to her mother. I reported that I needed to meet with her immediately, that we received emergency allegations regarding [redacted], and that she needed to come to the day care right away.

Q All right. Did you get through -- well, first of all, who did you contact?

A I contacted Sierra Day.

Q All right. Did she respond to your phone call?

A The first attempt, no. The second attempt, yes.
Q And did she come to the day care center?
A It took a few hours but she eventually got there.
Q Okay. Did you stay at the day care waiting for her there?
A Yes.
Q All right. Did you contact her father?
A Yes.
Q Were you able to contact her father?
A I did not get through. I left a voice mail; there was no response.
Q Okay. So approximately how long did you wait for Ms. Day to come to the day care?
A I got to the day care at 10:30 and I didn't meet with Ms. Day until 3:30, 3:45.
Q In the afternoon?
A Yes.
Q Okay. And where did you meet with Ms. Day?
A I met with Ms. Day at her home.
Q At her --
A At her home.
Q Okay. And where was her home at the time, Ms. Lilly?
A She was living at Harbor Crest Apartments.
Q Okay. And was [redacted] there with you, or did you

just meet with Ms. Day by herself?

A Ms. Day kept [redacted] at the day care.

Q I'm sorry?

A Ms. Day kept [redacted] at the day care. I met with Ms. Day by herself.

Q Okay. So when you went up to this apartment in Harbor Crest, were you able to go into -- inside the apartment?

A Yes.

Q All right. First of all, what were your observations of this apartment that you walked into, ma'am?

A The apartment was very clean. There was a lot of food in the home, all the utilities were working. [redacted] had her -- [redacted] had a lot of clothing, her own bed; all of her basic needs were being met.

Q All right. And is that something that you look at and consider when you are doing your assessment based on the reason why you went out there?

A Can you --

Q Yes. I'll rephrase.

You went out to the house. Now, you're at her house; correct?

A Yes.

Q You were called in; there was a referral made. Is

part and parcel of your investigation to do an assessment of where the child is living?
A Yes.
Q And the safety concerns with regard to this child?
A Yes.
Q All right. So when you say her needs were being met, is there like a mental checklist that you have to go through or actually a formal checklist that you have to mark off that there's enough food in the home?
A No. It's -- it's something that we're trained to do.
Q Okay. And so, with regard to the food, why is that necessary?
A To make sure that she has food to eat.
Q Okay. And safety concerns; what kinds of things are you looking at in the home?
A We're looking to see if there is any safety hazard such as exposed wires, black mold, cleaning supplies left out in her reach, there's no food in the home, the utilities aren't working.
Q All right. What about the bedroom; what did you notice about -- did she have a bedroom or did they share it?
A She had her own bedroom.
Q What did you notice in her bedroom?

A I noticed a lot of clothing, a lot of shoes. I did notice her own bed. I can't remember what else.

Q Okay. So did you and Ms. Day have a conversation about the incident that you were called out to investigate?

A Yes.

Q All right. What types of questions did you ask Ms. Day?

A I asked Ms. Day as how to how this incident could have occurred; who was supervising [redacted] when this incident occurred. I asked her, you know, just follow-up information, collaterals: Who watches [redacted], who helps supervise her, who her support systems are in regard to [redacted]

Q All right. Now, you've introduced something else here: Support system. What do you mean by that?

A We look at the family's support system to see, you know, we also use that to examine as collaterals to see if, you know, this child is being introduced to other people that could verify if they're being abused or neglected. So in regard to support systems, we're talking about community supports, family supports, friend supports.

Q All right. Now, during this conversation with Ms. Day, was she able to answer your questions?

A Yes.
Q And what information did Ms. Day share with you, Ms. Lilly?
A In --
Q In response to your question.
A In regard to the allegations, she reported when the incident occurred, [redacted] was at her maternal grandfather Eddie Day's home. She reported that she was being supervised by him and while she was in his care, she ran into the side of the table.
Q Okay. And was she able to provide you who her support system was, who she allowed to watch [redacted]
A Yes. She reported that she allows the maternal grandfather to watch [redacted] along with -- she reported that she was close with her pastor, Debbie, at the time.
Q Did she provide a last name for Debbie?
A No.
Q All right. Did you ask Ms. Day about [redacted] father?
A Yes.
Q And did she provide you any information with regard to [redacted] father?
A Yes. I attempted to engage her in conversation about Mr. Garrett. She reported that her and Mr. Garrett separated prior, three months before that. She reported

that she had no updated contact information for him and that the only way she was able to get hold of him was through Facebook.

Q All right. And when you are out and you are doing an assessment, do you also do a financial assessment and ask where funds are coming into the apartment?

A Yes.

Q And was she able to tell you where she was employed?

A Yes.

Q And where was she employed?

A To my knowledge, at that time she was employed at a dollar store of some sort.

Q Okay. And was she able to provide you other information? Was she receiving child support?

A Yes.

Q Did she tell you that?

A Yes.

Q She was receiving support from Mr. Garrett?

A Yes.

Q Was she receiving any other kind of income?

A She was receiving medical, food assistance, and I want to say SSI but I'm not positive.

Q Okay. Fair enough. When you say food assistance, what do you mean by that?

A Food stamps.
Q Okay. And is that also another necessary component for you when you're looking at doing your assessment?
A Yes, to see how they can financially provide and have the means to take care of their child.
Q All right. So you've now had this conversation with Ms. Day. Is there anything else that you discuss with Ms. Day with regard to this allegation?
A Yes. I discuss prior concerns that individuals at the day care had in regard to prior incidents that [redacted] has come in with.
Q All right. What did you talk to her about? What other incidents did you bring to her attention?
A The concerns that the day care expressed; [redacted] coming in with other marks, bruises.
Q And was she able to provide you some answers?
A She reported that most of them occurred when they were in the care of her grandfather or in the care of her sister or [redacted] aunt. She said that [redacted] aunt's two children, cousins, were very rough and played rough with her. She also reported at times [redacted] would go to day care and then she would come back with these marks.
Q All right. So now you are armed with all this information, Ms. Lilly. What is your next process in your

evaluation? What do you do next?
A We follow up with other collaterals, such as I spoke with the grandfather who collaborated the story that the incident happened while he was caring for [redacted], that she ran into a table.
Q When you say you spoke to the grandfather, what was his name again, please?
A Eddie Day.
Q So he corroborated that story?
A Yes.
Q Who else did you speak to?
A I spoke to various teachers within the day care, like I said, the day care director. And I also reached out for collateral information regarding the police departments and medical.
Q Okay. What do you mean the police department?
A Requested police reports, that's part of the investigation.
Q Okay. I'm sorry?
A That's part of the investigation.
Q Okay. And did you also meet with [redacted] and do anything else with [redacted] to memorialize your findings or what you had observed?
A What do you mean?
Q Did you take any picture of [redacted]

A Yes, I did.
Q Was it during this particular visit you took the photographs?
A Yes.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. FARAGLIA: Your Honor, may I approach?
THE COURT: You may.

BY MS. FARAGLIA:

Q State's Exhibits 101 to 104. Ms. Lilly, handing you what's been marked as State's Exhibits 101 to 104, take a moment. I'm sorry, it's 1001 to 1004. Do you recognize those, Ms. Lilly?
A Yes.
Q Did you take those photographs yourself?
A Yes.
Q Starting with State's Exhibit 1001, can you look at that photograph and tell me what that photograph is showing to us?
A That's a full head-shot of [redacted] face showing the bruising under her left eye.
Q State's Exhibit 1002?
A That is a picture to the right side of her face,

showing just darkness under her right eye. I was just concerned so I took that.

Q Okay. State's Exhibit 1003?

A That's a closer-up picture to the bruise under [redacted] left eye.

Q That's the reason why you were called in?

A Yes.

Q State's Exhibit 1004?

A Those were old -- those were old scarrings to [redacted] left check and upper neck area that I just followed through with taking pictures for documentation.

Q Did you notice those with your naked eye, ma'am?

A Yes.

Q All right. And as a basis for taking those photographs, did you share those photographs with somebody?

A Yes.

Q Who did you share those photographs with?

A My supervisor.

Q Okay. Why did you share them with your supervisor?

A As per follow-up protocol in regard to the referral.

Q Okay. So you took photographs, you talked with

some collateral folks, you talked with Grandpa. Did you meet with Grandpa?
A No.
Q Did you meet with Mr. Gay -- Mr. Garrett?
A No. I could not find him during the investigation.
Q All right. Now, when you say that you were at Harbor Crest, with regard to the clothing, what clothing did you notice?
A (No response.)
Q In the bedroom?
A Ms. Day's and [redacted]
Q Okay. And did you meet with any other relatives or friends of Ms. Day's with regard to your investigation?
A No.
Q All right. So, after you have conducted now your investigation, what's the next process with regard to this particular call that was made to the agency? What do you do, ma'am?
A We conducted the family assessment, which is an overall picture of any strengths, concerns that the family has. We had collateral information from all parties involved including outside parties, and we closed the case.
Q Okay. Did you find a need to put in any services

in this particular case?
A We referred Ms. Day to the community collaborative.
Q Tell me about that. What is the community collaborative?
A It is a neighborhood resource, completely volunteer services. They have access to anything within their neighborhood such as clothing banks, food banks, furniture banks, if needed, counseling resources, transportation resources, legal support, financial support.
Q And at the time back in I believe February 14th, 2017, was there anybody else involved with Ms. Day? Was she dating anybody? Would that have been important to you?
A That would have been important because that's someone else who would have been around [redacted] at the time, but to my knowledge, no, Ms. Day wasn't. She just recently separated with Mr. Garrett and that's part of the questions that we ask is who resides in the home and who has access to [redacted]
Q This family collaborative, why did you think it was important to provide her that information?
A We provide that information to all our families just because a lot of our families are not aware of the

services that can be offered within their community.

Q Ms. Lilly, once you concluded your investigation and assessment in this case, did you have any other involvement with this case?

A No, I did not.

Q Ms. Lilly, you indicated to us that it would be important to you as a caseworker, just in general, to find out if the mother or the father, depending on the situation, was dating somebody.

A Yes.

Q Why is that?

A We always check, we always do criminal background on all adults in the home along with any adults that have access to the child. We will do a sex offender registry list to make sure there is no access to sex offenders.

MS. FARAGLIA: Thank you. No further questions at this time.

THE COURT: Mr. Shaughnessy?

MR. SHAUGHNESSY: One minute, Judge.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MR. SHAUGHNESSY: No questions, Judge.

THE COURT: Ms. Longino?

MS. LONGINO: No questions, your Honor.

THE COURT: You may step down. Thank you.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MS. FARAGLIA: Your Honor, the State is going to call Mickhal Garrett.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **MICKHAL GARRETT**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: Make sure you speak into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MS. FARAGLIA: Thank you, your Honor.

DIRECT EXAMINATION OF MICKHAL GARRETT

BY MS. FARAGLIA:

Q Good afternoon, sir.
A Good afternoon.
Q Please state your name, spelling your first and last name for the court reporter.
A Yes. First name is Mickhal, last name is Garrett. Last name is spelled G-A-R-R-E-T-T.
Q Your first name, please?
A Mickhal, M-I-C-K-H-A-L.
Q Mickhal, what community do you reside in?
A I live in East Cleveland, Ohio.
Q Are you married?
A No, I'm not.
Q Do you have a significant other?
A Yes.
Q Her name is?

A Her name is Mia Coburn.
Q Do you have children?
A Yes, we do.
Q How many children do you have, sir?
A Well, I have two biological and two stepchildren.
Q Okay. And did you also have a daughter by the name of [redacted]?
A Yes, of course.
Q Mr. Garrett, are you gainfully employed, sir?
A Yes, I am.
Q What do you do for a living?
A Yes. I'm a parking enforcement officer, I work for the City of Cleveland.
Q How long have you been so employed?
A I've been present there working for the past eight months.
Q Prior to that, sir, where did you work?
A Prior to that I was a private security officer and I did security for Tower City for a company called Securitas.
Q And prior to that, were you trained with regard to you obtaining your certificate as a peace officer?
A I'm sorry? Can you repeat?
Q Prior to working at Tower City, did you take the time to obtain some type of certificate with regard to you

becoming a security officer?

A Yes.

Q When did you do that, sir?

A I did that in the year of 2017.

Q All right. And where did you do that at?

A Cuyahoga Community College is where I got my certificate for my Ohio Peace Officer Training Academy.

Q And prior to that, were you gainfully employed?

A Yes.

Q And where did you work? What kind of various employments have you had since 2013 when [redacted] was born?

A I've always been working. I've had multiple jobs. There were times where I was working two jobs. In the beginning, the first two years of [redacted] life, I was door security throughout those years primarily. And I always kept a steady work history. I was constantly working.

Q Did you work at various employments with regard to clothing shops, managerial positions at clothing shops?

A Yes, I was assistant manager also for Citi Trends clothing store.

Q And when did you meet Sierra Day?

A We met approximately 2012 in the summer, near her birthday.

Q Okay.

A Yes.
Q Okay. Sir, where did you go high school?
A I graduated out of Garfield Heights High School.
Q Where did Sierra go to high school?
A She was attending Shaw High School.
Q Approximately how long did you date?
A Approximately, before that, a year.
Q All right. And during that time, where were you residing?
A During that time I was living with a friend at the time in the very beginning, and then we moved on and got a place of our own.
Q When you were living with your friend, where was Sierra living?
A She was living with her parents.
Q Who're her parent?
A Her mother name is Natalie and her father name is Eddie.
Q To your knowledge, or in your interactions, does Sierra have brothers and sisters?
A Yes.
Q Who were the brothers and sisters, sir, that you are familiar with?
A I'm familiar with Erica Johnson. I'm familiar with Eric. I'm familiar with Isaiah. She has a number

of different sisters and brothers. I don't remember the rest.

Q Is it fair to say that she's got brothers and sisters that are older than her?

A Yes.

Q Who is younger than her? Are there any siblings that are younger than her?

A Her and her brother were the youngest.

Q And they're twins?

A Yes.

Q And that would be Isaiah?

A Correct.

Q Now, during your dating relationship, there comes a point in time that she becomes pregnant?

A Yes.

Q Okay. And when is your daughter born?

A Our daughter was born September 2nd, 2013.

Q All right. And once she was born, was she given your name?

A Yes.

Q Did you sign the birth certificate, sir?

A Yes, of course.

Q And where did you bring [redacted] back after being at the hospital?

A Oh, at the time, we were -- we went back to her

parents' home at that time.

Q Okay. And how long did you guys stay at her parents' home before the two of you moved out?

A It was almost a year.

Q All right. And how would you describe your relationship within that year? Now, you have a new baby, and so how is the new relationship starting on September 2nd, 2013, to, let's say, September of 2014, to [redacted] first birthday. Are you all living together?

A I was in the household quite often. I was working a lot. So any time I would get off work, I would go over to her parents' house to check on [redacted] and make sure everything was okay.

Q All right. And during this time, was your family involved with this child as well?

A As much as possible. I really don't have much family that lives here in Ohio, Cleveland, Ohio.

Q Okay. Where does your family reside, sir?

A Majority lives in Indianapolis, Indiana.

Q Would there be occasions where you would take [redacted] to visit with your family?

A Yes.

Q All right. And were you also financially supporting your daughter during this time?

A Yes.

Q Okay. Was [redacted] also receiving some type of benefits because she was just a little tike?

A Yes.

Q Okay. Was Sierra working at the time?

A Not at the time.

Q All right. Who was primarily responsible for [redacted] care during the first year of her life?

A We both were.

Q All right. And so does there come a point in time that Sierra moves out of her parents' home?

A Well, that didn't take place until we moved out together.

Q Okay. When was that?

A I was the primary, you know -- I was makin' the most money, you know, income, and that took place about a year after [redacted] was born.

Q So, let's just say we'll stick with September of 2014.

A Okay.

Q Where did you and Sierra move to with [redacted]

A We had moved to an apartment building owned by K&D in Euclid near 260th in Euclid.

Q Do you know what the name of the apartment building was?

A They change the name. I do not remember.

Q Was it Harbor Crest?
A No, it wasn't Harbor Crest.
Q Were you at the old Watergate or North Point?
A No, not North Point either.
Q Okay. Suffice it to say it was an apartment building?
A Yes.
Q Was it a complex or was it a side-by-side?
A Yes, it was a side-by-side, like three stories high apartment building.
Q Okay. And who lived in the apartment with you at the time?
A It was just me and her and [redacted]
Q Okay. And is Ms. Day in the courtroom today, Mr. Garrett?
A Yes.
Q Could you tell us just where she's sitting and --
MR. SHAUGHNESSY: We stipulate that he can identify her --
THE WITNESS: Yes, to the left of the courtroom.
THE COURT: So noted.
MS. FARAGLIA: Thank you, your Honor.

BY MS. FARAGLIA:

Q You moved into this apartment; who was responsible for paying for the upkeep of the apartment?

A I was primarily bringing in the most income in the home.

Q Was she working?

A At the time, no. But then she started working later on that year.

Q Okay. And when you say she started working later on that year, where was she working?

A Get Ready, Set, Grow day care.

Q When she was working at Get Ready, Set, Grow day care, who was taking care of [redacted]?

A When she was working at the day care, actually [redacted] was going to another day care that was across the street from the day care she worked at but I was always there; always there, you know, picking [redacted] up, dropping her off to day care, and I would pick her up after work.

Q Okay. And how long did that go on until you and Ms. Day decided to separate?

A That probably went on about probably about six months, seven months.

Q All right. So during this time that you were living now in your own apartment, did your family members come and visit?

A No -- well, yes, they did. They did come and visit. It's so sporadic, you know, the times were all comin' together but, yes, they did.
Q What about Sierra's family, would they come over and visit?
A Every now and again.
Q Okay.
A Every now --
Q Would you attend functions together? Birthday functions, dinner functions like dinner on a Sunday afternoon?
A Yes.
Q All right. Where would that take place?
A Sometimes can take place at her family's house for the most part. Her dad liked to cook a lot, so we would go over there. [redacted] loved her granddad too, so I would take her over there. We spent time like that. We would spend time at my family's as well when we had family gatherings, have dinner, things like that.
Q All right. So when you say granddad, are we talking about Mr. Eddie Day?
A Yes.
Q Did [redacted] at this time have some cousins?
A Yes, she did.
Q All right. And who had children in Sierra Day's

family other than you and Sierra?

A Her sister Erica did.

Q What did she have?

A She had two baby girls.

Q All right. Were they comparable ages to [redacted] or were they a little older?

A Yeah, they were very close in age.

Q Would [redacted] play with them?

A Yes, she did.

Q All right. And so how did your relationship move along during this time?

A Our relationship was okay at the time, in that very beginning, those first -- well, year, year-and-a-half of [redacted] life. It started getting a little rocky after, like, that first year-and-a-half. I just started seeing different signs.

I just wasn't really comfortable. And I really just tried to make my family work, you know, and make for the safety of my daughter, you know, and being present in her life.

Q All right. So did there come a point in time that you and Sierra Day separated?

A Yes, it did.

Q All right. About when was that, sir?

A That was about, it was the wintertime, I want to

say of 2016.
Q Okay. And --
A November to be exact.
Q All right. November of 2016. Where were you working at the time, sir?
A At that time I was working for Downtown Cleveland Alliance.
Q Were you also working for Constantino's Market?
A Yes, I was.
Q All right. So when you decided to move out, what did Sierra and [redacted] do? Did they stay at that apartment or did they move?
A They weren't there more than a couple months and they moved.
Q All right. Did they tell you where they moved?
A Yes. I did later find out.
Q Where did she move to?
A She had moved to Harbor Crest.
Q All right. And so with regard to your relationship at the time, how would you describe it? Was it still amicable or had it gotten a little more soured?
A Definitely I would say soured. I was just really doing whatever was best for [redacted], you know, I was over the whole relationship thing. It's just whatever is best for our daughter is what I was there for.

Q Did she ask you to leave the apartment?
A Yes.
Q And how did that go?
A I don't really like confrontation, so it was getting bad and I -- before it got too bad, I removed myself and I packed all my bags and I left. My things was -- I was finding my things in the garbage and, you know, I was just finding signs of, you know, wanting me out. So ...
Q All right. So where did you move to at the time?
A At the time I moved with my aunt.
Q Where did your aunt live?
A She lived in Euclid, Ohio.
Q All right. And at this point, did you have any method or mode of transportation?
A Yes, I did.
Q How did you get around?
A Well, at the time, I had a car. I was having some car trouble so it took about, I would say, almost six months to a year before I actually got my car back. So I was taking public transportation, the bus, RTA.
Q All right. Now, you indicated to us that in January of 2016 she moved over to Harbor Crest. Did you help her move?
A No.

Q Were you still communicating with her?
A Yes.
Q Were you seeing [redacted]?
A From time to time. Yes.
Q All right. Please tell me what you mean from time to time.
A Well, I would always get [redacted] as often as possible. I would go to work as early as seven in the morning and get off at midnight. So for the most part, I would get [redacted] on the weekends.
Q When you got her on the weekends, sir, where would you bring her?
A I took her home with me to my aunt's.
Q So how long did you stay at your aunt's house?
A Stayed there almost a year, I want to say, before I got my own place again.
Q Okay. And during that time, about how often would you see [redacted]?
A At least every other week, almost every other week.
Q Did you know what day care she was going to?
A It got confusing. At the time, I did. She was going to the Harbor Crest Day Care.
Q And did you find yourself going to Harbor Crest to see her on occasion?

A Yes.
Q And would the child care worker let you come in?
A You say the child care worker, day care workers?
Q Day care.
A Yes, they would.
Q All right. Was your name on as an emergency contact at the day care?
A Yes, it was.
Q All right. And so were there occasions where you would just go in and visit with her at the day care?
A Yes.
Q And how often would you do that?
A Sometimes I would go before work. But I would do that at least -- at least three, four times a month.
Q All right. And during the times that you went there, did you notice anything about [redacted] that caused you any concern or any moments of pause?
A At that time, no.
Q All right. And were you still paying child support?
A Yes, I was.
Q Were your wages being attached?
A Yes, they were.
Q All right. Did you have any conversations with Sierra Day about having some type of a formal visitation

schedule with her?

A Yes, I did.

Q All right. And did you and her talk about that?

A Yes, we did.

Q And were you able to come to any type of an agreement about that?

A No, we did not.

Q All right. Can you tell me what you shared with her or what you would like to do with regard to seeing your daughter at that time?

A Yes, at that time, I would let her know that I wanted to, you know, be present in my daughter life as much as possible. And at least every other weekend, you know, I would like to get [redacted] And that agreement didn't stick at all.

There were times where she would lie to me, say she were out of town or something like that. And then when I tried to go and fight to the courts and get emergency custody hearing, that's when I received papers about a restraining order.

Q All right. Well, we'll talk about that. Before we even get to the restraining order, does there come a point in time in September of 2017 that [redacted] comes to your home?

A Yes.

Q All right. Now, in September of 2017, where are you living?

A September 2017, I was still living in East Cleveland, Ohio.

Q Okay. Who were you living with?

A My and my fiancé, Mia Coburn.

Q Did she have children?

A Yes, she does, two boys.

Q How old are the boys?

A Jamir is five and Jeremiah is nine.

Q Were they living in the home with you?

A Yes, they were.

Q Did Mia have possession, care, and custody of those two boys?

A Yes, she does.

Q And so during that time, do you also -- is this a single-family home or an apartment?

A This is a two-family; upstairs and down.

Q A duplex?

A Yes.

Q Fair enough. Did you have a room for [redacted]?

A Yes.

Q Okay.

A [redacted] has her own.

Q She has her own room?

A Yes.
Q So in September of 2017, does she come over to your house to visit with you?
A Yes, she does.
Q How does she get there?
A I went and picked her up from her mother's home.
Q Where was she living in September of 2017?
A She was still living at Harbor Crest.
Q All right. And at this point in time, were you made aware that Sierra was dating somebody?
A No, I was not.
Q All right. And so when you go and pick her up, tell me the circumstances of that.
A When I went and picked [redacted] up, sometimes it was a little more challenging than others. There were times [redacted] -- I'm sorry, Sierra would give me -- you know, bring my daughter to me and -- with nothing; I mean, no toothbrush, no underwear, nothing.
I would make sure she has what she need, always. Just kept the confrontation down and just come for [redacted]. So I would get [redacted] and, you know, go on with my life, with my family.
Q All right. So in September now of 2017, do you get [redacted]?
A Yes. I did.

Q All right. And when you got [redacted], what were your observations of this child on that particular day?

A When I got [redacted]. I had to work later on that evening. And while I was at work -- well, before I went to work, we had a great time. We all went out to lunch, and had a lot of fun. Later on that evening, while working I got a call from my fianceé. Mia was stating that she had noticed --

Q You can't --

MR. SHAUGHNESSY: Objection.

MS. FARAGLIA: You can't say what she noticed or what she said to you.

THE WITNESS: Okay.

BY MS. FARAGLIA:

Q But as a result of your conversation with Mia when she called you at work, what did you do?

A Well, I told my job that I needed to leave.

Q All right. And about what time in the evening did you receive that phone call, sir?

A Approximately almost nine p.m.

Q So did you leave your employment?

A No, I had to stay the shift. I had to stay my full shift. I got off at 11 o'clock that day, 11 p.m.

Q So when you get off of at 11 o'clock, what do you do?

A As soon as I got home, [redacted] would always run right into my arms. So I held my baby and just -- I just gave her all the love I could give her and I -- I didn't want her to really know, you know, what was going on. So I examined her body.

Q All right. And as you were examining her body, what did you visibly observe, sir?

A I visibly observed a bruise on my daughter's chest area and her lower back.

Q All right. Did you talk to her about that?

A My daughter or --

Q Yes.

A Yes, I did.

Q Okay. Did you ask her how that came to be?

A Yes, I did.

Q And was she able to provide you some information?

A Yes, she did. She seemed a little confused, as if she didn't really know what to say.

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

BY MS. FARAGLIA:

Q Go ahead.

A And would say that "Mommy pushed me up the stairs." And she would also say -- I would ask her who

hit you and she would shove her shoulders real quietly. And I told her: You can talk to me, tell me anything, you can talk to me. And it was just real tough, it's like she wanted to speak out and say something but it's --

MR. SHAUGHNESSY: Objection.

A -- but it's like she was told to be quiet and not say anything.

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

BY MS. FARAGLIA:

Q All right. So based on your observations and based on -- did you look at her from head to toe?

A Yes, I did.

Q Other than the bruises and the marks that you've already testified to, do you notice anything else on this child's body?

A The fact that her tooth was loose and it was starting to rot, and I was very concerned about that. And I had been asking, you know, when is [redacted] dentist appointment, has she been to the dentist and things like that, but Mom would never follow up with me with anything.

Q So as a result of those observations and you talking to your daughter, sir, what do you do?

A At that time, we called the police immediately that night and filed a police report with East Cleveland police.

Q Did you also cause to take some photographs of [redacted]

A Yes, I did.

Q Who took those photographs?

A I did.

MS. FARAGLIA: May I approach, your Honor?

THE COURT: You may.

BY MS. FARAGLIA:

Q Mr. Garrett, handing you what's been marked as State's Exhibits 701 to 705. I'd like you to just take a moment and look at those photographs.

A Okay.

Q Do you recognize those photographs?

A Yes, I do.

Q Do those photographs fairly and accurately represent the photographs that you took on that September day in 2017?

A Yes, it does.

Q Of your daughter, [redacted]

A Yes.

Q Starting with State's Exhibit 701, what are we --

what are these photographs depicting for us?

A Okay. So these photos here shows the bruises on [redacted] chest area. She also has a, like, a scab, sore mark there. I was -- I'm not sure about the neck area, it looks a little dark but I wasn't sure. I was a little more concerned about her chest and her back because I did notice that those were bruises for sure.

Q All right. State's Exhibit 702, what is State's Exhibit 702 showing us?

A State's Exhibit 702 shows us the lower part of [redacted] back. Her lower back side shows a large bruise area there, looks like it could have been a hand.

MR. SHAUGHNESSY: Objection.

THE WITNESS: Hand mark or something.

THE COURT: Sustained.

BY MS. FARAGLIA:

Q You just noticed that these were bruises on her body?

A Yes.

Q All right. State's Exhibit 703?

A State's Exhibit 703 same as Exhibit 702, lower back area, bruises.

Q 704?

A 704 State's Exhibit, [redacted] left tooth area,

rotten and loose tooth.
Q All right. And 705?
A I think 705 is just a beautiful picture of me and my children, my family was happy.
Q All right. Now, you document these photographs; obviously, you think it's serious so you call the police department. Do you actually go to the police department, sir?
A No. They actually came to us.
Q Okay. When they come to you, do you make a report?
A Yes, we did.
Q All right. And as part of that report, who do you allege as being the perpetrator of these injuries?
A Her mom, [redacted] mom.
Q And that would be?
A Sierra Day.
Q Okay. Do you provide all this information to the police officer?
A Yes, I did.
Q Do you also provide these photographs to the police officer?
A Yes, I did.
Q All right. And so how long then do you keep her that weekend?

A I kept [redacted] as long as we could. I believe, I want to say it's probably Sunday that we took her back home; tried to keep her for the weekend.
Q Okay. And so you noticed these injuries on her, so when you took her back, did you have a conversation with Sierra Day?
A Yes, I did.
Q And what did you say to her, Mr. Garrett?
A Well, while trying to talk to me, she wasn't trying to talk to me at all, wasn't trying to speak back. She didn't talk back and tell me anything.
Q All right. Did you ask her: What the hell is going on?
A Yes, of course I did. I even contacted her ahead of time when I first noticed the bruises and she stated to me that her brother had hit her or something like that on her behind.
Q Okay. And so she provided you an explanation?
A Mm-hmm.
Q Based on her providing you an explanation, sir, what did you do next or what happened next?
A I told her that I was very unhappy that [redacted] has these bruises on her, you know, and that I was not made aware and that our daughter's safety is most important, you know, more important than anything. I would always

let her know that I wanted to know what's going on in [redacted] life always.

Q Was she able to provide you an answer to that?

A No, she did not.

Q All right. What else did you say to her during that contact?

A During that contact, I stated that I was going to do whatever it took to figure out what exactly is going on in that household, because it's very unlikely to see these bruises on my daughter and I've never -- this has never happened until this day. And once I found out, I told her it has -- it's got to stop and I'm gonna' do whatever it takes to make sure this don't happen to [redacted] again.

Q In your efforts to try to prevent this from happening again, sir, what do you do now? Do you turn to the courts?

A Yes, I did. I turned to the courts; I filed a motion to go and try to get custody of [redacted]

Q All right. And was there some paperwork that was filed against you?

A Yes.

Q Did you come to learn that there was a temporary protection order that was filed against you?

A Yes, I did.

Q How did you come to find that out, sir?
A I came to find that out after, approximately, September 27th of 2017, which was around the last time we had seen [redacted] Mom has stated -- I was trying to, like I said, always get [redacted] at least every other weekend, but Mom started sending me text messages when I was tryin' to get her and sayin' she was out of town.
And her bein' out of town probably lasted about a month-and-a-half before I actually went up to Ms. Day's day care, Get Ready, Set, Grow, and I noticed that Sierra was working. So I noticed she was working, I did not see [redacted] present. [redacted] was attending Get Ready, Set, Grow day care at that time.
Q What was the date of that, sir, if you recall?
A September -- the end of September 2017.
Q After you made your police report?
A Correct.
Q Okay. So now you go to Get Ready, Set, Grow. What happens when you go there?
A Okay. So -- I'm sorry. So about a month later after the end of September, I was tryin' to see [redacted] and it has been a while and Mom was sayin' that she was out of town, they were out of town. I noticed that she was at the day care, and that's when I -- that's when I actually started takin' more action in getting custody of

[redacted] and I hired an attorney at the time.

And I also, two days later, after recognizing Sierra was actually here in town, I received papers from the courts saying that I have a restraining order against me, against me for my daughter.

Q All right. Hold on just a minute.

MS. FARAGLIA: May I approach, your Honor?

THE COURT: You may.

MS. FARAGLIA: 903 to 907.

BY MS. FARAGLIA:

Q Mr. Garrett, handing you what's been marked previously as State's Exhibits 903 to 907, I'd like you to take just a moment to review each one of those documents.

A Okay.

Q All right. Mr. Garrett, let's start with State's Exhibit 903. Can you tell me what the document is? And, did you receive that document?

A Yes. This is Division of Domestic Relations. I did receive this paperwork also.

Q What is that?

A It's a petitioner statement from Ms. Day, restraining order.

Q So she filed a restraining order against you?

A Yes, she did.

Q What was the date of that restraining order, sir?
A October 30th, 2017.
Q All right. And that is after you had gone to the police department about the injuries --
A Exactly.
Q -- that you had seen on [redacted]?
A Yes.
Q All right. State's Exhibit 904, what is that document?
A State's Exhibit 904, Court of Common Pleas; it's a motion that I started for custody.
Q All right. And was that filed, sir, on your behalf?
A Yes, it was.
Q And before we go any further, going back to State's Exhibit Number 903, the protection order, what was she alleging that you had done, sir?
A Oh wow. She was stating that I would, I guess, harass her and stalk her and my daughter. She stated that I would come up to her job and threaten her and threaten my daughter. None of it was true. A lot of it was scribbled out. She messed up on a lot of her words, so it's kind of hard to read.
Q All right. And so at any point in time, sir, did you go to Get Ready, Set, Grow and cause any scene with

regard to Sierra Day?
A Not after the one time when I went there.
Q All right. And any time after that one time, did you go back --
A Never, no.
Q -- and do anything to cause any harm to Sierra Day and/or your daughter, [redacted]?
A Absolutely not.
Q You get this temporary retraining order, then you start filing your own motions?
A Yes.
Q Moving on to State's Exhibit 905, what is that document?
A 905, the magistrate had, looks like he had granted my court order, and we had a hearing set for 1-24 that Ms. Day did not show up for.
Q Okay. And during this time now, we have September, October, November, and December of 2017; after September 26th, when you took the photographs of that child, did you physically see her again?
A No, I did not.
Q All right. Did you try to see her?
A Yes, of course.
Q Did you call Ms. Day and tell her you wanted to see your daughter?

A Not after they put this restraining order against me.
Q Okay.
A But beforehand, yes.
Q All right. And the holidays came and went. You had Halloween, you had Thanksgiving. Did you see her on Halloween?
A Halloween, no, I did not.
Q Did you see her at Thanksgiving?
A Thanksgiving, no, we didn't.
Q All right. And Christmas?
A No.
Q All right. During this time, did you have contact with any of her family members?
A One of her siblings, her sister.
Q Okay. Now, before we talk about that, let's finish up with our documents there. State's Exhibit 906, what's State's Exhibit 906?
A State's Exhibit 906, Court of Common Pleas, Division of Domestic Relations, it looks like there was a continuance for our motion which was set for March 15th, 2018.
Q Okay. And State's Exhibit 907?
A Yes. This looks like -- this is from the Domestic Relations, so this is something Ms. Day had

filed here and I don't recall getting a copy of this -- yes, yes, I think I did.

Q Okay. All right. So that was all documentation that related to either the protection order that was filed against you and/or your filing of trying to get some more custody rights of your daughter, [redacted]

A Yes.

Q All right. Now, in December of 2017, did you have contact with Ms. Day's family members?

A I'm sorry, what was that time frame again?

Q December of 2017.

A Yes, I did.

Q Okay. Who did you have contact with?

A Erica Johnson.

Q All right. Did you call her or did she call you?

A We called each other.

Q Okay. And did you have a conversation with Erica Johnson?

A Yes, I did.

Q Without telling us what Ms. Johnson said to you, what did you do as a result of your conversation with Ms. Johnson?

A Most of the times we would talk, I was at work and I would contact my attorney, because I had an attorney at the time, and we were just trying to speed

this process up so we can get [redacted] you know. It had almost been seven months since I had last seen [redacted] So we was just really trying to -- it was all on the court's time. So when they got these dates set, you got to go by these dates they have in place.

Q And during this time, did you see [redacted]

A No. I never --

Q Had Erica seen [redacted]

A No, she hadn't.

Q And would you and Erica commiserate about your concerns?

A Yes.

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled.

BY MS. FARAGLIA:

Q And during this time, did you talk to any other family member or did any other family on the Day side contact you?

A No.

Q And during this time, did you come to learn that Sierra Day was dating Deonte Lewis?

A No.

Q When did you first learn that Sierra Day was dating Deonte Lewis?

A The very first time we had a court hearing after

my daughter life was lost.

Q All right. And prior to that, you did not know that she was dating him?

A Never.

Q Did you, sir, contact, in September of 2017, after you contacted the police, did you also contact or did the police contact Children and Family Services?

A I did contact Children and Family Services myself. I'm not sure if the police did.

Q Okay. And in addition to contacting Children and Family Services, did you yourself take it upon yourself to contact the day care and check on your daughter?

A Yes, I did.

Q And who did you speak with, sir?

A I spoke to a lady by the name of Chantale.

Q Without telling us what she said, what kind of questions were you asking of Chantale?

A When was the last time [redacted] has been at day care; I was -- I wanted to know was [redacted] safe, was she okay, was she healthy, when the last time she had seen [redacted] She had stated --

Q You can't say what she said to you.

A I'm sorry. Exactly.

Q That's okay. But did there come a point in time that you learned that no one had seen [redacted]?

MR. SHAUGHNESSY: Objection.

THE WITNESS: Yes.

THE COURT: Overruled.

BY MS. FARAGLIA:

Q And did that cause you more concern?

A Yes, it did.

Q And Mr. Garrett how did you come to learn of your daughter's death?

A I got a call on March 11th from Erica, Erica Johnson.

Q Without telling me what Erica said to you, sir, what did you do and where did you go?

A I was home with my fianceé and I think I lost it. I lost it. I lost it. My mind just could not bear to think about something like that, you know, not in a billion years. My complete -- my life, just everything just turned, you know -- I believe we went down to the detective office following the -- and spoke about -- spoke to them about [redacted]

Q Okay. So you went to the Euclid police department?

A Yes.

Q Okay. Were you able to provide them some information that you have provided to us here today?

A Yes.

Q Now, you indicated to us that you went to the day care, Get Ready, Set, Grow to see Sierra and [redacted]
A Mm-hmm.
Q After you had returned [redacted] after the September 2017 visit, when you took photographs; right?
A Yes.
Q At any point in time, did you and Sierra have a physical altercation in front of anybody?
A No.
Q Did you cause any type of scene?
A No.
Q Did you see your daughter that day?
A I did not.
Q When you were at Get Ready, Set, Grow, did you talk to any of the workers?
A No, I didn't that day. I didn't see anybody. When I walked in, it was dark inside. Actually, I did -- I did see a worker. It was a new lady, I've never met her before, but she showed me the room that Ms. Day was working in. That's when I politely went to that door and kept all peace and I asked her, "Where is [redacted] I want to see my baby."
Q Do you remember, sir, the day you went there? Do you remember where -- after the September incident at your home where you called the police but before December,

before -- did you go before Christmas or after Christmas?

A It was before Christmas.

Q Okay. All right. Fair enough. And do you remember what day of the week you went?

A I want to say between Wednesday and a Friday.

Q Okay. And you did not see your daughter in class?

A No, I didn't.

Q Was she even in the building?

A I'm not sure.

MS. FARAGLIA: One moment, your Honor.

THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

BY MS. FARAGLIA:

Q Now, Mr. Garrett, at any point in time during your court proceedings, did you come to learn that Sierra Day had moved to Cultural Gardens?

A No.

Q Did you know at all that she was even living there?

A I didn't.

Q Thank you.

MS. FARAGLIA: No further

questions at this time, your Honor.

THE WITNESS: You're welcome.

Mr. Shaughnessy?

MR. SHAUGHNESSY: No questions for this witness, Judge.

THE COURT: Ms. Longino?

CROSS-EXAMINATION OF MICKHAL GARRETT

BY MS. LONGINO:

Q Mr. Garrett, when you went to the day care and spoke with Ms. Chantale, did you ever come to learn when was the last time [redacted] had been at that day care?

A No, I didn't. I did never find out.

Q Okay. And had you seen Sierra -- I'm sorry, had you seen [redacted] between the month of June 2017 up until September 2017 when you saw her and saw these bruises on her?

A Yes, I did see my baby in between then, but we didn't recognize the bruises until September.

Q Okay. So from June to September, you saw no bruises up until September?

A Correct.

Q Okay.

MS. LONGINO: Thank you.

THE COURT: Anything

further?

REDIRECT EXAMINATION OF MICKHAL GARRETT

BY MS. FARAGLIA:

Q When Ms. Longino asked you about that, September of 2017, and in fact September 26th of 2017; correct?
A Correct.
Q And Sierra was living at Harbor Crest with your daughter?
A Yes.
Q You don't know who else she may or may not have been dating at the time?
A No.

MS. FARAGLIA: Thank you.

THE COURT: Any follow-up? Thank you. You may step down.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Why don't we take a five-minute recess, ladies and gentlemen. Please do not discuss the case.

- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

- - - o0o - - -

(Brief recess had.)

- - - o0o - - -

THE BAILIFF: All rise for the jury.

- - - o0o - - -

(Thereupon, the Jury entered the courtroom.)

- - - o0o - - -

THE COURT: You may be seated. Call your next witness.

MR. KILBANE: Your Honor, the State calls Officer Cory McFadden to the witness stand.

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **CORY McFADDEN**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good afternoon. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MR. KILBANE: Thank you, your Honor.

DIRECT EXAMINATION OF CORY McFADDEN

BY MR. KILBANE:

Q Good afternoon, Officer.
A Good afternoon.
Q Can you state your name, spell the last name for the court reporter.
A Cory McFadden, M-C-F-A-D-D-E-N.
Q And are you employed, sir?
A I am.
Q Where are you employed?
A With the City of Cleveland Division of Police.
Q In what capacity?
A Patrol officer.
Q How long have you been a patrol officer with the City of Cleveland?
A Two-and-a-half-years.
Q Prior to joining the Cleveland Division of Police, did you have any law enforcement experience?
A I did not.
Q Did you receive any training and certifications in order to become a police officer?
A I did.
Q Can you explain that for the jury?

A I have a degree in law enforcement and I attended the police academy with the Ohio State Highway Patrol.
Q And when was that, sir?
A 2016 through '17.
Q Sir, were you working on September 1st of 2017?
A I was.
Q And were you working with a partner on that night?
A Yes.
Q What was your partner's name?
A David Fox.
Q Did you respond to a call at 3322 West 73rd Street in Cleveland, Ohio, on that date?
A Yes, we did.
Q And do you know what the nature of that call was?
A For a child potentially being abused.
Q And do you recall what time you got to this home on September 1st of 2017?
A Early afternoon. I don't recall the exact time.
Q And when you get to the home, who do you speak with?
A The father, Mickhal Garrett.
Q So you spoke with Mickhal Garrett. Was anyone else present?
A His daughter was.
Q Do you know what his daughter's name was?

A Yes. [redacted].
Q And do you recall how old she was at the time?
A Three years old.
Q Was anyone else at the home that you recall?
A I did not talk to anyone else.
Q Did you see the child and Mickhal Garrett interact with one other?
A Yes, I did.
Q Can you describe their interactions?
A How you would expect a small girl to be with her father. She was very timid and shy around us; she stood by his side.
Q She was sitting by his side?
A She was standing by his side, we were outside.
Q Did you have a conversation with Mickhal Garrett?
A We did.
Q Based on that conversation, what did you do?
A We contacted 696-KIDS to follow up to see if the child was having a safe life and being well taken care of.
Q Why did you call 696-KIDS?
A The father found bruising; he showed us on her cheek and he said on her chest. At the time we couldn't really tell what they were from; they were very minor. We couldn't tell what they were from, if she was being

abused or if she fell. So we contacted 696-KIDS to follow up.

Q Did you personally observe the child?

A Only on her cheek. We didn't take her shirt off.

Q What specifically did you see on her cheek?

A Like a fading small bruise.

Q You said you never looked at her body, bare body?

A No, we did not.

Q Did you see any markings on her neck?

A No.

Q After you did this, this is when you call 696-KIDS?

A Yes.

MR. KILBANE: Could I have one moment, your Honor?

THE COURT: You may.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MR. KILBANE: No further questions.

THE COURT: Cross?

MR. SHAUGHNESSY: No questions, your Honor.

THE COURT: Cross?

MS. LONGINO: No questions, your Honor.

THE COURT: Thank you. You may step down. Have a nice day.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MS. FARAGLIA: The State calls Twanna James, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **TWANNA JAMES**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good afternoon. Please be seated. Make sure you speak directly into the microphone. You can adjust the microphone; the seat will not move.

You may inquire.

MS. FARAGLIA: Thank you, your Honor.

DIRECT EXAMINATION OF TWANNA JAMES

BY MS. FARAGLIA:

Q Good afternoon, Ms. James.

A Good afternoon.

Q Please state your full name and spell the last name for the court reporter.

A Twanna, J-A-M-E-S, James.

Q Ma'am, by whom are you employed?

A Children and Family Services.

Q How long have you so been gainfully employed by them?

A Six years.

Q And what kind of training and experience have you obtained in order for you to maintain your position with the Department of Children and Family Services?

A Well, first we have three months of training with the agency, and then we have on-going training every year. I have a Master's degree in criminal justice administration.

Q All right. And when were you first hired by Children and Family Services?

A 2012.

Q In 2012, did you have the ordinary training that they provided to their social workers?
A Yes.
Q What label or what title were you hired as?
A Social Worker 3.
Q And with regard to your title when you're hired, just tell me, did you have all the proper training that the agency provides to you?
A Yes.
Q Did you go through the eight modules of investigating a case?
A Yes.
Q And did you then go to the transitional unit?
A Transitional unit didn't exist when I started.
Q Okay. Tell me what existed when you started. Did the eight modules exist?
A Yes.
Q Just briefly, can you go through what are those eight modules?
A I can't remember that off the top of my head.
Q Okay. Suffice it to say is there like a protocol or a checklist that you go through from the time a referral is made to the time a case is either closed or it's set off into ongoing service?
A Right.

Q Okay. So you've been trained in all those things?
A Yes.
Q Okay. And so, with regard to when you got hired, once you finished your basic training, where did you go then?
A (No response.)
Q How did you obtain your cases?
A When I first started, I was in the START unit, on-going services. START stands for Sobriety Treatment And Recovery Team. So I stayed there for the first four years.
Q Okay. And then after -- now, this team, did you work along with social workers or did you get your own cases wherein folks had some type of sobriety issues?
A No. When I first started I personally shadowed other people I worked with. I didn't get cases right off the top.
Q I'm sorry?
A I didn't get cases as soon as I started, I worked with other workers.
Q So you worked right along, shadowing, if you will?
A Right.
Q Okay. How long did you do that?
A I don't recall, couple weeks I did that and then I started receiving my own cases.

Q I'm sorry?
A I believe I did that for a few weeks and then I started to receive my own cases.
Q All right. Once you received your own cases, were you gainfully employed by Children and Family Services back in May of 2017?
A Yes.
Q And what department were you working in at the time?
A I was in short-term services then.
Q All right. Explain to us, what is short-term services?
A Short-term services is when we get a case and we investigate the allegations on the case.
Q All right. Were you so gainfully employed by the Department of Children and Family Services back in May of 2017?
A Yes.
Q And were -- was there a referral made by a hospital with regard to an [redacted]
A Yes.
Q All right. Can you tell the ladies and gentlemen of the jury, how did you first become involved in the case and what did you initially do?
A Well, I was already in the field working on

another case and I received a call from my supervisor regarding the emergency. When we receive an emergency, we have to act immediately and go out.

Q Okay. When you say emergency, back in 2017, were there priority calls?

A Yes.

Q How many priorities did you have and can you define them for me?

A How many priorities did I have?

Q Is it --

THE COURT: The levels.

BY MS. FARAGLIA:

Q The levels: Priority 1, priority 2, priority 3?

A Oh, yeah. We had emergency, traditional, and AR.

Q Okay. So what is an emergency?

A Emergency means I have to go out right now. We'll have a hour to get there to investigate the allegations.

Q All right. What's the next level?

A Traditional, we have 24 hours to get out there. And AR is three days, but you still need to make -- for traditional and AR, you need to at least make a phone call to schedule an appointment, if not just go out.

Q What does AR stand for?

A I don't remember.

Q Okay. All right. Just take a deep breath. Okay? So, this was an emergency.

So where were you on the field and where did you have to go?

A I don't remember exactly where I was but I remember I had to go to Euclid Hospital.

Q All right. Did you go to Euclid Hospital?

A Yes.

Q What happened when you went to Euclid Hospital?

A When I went to Euclid Hospital, I spoke with an officer, I don't recall his name. He gave me a little update on what was going on. Then he gave me past reports from a day care. And then after I spoke to him, I was in -- I went to the room where [redacted] was, [redacted] and the day care teacher, and there was a nurse in there too.

Q Initially, Ms. James, what were your observations of [redacted]

A Well, initially she had a mark on her nose, like a scrape; it was a scab. And then I was shown the scrape marks she had in her head.

Q All right. And did you also see the blood in her ear?

A Yes.

Q All right. And so based on that information and your observations, what did you do?

A Well, I don't remember who I talked to first but I know I wasn't really concerned with the nurse, but the day care teacher and [redacted]

Q Okay. Did you do it all at one time or did you do it separately?

A We were all in the same room but I asked each one individually questions.

Q Okay. And with regard to the day care worker, was she able to provide you some information?

A A little, yeah.

Q All right. With regard to the nurse, was she able to provide you information?

A Yes.

Q With regard to [redacted] did you speak to her directly?

A Yes.

Q And what kind of information were you trying to obtain from [redacted]

A What happened to her; I would need to know what happened to her.

Q Was [redacted] able to tell you what happened to her?

A At first she wouldn't, she was like very timid, she wouldn't talk to me until I got her some candy.

Q Okay. Did you give her some candy?

A The day care worker actually had some fruit

snacks or something.
Q And did she give her some fruit snacks?
A Yes.
Q Were you able then to talk to her?
A Yes.
Q Did she tell you what happened to her?
A I did -- I asked her where did she get her boo-boo from, and she said, "Mommy did it."
Q Okay. And so as a result of your conversation with [redacted], what do you do next?
A I talk to -- I believe I talked to the nurse and I asked the nurse could she tell me what this mark would be, what this scratch or whatever could be. And does she -- did she see this as abuse.
Q All right. And is that typical for social workers to talk to the medical professionals with regard to what they see and what they observe?
A Yes.
Q All right. And based on the information that you received from those three folks, do you also have a responsibility to talk to the mother and father of the child?
A Yes.
Q All right. Did you do that in this case, ma'am?
A I talked to Mom. I was told Dad was nowhere

around.
Q Okay. And so with regard to Mom, where did you meet with Mom?
A I met with her in the waiting room. She wasn't in the same room with us.
Q Okay. Did you meet with her?
A Yes.
Q Did you introduce yourself?
A Yes.
Q Did you tell her why you were there?
A Yes.
Q All right. And at the time that you talked to Mom, do you have those other reports of situations at the day care?
A I had -- I don't know if I had them first before I talked to her or after I talked to her. I'm not really sure. I can't remember the timeline.
Q All right. When you talked to Mom, what is your purpose in talking to Mom?
A To find out what happened.
Q All right. Did you talk to her?
A Yes.
Q All right. And what kind of questions did you ask her, and what kind of information did you derive from her?
A I basically asked the questions to -- as to what

happened to [redacted] where did she receive her marks, was she aware that [redacted] had any marks, and like where was Dad. I went over those questions.

Q Okay. Did she provide you some answers?

A Well, as far as the marks, she said she didn't have any marks that morning. She doesn't know where they came from. She said that [redacted] was with someone else last night, maybe she could have been hurt while playing with other kids.

Q Did she provide you the name of the people she was with the night before?

A No. I don't recall. I won't say no.

Q Okay. All right. So what other information did they provide to you?

A In regard to Dad, she told me he worked three jobs, he doesn't come around, he has nothing to do with his daughter, and she doesn't have his number or the address and she's only able to speak to him through Facebook Messenger sometimes.

Q Okay. And so based on that information then, what do you do as part of your protocol in this investigation?

A Well, being that we didn't have a lot -- speaking with the nurse, I couldn't get any information from them regarding, like, she was abused. And since we didn't know, I ended up having -- I spoke to my supervisor and

told her what was going on, and then we decided to have an unofficial safety plan where --

Q What does that mean, unofficial safety plan?

A It means that we agree that the child is removed from Mom's care until we can have a staffing and safety plan, but it's unofficial because it's not signed. If you have a normal official safety plan it's signed off on and all participants agree to it.

Q So what causes you to have an unofficial safety plan, ma'am?

A Because there was still unanswered questions, so we felt it necessary to have a staffing at the building in the morning to go over everything.

Q All right. So the question is: What happens to the child?

A I took the child over -- well, I asked Mom for someone that [redacted] is comfortable with and she told me she was comfortable with a woman named Charlene. That's who normally babysits for her when Mom does what she needs to do. I got Charlene's name; I gave it to my supervisor. My supervisor ran a background check on her.

Q Does Charlene have a last name?

A I want to say Wagner.

Q All right. So is it protocol to run a background check on any person who is going to take custody of a

child?
A Right.
Q So your supervisor did that?
A Right.
Q All right. So what do you do next?
A Then after that, we went to -- I had to check out at Charlene's house, make sure it was appropriate, make sure she had what was needed in the home, make sure there were no hazards in the home, and also to speak to Charlene regarding Mom and [redacted]
Q Did you go to Charlene's house?
A Yes.
Q All right. What were your observations of Charlene's home? Was it an appropriate environment for this child?
A Yes.
Q Did she have enough food and heat?
A She had food, all the basic needs. She even had a bed in the back that she normally uses for [redacted] when she spends the night.
Q And did Charlene have her own children?
A Her child was grown.
Q So an older woman?
A Yes.
Q Okay. So once you did that, did you place [redacted]

in her care for the evening?
A For the evening, yes.
Q All right. And did you explain to Ms. Day why you were doing that?
A Yes.
Q Why did you do that?
A Because we had so many unanswered questions, we need to make sure -- we needed to find out what was going on with this child.
Q All right.
A We felt it was safer for her, you know, to go somewhere else until we figure this out.
Q Okay. So what happens the next day?
A The next day, we had a staffing at the agency.
Q All right. I'm sorry?
A At the agency. I'm sorry.
Q Okay. A staffing. What does that mean and who're your participants?
A The staffing is a meeting that we have when we discuss -- we put everything on the table and we discuss it.
Q Okay.
A At the meeting, it was of course myself, Mom, but I did tell Mom -- Mom said the child was with other people before. I did tell Mom to bring those people; she

didn't. But it was two supervisors, the facilitator, Mom, a collab worker, and myself.

Q Well, let's talk about this. So who're the two supervisors that participate in this staffing?

A Their names?

Q Yes.

A Kelly, I forget her last name, and the facilitator-supervisor, I don't know her name, but she was actually in there to check on her workers, the facilitator, make sure they are doing their job right. The collab worker, her name was Sherry; then Mom, Sierra, and myself.

Q Okay. And during this staffing, are you provided any other reports that come to the agency?

A No. I just had the report that the officer gave me, and I presented them at the staffing.

Q Okay. And had there been any other referrals at that point with regard to [redacted]

A Before I had the case?

Q Yes.

A There was a referral before I had the case, yes.

Q Do you take that into consideration?

A Yes.

Q Do you review that documentation and what the allegations were and who the participants were with regard

to that referral?
A Yes.
Q All right. Is that all reviewed by you and the supervisors, the facilitator, collaborative?
A Yes.
Q Is medical also included in this?
A I didn't have -- I don't remember having any medical at that time, but we did request medical with -- after we get a release of information from Mom.
Q Okay. And so what happens during the staffing with regard to this case?
A Well, we went over everything. We brought up -- I made sure everyone read the reports from the day care. I actually had pictures in my phone and I showed everyone what I seen at the hospital for [redacted].
We went over her past case. That was an unsubstantiated case. That's basically what we do during the meeting.
Q So unofficially did you offer them services?
A Mom?
Q Yes.
A I did offer her services. She said she was interested in the collab, which Sherry was there. She was interested in swimming, CDA for herself --
Q Okay. You have to slow down here.

A I'm sorry.
Q That's all right. So the collab, what do you mean by collab?
A It's the community collaborative where they -- it's a facility where they help parents do certain things. They can help you get into counseling. They can help you with Ohio Benefits Bank. They can help you with food banks, anger management, lawyers if need be; things like that.
Q So there is a collaborative. She was living in the City of Euclid at the time?
A Right.
Q Was there a Euclid collaborative?
A Right.
Q All right. And so what kind of services did you offer, and did she accept?
A I offered her those services with the collab and also supportive services because Mom said that [redacted] had a behavioral issue. So she said that we were going to have her tested.
Q Okay. What kind of behavioral issue did this child have?
A Well, she said that the baby, when she's around other people, she just acts out of control and she lies a lot.

Q Okay. During your observations of [redacted] did you see her acting out?
A She was very shy with me. She was with the day care worker, just sitting there. She didn't really do much when I was there.
Q Okay. This is when you were at the hospital?
A Right.
Q Now, did she bring her to the staffing?
A No. Charlene, the one we left her with, she took her to the day care for us the next morning. That was the plan.
Q So did you ever see [redacted] again?
A No.
Q All right. So you provided this collaborative; you provided -- what were the services again?
A She wanted the CDA service, I believe that's what it's called, for herself.
Q For herself?
A Mom.
Q What's CDA?
A It's some certification for day care or something like that.
Q Okay.
A She wanted swimming lessons for her and --
Q When you say for her?

A [redacted] sorry.
Q Okay.
A For [redacted] There was some other services that were offered by the collab as well for [redacted]. And then the supportive services referral was something separate.
Q Okay. What are those supportive services?
A Those supportive services that was to see if [redacted] did have a behavioral problem and if she did, they can help her with that.
Q All right. Who was going to be taking care of that?
A I did the referrals.
Q Okay. And then when you do these referrals, then do you also get an answer back from the referrals to see how these referrals have gone?
A Most of the time. I know I received one from the collab saying that they have contacted Mom.
Q Okay.
A But I don't recall what I heard from supportive services.
Q Okay. Did you do any follow-up on that, Ms. James?
A I don't remember.
Q All right. Well, once you have this staffing, then, what else is part and part -- part and parcel of

your responsibility?

A After we had the staffing? I'm sorry?

Q Yes.

A After we have the staffing, we couldn't prove -- we couldn't prove or disprove that Mom actually hurt her child on purpose. So that's what I did, I put the services in the home.

Q Once you put the services in a home, is there follow-up that your agency does? How does that work?

A The collab followed up with us, like I said, and they didn't -- I didn't wait for them -- I don't recall them calling me. Normally they call to say that they've contacted Mom or have not contacted Mom, but I don't recall what happened.

Q All right. And this is in May of 2017?

A Right.

Q Now, is there a time that you are contacted again with regard to this case or is that solely your involvement?

A That's it.

Q So how then after the staffing, how is this case left?

A Well, after the staffing, like I said, we couldn't prove anything so I throw the services in the home. It started out like it was a third or fourth file,

with two different services, so if something is going on, someone will report.

Q Did you receive any reports after that?

A No.

Q And, ma'am, did you have any other contact with [redacted] or her case at that point?

A Not that I can think of.

Q Okay.

MS. FARAGLIA: One moment.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

MS. FARAGLIA: Thank you. No further questions.

THE COURT: Cross?

MR. SHAUGHNESSY: Nothing on that, your Honor.

THE COURT: Ms. Longino?

MS. LONGINO: No questions, Judge.

THE COURT: You may step down.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Next witness.

MS. JORDAN: The State will call Chantale Milton, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **CHANTALE MILTON**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good afternoon. Have a seat.

Make sure you speak directly into the microphone. The microphone can adjust; the seat will not move.

DIRECT EXAMINATION OF CHANTALE MILTON

BY MS. JORDAN:

Q Good afternoon, Ms. Milton. Can you please state your name and spell it for the record.

A Chantale Milton, C-H-A-N-T-A-L-E, Milton,

M-I-L-T-O-N.
Q Ma'am, are you currently employed?
A Yes, I am.
Q Where are you employed at?
A At the Cleveland Clinic.
Q How long have you been employed at the Cleveland Clinic?
A Like a month-and-a-half.
Q Prior to being employed at Cleveland Clinic were you employed at a day care Get Ready, Get Set, Grow?
A Yes. Get Ready, Set, Grow.
Q When did you start working at Get Ready, Get Set, Grow?
A 2013.
Q When did you stop working at Get Ready, Get Set, Grow?
A November of 2018.
Q What was your position at the day care?
A I was a preschool toddler teacher during the day; did transportation routes in the morning, did transportation routes in the afternoon, and I was a school aide teacher in the evening.
Q So the morning shift ran from what time to what time?
A The center opens at 6:30.

Q What were your hours at the center?
A My hours were 6:30, sometimes to five, sometimes to 5:30, just depending on the ratio of the children.
Q What sort of training and experience did you have to have to do the job you did there?
A I had to have transportation, bus transportation training, CPR, first aid, child abuse training, and then like whatever extra training we just choose to take.
Q What extra training did you take?
A Just like if you wanted to do, like, team-building for whatever age groups that you work with, stuff like that; nothing that you had to do.
Q During your time at Get Ready, Set, Grow, did you have occasion to interact with Sierra Day?
A Yes.
Q Do you see that person in the courtroom today?
A Yes.
Q Could you please identify --

MR. SHAUGHNESSY: We stipulate she can identify Sierra Day.

MS. JORDAN: Thank you, counsel.

BY MS. JORDAN:

Q What were your first interactions with Ms. Day?
A When she started at the facility in 2014.

Q Okay. And when she started at the facility, were you aware that she had a child?
A I did.
Q Was her daughter attending that facility?
A She was not.
Q What was, if you recall, Ms. Day's assignment at Get Ready, Set, Grow?
A When she started, I believe she was an infant teacher.
Q Were you all teaching the same class?
A No.
Q Were you in the same class together?
A No.
Q Were you ever teaching the same group of students together?
A No.
Q Did there come a point in time when [redacted] started coming to the day care?
A Yes.
Q How old was [redacted] when she started coming to the [redacted]
A She was three.
Q When [redacted] started coming to the day care, was Sierra still working there?
A Yes.

Q What class should [redacted] have been in when she was at the day care?

A Three is classified as preschool.

Q So who would have been her teacher?

A Her mom.

Q So [redacted] is coming to a day care with her mom being the teacher?

A Yes.

Q What interactions, if any, did you have with [redacted]

A Well, she worked mid-shift so she was like coming in during nap time. So I would be in my classroom doing my own thing, and then she would walk down the hall with [redacted] and go to her classroom because it was nap time. So she was basically coming in to start break pretty much.

Q So [redacted] would come into the day care when her mom, Sierra, came to work?

A Yes. She did not come in every day but when she would come in, she would come with her mom.

Q What do you mean she didn't come every day?

A She didn't attend day care every day.

Q All right. Outside of the day care, did you have any interactions with Sierra?

A No.

Q Did you ever have a conversation with Sierra about where [redacted] was when she was not at the day care?
A No, because my child goes -- at the time went there too. So if I just choose, if he can go to a family member house or however; it just was not my business to ask.
Q Okay. I want to turn your attention to January 16th of 2018. Do you recall working at the day care on that day?
A Yes.
Q What were your observations and interactions with Sierra and [redacted] on January 16th of 2018?
A She came in for her shift, they walked down the hall --
Q When you say "she," are you referring to Sierra?
A Sierra. Her and [redacted] walked down the hall like they usually do; come in, walked into their classroom. I was still in my room, I was actually cleanin' up. They had left, like, a mess, I was still cleanin' up.
I want to say maybe about 30 minutes later, she came to my room to let me know, like, I guess, [redacted] had got sick in the bathroom and that she needed to get ready to leave. And I said, "Well, you need to call the owner and that 'cause I can't give you clearance to leave."
Q Okay.

A And she said okay and she left out. They both left out.
Q Okay. When you were working with Sierra, did you ever see any males come to the day care with her?
A Toward, like, I want to say, right before she stopped workin' there, I guess at the time it was her boyfriend, he would just like maybe come, drop them off, and -- well, I can't tell you about pick up because I wasn't there when she left.
Q Okay. The boyfriend that you would see coming to -- with Sierra to drop her off, do you see that person in the courtroom today?
A Yes.
Q Can you please identify him and describe him for the record?
A He has on a green shirt and a brown vest.

MS. JORDAN: May the record please reflect that the witness has identified Deonte Lewis?

THE COURT: May so reflect.

MS. JORDAN: Thank you.

BY MS. JORDAN:

Q You said you started to see Mr. Lewis come to the day care right around the time Sierra stopped working

there; correct?
A It was toward -- maybe around November-ish because it was wintertime.
Q What year are we talking about, 2017?
A 2017, yes.
Q When you would see Mr. Lewis come to the day care with Sierra, would he interact with anybody?
A No. He would just come in, make sure they came in, make sure they got down the stairs, and he would leave.
Q Did you ever have any interactions or come to be aware of [redacted] biological father?
A Yes.
Q And what were your interactions with him?
A Well, I already knew of him prior to the situation at hand. He came in one day and brought, like -- I think it was, like, a Monday because he was bringing her, [redacted], back I guess from, like, a weekend, I don't know if he might have had her over the weekend; came in, said: Hey, how are you doin'; took her down to her classroom, got ready to leave out, he said: Have a good day. That was, I want to say it was, like, that September.
Q Of 2017?
A Yeah.

Q Okay. Outside of that initial interaction, did you have -- up until -- prior to [redacted] death, did you have any interaction with Mr. Garrett?

A He had called me, I want to say it was like October-November because, like, I remember the weather; that's how I can pretty much remember.

Q We're still in 2017?

A Yes. Basically just wanted to know, like, I guess it was like a restraining order or something that took place or something of that nature and wanted to know, like, could he come to the center to see [redacted]. I let him know, well, like with day care if it's nothing court-written in her file, if you're on your child's paperwork you can come, you know, to see her but you can't take her.

He was letting me know about concerns; he asked me did I have any concerns. I told him, like, really, me and her mom didn't talk or get along too much. So I didn't really have interaction with her; number one, she was in with another age group that I didn't work with. And, number two, we didn't really get along. So I never really interacted with her, per se.

I told him there was a incident where she was cleaning up where bleach --

MR. SHAUGHNESSY: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: -- a bleach incident. She was cleaning up. Like, during toward the end of the day we've got to clean up for, like, the next day and I think either [redacted] was near the bucket or trying to get in the bucket and she was, like: Stop, like that, but it startled me because I was in a whole other classroom. I didn't think anything of it because I yell at my kid, so, but other than that, he did tell me he was, like -- no, I told --

MR. SHAUGHNESSY: Objection.

THE COURT: That's sustained.

THE WITNESS: Sorry.

BY MS. JORDAN:

Q Turning your attention back to Mr. Lewis who would walk Sierra to the day care, how often would you see him?
A I don't know if they walked --
Q How often would you see him at the day care?
A Maybe two, three times during the week.
Q And that begins around November 2017?
A Yeah.
Q When did you stop seeing Mr. Lewis about two to

three time a week with Sierra?
A When I stopped seeing Sierra.
MS. JORDAN: Thank you.
One moment, please, your Honor.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

BY MS. JORDAN:
Q Ms. Milton, I want to go back to the incident on January 16th of 2018, when Sierra and [redacted] came into the building. Do you recall whether or not [redacted] was walking or being carried?
A She walked her in.
Q When she was going to the bathroom and walking out with [redacted], do you remember if [redacted] was walking --
A I didn't see her go in the bathroom. When she came into the room, she told me she had got sick in the bathroom. I didn't even know that she was even -- I thought she was in her classroom.
When she brought her in to let me know she was about to go, she had her -- they both had their coats on. She was holding her. She said she had just thrown up and she needed to get her to the hospital because she had just threw up.
Q When was the last time you saw Sierra and [redacted]

A I want to say that day that she got sick was the last day I seen [redacted]
Q Okay. So January 16th?
A Mm-hmm.
Q And when was the last time you saw Sierra?
A I really can't tell you because the way her shift was, she was, like, a mid-shift and sometimes -- I mean, she would call off. So I can't even tell you the last day I physically seen her at work.

MS. JORDAN: Thank you. Nothing further at this time.

THE COURT: Cross?

MR. SHAUGHNESSY: Not for this witness. Thank you.

THE COURT: Ms. Longino?

CROSS-EXAMINATION OF CHANTALE MILTON

BY MS. LONGINO:

Q Ms. Milton, you said you would see Mr. Lewis two or three times a week. Is that two times a week sometimes and three times a week sometimes?
A Like, sometimes it wouldn't be the same days. It won't be like Monday, Tuesday, Wednesday. It would be at least two or three times a week, how I said.
Q You said that was from November 2017 until when?
A I can't tell you the last time I seen him. I

can't tell you that day. I can just tell you when I started to see him.

Q Okay. So could you think of maybe a total of how many times you may have seen him?

A Maybe, like eight or nine.

Q Eight or nine. Okay. So from November to January, that's 12 weeks, approximately. So within those 12 weeks, you saw you say him maybe eight or nine times?

A Yes.

Q Okay. Now, do you recall talking to an investigator by the name of Edward Hendricks?

A Yes.

Q Did you talk to Mr. Hendricks --

A I think that's his name. I remember someone calling me, yes.

Q Do you recall telling Mr. Hendricks --

MS. FARAGLIA: Objection.

MS. JORDAN: Objection, your Honor.

MS. FARAGLIA: Can we approach?

THE COURT: You may.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench

after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Mary Jo.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel on the record at the bench out of the hearing of the Jury as follows:)

- - - o0o - - -

THE COURT: Over here.

MS. JORDAN: The State was never made aware the defense investigator had spoken with witnesses. We have not been provided a report, any recordings, any investigative notes to indicate any of these questions that are going to be asked.

Mr. Hendricks' name does not appear on discovery and was never brought to the knowledge of the State. To ask this witness during trial whether or not the defense investigator spoke to her without providing that information in discovery is inappropriate.

MS. LONGINO: That's if --

THE COURT: Go ahead.

MS. JORDAN: Your Honor, we

don't have a report or a statement or -- we just --

THE COURT: You have to provide information as to what he gathered from his discussion with her. It's reciprocal discovery.

MS. LONGINO: That's if I call her as a witness under Rule 16.

MS. FARAGLIA: No, no. You're misguided in that fact.

MS. LONGINO: It's right in the rules, doesn't talk about misguided rules.

THE COURT: Don't you have to provide reciprocal discovery?

MS. FARAGLIA: Yes.

THE COURT: Where is it?

MS. FARAGLIA: Under Rule 16.

THE COURT: Who's got the rule?

MS. FARAGLIA: It's here. You have to at least give a summary of what the person is going to say. It's fair play.

MS. LONGINO: It's one time. I didn't call her as a witness, you did.

MS. FARAGLIA: You're trying

to impeach her.

THE COURT: Hold on.

MS. LONGINO: I didn't ask her about how many --

THE COURT: What's your question?

MS. LONGINO: My question is didn't she tell him every time [redacted] saw Mr. Lewis she was happy to see him, period.

THE COURT: You can ask that.

- - - o0o - - -

(Thereupon, the following proceedings were had before the Jury in open court:)

- - - o0o - - -

BY MS. LONGINO:

Q Ms. Milton, at the time you spoke to Mr. Hendricks, did you tell him that Deonte would drop off or pick up [redacted] from the day care and she was always happy to see him?

A I don't recall.

Q You don't recall telling Mr. Hendricks that?

A No.

Q That she was always happy to see Deonte?

A No.

Q What was her behavior with him that you observed?
A It was always him and her and her mom as a drop off. I never saw a pick-up because I would be gone for the day.
Q So you never saw him pick her up -- I mean, drop her off by himself?
A No.

MS. LONGINO: Nothing further.

THE COURT: Any follow-up?

MS. JORDAN: Briefly, your Honor.

REDIRECT EXAMINATION OF CHANTALE MILTON

BY MS. JORDAN:

Q Ms. Milton, you were used to seeing the defendant, Deonte Lewis, Sierra Day, and [redacted] together?
A Yes.

MS. JORDAN: Nothing further.

THE COURT: You may step down.

- - - oOo - - -

(Thereupon, the witness was excused.)

- - - oOo - - -

THE COURT: Call your next

witness.

MS. JORDAN: Yes, your Honor. The State would call Sakeya Fitzpatrick.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **SAKEYA FITZPATRICK**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Please be seated. Make sure you speak directly into the microphone. You can adjust the microphone; you cannot adjust the seat.

You may inquire.

DIRECT EXAMINATION OF SAKEYA FITZPATRICK

BY MS. JORDAN:

Q Good afternoon, ma'am. Could you please state your name and spell your name for the record.

A Sakeya, S-A-K-E-Y-A, Fitzpatrick,

F-I-T-Z-P-A-T-R-I-C-K.

Q Are you employed?

A Yes.

Q Where do you work?

A Creative Kids Child Care.

Q What do you do at Creative Kids Child Care?

A I am the lead toddler teacher.

Q Was there a point in time where you worked at Get Ready, Set, Grow day care?

A Yes.

Q What did you do at that facility?

A In the morning, I was the head Pre-K teacher, and in the afternoon I was also school-age teacher.

Q When did you start working at Get Ready, Set, Grow?

A June of 2017.

Q When did you stop working at Get Ready, Set, Grow?

A July of 2018.

Q What sort of training and experience did you have to have to be a preschool teacher?

A I have my CDA, which is a Child Development Associate. I'm also certified in CPR, first aid, communicable diseases --

THE COURT: Slow down.

BY MS. JORDAN:

Q Start over and go a little slower for me. Remember that our court reporter has to take down everything that you say. Sometimes I talk too fast for her.
A I have my CDA, which is the Child Development Associate. I have my first aid/CPR certification, my child abuse certification, my domestic violence certification, and communicable diseases.
Q Okay. When did you say you first started working at get Ready, Set, Grow?
A June 2017.
Q Okay. And when you started working there, what was your assignment?
A I was the lead Pre-K teacher in the morning and the school-age teacher in the afternoon.
Q What time did the morning shift run for?
A I did 7:30 to 11:30 and then from, I want to say -- I had an extended break, so it was like 2:30 to like five I was the school-age teacher.
Q What sort of things would you do as a Pre-K teacher?
A I did daily lesson planning with them. I did art activities with them. I -- excuse me. I assisted with serving meals for lunch and kept active supervision at all times.

Q When you started working at Get Ready, Set, Grow, was there anybody that you knew prior to working there already working at the agency?
A No, not personally, no.
Q Okay. When you started working there, did you have interactions with somebody by the name of Sierra Day?
A Yes.
Q Do you see that person in the courtroom today?
A Yes.
Q Could you please --
MR. SHAUGHNESSY: We'll stipulate that this witness can identify Sierra.
THE COURT: So noted.
MS. JORDAN: Thank you, counsel. Thank you, your Honor.

BY MS. JORDAN:

Q What were some of your first interactions with Ms. Day?
A Well, I met her the day that I got the job when I did my interview, and at the time I didn't realize that I had went to school with her because she was older than me. But when I met her, she was -- she was fine, she was outgoing, she was soft-spoken.
Q All right. Was she one of your co-workers that

you would start talking to and have conversations with at work?
A Yes.
Q Did the two of you sort of become acquainted with one other?
A We did.
Q What sort of things would you talk about?
A Just typical stuff. It wasn't nothing really out of the ordinary; little simple conversations.
Q Okay. During your interactions with Ms. Day, would she talk about her relationships and would you talk about your relationships?
A Not really.
Q Okay. Did there come a point in time where she made you aware when she was dating someone?
A Yes.
Q Could you tell me about that?
A She just told me that --
MS. LONGINO: Objection.
THE COURT: Overruled.
THE WITNESS: She told me that she was dating someone who went to school with us, and that was it.
BY MS. JORDAN:
Q When did she first inform you that she had started

dating?
A I want to say it was around August of 2017.
Q And she indicated that it was somebody that you two had went to school with?
A Mm-hmm.
Q I'm sorry, which high school are we talking --
A Shaw High School.
Q Did she ever provide you that person's name?
A Yes.
Q What was his name?
A Deonte.
Q Do you recall his last name?
A No, not at the time; she didn't give me a last name.
Q And during your chats with Sierra while you guys were at work, would you guys sort of talk about your relationship with Deonte as it was new?
A Not really.
Q Did she mention how often they would spend time together?
A I mean, from my knowledge, they were together; if it wasn't every day, it was every other day.
MS. LONGINO: Objection, your Honor. May we approach?
THE COURT: Sure.

\- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

\- - - o0o - - -

MS. LONGINO: Your Honor, I'd like to make a standing objection to the witness testifying as to what Sierra told her.

THE COURT: Very good. Overruled. You may proceed.

BY MS. JORDAN:

Q Ms. Fitzpatrick, did Sierra tell you how often she and Deonte would spend time together?

A No.

Q Based on the conversations that you had with her, were you able to determine how often he was around?

A No. Not really, no.

Q Okay. Did you see Deonte at Get Ready, Set, Grow?

A Yes.

Q How often would you see him at the day care?

A It wasn't very often, like he would come and drop them off at work and he would come in sometimes to go down to the classroom and talk to her, but it might have been maybe once or twice a week I would see him.

Q Once or twice a week?
A Mm-hmm.
Q When you would see Mr. Lewis once or twice a week, would he interact with any of the other staff?
A No.
Q What would he do?
A Walk in, go straight to where she was, and then when he was done, walk out.
Q Do you recall when you first started seeing him at the day care?
A No, I don't recall.
Q Do you recall the last time you saw him at the day care?
A It was in January of 2017, Sierra came in to pick up her last check and he was with her.
Q What observations, if any, did you have about Mr. Lewis when he was at the day care?
A He just seemed like a typical dude. He would walk in; walk in and walk out; ain't say nothin' to nobody, didn't make eye contact. I didn't deal with him.
Q Did he interact with Ms. Day?
A Yes.
Q Was she the only person in the day care that he would interact with?
A Yes.

Q You mentioned that you taught the Pre-K class; correct?
A Yes.
Q And would [redacted] have been of the age that she would have been in your class?
A Yes.
Q Could you tell me about your observations of [redacted]
A She was -- she was a happy, spunky, outgoing soft-spoken, just a happy child.
Q And so that was how she would present when she came to your class?
A Yes. When I did see her, yes, because Sierra's shift was, I believe it started at 11:30, so she didn't bring her in until afternoon shift started. By that time, I was going on break so I went to the school-age classroom when I came back from break.
Q Okay. And when you saw [redacted] where would she be located in the day care?
A Usually in the classroom with her mother.
Q Was there any other teacher assigned to that classroom?
A Me, but in the morning.
Q Was there any other teacher assigned to that classroom at the same time as Sierra?

A No.
Q So Sierra was the only teacher at Get Ready, Set, Grow that was actually in the class with [redacted]?
A Yes.
Q When was the last time you recall seeing [redacted]?
A I believe -- well, not I believe; it was January of 2018.
Q Tell me about the last recollection you have of seeing [redacted].
A Actually, it was right before Martin Luther King Day, that weekend we had a long weekend, and when I came back I didn't see her because when I came back from break, Sierra was already gone for the day. So I didn't physically see her, so it was before that weekend.
Q And we're talking January of 2018?
A Yes.
Q When was the last time you remember seeing Sierra?
A When she came and picked up her last check, which was right after Martin Luther King Day, probably either the second or last week in January.
Q When Sierra came to pick up her last check, who was with her?
A Deonte.
Q Was [redacted] with her?
A No.

Q But Mr. Lewis was?
A Yes.
Q Whom, if anything -- whom, if anyone, did Mr. Lewis speak to when he came to the day care for the last time with Sierra?
A Nobody.
Q Whom, if anyone, did Sierra speak with when she came for the last time?
A Nobody.
Q If you recall, what time of day were they there?
A I was on break, so it was between 11:30 and 2:30 p.m. because I was on break.
Q And [redacted] was not present; correct?
A No.
MS. JORDAN: One moment, please.

- - - o0o - - -

(Off the record.)

- - - o0o - - -

BY MS. JORDAN:

Q In your conversations with Sierra about her relationship with Deonte, did she ever mention that he spent the night at her home?
A No.
Q She didn't mention it or --

A She didn't mention.

MS. JORDAN: Nothing further.

THE COURT: Cross?

MR. SHAUGHNESSY: Nothing.

THE COURT: Ms. Longino?

CROSS-EXAMINATION OF SAKEYA FITZPATRICK

BY MS. LONGINO:

Q Ms. Fitzpatrick, you said you did see Mr. Lewis come to pick [redacted] up before?

A Not to pick her up but drop her off.

Q You never saw him pick up?

A No, I left before she did. She was the closer.

Q No. [redacted] not Sierra.

A No.

Q Okay. So you saw -- you only saw him drop [redacted] off; you never saw him pick her up?

A No.

MS. LONGINO: All right. Nothing further.

MS. JORDAN: Nothing further.

THE COURT: All right. You can step down.

- - - o0o - - -

(Thereupon, the witness was excused.)

- - - o0o - - -

THE COURT: Let's go to side bar real quick.

- - - o0o - - -

(Thereupon, a discussion was had between the Court and counsel off the record at the bench after which the following proceedings were had in open court:)

- - - o0o - - -

THE COURT: Raise your right hand, please.

- - - o0o - - -

**THE STATE OF OHIO**, to further maintain the issues on its part to be maintained, called as a witness, **JOHN BRAUN**, who, being first duly sworn, was examined and testified as follows:

- - - o0o - - -

THE COURT: Good afternoon. Speak directly into the microphone. You can adjust the microphone; the seat won't move.

You may inquire.

DIRECT EXAMINATION OF JOHN BRAUN

BY MS. JORDAN:

Q Good afternoon, Detective. Could you please state your name and spell it for the record.
A Detective John Braun, B-R-A-U-N.
Q And, sir, are you employed?
A Yes, I am.
Q Whom are you employed by?
A The City of Euclid.
Q In what capacity?
A Detective.
Q And how long have you been employed by the City of Euclid as a detective?
A I've been a detective since December of 2012.
Q What are some of your duties and assignments?
A I conduct follow-up investigations for felony cases and I'm also tasked with digital recovery for our office.
Q What training and experience do you have for that?
A For the digital recovery?
Q Yes.
A I have training through Homeland training, the Ohio Peace Officer Academy as well as the National White Collar Crime Center.
Q Can you briefly walk us through the process by which a phone extraction is done?
A Sure. I take pictures of the phone to show how

the phone is when I receive it. If there's a SIM card, I'll extract the SIM card data and then I conduct whatever examinations are available for that model phone.

Q I want to turn your attention to March 24th of 2018. Were you working that day?

A Yes.

Q What was your assignment?

A Detective.

Q Associated with your work on March 24th, 2018, did you have the opportunity to conduct extractions for two cellphones associated with the case of [redacted]

A Yes, I did.

Q What did you have to do to complete those extractions?

A If I remember correctly, I know at least one of them was password protected so I had to wait for a password to complete that extraction. Once I had that, the phones, like I said, I take pictures of the phone, conduct extractions of the SIM cards and conduct whatever extractions are available for those phones.

Q What sort of media device do you put the extractions on once they're completed?

A The extractions are saved to our server.

Q After being saved to the server, are they transferred to a jump drive or a disk, based on their

size?
A Only if they're needed for court, otherwise they remain on our server.
Q As part of your duties associated with these extraction reports, Detective, would you have provided this information to Detective Kroczak?
A Yes, I would have.
Q Would she have had access to obtain the extraction report that you completed?
A Yes, she would.
Q Are you aware if that process was completed in this case?
A Yes, it was.
Q I'm going to show you briefly the extraction reports so that you can identify them. Would you recognize them if you saw them again?
A Yes, I would.
MS. JORDAN: May I approach, your Honor?
THE COURT: Yes. What Exhibit Number?
MS. JORDAN: 908 and 909.
BY MS. JORDAN:
Q Detective, showing you what's been marked for identification purposes as State's Exhibit 909, can you

see the Mondo pad here, sir?
A Yes, I can.
Q Okay. And is this consistent with the extraction report that you would have completed associated with this case?
A Part of it is a report, yes, but that's all the stuff extracted.
Q When you say part of it is a report, what do you mean?
A Well, if you go into there, it's in a folder; there is a folder for each phone. I believe if you went back to the main folder, so now this is the report here.
Q So this is the report?
A Yes.
Q All the folders and all the documents are entirely what you extract from the --
A Right, it's all the data.
Q Okay. That was in relation to Exhibit 909 and State's Exhibit 908.
Is this the other extraction that you completed?
A Those are multiple extractions.
Q What do you mean?
A There is one for an Alcatel phone, one for an Azpen tablet, and one for an RCA tablet.

Q Are these all the extractions you completed for this case, Detective?

A They are.

Q Detective, generally speaking, what information is contained in extraction reports?

A In the reports, whatever data is parsed out by the software.

Q What do you mean when you say that?

A There's a lot. If it's a phone, it could be text messages, videos, photos, SMS messages, powering functions; it's a lot.

Q So anything associated with that phone device could potentially be part of an extraction report?

A Correct.

Q Any exchanges or communication with that phone device could be part of the extraction report?

A Correct.

MS. JORDAN: Thank you. Nothing further at this time, your Honor.

MR. SHAUGHNESSY: No questions, your Honor.

MS. LONGINO: No questions, your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

\- - - o0o - - -

(Thereupon, the witness was excused.)

\- - - o0o - - -

THE COURT: Ladies and gentlemen, that will conclude it for the day.

Please do not discuss this case. Once again, I'd ask that you report to the fourth floor tomorrow morning at quarter to nine. We'll start at nine o'clock.

Have a good night.

\- - - o0o - - -

(Thereupon, the Jury exited the courtroom.)

\- - - o0o - - -

(Thereupon, court stood in recess until Tuesday, March 5th, 2019, at nine a.m.)

\- - - o0o - - -