**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEONTE LEWIS, | ) | CASE NO. 1:23-cv-02254-JPC |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| WARDEN TIM MCCONAHAY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant, | ) | |

## I. Introduction

Deonte Lewis ("Petitioner") seeks a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges his convictions for aggravated murder and other related crimes, for which he is serving an aggregate sentence of 20 years to life in prison. This matter was referred to the undersigned under Local Rule 72.2 to prepare a report and recommendation on Lewis's petition and other case-dispositive motions. For the reasons set forth below, the undersigned recommends that the Court deny the petition.

## II. Relevant Factual Background

The Ohio Court of Appeals for the Eighth Appellate District set forth the following facts[1] on direct appeal:

> {¶ 4} A.D. was born on September 2, 2013. Following A.D.'s birth, Sierra and A.D. lived with A.D.'s father, Mickhal Garrett ("Garrett"). Sierra and Garrett were not

[1] The facts found by the appellate court of record "shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

married, and they ended their relationship when A.D. was less than two years old. Sierra obtained custody of A.D., and Garrett paid child support.

{¶ 5} In January 2016, Sierra and A.D. moved to the Harbor Crest Apartments in Euclid, Ohio. (Tr. 777.) Garrett had custody of A.D. for visitation on weekends "almost every other week." (Tr. 778.) Garrett testified that during a visit in September 2017, he and his fiancée discovered bruises on A.D.'s chest and lower back. (Tr. 783-784.) Garrett asked A.D. about the bruises, and A.D. told him, "Mommy pushed me up the stairs." Garrett took photographs of the bruises, which were admitted into evidence, and reported the bruises to Cleveland police. (Tr. 784, 786.) Garrett also discovered that A.D. had a loose tooth that was starting to rot. (Tr. 785.) Garrett confronted Sierra about the bruises and the tooth, but Sierra was unable to provide an explanation for the injuries. (Tr. 789-790.) Thereafter, Sierra obtained a temporary protection order against Garrett to prevent him from visiting A.D. (Tr. 790-791.)

{¶ 6} Sierra's brother, Isaiah Day ("Isaiah"), and her sister, Erica Johnson ("Johnson"), testified that Sierra became romantically involved with Lewis in July 2017. Multiple witnesses testified they believed Lewis lived with Sierra because they were together every day. (Tr. 565-566, 852, 885, 925, 938, 948.) Before Sierra started dating Lewis, A.D. regularly saw relatives on her maternal side of the family, and she acted like an ordinary child. (Tr. 930-931.) After Sierra became involved with Lewis, Sierra became estranged from her family and A.D. became withdrawn and stopped acting like a normal child. (Tr. 930-932, 945-949, 951.) Johnson testified that she also noticed that A.D. was becoming smaller. She explained:

> I thought maybe that just had something to do with her getting taller; you know, when toddlers grow, they slim out a little bit. She was getting littler and littler to the point you can see the extension of her stomach sticking out, so to speak.

(Tr. 932.)

{¶ 7} Several child-care workers who cared for A.D. at the Harbor Crest Day Care Center testified that A.D. was "energetic," "outgoing," and a "happy little girl" when they first met her in late 2016 and early 2017. (Tr. 644, 658.) One daycare worker, April Goode, described her as "verbal," meaning she could tell someone when she needed to go to the bathroom. Goode also stated that A.D. "interacted fine with other children." (Tr. 659.) However, A.D.'s behavior and demeanor changed over time. (Tr. 660.) Johnson testified that AD. came to her daughter's birthday party on July 30, 2017, but A.D. did not interact with the other children. Johnson explained:

> It was a normal kid party. Everyone was having fun. We adults were, you know, watchin' the kids and they were playin' in the pool and

> chasing each other, just havin' fun, and [A.D.] was just pretty much off to herself, not really interactin' with the other kids.

(Tr. 931.)

{¶ 8} Daycare workers at Harbor Crest Day Care Center noticed that A.D. often came to school with bruises and scratches. Tamira Finley testified that they started making observation reports every time they saw a new injury because they noticed that A.D. had "too many bumps and bruises." (Tr. 649.) Whenever a child-care worker noticed a new bruise or scratch, she would question A.D. about it, and A.D. would invariably say that "Mommy did it," or "Mommy hit me, Mommy hurt me." (Tr. 647, 651, 662.)

{¶ 9} On May 15, 2017, A.D. came to the Harbor Crest Day Care Center with a scrape across her face. Michelle Marshall, one of the child-care workers, asked Sierra what happened to A.D. Sierra told Marshall that A.D. fell at the park. (Tr. 671.) After Sierra left the building, Marshall asked A.D. if she fell at the park, and A.D. replied, "Mommy pushed me." (Tr. 678.) Seeking clarification, Marshall asked A.D. if Mommy pushed her down the slide. A.D. explained, "Mommy pushed me down the steps." (Tr. 678.) Marshall recorded her observations in an internal observation report maintained at the daycare facility.

{¶ 10} Three days later, on May 18, 2017, A.D. complained to Marshall that her head hurt. Marshall examined her head and discovered blood blisters on her head and dried blood in her ear. As usual, Marshall inquired as to what happened, and A.D. replied: "Mommy hit me, Mommy hurt me." (Tr. 680.) Marshall and the daycare director called the police to report suspected child abuse. EMS transported A.D. to Euclid Hospital, and Marshall, who followed in her own car, joined A.D. at the hospital. The emergency room physician suggested A.D.'s head was bleeding because her braids were too tight. (Tr. 688.) However, A.D. repeated over and over that her mother caused the injury. (Tr. 688.)

{¶ 11} As previously stated, Sierra and Lewis began dating in July 2017, and thereafter, Sierra's family saw less of A.D. According to Isaiah, Lewis was "possessive" of Sierra. Isaiah also believed that A.D. did not like Lewis. (Tr. 877, 878.) Isaiah testified that one day, in February 2018, he and Sierra were "hangin' out" at a friend's house for the evening. In the midst of conversation, Sierra mentioned that A.D. could not walk. Later that night, Lewis joined the party, and Isaiah noticed that he was nervous "[l]ike he did something." (Tr. 882-883.) Isaiah was concerned for A.D.'s safety and decided to go to Sierra's apartment to check on her.

{¶ 12} Isaiah testified that Lewis and Sierra were both present in the apartment when he came to check on A.D. under the pretext of a visit. (Tr.884-885.) He brought a bottle of Bacardi Silver and socialized for a while in the living room

before asking about A.D. Thereafter, Isaiah found A.D. laying in her bed in her bedroom. Isaiah explained:

> So I go I open the door. I see [A.D.]. She layin' on the bed. And it dawn on me, like, she says she can't walk. She was just layin' down like this. Her nickname Na Na, I said, "Na-Na," she layin' like this, she turn her head like this, "Uncle Isaiah, Uncle Isaiah."
>
> I'm like "You cool, you cool?" She like, "Yeah, yeah."
>
> Everythin' just seemed pretty cool. I'm like, well, she can't walk, I'm figurin' her ankle hurts or somethin' like that.

(Tr. 886.) Thereafter, Isaiah went to the kitchen and asked Sierra how A.D. was doing. Sierra told him that everything was fine, but indicated that A.D. was not eating much. *Id.*

{¶ 13} On March 11, 2018, Lewis called 911 to report that A.D. was "unresponsive." Nathan Lupah, a Euclid firefighter and paramedic who responded to the call, testified that Lewis opened the door to the apartment when he arrived. When Lupah entered the apartment, he found A.D. on the floor underneath an air conditioner that was running. (Tr. 402-403.) Lupah testified: "I remember thinking this is odd because it's cold outside" and noticed that the "wind was blowing on [A.D.]." (Tr. 438.) Robert Swope and Chris Wilson, of the Euclid Fire Department, also attended to A.D. at the scene. They noticed a strong smell of bleach upon entering the apartment, and Lieutenant Wilson discerned a smell of decomposition emanating from A.D.'s mouth while he was performing CPR. (Tr. 451, 508, 511.) The paramedics also noticed that A.D.'s jaw and body were stiff with rigor mortis. (Tr. 405.) According to Dr. Joseph Felo, a forensic pathologist in the Cuyahoga County Medical Examiner's Office, rigor mortis develops quickly and generally disappears within a day and half after death.

{¶ 14} Officer Nicholas Edington of the Euclid Police Department also responded to the 911 call. He testified that Lewis identified himself as A.D.'s stepfather. (Tr. 497.) Edington interviewed Sierra, who told him that A.D. stopped eating and became sick after the family went to Red Lobster the previous Thursday. (Tr. 499.) Sierra also told Edington that earlier that morning, A.D. fell off the toilet and hit her head. (Tr. 499.) Sierra claimed she found A.D. on the ground unresponsive.

{¶ 15} EMS took A.D. to Euclid Hospital. Meanwhile, Euclid police obtained a search warrant to search Sierra's apartment. Lewis provided police with a key to the apartment. (Tr. 504.) Detective Phil Tschetter testified that he took photographs of A.D.'s bed because it had no sheets, no pillow, and no bedding, except a single fleece blanket. He also noticed that the mattress smelled strongly of urine. (Tr. 587.)

{¶ 16} Detective Jennifer Kroczak, the lead homicide detective, listened to a recording of Lewis's 911 call to police. When asked whether Detective Kroczak made any observations while listening to the call, she stated:

> I noticed that there was no excitement in the voices of the callers. Both the defendants had spoken during that call. There was no panic; it was very flat. It wasn't what I would expect for a medical emergency of a four-year-old having stopped breathing.

(Tr. 1002.) Heidi Hobart, the 911 dispatcher, authenticated the recording of the 911 call and testified that she had been on the phone with Lewis for three minutes and 53 seconds before he mentioned that the child was not breathing. (Tr. 388.)

{¶ 17} Detective Kroczak authenticated photographs of A.D.'s body that were taken at Euclid Hospital. She described A.D.'s body as "extremely emaciated" and "skeletal." She testified that there were obvious signs of trauma and abuse, including a deep dark bruise over an entire eye that was swollen shut. (Tr. 1000.) There was also a one-inch laceration above the eyelid. A.D. had burns on her lower extremities and bruises on her body.

{¶ 18} Kroczak reviewed videos and other evidence extracted from Lewis and Sierra's phones and found a video of Sierra and Lewis having sex at 3:28 p.m. on March 10, 2018, the day before A.D. was found dead. (Tr. 1014-1016.) Detective Kroczak also identified a surveillance video from a nearby Chipotle, showing Lewis and Sierra purchasing burrito bowls on March 10, 2018, at 6:34 p.m. Despite these videos, Kroczak concluded, based on the evidence in her investigation, that only Lewis and Sierra had access to A.D. at the end of her life. (Tr. 1010.)

{¶ 19} Dr. Felo performed the autopsy on A.D.'s body. Dr. Felo estimated that A.D. had been dead for a day and half at the time of the autopsy. Dr. Felo described A.D. as "severely malnourished" and weighing only 26 pounds. Her skin was loose because she had lost muscle and fat below the skin. Dr. Felo observed that A.D. had a bruise on the right side of her forehead that was approximately one week old, and a black eye that she sustained two days before her death. A.D. also had some abrasions on her left arm and back. Some skin had "sloughed off" her lower legs and feet, and she had bed sores on her lower legs. (Tr. 1064-1065, 1073.)

{¶ 20} An internal examination revealed that A.D. developed a subdural hematoma, or blood clot, in the brain following blunt trauma to the left side of her head. The brain injury caused pressure to build on A.D.'s brain, which caused her to have a stroke. (Tr. 1066.) Dr. Felo estimated that the stroke would have occurred somewhere between two weeks and three months before A.D.'s death. The injury also caused a lack of oxygen in the brain that caused the back part of the brain to die. The back part of the brain controls muscle coordination. (Tr. 1070.) Dr. Felo explained that if A.D. could walk after the back part of her brain had died, her gait would have been clumsy and uncoordinated. (Tr. 1070.)

> {¶ 21} According to Dr. Felo, A.D.'s body slowly withered away after the stroke because brain damage and starvation caused her organs to deteriorate. Her lungs were collapsed because they were not taking deep breaths. Her pancreas was digesting itself because she was not eating. Dr. Felo also found acute hemorrhagic gastrophy, i.e., the formation of stomach ulcers, caused by excessive stomach acid and no food.
>
> {¶ 22} Dr. Felo opined that a lay person would have known that A.D. was dying because she was unable to walk for a period of time due to her injuries. (Tr. 1116.) Moreover, her gaunt face and emaciated body made it obvious that she was dying. (Tr. 1117.) Dr. Felo explained that A.D. gradually declined, having less and less appetite and becoming more and more lethargic over time. A.D.'s ability to use motor and cognitive skills also would have gradually diminished until the time of her death. (Tr. 1114.).

(ECF No. 20-1, PageID #: 340-47).

## III. Relevant State Procedural History

### A. Trial Court

A grand jury in the Cuyahoga County Court of Common Pleas charged Petitioner and Sierra Day ("Sierra") in an eight-count indictment with aggravated murder; murder; felonious assault; permitting child abuse; three counts of endangering children; and tampering with evidence. (ECF No. 20-1, PageID #: 206-08). Following his arrest and not guilty plea, Petitioner moved to sever his trial from that of Sierra, arguing he would be prejudiced by a joint trial. (*Id.* at PageID #: 210-16). The State opposed the motion, and the trial court ultimately denied the motion. (*Id.* at PageID #: 218-26, 228).

Following a joint trial, a jury convicted Petitioner and Sierra of all eight counts on March 7, 2019. (*Id.* at PageID #: 230). The trial court merged counts one through seven for purposes of sentencing and sentenced Petitioner to twenty years to life on count one (aggravated murder) and three years on count eight (tampering with evidence), to run concurrently. (*Id.* at PageID #: 232).

**B. Direct Appeal**

Petitioner appealed his conviction and sentence to the Eighth Appellate District Court of Appeals. (ECF No. 20-1 at PageID #: 236). Petitioner raised the following assignments of error:

> (1) Deonte Lewis's convictions for aggravated murder, murder, felonious assault, permitting child abuse, and endangering children violate his right to due process as protected by the 14th Amendment to the US Constitution and Article I, Section 10 of the Ohio Constitution.
>
> (2) Lewis's rights under the Sixth and Fourteenth Amendments of the US Constitution and Article I, Section 10 of the Ohio Constitution were violated because his trial counsel failed to provide him with effective representation.
>
> (3) The failure to sever the cases against these two codefendants violated Deonte Lewis's right to a fair trial.

(*Id.* at PageID #: 247). In his first assignment of error, Petitioner argued there was insufficient evidence to support his convictions. (*Id.* at PageID #: 256-67). Concerning his counsel, Petitioner argued they were ineffective for failing to object to or request a limiting instruction regarding evidence of Sierra's past abuse of A.D.; failing to request a reckless homicide instruction and instead requesting a negligent homicide instruction; failing to object to the prosecution's closing argument; failing to object to hearsay testimony; and promising to provide certain evidence but failing to do so. (*Id.* at PageID #: 270-85). The State filed an opposition brief and Petitioner filed a reply. (*Id.* at PageID #: 292-336).

On November 12, 2020, the appellate court affirmed in part, reversed in part, and remanded the case to the trial court. (ECF No. 20-1, PageID #: 338-68). Specifically, the appellate court concluded that there was insufficient evidence to support Lewis's convictions for child endangering under Ohio Revised Code § 2919.22(B)(1) and (2) because that statute requires abuse as opposed to neglect and "there [was] no evidence that he caused committed [sic] any affirmative act of torture or abuse or that he affirmatively caused any of A.D.'s physical injuries." (*Id.* at

PageID #: 355-56). Thus, the appellate court remanded to the trial court with instructions to vacate his child endangering convictions under Revised Code § 2919.22(B)(1) and (2). (*Id.* at PageID #: 367-68).

Petitioner filed a notice of appeal to the Supreme Court of Ohio. (ECF No. 20-1, PageID #: 370-71). Petitioner raised the following propositions of law in his brief in support of jurisdiction:

> (1) The right to effective assistance of counsel requires counsel to understand the applicable law and the case's underlying facts in reaching strategic decisions on their client's behalf.
>
> (2) Where the state relies on the accused's failure to act where it maintains the accused owed a duty of care, protection, and support to the deceased, it must demonstrate that there was a relationship between them sufficient to give rise to such a duty.
>
> (3) Where the evidence against joined codefendants is uneven or there is a risk that the evidence relevant against one codefendant will be improperly considered against the other, the right to due process and a fair trial requires the trial court to sever the two cases.

(*Id.* at PageID #: 373-90). The State filed an opposition brief. (*Id.* at PageID #: 392-409). On February 8, 2022, the Supreme Court of Ohio declined to accept jurisdiction over the dissent of multiple justices. (*Id.* at PageID #: 410-18). Petitioner moved for reconsideration, which the State opposed. (*Id.* at PageID #: 421-38). On April 12, 2022, the court denied the motion. (*Id.* at PageID #: 444).

Petitioner's convictions became final on November 28, 2022, when the United States Supreme Court denied Lewis's petition for a writ of certiorari. (ECF No. 20-1, PageID #: 514).

## IV. Federal Habeas Corpus Petition

This matter has a lengthy procedural history in this Court. Lewis, through counsel, filed his initial petition for a writ of habeas corpus on November 20, 2023. (ECF No. 1). The next day, Lewis filed a motion to file an amended petition on or before January 20, 2024, which the Court

granted. (ECF No. 4). Subsequently, Lewis requested and received an additional extension, filing his amended petition on February 3, 2024. (ECF No. 10).

On May 9, 2024, Lewis filed a second motion to amend the petition for habeas corpus, which this Court again granted. (ECF No. 12). On September 16, 2024, Lewis filed a second amended petition. (ECF No. 17). Respondent, Warden Tim McConahay, filed a return of writ on November 26, 2024. (ECF No. 20). Lewis requested and received multiple extensions of time to file the traverse. (ECF Nos. 21, 22, 23, 25, 27).

On September 5, 2025, Petitioner filed a motion to expand the record, which this Court subsequently denied on October 23, 2025. (ECF Nos. 26, 35). On January 30, 2026, Petitioner moved for leave to file a third amended habeas petition. (ECF No. 36). The Court granted in part and denied in part Petitioner's motion to amend on April 29, 2026. (ECF No. 40). Specifically, the Court granted Petitioner leave to amend grounds one through three as they related back to the second amended petition but denied leave to amend as to proposed grounds four through seven.[2] (*Id.*).

Petitioner filed his third amended petition on May 13, 2026, asserting the following grounds for relief:

> (1) Mr. Lewis was denied effective assistance of counsel in violation of the Sixth Amendment of the United States Constitution.
>
> (2) The trial court erred when it failed to sever Mr. Lewis's trial from codefendant's trial in violation of his Sixth and Fourteenth Amendment Confrontation Clause right and right to a fair trial.
>
> (3) There was insufficient evidence to convict Mr. Lewis in violation of his right to Due Process under the Fourteenth Amendment of the United States Constitution.

[2] On May 14, 2026, Respondent filed objections to the order allowing amendment, but the District Court subsequently overruled those objections. (ECF Nos. 42, 44).

(ECF No. 41, PageID #: 2018-21). Respondent filed a return of writ on June 26, 2026. (ECF No. 45). Lewis filed a traverse on July 27, 2026. (ECF No. 46). On August 11, 2026, Respondent filed a sur-reply to the Traverse. (ECF No. 47). Thus, this matter is finally ripe for review.

## V. Legal Standards

Because Petitioner is a state prisoner seeking federal habeas relief, his petition is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), and corresponding case law.

### A. Cognizable Federal Claim

Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all." *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991). Thus, "errors in the application of state law … are usually not cognizable in federal habeas courts." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). A federal habeas court does not function as an additional state appellate court; it does not review state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987)). Instead, "federal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).

### B. Exhaustion

Under 28 U.S.C. § 2254(b), a state prisoner seeking federal habeas relief must exhaust "the

remedies available in the courts of the State" or show that (1) there is an absence of available State corrective process or (2) circumstances exist that render such process ineffective to protect the prisoner's rights. "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To satisfy the exhaustion requirement, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845. However, when a petitioner fails to exhaust all of his state law remedies but can no longer do so under state law, the claim becomes procedurally defaulted. *Id.* at 848.

**C. Procedural Default**

Procedural default occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by the state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See generally Wainwright v. Sykes*, 433 U.S. 72, 80, 84-84 (1977); *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). In determining whether there has been a procedural default, the federal court looks to the last explained state-court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). When a state court declines to address a prisoner's federal claims because the petitioner failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be

"'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

A petitioner procedurally defaults a claim by failing to "fairly present" the claim in state court when he does not pursue that claim through the state's "ordinary appellate review procedures," and, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' … it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law." *Id.* (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

A petitioner can overcome a procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. Under this test, cause "must be something external to the petitioner, something that cannot be fairly attributed to him." *Id.* "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); *Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir. 2004) ("The 'fundamental miscarriage of justice' gateway is open to a petitioner who submits new evidence showing that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995))).

**D. AEDPA Standard of Review**

For claims addressed on the merits in state court proceedings, 28 U.S.C. § 2254(d) provides that federal habeas relief shall not be granted unless the state court decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

To determine whether relief should be granted, the Court must use the "look-through" methodology and look to the "last explained state-court judgment" on the petitioner's federal claim. *Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them no effect—which simply 'looks through' them to the last

reasoned decision—most nearly reflects the role they are ordinarily intended to play."); *Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations and citations omitted). "[U]nder the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Id*.

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(d)(2)). A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the trial court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). A state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290,

301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's … determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18 (citing 28 U.S.C. § 2254(e)(1)).

For state prisoners, the § 2254(d) standard "is difficult to meet… because it is meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This is because, "[a]s amended by AEDPA, § 2254(d) is meant only to stop short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id*. at 103. "It preserves authority to issue the writ in cases where there is no possibility [that] fairminded jurists could disagree that the state courts decision conflicts with this Court's precedents" and "goes no further." *Id*. Thus, in order to obtain federal habeas corpus relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

## VI. Discussion

Petitioner raises three grounds for relief: (1) he was denied effective assistance of counsel; (2) the trial court erred when it failed to sever Petitioner's trial from Sierra's trial; and (3) there was insufficient evidence to convict Petitioner. (ECF No. 41 at 5-8).

As an initial matter, Respondent argues that Petitioner "has partially procedurally defaulted his first ground for relief and entirely defaulted his second and third grounds for relief" and failed to show cause and prejudice or a fundamental miscarriage of justice to excuse the default. (ECF No. 45 at 13-15). In response, Petitioner asks that if the Court finds any of his claims unexhausted,

he be granted a stay pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005) to return to state court. (ECF No. 46 at 8-12). Respondent's sur-reply only substantively addresses the procedural default issue. (*See* ECF No. 47).

Petitioner's federal claims are similar to claims raised at various stages in the state courts. Thus, the undersigned assumes, without deciding, that he has exhausted his claims but, as discussed below, concludes that each of Petitioner's claims are meritless. Accordingly, the undersigned declines to address whether the claims are procedurally defaulted. *See Palmer v. Bagley*, 330 F. App'x 92, 108 (6th Cir. 2009) ("We need not address whether the [habeas] claims were procedurally defaulted because they are meritless."). The undersigned looks to the state appellate court's decision as the last explained judgment in addressing the merits of Petitioner's claims. *Ylst*, 501 U.S. at 804.

### A. Ground One: Ineffective Assistance of Counsel

Petitioner challenges counsel's effectiveness based on counsel's failure to (1) object to or request a limiting instruction concerning "prior acts" evidence of Sierra's past abuse of A.D.; (2) object to certain evidence and argument by the prosecution, including the prosecution's repeated reference to Petitioner and Sierra together in closing arguments; (3) request a lesser included offense instruction on reckless homicide; (4) object to hearsay testimony; and (5) adduce evidence of an alibi after discussing such in opening statements. (ECF No. 41-1 at 27-35). He argues that these errors, individually and collectively, prejudiced the outcome of his trial such that he is entitled to relief under *Strickland v. Washington*, 466 U.S. 668 (1984). (*Id.* at 36).

#### 1. Legal Standard

To establish ineffective assistance of counsel, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687-88, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A reviewing court's scrutiny of counsel's performance must be highly deferential. *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105.

### 2. State Court Decision

The state appellate court addressed Petitioner's ineffective assistance of counsel claims as follows:

> 1. Prior Acts Evidence
>
> {¶ 47} Lewis argues his trial lawyers were ineffective because they failed to object to evidence that Sierra had abused A.D. numerous times in the past. Indeed, seven witnesses described Sierra's prior acts of abuse, and three daycare workers authenticated "Child Observation Forms" they made to document the abuse they observed while A.D. was in their care. The documentary evidence contained descriptions of black eyes, a split lip, and various bruises on A.D.'s body.
>
> {¶ 49} However, the evidence of prior abuse referred to specific incidents that occurred before Sierra and Lewis were romantically involved. Sierra and Lewis started dating in July 2017, and the "Child/Observation Forms" described abuse that occurred in 2015, 2016, and the first half of 2017, before Sierra and Lewis

started dating. Although A.D.'s father, Mickhal Garrett, testified that he observed bruises on A.D.'s chest and back in September 2017, it was clear that A.D. told authorities that Sierra, not Lewis, caused those bruises. Therefore, it was clear that the prior acts evidence pertained solely to Sierra, and Lewis cannot show that he was unfairly prejudiced by its admission into evidence.

2. Reckless Homicide Instruction

{¶ 50} Lewis argues his trial counsel was ineffective because they failed to request a jury instruction on the lesser-included offense of reckless homicide.

{¶ 51} However, there is a presumption in Ohio that the failure to request an instruction on a lesser-included offense constitutes a reasonable "all or nothing" trial strategy. *State v. Jackson*, 6th Dist. Sandusky No. S-15-020, 2016-Ohio-3278, ¶ 20; *see also State v. Clayton*, 62 Ohio St.2d 45,402 N.E.2d 1189 (1980).

{¶ 52} By not requesting an instruction on a lesser-included offense, the hope is that the jury will acquit the defendant if the evidence does not support all the elements of the offense charged. *See, e.g., State v. Vogt*, 4th Dist. Washington No. 17CA17, 2018-Ohio-4457, ¶ 119 (It would have been inconsistent to argue for complete acquittal while at the same time arguing for the lesser-included offense.); *State v. Viers*, 7th Dist. Jefferson No. 01JE19, 2003-Ohio-3483, ¶ 47 (Trial courts tend to overrule [ineffective assistance] arguments based upon reviewing court's deference to the all-or-nothing trial strategy.); *State v. Griffie*, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996)("Failure to/ request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel.").

{¶ 53} Lewis argues that because there was no evidence that he purposely caused any harm to A.D., his trial lawyers should have requested a jury instruction on the lesser-included offense of reckless homicide. This argument fails to overcome the presumption that his counsel made a tactical decision to seek an acquittal rather than a conviction on a lesser-included offense. We, therefore, cannot say that counsel's performance was deficient simply because they decided not to request a lesser-included offense instruction.

3. Prosecutorial Misconduct

{¶ 54} Lewis argues his trial counsel was ineffective because they failed to object when the prosecutor repeatedly stated that both Sierra and Lewis caused A.D.'s fatal injuries when there was no evidence that Lewis caused any physical injury.

{¶ 55} The test for prosecutorial misconduct in closing argument is "'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000), quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 I (1984). "'To

demonstrate prejudice in this context, 'a defendant must show that the improper remarks or questions were so prejudicial that the outcome of the trial would clearly have been otherwise had they not occurred.'" *State v. Obermiller*, 147 Ohio St.3d 175, 2016-0hio-1594, 63 N.E.3d 93, 1105, quoting *State v. Collier*, 8th Dist. Cuyahoga No. 78960, 2001 Ohio App. LEXIS 4663 (Oct. 18, 2001).

{¶ 56} Lewis contends the prosecutor unfairly attributed Sierra's acts of child abuse to him when there was no evidence that he ever struck or beat A.D. However, as previously stated, evidence of Sierra's prior acts of abuse pertained solely to her and made no reference to Lewis. Indeed, the evidence clearly showed that Lewis was not involved in A.D.'s life until July 2017, and the prior acts evidence concerned incidents that occurred before that time. Nevertheless, Lewis objects to the following excerpt from the state's closing argument:

> The only person that wasn't happy in that equation was [A.D.]. Because there came a point in time, ladies and gentlemen, that regardless of who struck her or where the blow came from, this child suffered a blow. And I submit to you they are equally culpable for that blow. One is not more responsible than the other. Once she suffered that blow, that child started to deteriorate right in front of their eyes. As human beings, we nurture people that are ill. We spend hours at hospice centers watching people die because we love them. We don't let them be alone.
>
> But these two, they don't have a heart or a soul for what they did to this child. Torture and cruelly abuse. And she has the audacity to say find them not guilty? Are you kidding me?
>
> Not so much as a glass of water? She couldn't talk. She couldn't tell you what she was going through. The only thing she knew was lying in a bed, soaked with urine. That's what she knew. And those were the end of her days. Lying in a bed soaked with urine.

(Tr. 1249-1250.) Even if Lewis did not directly cause A.D.'s injuries, the evidence showed that he permitted the abuse and concealed the harm to A.D., thereby preventing her from receiving any medical treatment that might have saved her life or alleviated her suffering. Therefore, there was nothing inappropriate about the prosecutor's observation that Lewis contributed to A.D.'s suffering and death.

{¶ 57} Lewis also argues the prosecutor committed misconduct by asserting there was no evidence that he lived anywhere but with Sierra. Lewis objects to the following statements:

> By the way, where is there evidence that he was staying at his mom or dad's house? There is no evidence to that. Did it come from this witness stand? No.

Lewis argues these remarks misrepresented the evidence because Lewis included his parents' address on his written statement to police. Although it is true that Lewis wrote his parents' address on the police report, there was no testimony from any witness that he lived anywhere but with Sierra. Therefore, the prosecutor's statement is not wholly inaccurate since there was no oral testimony supporting his claim that he lived with his parents. Moreover, the jury heard the evidence and was free to decide where Lewis lived; the prosecutor's statement did not change the outcome of the trial.

4. Improper Hearsay

{¶ 58} Lewis argues his counsel was ineffective for failing to object to Isaiah's testimony that Sierra told him that Lewis was living with her. He contends the evidence was hearsay and would have been excluded if his trial counsel had objected. Moreover, he contends the outcome of the trial would have been different if this evidence had been excluded because Isaiah was the only witness who testified that Lewis was living with Sierra.

{¶ 59} However, as previously stated, whether Lewis was officially living with Sierra is of little importance because there was evidence that they were always together. Daycare workers testified that Lewis frequently accompanied Sierra and A.D. to the daycare centers when it was time to drop off A.D. in the morning. Other witnesses testified that they were "always together." Indeed, when asked whether Sierra and Lewis were living together, Johnson replied that they "[m]ight as well" be living together because "[t]hey were always together." (Tr. 938.) Indeed, Johnson "assumed that he did stay there with her." (Tr. 938.) Therefore, even if counsel had objected to the hearsay testimony that Sierra told Isaiah that Lewis was living with her and the testimony had been excluded, the outcome of the trial would not have been different because there was other competent evidence establishing that Lewis was staying in Sierra's apartment.

5. Promises in Opening Statements

{¶ 60} Finally, Lewis argues his trial counsel was ineffective because they promised during opening statements to call a witness who would testify that Lewis was staying elsewhere the weekend before A.D. died but counsel never called the witness during trial. Defense counsel stated, in relevant part:

> Now, the evidence will show that on March 5th, Mr. Lewis left Ms. Day's apartment; went to his brother's house, spent the night at his brother's house; came back on March 6th. Then, on March 7th, he went back to his brother's house; was gone for awhile, in and out, as I said. Then he went back on March 10th, and on March the 11th this child passed.

> (Tr. 381.) Lewis argues that counsel's failure to present the promised evidence is "further indicia of counsel's failure to provide competent representation." (Appellant's brief at 35.)
>
> {¶ 61} Evidence of an alibi might have changed the outcome of the trial for Lewis, depending on the witness's credibility and the circumstances of the alibi. However, just because counsel promised to provide an alibi witness does not mean exculpatory evidence actually existed. A broken promise is far less prejudicial than the failure to provide exculpatory evidence. There is no indication that counsel failed to present exculpatory evidence; only that they promised but failed to present an alibi witness. We cannot say that the broken promise, by itself, prejudiced the outcome of the trial.

(ECF No. 20-1, PageID #: 357).

### 3. Federal Arguments and Analysis

Respondent argues Petitioner has not demonstrated that the state appellate court decision involved an unreasonable determination of the facts or an unreasonable application of *Strickland*. (ECF No. 45 at 17). As to the prior acts evidence, Respondent asserts that "the Supreme Court has never held that a state law or rule of evidence permitting the introduction of 'bad acts' or 'other acts' evidence to establish the defendant's character violates the Due Process Clause" and Petitioner failed to "explain how the state appellate court's decision is objectively unreasonable under AEDPA." (*Id.* at 19-20). Concerning the failure to object during closing arguments, Respondent argues that the appellate court reasonably rejected Petitioner's claim because the prosecution did not engage in misconduct and Petitioner cannot show that counsel's decision not to object was not sound trial strategy. (*Id.* at 20-23). Respondent argues the state appellate court also reasonably rejected Petitioner's jury instruction claim and claim based on counsel's failure to object to the hearsay testimony of Isaiah. (*Id.* at 23-25). Concerning the alibi evidence, Respondent argues this claim was reasonably rejected by the state appellate court and is meritless because failure to fulfill a promise in opening statements does not amount to ineffective assistance unless counsel failed to reasonably investigate. (*Id.* at 25-26). Respondent asserts that Petitioner's

argument that he was "collectively prejudiced" by counsel's errors "is contrary to AEDPA and must be denied." (*Id.* at 26).

Petitioner argues that the state appellate court unreasonably applied *Strickland* and made unreasonable factual determinations in rejecting his ineffective assistance claims. (ECF No. 46 at 20-34). First, he argues the state appellate court's conclusion that counsel made a strategic decision not to request a lesser-included offense instruction was unreasonable given that counsel did request a different lesser included offense instruction. (*Id.* at 22-23). Additionally, he argues that the appellate court unreasonably applied *Strickland* "by presuming a 'strategy' that was based on an error of law" because "Counsel's legal error cannot be 'reasonable.'" (*Id.* at 24). Petitioner argues the state court did not address the prejudice prong of the *Strickland* analysis such that this Court should review that portion of his claim de novo and "find that defense counsel's failure to ask for the correct lesser-included offense instruction prejudiced the jury's finding that Mr. Lewis was guilty of aggravated murder." (*Id.* at 25).

Concerning counsel's failure to object to the prior acts evidence or request a limiting instruction, Petitioner argues this Court should find that the "appeals court's analysis is an unreasonable application of the facts" because it was not clear that the evidence concerning Sierra's abuse of A.D. only applied to Sierra. (*Id.* at 28-29). Turning to counsel's failure to object to the prosecution's closing arguments, Petitioner argues the appellate court's conclusion that the prosecution observing that Petitioner contributed to A.D.'s death "was not prejudicial is clearly contrary to *Strickland* because allowing it to stand misled the jury into believing Mr. Lewis's non-action was sufficient to convict him of purposeful homicide." (*Id.* at 30-31). Petitioner argues it was also unreasonable for the appellate court to conclude that counsel's failure to object to hearsay testimony did not affect the outcome of the trial because while the appellate court concluded "that

whether the co-defendants actually lived together was 'of little importance,'" it also held that Petitioner's "living arrangement was an integral fact in deciding the duty of care he owed to A.D." (*Id.* at 33). For each of these claims, Petitioner argues that because the state appellate court did not address whether counsel's performance was deficient for these failures, this Court should conclude it was on de novo review. (*Id.* at 26-36). Petitioner also argues the state appellate court's conclusion that he was not prejudiced by counsel's failure to provide an alibi witness after promising one is an unreasonable application of *Strickland* because "counsels' failure to provide this evidence once promised undercut their credibility with the jury for the remainder of the trial." (*Id.* at 34). Finally, Petitioner argues "the Court must view all of counsel's deficient decisions cumulatively." (*Id.*).

Having reviewed the record, the Court agrees with Respondent that Petitioner has failed to show that the state appellate court's decision was contrary to, or involved an unreasonable application of, *Strickland* or that it was based on an unreasonable determination of the facts. As to the prior bad acts evidence, the state court reasonably concluded Petitioner was not prejudiced by the admission of the evidence because the witnesses who testified regarding Sierra's prior abuse of A.D. referenced time periods before Petitioner's relationship with Sierra started. (ECF No. 20-1, PageID #: 358-59). On cross examination, Petitioner's counsel highlighted when the abuse occurred, A.D.'s statements that her mother—not Petitioner—caused the injuries, and that Petitioner "was nowhere around when these injuries were occurring." (ECF No. 20-4, PageID #: 1206-07, 1219-20, 1249-50). In light of counsel's cross examination, there is not a reasonable probability that the result of the proceedings would have been different if counsel had objected to or requested a limiting instruction regarding Sierra's prior bad acts.

Turning to counsel's failure to object to the prosecution's allegedly improper closing arguments, the state appellate court reasonably concluded "there was nothing inappropriate about

the prosecutor's observation that Lewis contributed to A.D.'s suffering and death" because "the evidence showed that he permitted the abuse and concealed the harm to A.D., thereby preventing her from receiving any medical treatment that might have saved her life or alleviated her suffering." (ECF No. 20-1, PageID #: 360-61). While Petitioner argues the jury was misled to believe that Petitioner's non-action was sufficient to convict him of purposeful homicide, the trial court properly instructed the jury on the elements of the crime and that they must reach a verdict based only on the evidence. (ECF No. 20-6, PageID #: 1711, 1718-20, 1722-41). Further, the court advised the jury that closing arguments were not evidence and that they were to rely on their own collective memories of the evidence. (*Id.* at PageID #: 1710-11, 1816). Courts "must presume juries follow instructions." *Saulsberry v. Lee*, 937 F.3d 644, 649 (6th Cir. 2019). Thus, there is not a reasonable probability that the result of the proceedings would have been different if counsel objected to the prosecution's statements during closing arguments.

Similarly, there is not a reasonable probability that the result of the proceedings would have been different if defense counsel objected to Isaiah's statement that Sierra told him she and Petitioner were living together. As the state court observed, other witnesses testified to seeing Petitioner with Sierra and A.D. at the daycare centers in the morning and that Sierra and Petitioner were "always together." (ECF No. 20-1, PageID #: 362; *see, e.g.,* ECF No. 20-4, PageID #: 1389-90, 1392-93, 1406-07, 1409-10; ECF No. 20-5, PageID #: 1478-83). Additionally, residents of Cultural Gardens testified that they believed Petitioner lived there. (*See* ECF No. 20-3, PageID #: 1035-37, 1042-44). Thus, there was sufficient evidence beyond the challenged statement for the jury to conclude that Petitioner—even if not formally living with Sierra—spent sufficient time with Sierra that he exercised custody and control over A.D.

Petitioner also challenges defense counsel's failure to produce an alibi witness after indicating in opening statements that the evidence would show that he was not at Sierra's apartment for approximately one week before A.D.'s death. (*See* ECF No. 20-3, PageID #: 933-34). The state appellate court reasonably concluded that in the absence of evidence that an alibi witness actually existed, the broken promise alone did not prejudice the outcome of the trial. The undersigned agrees. Importantly, the trial court instructed the jury that opening statements were an opportunity to present what counsel *believed* the evidence would show. (ECF No. 20-3, PageID #: 914-15; ECF No. 20-6, PageID #: 1710). The trial court instructed the jury that opening statements were permitted to assist them but were not evidence and that the case was to be decided based on the evidence. (ECF No. 20-3, PageID #: 915-15; ECF No. 20-6, PageID #: 1710-11). Additionally, the undersigned notes that while counsel referenced evidence that Petitioner had not been at the apartment for approximately a week prior to A.D.'s death, the medical examiner testified that A.D. suffered a brain injury that caused her to have a stroke at least *two weeks* prior to her death. (ECF No. 20-5, PageID #: 1624). Thus, there is not a reasonable probability that defense counsel's failure to call an unknown alibi witness impacted the outcome of the trial.

Petitioner's argument concerning counsel's failure to request a reckless homicide instruction warrants more detailed discussion, but Petitioner is ultimately not entitled to relief on that claim. Petitioner argues that trial counsel was deficient because they "failed to request that the trial court instruct the jury on reckless homicide, and instead erroneously asked for an instruction on negligent homicide." (ECF No. 45-1 at 32). Petitioner focuses on the fact that negligent homicide requires the use of a "deadly weapon or dangerous ordanance" and argues that counsel's misunderstanding of the law could not be sound trial strategy. (*Id.* at 33-34). However, whether counsel incorrectly requested a negligent homicide instruction is separate from whether failure to

request a reckless homicide instruction could have been sound trial strategy. Petitioner's position throughout trial was that he did not have control over A.D. or any reason to know of her condition. It is clear from the record that counsel was attempting to establish that Petitioner acted with, at best, negligence such that his actions did not show the required mental state to establish the charges against him. In light of this position at trial, Petitioner has not shown that declining to request a reckless homicide instruction—which would have required a finding of a more culpable mental state than counsel was arguing existed—was not sound trial strategy. *See Harrop v. Sheets*, 430 F. App'x 500, 507 (6th Cir. 2011) (where counsel requested other lesser instructions, decision not to request specific instruction could have been sound trial strategy).

Further, even if this Court were to assume the state court erred in concluding counsel's decision not to request the instruction was sound trial strategy and determine that counsel's performance was deficient, Petitioner has not shown that he was prejudiced by counsel's failure. Notably, Sierra's counsel requested a reckless homicide instruction. (ECF No. 20-6, PageID #: 1694-95). In arguing against the instruction, the state highlighted the evidence indicating that A.D. had suffered blunt force trauma to her head that led to her not being able to walk and asserted:

> There was nothing reckless about this. This child suffered a death somewhere between two weeks and up to three months while [Sierra] had custody and control over that child.
>
> There is no evidence that she ever sought medical treatment for her child. There is no evidence that she ever fed her child. And all the evidence shows that while she was under the care, custody, and control of that child she suffered blunt force trauma which ultimately leads to her death.

(*Id.* at PageID #: 1696-99). Similarly, in response to Petitioner's request for a negligent homicide instruction, the state argued that Petitioner "had care, custody, and control over this defendant [sic] particularly when he was living at Cultural Gardens, this child suffered blunt force trauma to the head which leads to the hematoma which leads to the strokes which leads to her malnutrition. And

he is – he's present for all this." (*Id.* at PageID #: 1703). The trial court denied both lesser included offense instructions without explanation. (*Id.*). Petitioner argues the evidence disparity between the two defendants would have warranted the instruction as to Petitioner even if it were not warranted for Sierra. However, this Court notes that while there was significant evidence of Sierra's *past* abuse of A.D., the evidence concerning the time immediately before her death was largely the same as to both Sierra and Petitioner. The evidence showed that both Sierra and Petitioner exercised control over A.D.; A.D. suffered a blow to her head that ultimately lead to her death two weeks to three months later; and the fact that A.D. was dying would be obvious to those around her. Thus, because the evidence regarding the relevant time was largely the same as to both Petitioner and Sierra, there is no reason to believe the trial court would have granted a reckless homicide instruction had Petitioner's counsel made a request separate from Sierra. Further, as discussed below, sufficient evidence existed for the jury to find Petitioner guilty of aggravated murder. Thus, Petitioner cannot establish prejudice under *Strickland*.

Petitioner has failed to establish that he is entitled to habeas relief based on his counsel's performance such that ground one is meritless.

**B. Ground Two: Failure to Sever**

Petitioner's second ground for relief challenges the trial court's refusal to sever his trial from Sierra's trial. (ECF No. 41-1 at 37-42).

**1. Legal Standard**

> A defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial. *See Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Nor does he have a right to a separate trial merely because defendants present antagonistic defenses. *See United States v. Day,* 789 F.2d 1217, 1224 (6th Cir.1986) (holding that absent some indication that the alleged antagonistic defendants misled or confused the jury, the mere fact that co-defendants blame each other does not compel severance). Courts should grant a severance "only if there is a serious risk that a joint trial would compromise a

> specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. Granting or denying severance is within the trial judge's discretion. *See Glinsey v. Parker,* 491 F.2d 337, 343 (6th Cir.1974). And, a state trial court's alleged abuse of discretion, without more, is not a constitutional violation. *See Sinistaj v. Burt,* 66 F.3d 804, 805, 808 (6th Cir.1995).
>
> A petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendant's bears a very heavy burden. *See United States v. Horton,* 847 F.2d 313, 316 (6th Cir.1988). As a general rule, joint trials are favored. *See United States v. Dempsey,* 733 F.2d 392, 398 (6th Cir.1984). Jurors are presumed to follow the instructions of the court and to give each defendant's case separate consideration. *See Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The mere potential for confusion, standing alone, will not outweigh society's interest in the speedy and efficient resolution of criminal trials. *See United States v. Moore,* 917 F.2d 215, 222 (6th Cir.1990).

*Stanford v. Parker*, 266 F.3d 442, 458–59 (6th Cir. 2001).

**2. State Court Decision**

After setting forth the governing state law on joinder and severance, the state appellate court rejected Petitioner's claim as follows:

> {¶ 68} Lewis argues his case should have been severed from Sierra's because the evidence of prior acts of abuse, which was admitted at trial, was admissible against Sierra but was not admissible against him. Although it is true that the court never instructed the jury to apply the evidence only against Sierra, the evidence clearly showed that the prior acts of abuse occurred before Lewis was involved in A.D.'s life. It was apparent to the jury that the evidence of prior acts of abuse applied only to Sierra. Indeed, much of evidence contained statements from A.D. telling child-care workers that "Mommy hurt me." Therefore, because this evidence applied only to Sierra's case, it could not have affected the outcome of Lewis's case.
>
> {¶ 69} Lewis nevertheless contends he was prejudiced by the court's failure to sever the cases because he was barred from eliciting testimony from a witness, who would have recounted statements made by Sierra. However, out-of-court statements offered to prove the truth of the matter asserted are generally inadmissible because they are hearsay. Evid.R. 801(C). Moreover, there is no way to determine if Lewis was prejudiced by the inability to call the witness since Lewis has not identified what the out-of-court statements would have been.
>
> {¶ 70} Finally, Lewis argues he was prejudiced by the joint trial because Sierra's lawyers presented evidence demonstrating that she was intellectually disabled. He claims evidence of her intellectual disability caused the jury to place a greater

> responsibility on him for A.D.'s death. However, there was evidence that despite Sierra's learning disabilities, she was capable of entering into a lease agreement by herself, managed to maintain employment, and paid her own bills. Moreover, as previously stated, there was evidence that both Sierra and Lewis were equally responsible for causing A.D.'s death regardless of Sierra's intellectual limitations. Therefore, Lewis fails to demonstrate that he was unfairly prejudiced by court's denial of his motion to sever his case from Sierra's.

(ECF No. 20-1, PageID #: 365-66).

**3. Federal Arguments and Analysis**

Respondent argues Petitioner is not entitled to federal habeas relief because he failed to explain how the state appellate court's decision was unreasonable under AEDPA. (ECF No. 45 at 29-32). In response, Petitioner argues the appellate court made an unreasonable finding of fact based on the state court record because "it is clear what [Sierra's out-of-court] statements would have been because trial counsel placed them on the record at sidebar." (ECF No. 46 at 39-41 (citing ECF No. 20-3, PageID #: 929-31)). Additionally, he argues the state court's determination that "any statements would have been inadmissible is an unreasonable application of law, because it based its decision on conjecture and never adjudicated the prejudice that inured to Mr. Lewis by excluding the … statement." (*Id.* at 41). As to the state court's conclusion that the jury could separate the evidence against the defendants, Petitioner argues such was "an unreasonable application of the facts" because the record "is devoid of any implication that the jury was able to distinguish what evidence could be applied to Mr. Lewis and what evidence could not, particularly because the State repeatedly referred to them as a unit." (*Id.* at 42). Petitioner also argues the appellate court "unreasonably applied *Zafiro v. United States*, 506 U.S. 534, 539 (1993), when it concluded that no prejudice from this evidence inured to the detriment of Mr. Lewis" because "there was no evidence that [Petitioner] laid hands on A.D. or 'purposely caused her death, yet the evidence of Sierra Day's abuse and neglect was overwhelming." (*Id.* at 43). Petitioner raises a

similar argument concerning evidence of Sierra's intellectual deficits, arguing the appellate court unreasonably applied *Zafiro* when it concluded Petitioner was not prejudiced because Sierra's "introduction of evidence that necessarily diminished her level of culpability could only serve to inculpate [Petitioner] further." (*Id.* at 44-45). Overall, Petitioner argues he was prejudiced by the joint trial because the prosecution linked Sierra's actions to Petitioner in order to secure convictions against him. (*Id.* at 45-46).

Having reviewed the record, the undersigned finds Petitioner has not carried the "very heavy burden" necessary to show that habeas relief is warranted. To the extent Petitioner challenges the state appellate court's factual determination that he "ha[d] not identified what the out-of-court statements would have been," his argument is unavailing. During opening arguments, Petitioner's counsel asserted that the evidence would show that Petitioner "lost his job because [Sierra] was constantly calling him at his job telling him he needed to come home because something was wrong with the baby." (ECF No. 20-3, PageID #: 929). At a sidebar, counsel clarified that "his mother will testify that she would call him all the time and he would have her on speaker phone; that he would -- she would call him all the time, he would have her on speaker phone and she would hear her say these things." (*Id.* at PageID #: 930). The trial court ultimately determined that Sierra's statements would not be admitted and instructed the jury to disregard the statements as to what Sierra said. (*Id.* at PageID #: 930-31). While the transcript sheds light on the subject of Petitioner's mother's proposed testimony, it is far from clear what exactly she would have testified to, what Petitioner alleges Sierra said, or how such would have influenced his case. As to Petitioner's argument that the appellate court unreasonably applied the law when it determined the statements would be inadmissible hearsay, his argument is misplaced because whether a hearsay exception applies is a matter of state law and habeas relief is only warranted if

a state court decision is an unreasonable application of *federal* law. *See Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *see Thompkins v. Macauley*, No. 21-1282, 2021 WL 7629670, at *2 (6th Cir. 2021) (finding "no reasonable jurist could debate" the denial of petitioner's federal habeas claim based on trial court's exclusion of codefendant's hearsay statement at trial "[b]ecause of the wide latitude afforded to states regarding evidentiary matters under the Due Process Clause").

Turning to the state court's determination that the admission of the prior acts evidence against Sierra and evidence of Sierra's intellectual disability did not prejudice Petitioner, the undersigned again finds Petitioner has not carried his burden of showing that the state court made an unreasonable factual determination or misapplied federal law. While Petitioner argues there is no evidence to support that the jury could separate the evidence against him from that against Sierra in the absence of a limiting instruction, the state appellate court recognized the lack of a limiting instruction but concluded that the evidence against Sierra "clearly showed that the prior acts of abuse occurred before Lewis was involved in A.D.'s life." (ECF No. 20-1, PageID #: 365). As discussed above, Lewis's counsel highlighted that all of the prior acts evidence related to periods before Lewis was involved in A.D.'s life and were linked directly to Sierra. Thus, the record makes clear that this evidence related only to Sierra. While the trial court often referred to Petitioner and Sierra jointly while instructing the jury, it did instruct the jury that the prosecution was required to prove all essential elements of the crimes beyond a reasonable doubt; instructed the jury on what it must find before it could find Sierra "and/or" Petitioner guilty; and provided the jury with separate verdict forms as to each defendant. (ECF No. 20-2, PageID #: 584; ECF No. 20-6, PageID #: 1719-41). Based on the record as a whole, the state appellate court's conclusion that the jury was capable of separating the evidence was not unreasonable.

Finally, the state appellate court did not unreasonably apply *Zafiro* in concluding that Petitioner was not prejudiced by the joint trial. Petitioner relies specifically on the following statement from *Zafiro*: "When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." 506 U.S. at 539. However, at best, Petitioner has shown that a heightened risk of prejudice existed, not that he was actually prejudiced by the joint trial. While the evidence of Sierra's prior acts and alleged intellectual disability would not have been admissible in a separate trial, as discussed below, there was sufficient independent evidence to support Petitioner's conviction. Petitioner failed to show that the joint trial deprived him of a specific trial right or prevented the jury from making a reliable judgment about guilt or innocence such that severance was required. *Id.* at 534. He has thus failed to show that the state appellate court unreasonably applied *Zafiro*.

Because Petitioner failed to establish that the state appellate court's rejection of his severance claim was contrary to, or based on an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts, he has failed to show that he is entitled to federal habeas relief under § 2254(d).

**C. Ground Three: Sufficiency of the Evidence**

Petitioner's third ground for relief challenges the sufficiency of the evidence to support his convictions for aggravated murder, murder, felonious assault, and permitting child abuse based on a lack of evidence that he harmed A.D. (ECF No. 41-1 at 43-47). Respondent asserts in response that because the trial court merged Petitioner's convictions for sentencing, only his aggravated murder and tampering with evidence convictions are subject to sufficiency review. (ECF No. 45 at 33 (citing *Smith v. Coleman*, 521 F. App'x 444, 459 (6th Cir. 20123))). As Petitioner does not dispute this assertion and only presents argument regarding the aggravated murder conviction in

his traverse, the undersigned addresses only the sufficiency of the evidence to support that conviction.

**1. Legal Standard**

When presented with a sufficiency of the evidence claim on federal habeas review, a court makes two relevant inquiries. First, the court considers "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In doing so, the court does not reweigh the evidence, re-evaluate witness credibility, or substitute its judgment for that of the jury. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (citations omitted). Even though the court may not have convicted the defendant if it were the trier of fact, it "must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution." *Id.* Second, assuming the court concludes that no reasonable jury could have found the defendant guilty beyond a reasonable doubt, the court must still defer to the state appellate court's decision as long as it was not unreasonable. *Id.* (citing 28 U.S.C. § 2254(d)(2)).

**2. State Court Decision**

The state appellate court provided the following analysis of Petitioner's sufficiency claim:

> {¶25} "[T]he test for sufficiency requires a determination of whether the prosecution met its burden of production at trial." *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.
>
> {¶26} Lewis was found guilty of aggravated murder, in violation of R.C. 2903.01(C), which states, in relevant part, that "[n]o person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense." Pursuant to R.C. 2901.22, a person acts "purposely"

> when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

R.C. 2901.22(A). "[A] person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." *State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978). Purpose or intent can be established by circumstantial evidence. *State v. Garner*, 74 Ohio St.3d 49, 60, 656 N.E.2d 623 (1995) (Intent can be determined from the surrounding facts and circumstances.).

{¶27} Lewis argues that because not a single witness testified that he ever touched A.D., and there was no evidence that he lived with Sierra and A.D., there is insufficient evidence to support his aggravated murder conviction. However, Isaiah testified that Lewis was living with Sierra. (Tr. 890.) Moreover, whether Lewis was officially living with Sierra is irrelevant to the issue of whether he purposely caused A.D.'s death. The evidence showed that Sierra and Lewis were always together. (Tr. 948.) On February 9, 2018, a little over month before A.D.'s death, police received a call for a disturbance between a man and woman in Day's apartment building. Police arrived on the scene and identified the man and woman as Lewis and Day. Officer Edington testified that, at that time, he observed Lewis in the hallway of the apartment holding a bag of clothes, shoes, and other belongings, which suggested that Lewis had been living in the apartment in Day. (Tr. 514-515.) Day and Lewis apparently reconciled because Lewis later identified himself as A.D.'s stepfather to first responders and to the 911 dispatcher when he called to report that A.D. was nonresponsive on March 11, 2018. According to Officer Edington, Lewis produced the key to the apartment when the police came with the search warrant. Therefore, there was sufficient evidence that Lewis had unfettered access to A.D.

{¶28} There is also evidence that Lewis knew A.D. was unable to walk and had stopped eating. Yet he did nothing to help her. Rather, he made concerted efforts with Sierra to conceal A.D.'s plight. Isaiah testified that A.D. had lost the ability to walk by the time he visited her on an unspecified date in February 2018. Lewis and Sierra spoke with police at the apartment on February 21, 2018, when Sierra reported the theft of a laptop computer, but Lewis never told police there was an injured child in the apartment. When Lewis called 911 to report that A.D. was unresponsive, he neglected to tell the dispatcher that she had stopped breathing until he had been on the phone for almost four minutes. Lewis's failure to report the truth of A.D.'s demise to the dispatcher demonstrates a specific intent to conceal the harm that was done to her before her death. Lewis further concealed the harm done to A.D. when he falsely told police that she became ill after dining at a Red Lobster a few days before she died. By purposely concealing A.D.'s condition from people who would have helped her, Lewis purposely let her die. He, therefore, collaborated

> with Sierra in purposely causing her death. And because it is undisputed that A.D. was under 13 years of age at the time of her death, there was sufficient evidence to support Lewis's aggravated murder conviction under R.C. 2903.01(C).

(ECF No. 20-1, PageID #: 348-50).

**3. Federal Arguments and Analysis**

Respondent argues Petitioner has not demonstrated that the appellate court's conclusion that there was sufficient evidence to support his conviction involved an unreasonable application of the *Jackson* standard or an unreasonable determination of the facts such that he is not entitled to federal habeas relief. (ECF No. 45 at 42). Petitioner replies that the "Ohio court never adjudicated the claim of insufficiency of aggravated murder" because it only noted "instances where Mr. Lewis purposely *concealed* harm to A.D. or purposely *concealed* her mother's acts" and such is "not the same as finding purposeful acts to cause death in support of an aggravated murder conviction." (ECF No. 46 at 50). Thus, Petitioner argues this Court should conduct a *de novo* review and determine that there was insufficient evidence to support his conviction. (*Id.* at 50-51).

Petitioner's argument is again unavailing. Contrary to Petitioner's argument, the state appellate court did find that Petitioner purposefully caused A.D.'s death, stating that "[b]y purposely concealing A.D.'s condition from people who would have helped her, Lewis purposely let her die" and therefore "collaborated with Siearra in purposely causing her death." (ECF No. 20-1, PageID #: 350). Of specific relevance, the state appellate court noted that the evidence established Petitioner "neglected to tell the dispatcher that [A.D.] had stopped breathing until he had been on the phone for almost four minutes" and this "failure to report the truth of A.D.'s demise … demonstrates a specific intent to conceal the harm that was done to [A.D.] before her death." (*Id.*). Although not specifically in reference to the aggravated murder charge, the appellate

court also noted that the evidence established that Lewis "knew A.D. sustained a serious injury that eventually impaired her ability to walk" and was severely malnourished, to the point it was "obvious that she was dying." (*Id.* at PageID #: 353). Thus, while "there [was] no direct evidence that Lewis caused any of A.D.'s physical injuries, there was evidence that Lewis contributed to her death by hiding her from authorities, who could have saved her life." (*Id.* at PageID #: 353). In other words, the state appellate court concluded that regardless of whether Petitioner caused the head injury that prompted A.D.'s stroke and started her deterioration, there was sufficient evidence to support that Petitioner had knowledge that A.D. was dying. Further, with this knowledge, Petitioner did not merely fail to aid A.D. but rather took steps to prevent her from receiving any aid from other sources. Based on an independent review of the evidence, the undersigned cannot say that it was unreasonable for the state appellate court to conclude that any rational trier of fact could have found Petitioner guilty of aggravated murder. Thus, Petitioner has failed to show that he is entitled to federal habeas relief on his sufficiency claim. *See Brown*, 567 F.3d at 205.

Petitioner's third ground for relief is meritless.

## VII. Certificate of Appealability

A habeas petitioner may not appeal the denial of his application for a writ of habeas corpus unless a judge issues a certificate of appealability and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c) ("A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right."). The "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The granting of a certificate of appealability does not require

a showing that the appeal would succeed on any claim. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Here, Petitioner's grounds for relief are meritless. If the Court accepts the foregoing recommendation, then Petitioner has not made a substantial showing of a denial of a constitutional right. He would then not be entitled to a certificate of appealability. Thus, I recommend that the Court not issue a certificate of appealability.

## VIII. Recommendation

Petitioner has presented only meritless claims. Thus, I recommend that the Court deny his petition in its entirety and not grant him a certificate of appealability.

Dated: October 20, 2026

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).